**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Anthony Jordan, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 15-cv-5907 |
| | ) | |
| Timothy Evans (in his official capacity as | ) | Hon. Sara L. Ellis |
| Chief Judge of the Circuit Court of Cook | ) | |
| County), | ) | Jury Demanded |
| | ) | |
| Defendant. | ) | |

**THE PARTIES' JOINT STATEMENT OF FACTS PURSUANT TO LOCAL RULE 56.1
AND THE COURT'S STANDING ORDER REGARDING SUMMARY JUDGMENT**

Defendant TIMOTHY EVANS, in his Official Capacity as Chief Judge of the Circuit Court

of Cook County, Illinois, and Plaintiffs ANTHONY JORDAN, KENNETH GREENLAW,

PATRICK NELSON, and THEODIS CHAPMAN, by and through their respective attorneys,

hereby submit this joint Statement of Facts pursuant to Local Rule 56.1 and the Honorable Judge

Sara L. Ellis's Standing Order regarding Summary Judgment.

**I.      Cook County Juvenile Probation Department**

1.      From July 1994 until May 2014, Michael Rohan (Caucasian) served as Director of

the Cook County Juvenile Probation Department ("JPD"). (Ex. A, Rohan Dep. Tr. at 5:6-22, 6:8-

10; Ex. N. Smith Dep. Tr. at 20:11-18.)

2.      Rose Golden (Caucasian) served as Director of JPD from May 2014 to January

2015. (Ex. B, Das Dep. Tr. at 23:11-24:7; Ex. C. Smith Dep. Tr. at 105:4-13)

3.      Avik Das (Asian) became Acting Director and Chief Probation Officer of the JPD

in January 2015. (Ex. B, Das Dep. Tr. at 15:10-16:3, 33:19-34:6.)

4.      The Director of JPD has authority over all levels of discipline short of termination. The Director may impose verbal and written reprimands and temporary suspensions without the permission of the Chief Judge. The Chief Judge of the Circuit Court of Cook County must approve terminations of employment and is informed of suspensions and other disciplinary actions. (Ex. A, Rohan Dep. Tr. at 9:5-21.)

## II.      The Union and CBA

5.      Probation officers, including supervising probation officers, are represented for the purposes of collective bargaining, including disciplinary grievances, by AFSCME Council 31, Local 3477 (the "Union"). (Ex. D, Smith Decl. ¶¶ 3, 5.)

6.      Jason Smith was a Union steward from 2010 to 2016. He was Vice President of the Union from 2012 to 2014. He was President of the Union from 2014 to 2016. Smith's duties as a steward, Vice President, and President included filing grievances, representing JPD employees in grievance meetings, making information requests of the JPD, receiving and reviewing documents from the JPD, and bargaining with JPD management. From 2012 to 2016 he was involved in representing the probation officers on essentially all discipline that the JPD issued. His duties as a union officer brought him into substantial contact with employees throughout the JPD, and he gained personal knowledge of the structure of the JPD and the terms and conditions of employment of bargaining unit employees. (Ex. C Smith Dep. Tr. 29-30; Ex. D, Smith Decl. ¶ 5.)

7.      There is a Collective Bargaining Agreement between AFSCME Council 31, Local 3477 and the Chief Judge of the Circuit Court of Cook County (the "CBA") that governs the employment relationship between JPD and the Chief Judge. The CBA states: "Although discipline shall normally be progressive and corrective, the Employer need not apply these types of discipline

in sequence but rather base the type of discipline to fit the severity of the offense and/or infraction involved." (Ex. A, Rohan Dep. Tr. at 19:14-20:19; Ex. V Collective Bargaining Agmt. at 27.)

8.      Rohan testified that during his tenure as Director, "major causes of discipline" were not subject to progressive discipline. He testified as follows regarding them:

Q: And what is a major cause of discipline?

A: Stealing. Theft of services. Falsification of records. Those are just come examples. You know, it would have to be pretty egregious behavior.

Q: Is this written down anywhere?

A: What is "this"?

Q: The major discipline—major offensive discipline.

A: Not in the contract. I don't believe I—I don't believe that it's delineated per offense or incident, no.

Q: Do you have any document that delineates it? Pardon me. As Director of JPD, did you have a written document that delineated what these major offenses were?

A: No.

Q: How did you know what they were?

A: Common sense.

 (Ex. A, Rohan Dep. Tr. at 19:14-20:19.)

9.      Rohan testified as follows regarding written disciplinary standards:

Q. Is there any document in writing, to your knowledge, within the Cook County juvenile probation officer that determines the level of discipline for a particular offense?

A. No.

Q. Should there be?

A. No.

Q. Why not?

A. It has to be -- it would be my impression that it would still be you do a comparative analysis of any like incident, which wouldn't lend itself to a document, and then you still have to bring multiple factors into the decision before you reach your -- the disciplinary decision. So, no, I don't think it lends itself to a document or a guide.

(Ex. A, Rohan Dep. Tr. at 71:14-72:5.)

10.     When asked whether he investigated complaints of racial disparity in the discipline imposed on juvenile probation officers, Rohan testified as follows:

A. If there was an allegation raised, we would have investigated it. Any allegation that was presented, if it was in writing, I would have had HR go back and do an analysis of disciplinary action on like cases, usually like cases, and to do a comparative analysis. That would be done by Charles Young or Rose Golden.

Q. And was that, in fact, done?

A. I would have to state that if I had asked it to be done, it would have been done.

Q. Do you know whether it was done?

A. Over a 20-year period, I am confident that we would have done a comparative analysis at some point during that 20 years of disciplinary action relative to like disciplinary decisions.

(Ex. A, Rohan Dep. Tr. at 18:1-9.)

11.     Rohan considered discipline to be confidential and would not share the information on discipline with bargaining unit members who were not union officers. (Ex. A, Rohan Dep. Tr. at 46.)

12.     Jason Smith testified that he brought grievances on behalf of JPD officers who were complaining about racial discrimination, and that all of these grievances were denied. (Ex. C, Smith Dep. Tr. at 50:17-51:11.)

4

13. Avik Das served as a union officer during the years 2000-2012. During his time as a union officer, Das was aware of meritorious complaints by African-American officers suffering race discrimination. (Ex. B, Das Dep. Tr. at 45:15-48:6, 109-110.)

14. When Das was asked whether anybody took steps to remedy meritorious claims of race discrimination, Das testified as follows:

A I believe so, yes.

Q Who?

A Ultimately I believe it would be Mike Rohan.

Q What did Mike Rohan to do to correct those actions of race discrimination against African-Americans that took place in the workplace.

A. I believe he resolved grievances.

Q. Do you know if he took any remedial steps to ensure that there weren't future instances of similar conduct targeting African Americans for race discrimination?

A. I don't know.

(Ex. B, Das Dep. Tr. at 47:20-48:11.)

### III. Kenneth Greenlaw

15. In 1999, Plaintiff Kenneth Greenlaw became employed with JPD as a Juvenile Probation Officer. (Ex. E, Greenlaw Dep. Tr. at 10:18-21.)

16. Greenlaw was terminated from JPD in April 2014. At the time of his termination, he served as a Compliance Officer with the Intensive Probation Services Division ("IPS") with JPD. (Ex. E, Greenlaw Dep. Tr. at 17:4-20.)

17. Greenlaw's job responsibilities with IPS included making visits to juveniles' homes and schools to verify that juvenile probationers were complying with the conditions of their

probation, such as attending school, staying at home, and attending counselling programs. Greenlaw's position required him to use a department vehicle. (Ex. E, Greenlaw Dep. Tr. at 22:22-23:14.)

18.     Greenlaw used a JPD-administered gas card to fill up the tank of his department vehicle. JPD required users of the JPD-issued gas cards to obtain receipts and document information on a vehicle inspection sheet. (Ex. E, Greenlaw Dep. Tr. at 24:1-24:13.)

19.     JPD required its employees to fill out the vehicle inspection sheets before and after the shift. These forms, *inter alia*, required JPD employees to indicate the level of gas that was in the car at the beginning and ending of the shift. (Ex. E, Greenlaw Dep. Tr. at 75:2-24.)

20.     On March 10, 2013, JPD convened an investigatory hearing relating to allegations of misuse of Greenlaw's JPD-issued gas card. Greenlaw's union representatives Jason Smith and Jeff Haynes attended this meeting. (Ex. E, Greenlaw Dep. Tr. at 29:4-30:21; Ex. F, Greenlaw Dep. Ex. 1.)

21.     The allegations against Greenlaw at the March 10, 2013 investigatory hearing included:

- Forty-five instances of gas purchases made twice daily that did not correspond with the miles Greenlaw travelled;

- Three instances of gas purchased at the beginning of a shift when gas had been purchased at the end of the previous shift;

- Three instances of gas purchases made outside of documented work hours;

- One instance of gas purchases made on days Greenlaw documented he worked the full day in the office;

- Twenty-eight occasions of missing gas receipts; and

6

- Forty instances of missing vehicle inspection forms.

(Ex. E, Greenlaw Dep. Tr. at 31:12-32:4; Ex. F, Greenlaw Dep. Ex. 1.)

22.     During the March 10, 2013 investigatory hearing, Greenlaw was given the opportunity to explain the discrepancies in his gas use. (Ex. E, Greenlaw Dep. Tr. at 33:2-36:13; Ex. F, Greenlaw Dep. Ex. 1.)

23.     On April 11, 2014, Greenlaw was given a rebuttal hearing, in which he was allowed to respond to the charges against him. Greenlaw had union representation at this meeting. (Ex. E, Greenlaw Dep. Tr. at 38:2-41:3.)

24.     Rohan testified that he recommended termination of Greenlaw based on JPD's investigation finding that Greenlaw had made fraudulent use of his gas card on multiple occasions. Ernest Boyd (African-American) was Greenlaw's partner in the JPD IPS and was terminated for the same reason. (Ex. A, Rohan Dep. Tr. at 83:4-14, Ex. E, Greenlaw Dep. Tr. at 50:18-21.)

25.     When questioned by plaintiff's counsel how Greenlaw could have been terminated for fraud when he self-reported his use of the gas card, Rohan testified that Greenlaw was terminated for theft of services. (Ex. A, Rohan Dep. Tr. at 86:23-87:18.)

26.     An audit by the Cook County Comptroller's Office found discrepancies in record keeping for many vehicles throughout Cook County agencies, including JPD. A report describing the issue was released. Rohan testified regarding the report as follows:

> A: I remember seeing a report relative to our department that clarified that here was questions relative to certain cards. That's about all I can tell.
>
> Q: Did the report allege that there were discrepancies in your department?
>
> A: I am telling you honestly, I can only recall that I saw a report and that I recall that it pointed out discrepancies with at least that card, perhaps another card, I don't recall with absolute certainty. I would tell you if I did.

(Ex. G, Greenlaw Interrogatory Resp. No. 8; Ex. A, Rohan Dep. Tr. at 95:22-96:17.)

27. When asked whether there were other JPD officers who had discrepancies in gas use other than Greenlaw and Boyd, Rohan testified as follows:

A. He and his partner were the only two that were brought to my attention.

Q. Did you inquire as to whether there were others?

A. I am confident I did, based on this incident.

Q. Do you have a specific recollection at the moment as to whether you did?

A. It's my impression that I asked Mr. Young, the assistant director, we had a deputy who was responsible for the use of all cars, to pull all records relative to the use, who was using them, who had gas cards, and to do a comparative analysis. But as to who was the other deputy, I can't say at this time. So in addition to Charles Young, someone else helped us on the review of those records.

***

Q. So far as you know, there were no discrepancies in gas card recordkeeping, other than the recordkeeping of Boyd and Greenlaw?

A. Not that were brought to my attention.

(Ex. A, Rohan Dep. Tr. at 94:14-95:21.)

28. Greenlaw was notified of his termination in a letter dated April 22, 2014 signed by Rohan. This document stated that Rohan was "in receipt of reports which charge you with chronic non-compliance with department protocols as well as misuse of [Greenlaw's] assigned department gas card," and re-stated the charges stated in the March 10, 2013 hearing. (Ex. E, Greenlaw Dep. Tr. at 41:19-44:17; Ex. H, Greenlaw Term. Ltr.)

29. The April 22, 2014 letter stated that "[d]uring the course of the investigatory and pre-disciplinary meetings neither [Greenlaw] nor [his] union representatives offered any feasible explanations to mitigate these very serious allegations. The misuse of the county vehicle and the department gas card constitutes the equivalent of theft of services." (Ex. E, Greenlaw Dep. Tr. at 41:19-44:17, Ex. H, Greenlaw Term. Ltr.)

30.     Greenlaw believes that the termination was unjustified. Greenlaw stated regarding his termination:

> [O]ther JPD officers, supervisors, and deputy chiefs . . . had access to the car that I used. . . . The vehicle log sheets that I was supposed to turn in are to be filled at the beginning and end of the shifts. I did not complete them all the time, just as many IPS officers did not consistently complete the vehicle log sheets at the end of the day. . . . [T]o explain why we travelled as much as we did—I stated that we had no office space, or any permanent place to meet and do official business on a regular basis. . . . As to why we filled up the tank twice a day on some occasions, I explained that we had to maintain three fourths of a tank. . . . Sometimes at the beginning of the shift we found that the car was not at the requisite three quarters but only half— so we filled it up because it had not been done the night before. . . . It is also possible that late at night I just accidentally put down an incorrect mileage number on some occasions when I was in a hurry.

(Ex. G, Greenlaw Answers to Interrogatories ¶ 9.)

31.     Greenlaw filed a grievance concerning his termination through the union. In this grievance, Greenlaw did not allege that he was discriminated on the basis of his race. (Ex. E, Greenlaw Dep. Tr. at 119:5-120:5.)

32.     Jason Smith testified that in his capacity as union representative, he presented information of racially disparate discipline on behalf of Kenneth Greenlaw as part of Greenlaw's grievance proceedings. (Ex. C, Smith Dep. Tr. at 64:17-65:13.)

33.     Greenlaw received a grievance hearing, but the grievance decision was not in his favor. (Ex. E, Greenlaw Dep. Tr. at 120:9-17.)

34.     Jason Smith attested as follows regarding the Greenlaw termination grievance:

> [S]ome of the paperwork that the Employer used to terminate Greenlaw was for the wrong vehicle. I pointed this out to the Employer, and they just ignored the fact. Also, Greenlaw was working as an IPS (intensive probation officer). IPS is an extremely stressful position, one of the most stressful in the department. It involves repeated night visits to juveniles accused of serious crimes like murder, attempted murder, and rape. It was not unusual at all for IPS officers to miss filling out some of the paperwork on a shift. The focus for an IPS officer is on getting your work done visiting kids and

> on keeping yourself safe, and everyone in the department knew that keeping 100% accurate gas card paperwork took a back seat to that. The fact that the Employer completely disregarded these and other facts, and disregarded their own obvious paperwork errors in the process of terminating Greenlaw (who had never even been disciplined before), convinced me that they had ulterior motives for terminating him.
>
> If Greenlaw had been a white officer, the way the Employer handled his termination would have struck me as very unusual, both in the process and the outcome. Unfortunately, it was consistent with how the Employer treated African-American officers.

(Ex. D, Smith Decl. ¶¶ 11-12.)

35.     After his termination, Greenlaw filed a Charge of Discrimination with the EEOC alleging that JPD had engaged in race discrimination. (Ex. E, Greenlaw Dep. Tr. at 110:5-111:19.)

36.     Greenlaw understands that there were two stated reasons for his termination: chronic noncompliance with department protocols; and misuse of his department assigned gas card. (Ex. E, Greenlaw Dep. Tr. at 46:20-47:8.)

37.     The only other individual Greenlaw knows of who was terminated for misuse of an assigned department gas card is Ernest Boyd (African-American). (Ex. E, Greenlaw Dep. Tr. at 54:9-24.)

38.     Greenlaw is unable to identify the name of any employee of JPD who misused an assigned department gas card and was not terminated. (Ex. E, Greenlaw Dep. Tr. at 55:1-6.)

39.     When asked whether it would have been harder for the department to make him a scapegoat if he were Caucasian, Greenlaw answered, "I don't know." (SAC, Dkt. No. 55 at ¶ 62; Ex. E, Greenlaw Dep. Tr. 94:19-23.)

40.     Greenlaw did not see Caucasian JPD employees treated better in the workplace while employed with JPD. (Ex. E, Greenlaw Dep. Tr. at 125:19-21.)

**IV.     <u>Anthony Jordan</u>**

41.     Anthony Jordan began his employment with JPD in April 1998 as a Juvenile Probation Officer. (Ex. I, Jordan Dep. Tr. at 12:6-16.)

42.     In 2007, Jordan was suspended by JPD due to an arrest for possession of cannabis and domestic battery. Rohan made the decision to suspend Jordan. Jordan does not believe he was suspended due to his race or treated unfairly. (Ex. I, Jordan Dep. Tr. at 24:22-25:14.)

43.     In 2008, Jordan was suspended by JPD due to allegations of sexually harassing an intern. Michael Rohan imposed this discipline. Jordan served a three-day suspension, which was reduced from an initial five-day suspension through a settlement with the JPD. (Ex. I, Jordan Dep. Tr. 25:15-26:9.)

44.     In 2010, Jordan received a verbal reprimand for using profanity towards a co-worker. (Ex. I, Jordan Dep. Tr. at 28:10-15.)

45.     In November 2010, Jordan was placed on a three-month supervision plan by JPD. (Ex. I, Jordan Dep. Tr. at 47:15-48:4; Ex. J, Jordan Dep. Ex. 3.)

46.     In October 2011, Jordan entered into a Last Chance Agreement with JPD. Jordan was given the option of entering into this agreement, facing arbitration, or being terminated. (Ex. I, Jordan Dep. Tr. at 65:1-66:3, 68:7-17; Ex. K, Jordan Dep. Ex. 9.)

47.     A Last Chance Agreement stipulates that in lieu of termination, the employee would comply with certain restrictions and expectations, and if that employee failed to abide by those restrictions he or she would be terminated. (Ex. A, Rohan Dep. Tr. at 67:19-68:10.)

48.     Rohan testified that on each occasion JPD agreed to a Last Chance Agreement, negotiations for the Last Chance Agreement were initiated by the union. (Ex. A, Rohan Dep. Tr. at 67:19-68:10.)

11

49.     Rohan testified Caucasian JPD employees, as well as African-American JPD employees, were also subject to Last Chance Agreements. Rohan could recall two specific Caucasian JPD employees who had been subject to Last Chance Agreements: Jim Corbett and Joe Wozniak. (Ex. A, Rohan Dep. Tr. at 68:13-69:12.)

50.     Smith attested as follows regarding last chance agreements:

> Occasionally the Employer and the Union would agree to a "last chance agreement" regarding a particular employee. In my experience as a union representative, at times these agreements were proposed by the Employer and at times by "rogue" union stewards. When I was president, I had a policy of generally <u>not</u> proposing last chance agreements to the Employer because the Employer had a history of using them to discriminate against African-Americans.
>
> From 2010 to 2016, <u>no</u> white probation officers were put on last chance agreements. Jim Corbett was a white probation officer but was not put on a last chance agreement. Joe Wozniak was put on a last chance agreement but he was not a probation officer, was not in the bargaining unit, and was not covered by the contract between the Employer and Local 3477.

(Ex. D, Smith Decl. ¶¶ 6-7.)

51.     The Last Chance Agreement noted Jordan's "significant and chronic work deficiencies with cases under [his] supervision." In connection with this agreement, Jordan received a 30-day suspension. (Ex. I, Jordan Dep. Tr. at 72:10-14, 74:15-17; Ex. K, Jordan Dep. Ex. 9.)

52.     As part of the Last Chance Agreement, Jordan agreed that he would "cooperate with counseling services and any plan set forth upon his return to correct his performance deficiencies," and that "[a]ny non-compliance with directives, department standards, and protocols from [Jordan's] supervisor, deputy chief, and administrators  [would] lead to [his] termination." (Ex. I, Jordan Dep. Tr. at 65:1-66:10; Ex. K, Jordan Dep. Ex. 9.)

53.     In connection with the Last Chance Agreement, Jordan drafted a letter to Rohan reading, in part, "I am sincerely sorry for the unsatisfactory services that I have rendered to my clients and the people of Cook County . . . ." (Ex. I, Jordan Dep. Tr. at 69:12-70:8; Ex. K, Jordan Dep. Ex. 9.)

54.     In April 2014, Jordan decided to transfer to the Electronic Monitoring division ("EM Division") with JPD. (Ex. I, Jordan Dep. Tr. at 18:6-18, 20:1-11, 21:21-23, 79:17-80:16.)

55.     Jordan testified that his supervisor, William Pieroth, informed Jordan that he had discretion in whether to issue a violation report when the electronic monitoring indicated a violation of a probationer's terms of release. (Ex. I, Jordan Dep. Tr. at 96:1-12.)

56.     Jordan's job responsibilities while in the EM Division included attaching tracking bracelets to probationers and monitoring probationers through Sentinel, JPD's monitoring system. Jordan would monitor whether probationers left their house or if they failed to charge their tracking bracelet. (Ex. I, Jordan Dep. Tr. at 23:16-24:21, 80:17-81:8, 89:1-90:11.)

57.     Jordan received four hours of training on how to use the Sentinel System. Jordan testified that he did not find the training helpful. (Ex. I, Jordan Dep. Tr. at 80:17-82:18.)

58.     Jordan is not aware of any Caucasian officers who asked for and received additional training on the Sentinel System. (Ex. I, Jordan Dep. Tr. at 135:2-10.)

59.     While assigned to the EM Division, Jordan was responsible for monitoring between 15 and 20 probationers through the Sentinel system. (Ex. I, Jordan Dep. Tr. at 91:10-93:6.)

60.     Jordan testified that his supervisor was also supposed to be monitoring the movements of Jordan's assigned probationers. (Ex. I, Jordan Dep. Tr. at 91:21-24.)

61.     On September 16, 2014, Jordan was placed on temporary suspension because a probationer on Jordan's caseload violated the terms of his probation and committed rape "on

13

[Jordan's] watch," in Jordan's characterization of how others viewed the incident. (Ex. I, Jordan Dep. Tr. at 85:1-2, 86:7-87:22; Ex. L, Jordan Dep. Ex. 10.)

62.     Jordan submitted a violation report for this probationer on September 14, 2014; but did not submit any violation report for that probationer despite unauthorized movements overnight on August 29, 2014 and September 3, 2014. (Ex. I, Jordan Dep. Tr. at 94:6-94:24, 113:15-23, 116:13-16; Ex. L, Jordan Dep. Ex. 10.)

63.     Jordan believes that he received his suspension due to his race. (Ex. I, Jordan Dep. Tr. at 97:4-19.)

64.     During his deposition, Jordan was unable to recall any Caucasian probation officer that was accused of the same conduct as he was. (Ex. I, Jordan Dep. Tr. at 97:4-19.)

65.     On January 30, Jordan attended a Predisciplinary Meeting. Union representation attended this meeting and spoke on Jordan's behalf. (Ex. I, Jordan Dep. Tr. at 123:9-124:24; Ex. M, Jordan Dep. Ex. 13.)

66.     Jordan was terminated on February 3, 2015. He was informed of his termination at a meeting on February 3, which was attended by Patterson and Golden (Caucasian), as well as his union representatives Jason Smith and Theodis Chapman. (Ex. I, Jordan Dep. Tr. at 18:19-19:1, 128:11-129:13; Ex. M, Jordan Dep. Ex. 13.)

67.     The reason for Jordan's termination that was stated in a February 3, 2015 letter from Golden was his failure to discharge his duties as a Probation Officer, failure to monitor EM software on a daily basis and appropriately respond, and failure to abide by JPD's code of conduct. The letter also made reference to the 2011 Last Chance Agreement. (Ex. B, Das Dep. Tr. 64:17-65:3; Ex. M, Jordan Dep. Ex. 13.)

68.     Jordan contends that he was terminated from the JPD because of his race. According to Jordan, "it was easy for me to be the scapegoat based on this case that was high profile." By "high profile," Jordan means that a probationer assigned to Jordan committed a rape. (Ex. I, Jordan Dep. Tr. at 129:20-130:21.)

69.     Jordan during his deposition stated he has "no factual basis" for stating that it was easier to make him a scapegoat because of his race other than the fact that "there have been other officers who would either receive verbal, written, or be transferred to another unit or another department rather than lose their job for more than what I was terminated for." (Ex. I, Jordan Dep. Tr. at 131:3-21.)

70.     During his deposition Jordan was unable to recall any JPD probation officer who was not terminated even though a juvenile under his or her charge had violated probation and raped somebody. (Ex. I, Jordan Dep. Tr. at 133:16-21.)

71.     During his deposition Jordan was unable to recall any JPD probation officer who was not terminated who had engaged in "egregious" misconduct. (Ex. I, Jordan Dep. Tr. at 131:14-133:15.)

72.     Brian Modjeski, Jordan's direct supervisor, was a supervising probation officer and was in the bargaining unit. (Ex. D, Smith Decl. ¶ 9.)

73.     According to Smith, neither Modjeski nor Mr. Modjeski's supervisor, William Pieroth, were disciplined as a result of Jordan's failure to submit a violation report. There was an investigatory hearing relating to Modjeski's involvement, but JPD did not proceed with discipline to him regarding Anthony Jordan. (Ex. N, Jordan Interrogatory Resp. No. 6; Ex. C, Smith Dep. Tr. at 218:2-9.)

74.     Modjeski and Pieroth are both white. (Ex. I, Jordan Dep. Tr. 18:17-18, 20:7-11.)

15

75. Jordan testified that it was his understanding that "usually if an officer gets suspended, the supervisor gets suspended." This understanding was based on his prior history of receiving a suspension in 2011, when his supervisor Michael Willis was also suspended (Ex. I, Jordan Dep. Tr. at 149:4-15.)

76. Rose Golden made the decision to terminate Jordan. (Ex. B, Das Dep. Tr. at 67:2-4.)

77. Avik Das's understanding of the reason for Jordan's termination was his "failure to execute the minimum standards of his assignment," and his failure to "address the unapproved movement of this young person who was on electronic monitoring." Das did not recall whether Jordan failed to address the unapproved movement at all, or whether he failed to do so in a timely manner. (Ex B, Das Dep. Tr. at 64:12-65:6.)

78. Das testified that there is no objective measure of inactivity for JPD Officers in the EM Division. (Ex. B, Das Dep. Tr. at 65:12-66:7.)

79. Jason Smith, when asked whether he knew of non-African-American juvenile probation officers who failed to file a violation report, and then that individual committed rape, testified as follows:

> A. [W]e have seen reports from the media about other juveniles who have actually gone out and raped other individuals or robbed other individuals while they was on electronic monitoring.. . . the report from the media says that this juvenile was on electronic monitoring. The investigation never came across my desk. I requested information regarding discipline, so, therefore, I can only assume that an investigation never took place. But there has been other instances before my time where the juveniles have gone out and committed more heinous crimes than just kidnap and rape. They have actually shot individuals while on electronic monitoring. They have actually did home invasions, burglaries.
>
> Even myself being down in house arrest, I have known that there was particular officers who was monitoring certain juveniles that they actually did go out and commit an offense, and those officers was white and they was not disciplined.

16

Q. Do you know the names of those officers?

A.   It's been almost 13 years.

(Ex. C, Smith Dep. Tr. at 178:23-180:19)

**V.     Patrick Nelson and Theodis Chapman**

80.     Patrick Nelson began working for the JPD as a probation officer with the Jumpstart program in 2001. (Ex. O, Nelson Dep. Tr. at 20:11-13.)

81.     Theodis Chapman began working for the JPD as a probation officer with the Jumpstart program in 2003. (Ex. P, Chapman Dep. Tr. at 15:4-18.)

82.     The Jumpstart program is designed to provide education to juvenile probationers who are not complying with educational services or not going to school. (Ex. O, Nelson Dep. Tr. at 20:17-21:19-24.)

83.     Both Nelson and Chapman worked as teachers in the Jumpstart program. (Ex. O, Nelson Dep. Tr. at 20:17-21:19-24; Ex. P, Chapman Dep. Tr. at 15:17-18, 23:12-24.)

84.     The Jumpstart program also employed JPD officers as "Outreach Officers." Outreach Officers were akin to truant officers, and went into the field to bring absent juvenile probationers to class. (Ex. O, Nelson Dep. Tr. at 24:24-25:19.)

85.     Nelson filed two Charges of Discrimination with the EEOC against the Juvenile Probation Department; one dated August 8, 2014; and the other dated December 10, 2015.  (Ex. O, Nelson Dep. Tr. at 73:19-23, Ex. Q, Nelson 8/8/2014 Charge; Ex. R, Nelson 12/10/2015 Charge.)

86.     Nelson's August 8, 2014 Charge alleged race discrimination stating that he was "denied the ability to earn and use compensatory time and being denied a performance bonus." (Ex. O, Nelson Dep. Tr. at 74:14-20.)

87.     Nelson's December 10, 2015 charge of discrimination alleged retaliation. Specifically in his December 10, 2015 Charge, Nelson claimed that he was "denied training hours," and that his employer eliminated his position and denied him the opportunity to assume one of the two positions created within the same unit. (Ex. O, Nelson Dep. Tr. at 93:15-94:10; Ex. R, 12/10/2015 Charge.)

88.     Chapman also filed two Charges of Discrimination; one dated August 18, 2014; and the other dated December 4, 2015. (Ex. P, Chapman Dep. Tr. at 217:14-218:3, 229:10-23; Ex. S, Chapman 8/18/2014 Charge; Ex. T, Nelson 12/4/2015 Charge.)

89.     Chapman's August 18, 2014 Charge alleged race discrimination stating that he was subjected to different terms and conditions of employment, including but not limited to, regulations regarding compensatory time and lowered performance evaluations." (Ex. P, Chapman Dep. Tr. at 218:2-219:1; Ex. S, Chapman 8/18/2014 Charge.)

90.     Nelson's December 10, 2015 charge of discrimination alleged race discrimination and retaliation. Specifically in his December 10, 2015 Charge, Nelson claimed that he was "subjected to different terms and conditions, including but not limited to, scrutiny, policy changes, inaccurate performance evaluations and being placed in a field probation officer position." (Ex. P, Chapman Dep. Tr. at 229:14-230:17; Ex. T, Nelson 12/4/2015 Charge.)

**A. Allegations Regarding the Supervisor Exam**

91.     Nelson took the supervisor test in 2007 or 2008. Nelson did not receive the required score to be considered a supervisor. (Ex. O, Nelson Dep. Tr. at 150:8-151:13.)

92.     Nelson also took the supervisor test in February 2012, and again did not receive the required score to be considered a supervisor. He received notification that he did not pass by way of a letter dated February 23, 2012 (Ex. O, Nelson Dep. Tr. at 204:12-205:8.)

93.     Chapman took the supervisor test in 2007 and February 2012. He did not receive the required score to be a supervisor either time. (Ex. P, Chapman Dep. Tr. at 133:13-16.)

94.     In 2012, after learning that he did not pass the test, Chapman made a request to JPD Human Resources Director William Patterson (African-American) to see a copy of his exam. This request was denied. (Ex. P, Chapman Dep. Tr. at 140:5-142:6.)

95.     Nelson also asked to see the test. This request was denied. (Ex. O, Nelson Dep. Tr. at 151:14-152:7.)

96.     Nelson does not know of another Juvenile Probation Officer of any race who received a copy of their failed test. (Ex. O, Nelson Dep. Tr. at 151:14-152:7.)

97.     Chapman testified that Michael Porter (African-American) and Charles Young (African-American) were allowed to view their tests. Porter found an error in the scoring of his 2007 exam, but once it was corrected he still did not pass the exam. (Ex. P, Chapman Dep. Tr. at 142:11-23, 265:1-15.)

98.     According to Nelson, the supervisor exam is discriminatory because it does not focus on the Juvenile Court Act, and instead favored individuals from a therapeutic background. According to Nelson, the individuals in the JPD with a therapeutic background were "98 percent Caucasian." (Ex. O, Nelson Dep. Tr. at 153:12-154:17.)

99.     Nelson testified that the supervisor exam was designed to draw on the knowledge base of clinical probation officers were are largely white rather than field officers. Nelson further testified that the supervisor examinations were set up as a survey and not as an objective neutral test to gauge the knowledge of the responsibilities and duties of the day to day duties of probation officers. (Ex. O, Nelson Dep. at 154-57; Ex. U, Nelson Ans. to Def. Interrogatories #10.)

100.     Chapman testified that he believes that the supervisor exam is racially discriminatory because it contains "an insurmountable number of questions that pertained to clinical knowledge or someone that had went through some clinical training." Chapman explained that the term "clinical" meant "psychological." (Ex. P, Chapman Dep. Tr. at 148:8-151:13.)

101.     There are African-American supervisors in the JPD, who were promoted to supervisor only after Jason Smith filed a grievance on their behalf. All of these supervisors passed the supervisor's exam. (Ex. P, Chapman Dep. Tr. at 154:14-16; Ex. C, Smith Dep. Tr. at 189:4-190:12.)

102.     Nelson also believes that the supervisor exam is discriminatory because it "leaves the determination of right and wrong answers to the subjective beliefs of management." (Ex. O, Nelson Dep. Tr. at 156:23-157:23.)

**B.  Allegations Regarding Transfer From Jumpstart**

103.     During Nelson's work with the Jumpstart program, the attendance at the program fell "tremendously." Due to this falling enrollment, Nelson heard talk of restructuring the program. (Ex. O, Nelson Dep. Tr. at 109:20-111:4, 113:12-17.)

104.     At the time Nelson was told that the teaching position in the Jumpstart program was going to be eliminated, Nelson had approximately 6 to 15 kids per class. This was down from a high of 70 kids. (Ex. O, Nelson Dep. Tr. at 184:10-16.)

105.     By 2015, due to the opening of charter schools, there were between fifteen and twenty-five kids total in Jumpstart. (Ex. P, Chapman Dep. Tr. at 39:5-20, 173:10-24.)

106.     Jumpstart's enrollment also declined because the Outreach Officers were not diligently doing their jobs. (Ex. O, Nelson Dep. Tr. at 107:2-13.)

107. In November 2015, the instruction side of Jumpstart was eliminated and Nelson and Chapman were transferred to field probation positions. (Ex. O, Nelson Dep. Tr. at 28:4-18, 133:8-16, 135:2-9; Ex. P, Chapman Dep. Tr. at 43:1-10, 176:23-177:3.)

108. Once Nelson was transferred, nobody filled Nelson's former job with Jumpstart. (Ex. O, Nelson Dep. Tr. at 28:4-18, 133:8-16, 135:2-9.)

109. Neither Nelson's nor Chapman's salary changed when they were moved out of Jumpstart. (Ex. O, Nelson Dep. Tr. at 40:1-8, 229:7-12; Ex. P, Chapman Dep. Tr. at 207:5-7.)

110. Nelson never put in a bid to remain in Jumpstart. He was never asked by management whether he wished to remain in Jumpstart. Although Nelson had heard talk about reorganization of Jumpstart, he was never told Jumpstart was being reorganized until the reorganization occurred. Nelson was never told he could not bid on other Jumpstart positions. (Ex. O, Nelson Dep. Tr. at 182-183.)

111. Nelson's stated reason for not putting in a bid was that the reorganization of Jumpstart "was a surprise" and the remaining positions had already been filled by the employer on a basis other than seniority, which Nelson believed violated the contract. (Ex. O, Nelson Dep. Tr. at 169-70, 182.)

112. Chapman did not put in a bid to remain in Jumpstart. (Ex. P, Chapman Dep. Tr. at 181:10-12, 188:15-17.)

113. Nobody at JPD told Nelson that his position with Jumpstart was being eliminated because he filed charges of discrimination. (Ex. O, Nelson Dep. Tr. 99:15-23.)

114. During a meeting, Avik Das told Nelson that he was not being removed from the Jumpstart program because he had filed a lawsuit. However, Nelson believes that in fact Das

removed him from the Jumpstart program due to his lawsuit. According to Nelson, this is because

Das's statement occurred as follows:

> It was kind of like when, you know, the Riddler says something in Batman, you know. Why would you just say that; I mean, he just blurted it out.
>
> But all of these things are happening, and they are definitely against the CBA, and they are somewhat against your own policy. You are doing things against your own policy. So you know, I think that was [a] Freudian slip.

(Ex. O, Nelson Dep. Tr. at 172:13-18.)

115.    When or before the instructor position in Jump Start was eliminated, Hatanisha

Jackson (African-American), another Jump Start instructor, was transferred within Jumpstart to a

non-teaching position. Nelson believes that he should have been moved to her job due to his

seniority and the fact that he asked to be given her job. (Ex. O, Nelson Dep. Tr. at 106:4-9, 133:17-

24, 135:7-20, 136:10-16, 137:2-6. Ex. C, Smith Dep. Tr. 195)

116.    Rohan testified that he eliminated or disbanded several JPD units that were

primarily comprised of Caucasian officers during the last several years of his tenure with JPD.

Rohan provided two examples of such units during his deposition: the Girls Unit and the Victim

Services Unit. (Ex. A, Rohan Dep. Tr. at 78:9-17.)

117.    Smith attested that the Girls Unit was not predominately white and that the Victim

Services Unit was very small, composed of perhaps two officers. (Ex. D, Smith Decl. ¶ 10.)

118.    Das considered Jumpstart to be "a program that filled a critical gap in education

services specifically Chicago public schools." (Ex. B, Das Dep. Tr. at 67.)

119.    Das testified that Jumpstart was ultimately eliminated due to its "becoming less and

less utilized," and due to JPD being short-staffed in other areas. Das decided that Jumpstart should

be closed due to his prioritization of field probation and electronic monitoring. There were other

programs that Das could have taken staff from if he wanted to keep Jumpstart in place. (Ex. B, Das Dep. Tr. at 67:12-69:1, 118:24-119:16, 120:3-4, 121:18-122:6.)

120.    JPD has attempted to continue to provide the services that used to be provided through Jumpstart. (Ex. B, Das Dep. Tr. at 120.)

121.    Smith testified that Jumpstart was never fully closed, but that the work was reorganized in a way that eliminated Nelson's and Chapman's positions. Ex C, Smith Dep. Tr. 197-198.)

## VI.    This Litigation

122.    Plaintiffs filed this case on July 5, 2015. (*See* Dkt. No. 1.)

123.    In the operative Second Amended Complaint, Plaintiffs asserted causes of action under Title VII (Counts I and II), the Illinois Probation Act (Count III), and the Illinois Civil Rights Act (Count IV). (*See* Second Am. Compl., Dkt. No. 55.)

124.    Paragraphs 26-33 of the Second Amended Complaint make allegations of racially disparate disciplinary actions allegedly complied by Local 3477. Defendant alleged that it lacked knowledge or information sufficient to either admit or deny specific numerical allegations in the Complaint. (Answer to Second Am. Compl., Dkt. No. 56 at ¶¶ 26-23.)

125.    Smith testified that he compiled the data in Paragraphs 26-33 based on records that the JPD provided to the Union while Smith was an officer of the Union. (Ex. C, Smith Dep. Tr. at 99, 108 et seq.)

126.    To Das's knowledge, nobody at JPD investigated whether the specific numerical allegations in paragraphs 26-33 of the Second Amended Complaint were correct or not. (Ex. B, Das Dep. Tr. at 102:6-104:16.)

127.    When Rohan was asked about the specific numerical allegations in paragraphs 26-33 of the Second Amended Complaint, Rohan testified as follows:

> Q. I am asking whether it's possible, based on your own experience, because you were involved in this disciplinary process, that this kind of disparity and discipline is at least possible?
>
> A. It's possible.
>
> Q. If this disparity that you say is possible did, in fact, exist, as you sit here today testifying in this case, do you find that disparity disturbing?
>
> A. I find -- I am confident that the discipline that we carried out during my tenure was appropriate and fair, not disturbing.

(Ex. A, Rohan Dep. Tr. at 43:13-24.)

128.    During Smith's union presidency the racial makeup of the bargaining unit was approximately 50% white, 40% black, and 10% other (including Latino and Asian). (Ex. D, Smith Decl. ¶ 8.)

129.    Jason Smith testified that during a disciplinary hearing involving Dan Walsh, a white JPD officer who was cited for insubordination, William Patterson stated, "if the union wasn't complaining about discrimination, you wouldn't be here." (Ex. C, Smith Dep. Tr. at 133-134.)

130.    Jason Smith testified that Kevin Gavin, who is white, was given a suspension of 1.5 days for putting in false entries to visits he never made. (Ex. C, Smith Dep. Tr. at 128-129.)

131.    Jason Smith testified that Joi Basley, a Black JPD officer was required to accept a last chance agreement for putting in false information as to visits or contacts she never made. According to Smith, Rohan overrode Basley's supervisor in imposing this punishment. (Ex. C, Smith Dep. Tr. at 126-127.)

132.    Kevin Gavin and Joi Basley were not in the same unit, and did not have the same supervisor. (Ex. C, Smith Dep. Tr. at 130:5-8.)

133.    As JPD's final decision maker at the time in the multi-step grievance process, Rohan made the disciplinary decisions for both Gavin and Basley. (Ex. C, Smith Dep. Tr. at 127:7-15, 128:13-129:10.)

134.    When Das became Director, he settled an open grievance involving Lauren Brown, an African-American officer who alleged she had received disparate discipline based on her race. During his deposition Das stated that did not specifically remember a particular complaint about racial disparity involving Brown. He then testified as follows:

Q. Were you correcting [Officer Brown's] grievance outcome to correct the previous racial discrimination of your predecessor?

A. No. I believe I -- I specifically was addressing the officer as I had known her and worked out the settlement.

Q. As you testified before, you knew from your time as a union officer that there were meritorious complaints within the unit about African officers suffering race discrimination, correct?

A. Yes.

Q. And this was a complaint from an African American officer that she had been disciplined more harshly because of her race, correct?

A. Yes.

Q. And when you were in a position to settle it out, you did, correct?

A. Yes.

(Ex. B, Das Dep. Tr. 109-110.)

135.    On September 20, 2016, the Court dismissed Plaintiff's claims under the Illinois Probation Act. (Dkt. No. 69.)

136.    The Court has jurisdiction over Plaintiff's remaining claims pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1367. (Def's Ans., Dkt. No. 46 ¶ 3.)

137.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events giving rise to this claim occurred in this District. (Def's Ans., Dkt. No. 46 ¶ 4.)

138.    The Court set class certification deadline of January 16, 2018. Plaintiffs did not file a motion for class certification. (*See* Dkt. No. 97.)

**For Defendant**

| | |
|---|---|
| LISA MADIGAN | */s/ Jeffrey Freeman*_____ |
| Illinois Attorney General | JEFFREY FREEMAN |
| | Office of the Attorney General |
| | 100 West Randolph Street, 13th Floor |
| | Chicago, IL 60601 |
| | P: (312) 814-4451 |
| | F: (312) 814-4425 |
| | jfreeman@atg.state.il.us |

**For Plaintiffs**

/**s**/_Thomas Geohegan_____
THOMAS HOWARD GEOGHEGAN
Despres Schwartz & Geoghegan
77 West Washington Street
Suite 711
Chicago, IL 60602
(312) 372-2511
Email: admin@dsgchicago.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on September 21, 2018, he electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Northern District of Illinois using the CM/ECF system. All participants in the case are registered CM/ECF users who will be served by the CM/ECF system.

*/s/ Jeffrey J. Freeman*