JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
1–4

**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4   ANTHONY JORDAN, KENNETH        )

5   GREENLAW, THEODIS CHAPMAN,     )

6   and PATRICK NELSON, on behalf  )

7   of themselves and others       )

8   similarly situated,            )

9          Plaintiffs,             )

10      vs.                        ) No. 15-cv-5907

11  TIMOTHY EVANS, CHIEF JUDGE OF  )

12  THE CIRCUIT COURT OF COOK      )

13  COUNTY,                        )

14          Defendant.             )

15

16          The deposition of JASON SMITH, called

17  for examination, taken pursuant to the Federal

18  Rules of Civil Procedure of the United States

19  District Courts pertaining to the taking of

20  depositions, taken before KRISTIN C. BRAJKOVICH, a

21  Certified Shorthand Reporter, CSR. No. 84-3810, of

22  said state, at Suite 1300, 100 West Randolph

23  Street, Chicago, Illinois, on the 20th day of

24  September, A.D. 2017, at 10:23 p.m.
```

**Page 2**

```
1   PRESENT:

2

3       DESPRES, SCHWARTZ & GEOGHEGAN, LTD.,

4       (77 West Washington Street, Suite 711,

5       Chicago, Illinois 60602,

6       1-312-372-2511), by:

7       MR. THOMAS H. GEOGHEGAN,

8       tgeoghegan@dsgchicago.com,

9           appeared on behalf of the Plaintiffs;

10

11      OFFICE OF THE ATTORNEY GENERAL,

12      STATE OF ILLINOIS,

13      ATTORNEY GENERAL LISA MADIGAN,

14      (100 West Randolph Street,

15      Chicago, Illinois 60601,

16      1-312-814-5022), by:

17      MR. JOHN HAYES,

18      jhayes@atg.state.il.us,

19          appeared on behalf of the Defendant.

20

21

22

23  REPORTED BY:  KRISTIN C. BRAJKOVICH,

24             CSR No. 84-3810.
```

**Page 3**

1          (WHEREUPON, the witness was duly

2          sworn.)

3          JASON SMITH,

4  called as a witness herein, having been first duly

5  sworn, was examined and testified as follows:

6          EXAMINATION

7  BY MR. HAYES:

8      Q.   Good morning, Mr. Smith.  My name is

9  John Hayes.  I'm representing the defendant in this

10  case, Jordan, et al., versus the Cook County -- I'm

11  sorry -- the Chief Judge of the Circuit Court of

12  Cook County.

13          MR. HAYES:  Let the record reflect this is the

14  deposition of plaintiff, Jason Smith, in the just

15  mentioned case filed in the U.S. District Court for

16  the Northern District of Illinois.  The deposition

17  is subject to all applicable federal rules.

18  BY MR. HAYES:

19      Q.   Mr. Smith, I'm just going to go over

20  some ground rules.  First, do you understand that

21  you are under the same obligation to tell the truth

22  today as you would in front of a judge or jury?

23      A.   Yes.

24      Q.   In terms of answering, I'm going to need

**Page 4**

1  you to say yes or no, so all of your answers need

2  to be verbal.  The court reporter can't take down

3  nods, shakes of the head, gestures, things like

4  that.  Do you understand?

5      A.   Yes.

6      Q.   Another thing, in terms of answering,

7  you may anticipate where I'm going with the

8  question, but wait until I finish it so she can get

9  a clean record of it and then you can answer.  And

10  I will do my best to do the same thing.  If you are

11  answering, I'll let you finish and then I'll talk.

12  Do you understand that?

13      A.   Yes.

14      Q.   Occasionally, your counsel here may

15  object.  That is fine, but unless he directs you

16  not to answer, you still need to answer the

17  question.  Do you understand that?

18      A.   Yes.

19      Q.   If you don't understand a question, just

20  let me know, and I'll rephrase it or repeat it or

21  whatever.  Okay?

22      A.   Yes.

23      Q.   If you need a break, that's fine.  Just

24  let me know.  I know sometimes this can get kind of



Page 5

1    tedious, so just let me know.  The only thing that
2    I ask is that if I have a question pending, you
3    wait until you answer the question to take a break.
4    Okay?
5        A.   Yes.
6        Q.   Are you taking any medication that would
7    affect your ability to testify today?
8        A.   No.
9        Q.   All right.  Is there any reason that you
10   can think of that would prevent you from answering
11   truthfully today?
12       A.   No.
13       Q.   Have you ever been deposed before?
14       A.   No.
15       Q.   Have you yourself ever filed a lawsuit
16   before?
17       A.   No.
18       Q.   Have you ever been a defendant to a
19   lawsuit before?
20       A.   No.
21       Q.   As, you know, Tom had mentioned earlier,
22   he's going to be asserting attorney-client
23   privilege, and so I'm going to ask you some
24   questions about what you did to prepare for your

Page 6

1    dep.  I don't want to know at this point what you
2    talked to him about in terms of preparing, but I'm
3    just going to ask you some general questions.
4    Okay?
5        A.   Yes.
6        Q.   Okay.  So what did you do to prepare for
7    your deposition today?
8        A.   I met with the firm.
9        Q.   Okay.  By "the firm," do you mean
10   Mr. Geoghegan here?
11       A.   And other attorneys as well.
12       Q.   Okay.  Would that have been Mr. Persoon?
13       A.   Yes.
14       Q.   Anyone else in the room?
15       A.   No.
16       Q.   And when did you meet with him?
17       A.   I can't recall.
18       Q.   Okay.  Was it within the last week or
19   so?
20       A.   Yes.
21       Q.   Okay.  About how long was that meeting?
22       A.   Maybe about either -- with Geoghegan or
23   with Persoon?
24       Q.   Let's start with Geoghegan first.

Page 7

1        A.   Maybe about a half an hour to an hour.
2        Q.   So they were separate meetings?
3        A.   Well, Mike Persoon came in kind of at
4    the end.
5        Q.   That's fine.  Did you review any
6    documents at this meeting?
7        A.   At this meeting?
8        Q.   At the meeting that we are talking
9    about, yeah, with your attorneys.
10       A.   Yes.
11       Q.   Do you recall what documents those were?
12       MR. GEOGHEGAN:  Well, I object to any
13   discussion of documents that might reveal -- or I
14   object to this question on attorney-client
15   privilege.  You can ask him what documents he
16   looked at.
17       MR. HAYES:  Isn't that what I asked?
18       MR. GEOGHEGAN:  No.  You asked in the presence
19   of your lawyers what documents did you look at.
20   BY MR. HAYES:
21       Q.   Okay.  What documents did you review to
22   prepare for this deposition today?
23       A.   I reviewed the documents that I have had
24   in my possession since 2010, 2011, maybe 2012.

Page 8

1        Q.   Okay.  And specifically what documents
2    are you referring to?
3        A.   Just correspondence that I have sent to
4    the chief judge, to Mike Rohan, to Rose Golden, to
5    William Patterson, to deputy chief probation
6    officers, information that I have sent to the
7    plaintiffs in the case, information that I have
8    sent to possibly other entities in regards to the
9    systemic issues that was impacting on the Office of
10   the Chief Judge.
11       Q.   Can you ballpark, how many pages are we
12   talking about here?
13       A.   Over 8,000.
14       Q.   Okay.  And these are all in your
15   personal possession?
16       A.   Yes.
17       Q.   And these, you know, 8,000-plus pages,
18   do they all refer to the allegations in this
19   lawsuit, or are there some that are outside?
20       A.   I think the bulk of the information
21   particular to this issue is pertaining to the
22   issues that was impacting juvenile probation.
23       Q.   All right.
24       A.   So I think all of the documents kind of



Page 9

1  lead back to the same issue, to be quite honest
2  with you.
3      Q.    The issues that are in this lawsuit?
4      A.    Well, not just those particular issues
5  that are present, but like I have said before, I
6  think I believe that there was a systemic issue of
7  systematically racial discrimination taking place
8  in juvenile probation.
9      Q.    And these documents, you said, were
10 starting around 2010; is that right?
11     A.    I believe so.
12     Q.    And I wrote 2012 here.  Is that where
13 they end, or do they go up to the present?
14     A.    They kind of go up to the present
15 because probation officers are still complaining
16 about racial discrimination within the department.
17     Q.    All right.  When you say department --
18 and I'll do this, too -- you are referring to the
19 juvenile probation department; is that right?
20     A.    No.
21     Q.    What are you referring to?
22     A.    I'm referring to the Office of the Chief
23 Judge, his department plus the juvenile probation
24 department.

Page 10

1      Q.    Okay.  You view them as the same entity?
2      A.    I do.  The department doesn't.
3      Q.    Okay.  And I think we just need to kind
4  of clarify where we are going.  If you are saying
5  "department" and you are referring to the Office of
6  the Chief Judge, and then I know that other -- or
7  at least I refer to it as the JPD, which is the
8  juvenile probation department, as "the department."
9  So I guess if you don't clarify, I will do it.  If
10 we can try to stick to JPD for the juvenile
11 probation department.  Is that okay?
12     A.    No.
13     Q.    You don't want to call it the JPD?
14     A.    Department or --
15     Q.    I'm just trying to get -- I know.  I'm
16 kind of confused too.  I'm just trying to get a
17 clear record because we are going to get this
18 written transcript back, and the things are going
19 to say "department."  When you say "department," if
20 you are referring to the Office of the Chief Judge
21 and not the juvenile probation department, it's not
22 going to be clear.  Or sometimes if you say
23 "department" and maybe you are referring to the
24 JPD, it's just going to be confusing.  So I want to

Page 11

1  make sure that when you say "department," you
2  either clarify what you are referring to going
3  forward.  Does that make sense?
4      A.    Sure.  So we can clarify that the chief
5  judge is the employer.
6      Q.    We'll get into that.
7      A.    Okay.  I just want to make sure.
8      Q.    No.  I'm aware of the position of the
9  plaintiffs on that.
10     A.    Well, the collective bargaining
11 agreement.
12     Q.    I'm not getting into the legal
13 arguments.  I just wanted to make a clear record.
14         So why don't we start with -- so we have
15 the Office of the Chief Judge, right?
16     A.    Right.
17     Q.    And what does -- what is your
18 understanding of what the Office of the Chief Judge
19 oversees?
20     A.    It oversees the adult probation
21 department, juvenile probation department, social
22 services department, forensics, the clinical
23 department, and some other departments that are
24 under the chief judge, the Juvenile Temporary

Page 12

1  Detention Center.
2      Q.    So there are several different
3  departments under the Office of the Chief Judge; is
4  that right?
5      A.    Yes.
6      Q.    I just wanted a clear record.  I'm not
7  trying to box you in to some legal argument here.
8      A.    I understand.
9      Q.    Outside of, you know, the -- your
10 attorneys here, have you spoken with anyone else
11 about your deposition in the last month or so?
12     A.    Just my fiancee.
13     Q.    Did you speak to the other plaintiffs in
14 this case about your deposition?
15     A.    No.
16     Q.    Have you spoken to any of your other
17 coworkers about your deposition today?
18     A.    I believe my supervisor knows about my
19 deposition today because I had to take a leave.
20     Q.    And who is your supervisor?
21     A.    Benny Blair.
22     Q.    Benny?
23     A.    Yes.
24     Q.    Blair?



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
13–16

Page 13

1   A.   Yes.

2   Q.   B-l-a-i-r, does that sound right?

3   A.   Yes, that's correct.

4   Q.   Okay.  Outside of Mr. Blair, have you

5   talked to any other coworker about your deposition

6   today?

7   A.   Not that I can recall.

8   Q.   I'm just going to go over some

9   background questions here.  Mr. Smith, what is your

10  date of birth?

11  A.   9/21/78.

12  Q.   Happy pre-birthday.  For the record,

13  what is your race?

14  A.   I'm African-American.

15  Q.   Are you married -- I'm sorry.  You are

16  not married, right, because you just mentioned your

17  fiancee; is that correct?

18  A.   That's correct.

19  Q.   Do you have any children?

20  A.   No.

21  Q.   How far have you gone in school?

22  A.   I have my master's degree.

23  Q.   From where?

24  A.   From Governors State University.

Page 14

1   Q.   And when did you get that?

2   A.   2009.

3   Q.   And what is your master's degree in?

4   A.   Criminal justice.

5   Q.   What is your bachelor's in?

6   A.   Business.

7   Q.   And where is that from?

8   A.   Governors State University.

9   Q.   Is that a B.S. or B.A.?

10  A.   B.A.

11  Q.   When did you get that?

12  A.   2002.

13  Q.   Any other education past your master's

14  degree?

15  A.   No.

16  Q.   Kind of another general question.  Have

17  you ever been convicted of a felony?

18  A.   No.

19  Q.   All right.  Now I'm going to talk about

20  your employment history a little bit.  When did you

21  first start your employment with the JPD?

22  A.   April 3, 2003.

23  Q.   And what was your position at that time?

24  A.   Initially, at that time I was a

Page 15

1   probation officer trainee.

2   Q.   And how long were you a trainee for?

3   A.   About seven weeks.

4   Q.   And then what happened?

5   A.   I completed all of the prereqs, passed

6   the final exam, and became a probation officer and

7   was sworn in.

8   Q.   Sometime -- would that be sometime in

9   June or July of 2003?

10  A.   June, yes.

11  Q.   And where were you first stationed?

12  A.   I was first stationed in home

13  confinement, electronic monitoring.

14  Q.   And how long were you in electronic

15  monitoring for?

16  A.   Almost 18 months.

17  Q.   Okay.  What were your job

18  responsibilities in electronic monitoring?

19  A.   My job responsibilities were to go out

20  into the field, make sure that the juveniles was at

21  home because they were under house arrest, to

22  monitor their movement, to give them permission to

23  move, to go to school, go to the doctor, to go to

24  church.

Page 16

1       In addition to that, my responsibilities

2   was to come back, complete whatever necessary

3   paperwork, submit it, file any violations of house

4   arrest or electronic monitoring, and to testify in

5   court.

6   Q.   After electronic monitoring, where did

7   you go?

8   A.   I elected to go into the field as a

9   field probation officer.

10  Q.   Okay.  Is that something that you asked

11  to do?

12  A.   Yes.

13  Q.   And how does that work, or how did that

14  work for you?

15  A.   So typically in the collective

16  bargaining agreement, you have to put in a

17  transfer, and when there are openings within that

18  unit, the department will grant your transfer.

19  Q.   Is that what you did?

20  A.   I did.

21  Q.   Okay.  And then where were you a field

22  probation officer?

23  A.   I was a field probation officer in the

24  Chicago West unit, located in the Lawndale area.



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
17—20

Page 17

1    Q.    Okay.  And how long were you in that, I
2  guess, location?
3    A.    I have been in that position for
4  13 years.
5    Q.    You are still there?
6    A.    Yes.
7    Q.    Okay.  Now, we are going back a ways.
8  If you remember, when you started at the JPD, what
9  was your salary?
10    A.    I believe my salary was maybe 32.
11    Q.    32,000 per year?
12    A.    Well, I'll be a little bit more
13  generous, maybe 38.
14    Q.    Just roughly.  That is fine.  What is
15  your current salary?
16    A.    71.
17    Q.    So it's safe to say that you have
18  received raises over that time period, correct?
19    A.    That's correct.
20    Q.    Were all of your raises contractually
21  mandated?
22    A.    Yes.
23    Q.    And just for the record, you understood
24  my question.  When I say "contractually mandated,"

Page 18

1  they were called for in the CBA, right?
2    A.    That's correct.
3    Q.    Immediately prior to working for the
4  JPD, where did you work?
5    A.    I was a sergeant for the Department of
6  Corrections in Wisconsin.  I also was a keynote --
7  was a speaker, motivational speaker, going out to
8  various places on behalf of the department prior to
9  my official position as a probation officer.
10    Q.    We'll take that each one.  When you were
11  with the Wisconsin Department of Corrections, when
12  did you start there?
13    A.    I believe I started with the Wisconsin
14  Department of Corrections in December of 2000.
15    Q.    And when did you leave there?
16    A.    I believe it was April of 2002 -- I'm
17  sorry -- March of 2002.  No, I'm sorry.  I'm
18  getting my dates confused.
19    Q.    I understand we are going back a ways.
20    A.    I had to start with the Wisconsin
21  Department of Corrections December of 2001 because
22  I left and came to juvenile probation and back to
23  Chicago, March of 2003, and then I started my
24  assignment at juvenile probation.

Page 19

1    Q.    And you said you were a motivational
2  speaker; is that right?
3    A.    Yes.
4    Q.    And did you say that was for the JPD?
5    A.    Yes.
6    Q.    Could you explain what that entailed?
7    A.    So there was a -- I was employed by the
8  West Side Association for Community Action as a
9  peer counselor starting in 1995.  When the whole
10  alternative to detention was implemented, Mike
11  Rohan and the juvenile probation department asked
12  me to go out and speak on behalf of the alternative
13  to detention for juvenile probation.  I introduced
14  people from various offices, from the Department of
15  Justice, went to different probation departments,
16  Indiana, flew out to Dallas, Florida, Indiana, and
17  Mexico for the KCE Foundation.
18    Q.    What is that?
19    A.    It is an organization that provides
20  grant funding for certain projects, particularly
21  under the juvenile probation department.
22    Q.    And so what is the time frame that you
23  are speaking about on behalf of the JPD?
24    A.    From 1996 to 2010, 2011.

Page 20

1    Q.    So you were speaking on their behalf
2  both prior and during your employment with JPD?
3    A.    Yes.
4    Q.    And prior to your employment with JPD,
5  did you receive payment for your speaking
6  engagements?
7    A.    I did.
8    Q.    Approximately how much, if you know?
9    A.    Each entity would roughly paid me maybe
10  about $900, $1,000.
11    Q.    And you mentioned Mike Rohan, and just
12  for the record, who is he?
13    A.    He's the former director of juvenile
14  probation.
15    Q.    I'm going to ask you this question about
16  just about everyone you mentioned just because this
17  is a race case, but what is his race?
18    A.    He's white.
19    Q.    And did you know Mr. Rohan prior to
20  being retained for these speaking engagements?
21    A.    Yes.
22    Q.    How?
23    A.    Because the West Side Association for
24  Community Action had the evening reporting program,



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
21–24

Page 21

1  which was connected to the juvenile probation
2  program as an alternative to detention.
3      Q.   When would you say that you first met
4  Mr. Rohan?
5      A.   1996.
6      Q.   Okay.  Now I just want to focus on your
7  time at JPD.
8      A.   Okay.
9      Q.   While you have been employed at the JPD,
10  have you received any merit bonuses?
11      A.   I have.
12      Q.   Could you explain what a merit bonus is?
13      A.   A merit bonus is exceeding expectations
14  throughout the course of the year regarding your
15  performance and fulfilling your job expectations
16  and duties.
17      Q.   And is a merit bonus something that you
18  get based on a good performance review?
19      A.   That's correct.
20      Q.   So you would receive that once a year;
21  is that right?
22      A.   Yes.
23      Q.   Do you know how many times you received
24  a merit bonus during your employment with JPD?

Page 22

1      A.   14 years.
2      Q.   So every year?
3      A.   Yes.
4      Q.   Again, I'm trying to peg down a number
5  here.  Do your best.  How much are we talking about
6  for these merit bonuses?
7      A.   On the average, $400 a year.
8      Q.   Has it gone up over time?
9      A.   No, it has not.  It all depends on how
10  many probation officers actually exceed in that
11  year, so all of the probation officers split a pot.
12      Q.   I see.  Outside of these merit bonuses,
13  do you receive any other bonuses or extra pay at
14  JPD?
15      A.   No.
16      Q.   Okay.
17      A.   If you want to count compensatory time.
18      Q.   No, we are not counting that, but thanks
19  for thinking of that.
20          Outside of your CBA raises, did you ever
21  receive a merit raise?
22      A.   Outside of the CBA?
23      Q.   Yeah.
24      A.   No.

Page 23

1      Q.   Does anyone at the JPD get merit
2  raises -- you know, merit raises that are not
3  mandated on a CBA?
4      A.   Yeah.
5      Q.   Do you know anybody who has?
6      A.   Deputy chief probation officers.
7      Q.   So people at the supervisory level?
8      A.   Yes, management.
9      Q.   Management.  Are they in the union or
10  no?
11      A.   They are not.
12      Q.   So they get raises outside of the union
13  contract, right?
14      A.   That's correct.
15      Q.   But no one in the union contract will
16  get merit raises; is that right?
17      A.   Not that I know of outside of the CBA.
18      Q.   During your time at the JPD, have you
19  ever been disciplined?
20      A.   No.
21      Q.   Have you ever been suspended while at
22  the JPD?
23      A.   Could you define suspended?
24      Q.   Yeah.  Here, we'll use a document.  It

Page 24

1  will be easier.
2      A.   Okay.
3      MR. HAYES:  No. 1.
4          (WHEREUPON, a certain document was
-10:-22:-47          marked Smith Deposition Exhibit
-10:-22:-47          No. 1, for identification.)
-10:-22:-47  BY MR. HAYES:
8      Q.   Okay.  Mr. Smith, you have been handed
9  what has been marked as Exhibit 1.  I'm going to --
10  well, the court reporter will be handing you
11  several exhibits throughout your deposition today,
12  so keep them in front of you and she will collect
13  them at the end.
14      A.   Okay.
15      Q.   So when I gave them to you, what I want
16  you to do is look it over and then I'm going to ask
17  you some questions about it.  Okay?
18      A.   Yes.
19      Q.   And, for the record, I always like to
20  get the Bates number, which is a little number
21  which is in the right-hand corner.  That also helps
22  us to navigate.  For the record, the Bates number
23  on Exhibit 1 is Defendant 8538 and 8539.
24          Mr. Smith, have you seen this document



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
25–28

Page 25

1  before?
2      A.   I have.
3      Q.   And what is that?
4      A.   It's my reinstatement for falsely being
5  accused of a crime that I did not commit.
6      Q.   And the date of it is November 1, 2010,
7  right?
8      A.   Yes.
9      Q.   And I'll just read a little bit of it.
10  The first sentence says, On May 3, 2010, you are
11  informed that effective May 4, 2010, you are being
12  temporarily suspended without pay resulting from
13  your arrest on April 29, 2010, for domestic
14  battery.  Do you see that?
15      A.   Yes.
16      Q.   So is it true that you were suspended on
17  May 4, 2010?
18      A.   No.
19      Q.   You were not suspended?
20      A.   It's a temporary suspension.  It's
21  within the CBA.  Any time a probation officer is
22  arrested, the department can invoke or not invoke
23  the temporary suspension.
24      Q.   And what is a temporary suspension then?

Page 26

1      A.   A temporary suspension is when the
2  department believes that you are a threat to the
3  work force or that you have been arrested.
4      Q.   And that is in the CBA?
5      A.   Yes, it is.
6      Q.   All right.  And it's different from a
7  regular suspension?
8      A.   Yes.
9      Q.   All right.  What is a regular
10  suspension?
11      A.   It's actually discipline.
12      Q.   All right.  So we'll take this in two
13  steps.  First, you don't consider the temporary
14  suspension discipline; is that right?
15      A.   It's not.
16      Q.   And is that written in the CBA?
17      A.   It's spelled out in the CBA that the
18  only thing that you can get for discipline is
19  verbal, written reprimand, suspension, or
20  termination.  It does not say temporary suspension.
21  And that is something that has been negotiated with
22  the chief judge in all of the CBAs.
23      Q.   So when I asked you if you had received
24  discipline, you said no, and that is because you

Page 27

1  don't believe the temporary suspension is
2  discipline, right?
3      A.   According to the department, it was not
4  discipline.  That is the language that they use.
5      Q.   Outside of this suspension and the
6  temporary suspension in 2010, have you ever
7  received any other temporary suspension?
8      A.   No.
9      Q.   And it says here that you received the
10  pay that you did not get during the temporary
11  suspension, right?
12      A.   They restored me.  They gave me all of
13  the money that I missed during that time, my
14  vacation time, my personal days, and plus they paid
15  me out for my compensatory time.
16      Q.   Is it a policy that an employee of JPD
17  goes on temporary suspension when they are
18  arrested?
19      A.   Yes.
20      Q.   Are you aware of other JPD employees
21  being put on temporary suspension when they have
22  been arrested?
23      A.   Yes, and some not.
24      Q.   So during your time at JPD, you have

Page 28

1  never received a verbal reprimand?
2      A.   No.
3      Q.   Or a written reprimand?
4      A.   No.
5      Q.   Or a regular suspension?
6      A.   No.
7      Q.   Was there anything else that was
8  discipline?  I can't remember.
9      A.   Just termination.
10      Q.   And you clearly have not been
11  terminated, right?
12      A.   Correct.
13      Q.   As an employee of the JPD, are you in a
14  union?
15      A.   Yes.
16      Q.   Okay.  Which one?
17      A.   AFSCME Local 3477.
18      Q.   And would that be for your entire time
19  employed with the JPD?
20      A.   Yes.
21      Q.   During your employment with JPD, have
22  you held any position within the union?
23      A.   Yes.
24      Q.   Okay.  Could you describe those, please?



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
29–32

Page 29

1   A.   I started off as a steward.
2   Q.   Give me when that was.
3   A.   2011.
4   Q.   And just briefly, what does a steward
5   do?
6   A.   A steward represents members in the
7   bargaining unit.  They try to resolve grievances,
8   they file grievances, they speak to management
9   regarding violation of the policies or the CBA.
10  Q.   Okay.  And how long were you a steward
11  for?
12       MR. GEOGHEGAN:  Off the record.
13       (WHEREUPON, discussion was had off
14       the record.)
15  BY MR. HAYES:
16  Q.   How long were a steward for?
17  A.   About a year -- I'm sorry.  Five years.
18  Q.   So you were a steward approximately 2011
19  through 2016, does that sound right?
20  A.   Yes.
21  Q.   During your time at the JPD, did you
22  hold any elected position in any way?
23  A.   Vice president.
24  Q.   When was that?

Page 30

1   A.   2012.
2   Q.   For how long?
3   A.   To 2014.
4   Q.   And who was the president at that time?
5   A.   In 2014?
6   Q.   2012 to 2014.
7   A.   Avik Das -- no.  I'm sorry.  Mike
8   Willis.
9   Q.   After vice president did you hold any
10  other role in the union?
11  A.   I became president.
12  Q.   In what year?
13  A.   2014.
14  Q.   All right.  That is elected, right?
15  A.   Vice president and president, yes.
16  Q.   And how long were you president for?
17  A.   Two years.
18  Q.   Through 2016?
19  A.   Yes.
20  Q.   Who is the president now?
21  A.   Lloyd Marshall.
22  Q.   When is the next election?
23  A.   2018.
24  Q.   All right.  Are you going to run in that

Page 31

1   one, if you know, as you sit here today?
2   A.   I'm not sure.
3   Q.   Any other positions in the union during
4   your employment with JPD?
5   A.   I was the political action committee
6   chairperson.
7   Q.   First, when was that?
8   A.   2012, I believe.
9   Q.   Okay.  For how long?
10  A.   No, it was 2011.  For maybe about a
11  year.
12  Q.   And now what is that?
13  A.   It's a position where they go out, they
14  try to meet with certain politicians, they
15  participate in certain political events, they back
16  certain candidates, they give recommendations about
17  certain candidates who is running for office to ask
18  and counsel to everyone.
19  Q.   That sounds familiar.  Was either
20  Mr. Nelson or Mr. Chapman in that role at some
21  point?
22  A.   Yes.
23  Q.   Which one or both, if you know?
24  A.   I believe Mr. Chapman was in that role.

Page 32

1   Q.   Would that have been before or after
2   you, if you know?
3   A.   I believe it was after me.
4   Q.   All right.  During the whole time you
5   were vice president and president, you were also a
6   steward; is that right?
7   A.   That's correct.
8   Q.   How does one become a steward?
9   A.   It all depends on who is actually the
10  leadership for the union.  Normally, for my
11  particular situation, I was asked to become a
12  steward.
13  Q.   Who asked you?
14  A.   Avik Das.
15  Q.   I'm imagining, he's going to come up a
16  lot today, so let say, who is Avik Das?
17  A.   Avik Das right now is the chief
18  probation officer/acting director of juvenile
19  probation.
20  Q.   And, again, what is his race, if you
21  know?
22  A.   I believe he is -- I don't know, Indian.
23  Q.   How long have you known Mr. Das?
24  A.   Since 2011.



JASON SMITH                                                    September 20, 2017
ANTHONY JORDAN vs TIMOTHY EVANS                                        33—36

Page 33

1    Q.   You are not a steward right now, right?
2 You are not a steward now, right?
3    A.   Yes.
4    Q.   Do you want to be a steward now?
5    A.   No.
6    Q.   While you were vice president and
7 president of the union, how much of your time would
8 you spend on union activities?
9    A.   I believe throughout my tenure, some
10 people would tell you that I slept and ate my union
11 activities.
12   Q.   I'm sorry.  That you what?
13   A.   That I slept and ate, so from the
14 morning to the night.  Even at night, just becoming
15 familiar with certain laws, the CBA, the Illinois
16 Public Labor Relations Act, and different aspects
17 of certain laws that impact bargaining members,
18 their constitutional rights, their civil rights.  I
19 pretty much studied day and night.
20   Q.   While you were either president or vice
21 president of the union, did you still maintain an
22 active caseload?
23   A.   Yes.
24   Q.   So that does not change, based on your

Page 34

1 role in the union?
2    A.   No.
3    Q.   Okay.  We have touched upon this a
4 little bit, but I want to ask you some questions
5 about the chief judge.  Are you familiar with the
6 chief judge of the Circuit Court of Cook County?
7    A.   I am.
8    Q.   And who is he?
9    A.   Timothy Evans.
10   Q.   And do you consider him your employer?
11   A.   He is the employer.
12   Q.   Why do you say that?
13   A.   Well, according to the law, according to
14 the CBA, according to the arbitration decisions,
15 they all say that the chief judge is the ultimate
16 employer.  There was a lawsuit filed by AFSCME
17 Council 31 regarding the chief judges in the
18 different counties, and there was a dispute
19 regarding if Cook County was a dual employer.
20       It was determined by the Court that the
21 chief judge was the employer for the probation
22 officers.
23   Q.   Setting aside the law for a second, your
24 experience working at the JPD, has the chief judge

Page 35

1 ever made any direct decisions regarding your
2 employment?
3    A.   Yes.
4    Q.   And what were they?
5    A.   I'm assuming to hire me.
6    Q.   You say "assuming."  Why would you
7 assume that?
8    A.   Outside of the law?
9    Q.   Yeah.
10   A.   I believe that I had to submit my
11 credentials to the administrative offices of the
12 Illinois courts.  I had to apply to his office.  He
13 is the chief judge, so he makes the final decision
14 and all decisions regarding the probation officers.
15   Q.   How do you know he makes the final
16 decision -- let me strike that because I know where
17 you might go with that.
18       Do you have any personal knowledge of
19 him making the final decision of -- final
20 employment decisions of JPD employees?
21       MR. GEOGHEGAN:  Objection.  That question,
22 first of all, calls for a legal conclusion in and
23 of itself, but it needs some clarification, I
24 think.

Page 36

1 BY MR. HAYES:
2    Q.   All right.  It was a little roundabout.
3       Do you have any personal knowledge of
4 Judge Evans making any decisions regarding your
5 employment while at JPD?
6    A.   Regarding my employment?  Outside of the
7 CBA and the law, no.
8    Q.   Okay.
9       MR. GEOGHEGAN:  I'm assuming for the record
10 here, some firsthand observation of the judge doing
11 something?
12       MR. HAYES:  I said personal knowledge, so that
13 should have -- I think it comes --
14 BY THE WITNESS:
15   A.   That affects me personally?
16 BY MR. HAYES:
17   Q.   Right, your employment personally.
18       MR. GEOGHEGAN:  That you saw or have direct --
19 BY MR. HAYES:
20   Q.   Right.  That is what I was subsuming
21 into personal knowledge.
22   A.   Well, I mean, outside of him sending me
23 a letter congratulating me on a well speech when I
24 was a keynote speaker in Oak Brook, I'm assuming



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
37—40

Page 37

1  not.

2      Q.   So you got a personal letter from Judge

3  Evans?

4      A.   Yes.

5      Q.   When was that?

6      A.   June of 2003.

7      Q.   Okay.  Have you ever -- have you

8  received any other direct correspondence from Judge

9  Evans while working at the JPD?

10         And let me clarify that.  There is lots

11  of documents that have him on the letterhead.  I

12  know that, but when I say "personal

13  correspondence," I say signed by him or an e-mail

14  from him.

15     MR. GEOGHEGAN:  Let me see if I understand the

16  question.  You mean, does he have documents that he

17  received either in a personal capacity or union

18  officer capacity or any other capacity that have

19  been signed by Judge Evans?

20     MR. HAYES:  Sure.  That is a good question.

21     THE WITNESS:  I don't know if that is what he

22  means or not, but those are certain things --

23     MR. GEOGHEGAN:  You don't have to produce any

24  documents.

Page 38

1      THE WITNESS:  Okay.  I gave them to them.

2  BY MR. HAYES:

3      Q.   Well, let the record show that you just

4  showed your attorneys some documents, so what

5  documents did you bring with you today?

6      A.   The letter that the chief judge wrote to

7  Commissioner Moore regarding the JPD officers not

8  being able to arrest regarding the improvement of

9  EM, where he mentioned that EM is now a 24-hour EM

10  responsive shift.  He talks about why juvenile

11  probation officers don't carry firearms because you

12  worry about the juvenile probation department

13  image.  The reason why juvenile probation officers

14  don't arrest.  Regarding the request that he filled

15  the chief probation officer position.

16         Also he talks about the tasks for each

17  officer and how EM has been vastly improved.  The

18  judges making decisions --

19     Q.   Okay.  And these --

20     A.   He talks about the violence in the

21  community.  He also cites that -- you have also

22  asked that we provide the probation officers the

23  power to arrest juvenile offenders who violate the

24  terms of the EM.  While this is allowed on a

Page 39

1  limited basis by the probation and Probation

2  Officer Act, JPOs have not traditionally exercised

3  this authority.

4         And this is in regards to the Aaron

5  Parks case and why that certain kid was not

6  arrested, because EM officers don't have the

7  authority to go out to arrest, and then he talks

8  about his concern about firearms.  This idea will

9  have an erosion effect on the supportive

10  relationship that is the characteristic of JPO

11  work.  Moreover, probation officer powers of arrest

12  are limited to the violation of the terms of

13  probation, which are not necessarily the same as a

14  violation of the terms of EM.

15         That we stand with the youth and are not

16  afraid of them, despite the fact that the majority

17  of the youth are the ones who are committing these

18  violent acts within the City of Chicago.  I am

19  concerned about the compassionate face of our

20  juvenile court and judges that JPO provide, and we

21  strive to reflect the rehabilitative values of

22  juvenile justice and the idea that JPOs are

23  resources and support to young people and

24  communities struggling with violence and crime.  I

Page 40

1  mean, I don't know if that is --

2      Q.   That is fine.  Since you are reading

3  from them, I have those, I have seen those, but I

4  would like to make those an exhibit just because

5  rather than not have to go dig through them.  So

6  I'll make copies, but can you leave them out?

7      MR. GEOGHEGAN:  Leave them?

8      MR. HAYES:  Yeah.  Can we go off the record?

9         (WHEREUPON, discussion was had off

10         the record and Exhibit No. 2 was

11         marked for identification.)

12     MR. HAYES:  Okay.  Back on.

13  BY MR. HAYES:

14     Q.   Mr. Smith, I just handed you what has

15  been marked as Deposition Exhibit 2.  These are the

16  documents that you brought with you today -- some

17  of the documents that you brought with you today

18  that you were just reading from; is that right?

19     A.   Yes.

20     Q.   All right.  I'll put that aside for now.

21  Going back to my question, I just -- I think I just

22  want a yes or no, if you remember.

23         During your time at JPD, did you --

24  other than the letter that we already discussed,



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
41–44

Page 41

1  did you personally receive any other correspondence
2  from Chief Judge Evans, for example, to Jason Smith
3  from Timothy Evans?
4      A.   Not that I can recall at this time, but
5  I'm sure if I had more paperwork or more of my
6  documents, I could provide a more direct answer.
7      Q.   As you are sitting here now, you can't
8  think of anything, right?
9      A.   Not at this time.
10     Q.   Okay.  And I believe you testified that
11 you believed Judge Evans was involved in your
12 hiring; is that right?
13     A.   Yes.
14     Q.   Were there any other facets of your
15 employment that you believe Judge Evans was
16 directly involved in?
17     A.   Besides the fact that Mike Rohan told me
18 that he would speak to the chief judge about me
19 becoming a probation officer if I spoke out in
20 Oak Brook, no.
21     Q.   In your position as field probation
22 officer, who is your direct supervisor now?
23     A.   Benny Blair.
24     Q.   And what is Mr. Blair's title?

Page 42

1      A.   Supervisor, probation officer.
2      Q.   And then who is Mr. Blair's supervisor?
3      A.   Mr. Dennis Alexander.
4      Q.   And what is his title?
5      A.   He's the deputy chief probation officer.
6      Q.   The race of Mr. Blair, I don't think
7  that we have that?
8      A.   He's African-American.
9      Q.   Mr. Alexander's race?
10     A.   He's African-American.
11     Q.   So who -- who tells you what to do on a
12 daily basis in terms of your duties as a field
13 probation officer?
14     A.   Mr. Blair.
15     Q.   And then I'm sure you have had different
16 supervisors while you have been employed at JPD,
17 right?
18     A.   Just one more.
19     Q.   Oh, and who was that?
20     A.   Mary Davoren.
21     Q.   Could you take a stab at spelling that
22 last name?
23     A.   D-a-v-o-r-e-n.
24     Q.   Davoren; is that right?

Page 43

1      A.   Davoren, yes.
2      Q.   And what is her race?
3      A.   She's white.
4      Q.   Is she with JPD anymore?
5      A.   I think so.  I think she's out in
6  Skokie.
7      Q.   And she was your direct supervisor --
8  was it supervisory probation officer; is that
9  right?
10     A.   Yes.
11     Q.   When you received your temporary
12 suspension in 2010, do you know who made the
13 decision to do that?
14     A.   I believe it was Mike Rohan.
15     Q.   And what was his position at that time?
16     A.   He was the director.
17     Q.   Of?
18     A.   Juvenile probation.
19     Q.   Just for the record.  Have you ever
20 personally met Chief Judge Evans?
21     A.   Yes.
22     Q.   How many times?
23     A.   Over -- maybe over 10 to 15.
24     Q.   And if you can generalize, great.  If

Page 44

1  not, then give me specifics.  What were the reasons
2  for you meeting with the chief judge?
3      A.   The first time was he congratulated me
4  on a speech.  I tried to make appointments with his
5  office to talk about what was taking place in
6  juvenile probation.  I saw him at different
7  commission meetings, Cook County board meetings,
8  and spoke to him on several occasions when he would
9  actually appear.  I believe that I met him a couple
10 of times when he would come down to juvenile
11 probation for different events.  So, yeah, I met
12 him a couple of times.
13     Q.   Did you ever have a sit down meeting
14 with Chief Judge Evans regarding any allegations of
15 discrimination in the JPD?
16     A.   No.  I tried several times to make
17 appointments with his office.  I would always get
18 his secretary.  She would refer me to his
19 voicemail, but I did --
20     Q.   Sorry.  Go ahead.
21     MR. GEOGHEGAN:  Let him --
22     MR. HAYES:  Yeah, go ahead.
23 BY THE WITNESS:
24     A.   I did talk to him briefly as we were



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
45–48

Page 45

1  walking through the county building halls regarding
2  what was taking place in juvenile probation.
3  BY MR. HAYES:
4  Q.  When was this?
5  A.  I believe it was -- I organized
6  100 probation officers to go down to the county
7  building when they was getting laid off, and he was
8  at the county board meeting, so maybe between 2014,
9  2015.
10  Q.  Okay.
11  A.  Maybe a little bit before then.
12  Q.  Okay.  And you say that you briefly
13  talked to him.  How long was your conversation?
14  A.  Roughly about seven to eight minutes.
15  He told me that he would like to hear more, to make
16  an appointment with his office.
17  Q.  Did you do that?
18  A.  I tried on several occasions.
19  Q.  Okay.  And outside of that, you never
20  sat down with him regarding any allegations of
21  discrimination?
22  A.  No.
23  Q.  Did you sit down with anyone from the
24  chief judge's office regarding your allegation of

Page 46

1  discrimination?
2  A.  Bruce Wisniewski, Keith Sevcik.
3  Q.  Who is Bruce Wisniewski?
4  A.  He was the human resource administrator
5  for the Office of the Chief Judge.
6  Q.  And when was that meeting?
7  A.  It was several times because I filed so
8  many grievances, that each time I would go down
9  there, Bruce would say to me, You again?
10  Q.  Could you guess how many times?  More
11  than five?
12  A.  Yeah, more than five.
13  Q.  More than ten?
14  A.  More than ten.
15  Q.  Now, were these meetings with
16  Mr. Wisniewski, were they to discuss the grievances
17  that you filed; is that right?
18  A.  Yes.  He would schedule the grievances.
19  Q.  And are these grievances of individual
20  JPD employees?
21  A.  Some individuals and maybe one or two as
22  a group.
23  Q.  Okay.  And what was the time period for
24  these grievances?

Page 47

1  A.  From 2012 to 2016.
2  Q.  Okay.  You also said that you sat down
3  with Keith Sevcik; is that right?
4  A.  Yes.
5  Q.  And who is Mr. Sevcik?
6  A.  I believe he's the legal counsel for the
7  Office of the Chief Judge.
8  Q.  How many times did you meet with him
9  regarding allegations of racial discrimination over
10  at JPD?
11  A.  More than ten.
12  Q.  When you talk about sitting down with
13  folks and Mr. Sevcik about allegations of racial
14  discrimination, are you referring to grievance
15  hearings, or are these separate hearings?
16  A.  No, we are referring to grievances.
17  That was the formal process.
18  Q.  Would that be the same thing when you
19  are talking about Mr. Wisniewski?
20  A.  Wisniewski.
21  Q.  Wisniewski, do you know how to spell
22  that?  If you don't know, don't worry about it.
23  A.  W-i-e-n-s-k-w-i.
24  Q.  Was it -- were those grievance hearings

Page 48

1  with him as well?
2  A.  One, and some of them was informal, when
3  he was scheduling the grievance hearings.
4  Q.  What I want to do is separate out the
5  grievance hearings from any other sit down meetings
6  that you might have had with anyone at the chief
7  judge's office regarding race discrimination.
8  So setting aside the grievances, how
9  many meetings would you say that you had with
10  someone from the chief judge's office regarding
11  allegations of racial discrimination?
12  MR. GEOGHEGAN:  But just to clarify this
13  question, you are not assuming in this question
14  that there were no discussions about race
15  discrimination in the grievances?
16  MR. HAYES:  Correct.  No, I'm setting aside
17  the grievance hearings.  I don't want to talk about
18  the grievance hearings right now.
19  BY THE WITNESS:
20  A.  So what we was told was that in order to
21  file a formal complaint was through the grievance
22  process.
23  BY MR. HAYES:
24  Q.  Okay.  So would that -- does that



Page 49

1  mean -- I don't want to put words in your mouth,
2  but does that mean that you did not have any
3  meetings with anyone from the chief judge's office
4  outside of the grievance hearings regarding
5  allegations of race discrimination in the JPD?
6      A.   Informally, yes.
7      Q.   All right.  So "informally," what do you
8  mean by that?
9      A.   So each time I would file a grievance,
10  Bruce Wisniewski and I would have a conversation
11  about the merit of the grievance.  So inside his
12  office, I would bring up that there is some
13  disparity taking place regarding African-Americans
14  and the discipline that they are receiving and the
15  white officers within Cook County Juvenile
16  Probation.
17         Then further conversation went into the
18  systemic issues that was impacting a particular
19  group of people, from certain probation officers
20  not being able to transfer, to proposals that
21  management was actually submitting to restructure
22  the department, to probation officers receiving
23  compensatory time.
24         There was a lot of different issues that

Page 50

1  was coming up throughout the course of the four
2  years that I was vice president and president
3  because I was able to look at certain information
4  that the department was providing to me.
5      Q.   Right.  Believe me, I'm going to ask you
6  questions about that stuff, so we'll get into that stuff.
7      MR. GEOGHEGAN:  Objection.  If you wanted to
8  add any more to your answer, you can continue.
9  BY MR. HAYES:
10     Q.   If you want to now, but I'm going to ask
11  questions on that too.  Okay?
12     A.   No.
13     Q.   If you can put a number on it, how many
14  grievances did you file during this time period in
15  2012 to now or during -- sorry, strike that.  That
16  was bad.
17         During your tenure as vice president and
18  president of the union, how many grievances did you
19  file on behalf of JPD employees that alleged race
20  discrimination, if you can give me a number?
21     A.   I don't know.
22     Q.   Are we talking again more than ten?
23     A.   Yeah, more than ten.
24     Q.   More than 20?

Page 51

1      A.   Yeah, probably more than 20.
2      Q.   Okay.  I know this gets tedious, but
3  more than 30?
4      A.   Honestly, I can't recall, but I can --
5      Q.   Go ahead.
6      A.   I can recall certain grievances that I
7  did file on behalf of officers who was complaining
8  about racial discrimination.
9      Q.   Okay.  And then what happened in these
10  grievances that alleged race discrimination?
11     A.   All of them was denied.
12     Q.   When you say "denied," I just want to
13  get the procedure out.
14     MR. GEOGHEGAN:  Were you done with your
15  answer?
16     THE WITNESS:  Yeah.
17     MR. GEOGHEGAN:  I'm sorry.
18  BY MR. HAYES:
19     Q.   When you say "denied," what is the
20  process?
21     A.   So the process is for the union to
22  present information and evidence, and each time I
23  met with Keith, Bruce, whoever, I would present the
24  information that was presented to me from our

Page 52

1  department.  Historical records, current
2  information that the department provided to me per
3  my release of requests for information, unfair
4  labor practices charges that I actually filed
5  against the Office of the Chief Judge to actually
6  compel the department to turn over certain
7  documents.
8         So I would actually bring it up at each
9  step of the grievance process, and at each step
10  they would deny and deny that there was any racial
11  discrimination taking place within the department.
12  Even when I showed them their own confidential
13  records regarding last chance agreements, regarding
14  the length of suspension that each probation
15  officer was receiving, they would still just deny
16  that there was any racial discrimination taking
17  place.
18         The department is required to turn over
19  quarterly a transaction list of people who are on
20  leave, who have been suspended, who receive some
21  type of discipline, verbal reprimand, and I would
22  use the department information and convince them
23  because in our department, there's a thing called
24  disproportionate minority contact, where they are



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
53–56

Page 53

1 saying that the system or certain minorities are
2 having too much contact with the system and it's
3 based off race.
4 Q. What do you mean by "the system"?
5 A. The criminal justice system, so it's
6 called disproportionate minority contact. So I
7 would actually compare that to what was taking
8 place with Mike Rohan regarding the
9 African-American probation officers who was
10 actually receiving a six-month suspension or
11 three-month suspension compared to their
12 counterparts, which happened to be white probation
13 officers.
14     And I actually used and showed Mike
15 Rohan an audit that was actually completed on each
16 unit within the department to show that there was
17 some disparity taking place when there was not a
18 recommendation for a particular officer who just
19 happened to be white and a particular officer who
20 happened to be black within that same unit.
21     Q. And, again, just to be clear. I mean, I
22 think I have an understanding of the process, but I
23 want to make sure that we are on the same page
24 here. When you talk about grievances denied,

Page 54

1 grievances have steps; is that right?
2 A. Yes.
3 Q. How many steps?
4 A. It's supposed to be the supervisor, but
5 the department have taken the position, which is --
6 I don't want to get into the legal terms.
7 Q. How many steps are there?
8 A. It's four or five.
9 Q. Okay. And when you are meeting with
10 someone from the Office of the Chief Judge, be it
11 Keith or Bruce, what step is that?
12 A. Or Kate Galbraith, or there was another
13 gentleman who was actually hearing the grievances,
14 too. He had passed away.
15 Q. And what step is that, when you are
16 meeting with someone from the Office of the Chief
17 Judge?
18 A. That is the fourth. That is the fourth
19 step.
20 Q. Were any of these grievances that we
21 have been talking about alleging racial
22 discrimination, were they ever -- was the process
23 ever cut off of those grievances before getting to
24 Step 4?

Page 55

1 A. Yes.
2 Q. Okay. And when was that?
3 A. Before my tenure.
4 Q. Okay. So of the grievances alleging
5 racial discrimination against JPD that you brought,
6 none were cut off before Step 4; is that right?
7 A. No, that is not correct.
8 Q. Okay. How was the -- tell me then
9 when -- if you can give me a specific example of
10 when a grievance that you filed alleging race
11 discrimination did not proceed to Step 4?
12 A. Certain times certain probation officers
13 will be, prior to these meetings, that they did not
14 want to grieve, that they were afraid that they
15 were going to lose their job, and they would accept
16 whatever discipline that the department would
17 impose on them. So they would actually beg and ask
18 that the grievance be resolved or that the matter
19 be cut off even before it gets to the chief judge's
20 office.
21     So sometimes I'm not directly involved.
22 The stewards are involved. They are supposed to
23 come and talk with the vice president and
24 president, but certain stewards was going rogue at

Page 56

1 that time, particularly a case of --
2 Q. When you say "at that time," I just want
3 to be clear. Is that your vice presidency,
4 presidency time period?
5 A. Yes. I could recall a particular issue
6 regarding the Kenneth Greenlaw case where the
7 supervisor, when I was present, had a steward in
8 there, and Mike Rohan had offered him, I think it
9 was -- he told him if he did not accept this
10 three-day suspension, it would be ten, so he would
11 accept the three-day suspension without actually
12 going through the entire process or going to the
13 Office of the Chief Judge.
14 Q. Were you in there for that, in the
15 meeting where Mr. Rohan said, Accept the three or
16 you'll get ten?
17 A. I have been in several meetings.
18 Q. Just were you in that meeting?
19 A. I was not in that meeting, but the
20 steward came back and told me.
21 Q. Who is that steward, if you remember?
22 A. Christen Loeb.
23 Q. I'm going to ask the next question based
24 on your testimony. Correct me if I'm not getting



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
57–60

Page 57

1  it right.

2      Any of these grievances that we have
3  been talking about that you brought for race
4  discrimination against JPD during your presidency
5  and vice presidency, are you aware of any of them
6  being cut off at one of the steps prior to Step 4
7  by management refusing to hear it?

8      A.   By management refusing to hear a
9  grievance?

10     Q.   Yeah.

11     A.   Unless it's not timely or if it was
12  procedurally done incorrectly, that might be the
13  only reason, but I don't see any other time a
14  grievance would be cut off.

15     Q.   Okay.

16     A.   Not that I can recall.  If I had more of
17  my paperwork in front of me, I believe that I could
18  answer the question a little more accurately.

19     MR. GEOGHEGAN:  Off the record for a second.

20     (WHEREUPON, discussion was had off
21          the record.)

22     MR. HAYES:  Okay.  Back on the record.

23  BY MR. HAYES:

24     Q.   Let's switch gears again a little bit,

Page 58

1  Mr. Smith.  I want to talk a little bit about the
2  named plaintiffs in this case.

3      A.   Okay.

4      Q.   Are you familiar with Anthony Jordan?

5      A.   I am.

6      Q.   How do you know Mr. Jordan?

7      A.   I have represented him as president of
8  the union during the time that he was on his
9  temporary suspension and terminated from the
10  department.

11     Q.   So you were his steward for his
12  termination?  Does that sound right?

13     A.   Yes.

14     Q.   Prior to that had you worked with
15  Mr. Jordan?

16     A.   No. I'm sorry.  When you mean "worked,"
17  we worked in the same department.

18     Q.   Right.  That was actually not a great
19  question.

20     Prior to representing him in his
21  temporary suspension termination proceedings, had
22  you worked in the same unit with Mr. Jordan?

23     A.   No.

24     Q.   Did you know of Mr. Jordan prior to

Page 59

1  that?

2      A.   Yes.

3      Q.   Okay.  And how did you know him?

4      A.   I'm a friendly guy, so I have seen him
5  around the department a couple times, so I normally
6  try to speak to everyone that I come across.

7      Q.   While we are talking about the
8  department, what is the size -- how many employees
9  does JPD have, if you know?

10     A.   My particular interest was just the
11  juvenile probation officers, so I knew that the
12  department had over 300 juvenile probation officers
13  and that does not include the deputy chief
14  probation officers or management.

15     Q.   This would have been the union
16  employees, right?

17     A.   Yes.

18     Q.   While you were president of the union?

19     A.   And vice president.

20     Q.   Over 300.  Are we talking about 305 or
21  like 350?

22     A.   Maybe like roughly -- maybe like 320,
23  330.

24     Q.   Okay.  Do you socialize with Mr. Jordan

Page 60

1  outside of work?

2      A.   No.

3      Q.   Have you ever been to Mr. Jordan's
4  house?

5      A.   Yes.

6      Q.   Okay.  How many times?

7      A.   Once.

8      Q.   But not to socialize?

9      A.   He had a heart attack.

10     Q.   So you visited him after his heart
11  attack?

12     A.   Yes.

13     Q.   And when was that?

14     A.   I can't recall.  Maybe sometime last
15  year, when he had his heart attack.

16     Q.   But other than that, you have never seen
17  Mr. Jordan outside of work?

18     A.   No.

19     Q.   Okay.  Are you familiar with Kenneth
20  Greenlaw?

21     A.   Yes.

22     Q.   How do you know Mr. Greenlaw?

23     A.   He's a probation officer that I
24  represented in the grievance hearing.

JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
61–64

Page 61

1    Q.    So you represented him in his
2  termination as well?
3    A.    Yes.
4    Q.    Okay.  Did you represent Mr. Greenlaw in
5  any other grievance that he might have had?
6    A.    Not that I can recall.
7    Q.    Okay.  Prior to representing
8  Mr. Greenlaw with this grievance regarding his
9  termination, did you work directly with
10  Mr. Greenlaw?
11    A.    No.
12    Q.    So is it fair to say that you did not
13  have the same direct supervisors; is that right, as
14  Mr. Greenlaw?
15    A.    We all had different supervisors.
16    Q.    All right.  Do you socialize with
17  Mr. Greenlaw outside of work?
18    A.    No.
19    Q.    Have you ever been to Mr. Greenlaw's
20  house?
21    A.    No.
22    Q.    Okay.  Do you know Patrick Nelson?
23    A.    Yes.
24    Q.    How do you know Mr. Nelson?

Page 62

1    A.    He's a probation officer in the
2  department.
3    Q.    Did you help Mr. Nelson with any
4  grievance -- any of his grievances at the JPD?
5    A.    I believe so.
6    Q.    Okay.  And do you know what those were
7  about -- sorry.  Was it more than one?
8    A.    Yes, it was more than one.
9    Q.    And do you know what they were about?
10    A.    I believe it was for his performance
11  evaluations, the elimination of his position.  I
12  believe it was maybe the issue of compensatory
13  time.  Yeah, I believe so.
14    Q.    Okay.  And do you know roughly the time
15  period of these grievances that you assisted him
16  with?
17    A.    No.  It could have been anywhere between
18  2014 maybe or '13 to the -- maybe to the present
19  day.  I don't recall.
20    Q.    Do you socialize with Mr. Nelson outside
21  of work?
22    A.    No.
23    Q.    Okay.  Have you ever been to
24  Mr. Nelson's house?

Page 63

1    A.    Yes.
2    Q.    Okay.  Why have you been to his house?
3    A.    To prep for the grievance hearings.
4    Q.    How many times would you say that you
5  have been to his house?
6    A.    Maybe once or twice.
7    Q.    Would you go to other officers' houses
8  to prep for grievance hearings?
9    A.    If I can't meet with them during work
10  hours.
11    Q.    So have you gone to other probation
12  officers' houses to prep for grievance hearings?
13    A.    I have.
14    Q.    Approximately how many other officers
15  would you say that you have been to their houses?
16    Q.    Or outside of the JPD?
17    A.    Yeah.
18    A.    Maybe 20.  20, 30 probably.
19    Q.    Okay.  So I just went over four
20  individuals.  Are you aware that these are the four
21  named plaintiffs in this lawsuit that you are here
22  for today, right?
23    A.    Yes.
24    Q.    Did you at any time ever tell any of the

Page 64

1  four plaintiffs to file a charge of discrimination
2  with the EEOC?
3    A.    Not directly, but I mentioned that they
4  can seek outside help if they wasn't happy about
5  the results.
6    Q.    Results of their grievances?
7    A.    Yes.
8    Q.    Okay.  You say that you told that to all
9  four of them?
10    A.    No.
11    Q.    Who did you tell that to, if you know?
12    A.    I believe Howard Brown, Julie
13  Montgomery.  I probably mentioned it to maybe all
14  of them maybe indirectly, even though the grievance
15  hearing allowed me to present the information and
16  evidence.
17    Q.    I think there might have been confusion.
18  When you say "all of them," are you referring to
19  all of the JPD employees that you helped with
20  grievances?
21    A.    Yeah.
22    Q.    So I want to know about the actual
23  plaintiffs in the case.  So Jordan, Greenlaw,
24  Nelson, Chapman.  Did you ever tell them that they



JASON SMITH                                    September 20, 2017
ANTHONY JORDAN vs TIMOTHY EVANS                        65–68

Page 65

1   should file a charge of discrimination with the
2   EEOC?
3       A.   Not directly, no.
4       Q.   But would you have told them kind of the
5   same thing that you just testified about kind of
6   indirectly or whatever?
7       A.   When I presented information on their
8   behalf and they see the documents that the
9   department produced and provided to me, I'm sure
10  they had to take notice.  The language, the stats,
11  the number of probation officers compared to white
12  probation officers who had been suspended and
13  terminated under the Office of the Chief Judge.
14      Q.   Did you assist any of the -- just the
15  four plaintiffs in filing their charges of
16  discrimination with the EEOC?
17      A.   When you say "assist," you mean like
18  provide them with information?
19      Q.   Sure.  Well, if that is your answer,
20  that is fine.  Did you provide them with
21  information?
22      A.   Yeah, especially during the grievance
23  hearings.
24      Q.   All right.  Then specifically did you --

Page 66

1   just the four plaintiffs, any of them, did you
2   assist them in any way?  And by "assist," I mean,
3   did you tell them, Here, this is where you go to
4   the EEOC, this is how you fill it out, any of that?
5       A.   If they had a question, yes.  I would
6   answer the questions as their president or vice
7   president.  I would give them the information that
8   they were seeking.
9       Q.   And do you recall directly assisting any
10  of the four plaintiffs in filing a charge of
11  discrimination with the EEOC?
12      A.   Probably so, if I can recall.  I
13  don't -- I'm a little bit confused by the word
14  "assist" because all I did was give them the
15  information, and these are four grown men who made
16  a decision to file charges based off the
17  information that they had in their possession.
18      Q.   Let me break it down a little bit.  That
19  might help.
20      A.   Okay.
21      MR. GEOGHEGAN:  I'm going to object to the
22  form of the question, and I rarely have a relevance
23  objection at a deposition, but I think this is
24  getting pretty far afield of the case.

Page 67

1   BY MR. HAYES:
2       Q.   Did you -- did you go to the EEOC with
3   any of the plaintiffs when they filed their charge?
4       A.   Maybe.  I think I did.
5       Q.   Do you know which one, which ones?
6       A.   Maybe -- maybe Nelson, I think.
7       Q.   Okay.  Was he the only one?
8       A.   That I can recall at this time.
9       Q.   Okay.  Outside of the four plaintiffs,
10  did you -- and outside of what you already
11  testified to kind of indirectly telling employees
12  about their options, did you ever tell any JPD
13  employees specifically, You should file a charge of
14  discrimination with the EEOC?  Again, outside of
15  the four named plaintiffs here.
16      A.   If they believe that they was a victim
17  of racial discrimination.
18      Q.   Can you think of a specific instance
19  where you told someone that?
20      A.   I can recall Howard Brown, where I
21  walked in on the deputy chief probation officer who
22  had accused Howard Brown of not servicing a client,
23  and I actually caught the deputy chief probation
24  officer, Virginia Caulfield, manipulating the

Page 68

1   system, and it was actually the supervisor who
2   happened to be white never assigned the case to
3   Howard Brown and who was never put under
4   investigation.
5       Q.   All right.  So did you tell Howard Brown
6   to file an EEOC charge based on that instance that
7   you observed?
8       A.   Well, he -- if I can remember correctly,
9   he asked me if we can file a grievance, and I said,
10  Well, you have not been impacted because they did
11  not discipline you, but we can file a grievance and
12  make it a formal complaint or you can go to the
13  EEOC and file a complaint regarding differential
14  treatment that you believe you received.
15      Q.   Do you know if he went to the EEOC to
16  file a charge?
17      A.   I don't -- I can't recall right offhand,
18  but --
19      Q.   Regarding this lawsuit that you are here
20  for today, Jordan, et al., did you have any role
21  whatsoever in the filing of that lawsuit?
22      A.   As far as providing documentation?  I
23  think that being African-American in the
24  department, I think all African-Americans,



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
69–72

Page 69

1  especially minorities, they all should have a role
2  in this lawsuit, especially given the systemic
3  issue that impact the Office of the Chief Judge and
4  juvenile probation.
5      Q.   Did you ever tell any of the other four
6  named plaintiffs here that they should file a
7  lawsuit?
8      A.   No, I didn't tell them that they should
9  file a lawsuit.  Yeah.
10     MR. GEOGHEGAN:  I want to object to any
11 communications between Mr. Smith and our law firm
12 about this lawsuit.  I'll instruct him not to
13 answer those.  Those are all privileged, but I
14 don't have any objection to the question that you
15 just asked.
16     MR. HAYES:  I know.  I'm trying to -- I guess
17 we are just going to roll, and if we get to it, we
18 get to it and we'll deal with it.
19     MR. GEOGHEGAN:  I have the understanding that
20 Mr. Smith is --
21     MR. HAYES:  He's all over everything.
22     MR. GEOGHEGAN:  That he's an intelligent and
23 sophisticated individual and understands that you
24 are not asking about communications with our firm.

Page 70

1      MR. HAYES:  Right.  I'm fine.
2  BY MR. HAYES:
3      Q.   I understand that your attorney has put
4  forth an objection of attorney-client privilege, so
5  that means that -- at this point, I don't want to
6  know any of your communications between you and
7  anyone at that firm.  Okay.
8          What I will be looking for is your role
9  in terms of what you provided and how you came to
10 some of these conclusions that are in the
11 complaint.  That is what I'm going to be looking
12 for.  Okay?  I just want to be clear on that.
13     A.   That's fine.
14     MR. HAYES:  Tom, we good at least until the
15 questions?
16     MR. GEOGHEGAN:  Yeah, that is a legitimate
17 area of inquiry.
18     MR. HAYES:  Okay.
19 BY MR. HAYES:
20     Q.   Are you currently a hired consultant of
21 the law firm -- and I'm probably going to butcher
22 it -- of Despres, Schwartz & Geoghegan?
23     A.   Yes.
24     Q.   And without getting into what you talked

Page 71

1  to them about, what is your understanding of your
2  role as a consultant on this case?
3      A.   My role is --
4      MR. GEOGHEGAN:  Objection.  I am going to
5  object to these questions.  We have already
6  identified him as a client of the firm for purposes
7  of this case, and I'm going to instruct him not to
8  answer those questions.
9      MR. HAYES:  Well, is he a client, or is he a
10 consultant?
11     MR. GEOGHEGAN:  I stated at the beginning, he
12 is a client.  Of course he has information and he
13 provides it to us as a client, but he's -- I think
14 he misunderstood the question.  He is a client of
15 the firm, and I'm instructing him not to answer
16 questions about what he provides to the firm.
17 BY MR. HAYES:
18     Q.   Is it your understanding, Mr. Smith,
19 that you are a client of the law firm?
20     A.   Yes.
21     Q.   Okay.  So is it your understanding that
22 you are not a consultant?
23     A.   I mean --
24     MR. GEOGHEGAN:  Objection.  I think he

Page 72

1  misunderstands what you mean by "consultant."
2      MR. HAYES:  I know.  I'm trying to figure it
3  out here.
4      MR. GEOGHEGAN:  Obviously, we consult with him
5  and vice versa, but it's not a consultant
6  relationship in the sense that you mean it.
7  BY MR. HAYES:
8      Q.   Are you being paid as a consultant?
9      A.   No.
10     Q.   Okay.  When did you become a client of
11 the law firm?
12     A.   2015, I believe, or 2016.
13     Q.   Do you know if it was before or after
14 this lawsuit was filed?
15     A.   It was after this lawsuit was filed.
16     Q.   Okay.
17          (WHEREUPON, a certain document was
-10:-22:-47          marked Smith Deposition Exhibit
-10:-22:-47          No. 3, for identification.)
-10:-22:-47 BY MR. HAYES:
21     Q.   Okay.  Mr. Smith, you have been handed
22 what has been marked as Exhibit 3.  I'll tell you
23 it's the second amended complaint in this matter.
24 Have you seen this before?



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
73–76

Page 73

1    A.   Yes.
2    Q.   Okay.  Again, I'm trying to find out
3  what was your role, if any, without getting into
4  attorney-client communications in the drafting of
5  this complaint?
6        MR. GEOGHEGAN:  Oh, I'm going to instruct him
7  not to answer that.
8        MR. HAYES:  All right.  Let's go off the
9  record for a minute.
10       (WHEREUPON, discussion was had off
11        the record.)
12       MR. HAYES:  Okay.  Let's go back on.  For now,
13  I'll move on.  I'll keep asking questions and see
14  what happens.
15       Now, Mr. Smith, you established that you
16  have seen this document before; is that right?
17   A.   Yes.
18   Q.   And is it your understanding that this
19  is the operative complaint in this lawsuit, meaning
20  this is the true and correct complaint right now,
21  right?
22   A.   I mean, I know it said on behalf of
23  themselves and other similarly situated plaintiffs.
24  I don't know if there may be additional plaintiffs

Page 74

1  that may come forward.
2    Q.   Okay.  You are not currently a plaintiff
3  in this lawsuit, right?
4    A.   I think being an African-American in the
5  department indirectly, you could say that I am a
6  plaintiff because it impacts me as an
7  African-American.
8    Q.   Let me reask that.
9    A.   It's similar --
10   Q.   No, go ahead.
11   A.   It's similar to the Chicago Police
12  Department, when the Chicago Police Department was
13  discriminating against African-American police
14  officers and the fire department, when they was
15  discriminating against African-Americans regarding
16  their exam.  So I think indirectly being an
17  African-American in the department, that it does
18  impact me.
19       MR. GEOGHEGAN:  Objection.  I think it's --
20  this document speaks for itself.  He's not formally
21  a named plaintiff in this.
22       MR. HAYES:  I mean, you are objecting after
23  his answer, and I was going to clean it up.
24

Page 75

1  BY MR. HAYES:
2    Q.   Are you currently a named plaintiff in
3  this lawsuit?
4    A.   Not a named plaintiff, but, again, I
5  kind of -- I don't know how you can put and say it
6  does not impact me directly, because they are
7  similarly situated, and I assume I'm a similarly
8  situated individual.  But, no, my name does not
9  appear directly anywhere on the lawsuit.
10   Q.   All right.  Now, I'm going to go through
11  some of these specific paragraphs and ask you some
12  questions about it.  If you could turn to page 4.
13  I want to focus on paragraph 11.  It says,
14  Effective December 1, 2008, and continuing in
15  effect, a collective bargaining agreement was
16  entered into between defendant, Chief Judge Timothy
17  Evans, and the American Federation of State,
18  County, and Municipal Employees, Council 31, the
19  union.  Do you see that?
20   A.   Yes.
21   Q.   My question is, did you have any role in
22  the drafting or negotiating of the CBA?
23   A.   No, because it would have also stated
24  Local 3477.

Page 76

1    Q.   So is it your understanding that this
2  collective bargaining agreement applies to other
3  locals beyond just 3477?
4    A.   No.
5    Q.   So does it apply just to 3477?
6    A.   Yes, this particular collective
7  bargaining agreement.  Each local has their own
8  collective bargaining agreement because each local
9  has a different president and vice president.
10   Q.   Okay.  The CBA that is being referenced
11  in paragraph 11, if you know, did you have any role
12  in the drafting or negotiating of that CBA?
13   A.   Possibly indirectly.  I mean, I am the
14  president -- or was the president of the union.
15   Q.   But not in 2008, right?
16   A.   No, not in 2008.
17   Q.   Okay.  Has there been a CBA negotiated
18  with Local 3477 after 2008?
19   A.   Yes.
20   Q.   And when was that?
21   A.   The CBA expired in 2012.
22   Q.   Did you have a role in drafting or
23  negotiating of that CBA?
24   A.   Yes.



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
77–80

Page 77

1  Q.  What was your role in that CBA?
2  A.  I helped negotiate the current
3 collective bargaining agreement.
4  Q.  And when you say "helped negotiate," can
5 you be specific about what you did?
6  A.  I attended meetings, gave input
7 regarding the working conditions of the probation
8 officers, came back, relayed the information to the
9 probation officers, fought with Council 31 over
10 certain languages, provisions within the CBA, and
11 we met with the chief judge's representative, Laura
12 Kelly, the department, and the county.
13  Q.  Did the union have an attorney that
14 negotiated the CBA?
15  A.  Did we have an attorney?
16  Q.  Yeah.
17  A.  To negotiate the CBA?
18  Q.  Right.
19  A.  I'm not sure if he was an attorney, but
20 I'm sure there was some attorneys present.
21  Q.  All right.  Let me ask it this way.  For
22 this, the one that you helped negotiate in 2012,
23 that is still current?
24  A.  Yes.

Page 78

1  Q.  Okay.  Do you know when that expires?
2  A.  November 1st, November 30th of this
3 year.
4  Q.  Okay.  I assume because you are not in
5 the union, but do you currently have any role in
6 the negotiation of the new CBA after November 30,
7 2017?
8  A.  Just the vote on the contract once they
9 present all of the information.
10  Q.  And looking at paragraph 11, do you
11 know, it says, Effective December 1, 2008, and
12 continuing in effect, but you said the 2008 one,
13 did that expire or what happened?
14  A.  I'm sorry.
15  Q.  No, go ahead.  I just want to know what
16 happened.
17  A.  Any time that a collective bargaining
18 agreement has an expiration date, it still is in
19 effect until you negotiate a new one.
20  Q.  Do you know when the new one -- the
21 2012 -- the current CBA, when did that come into
22 effect?
23  A.  I believe we signed it in 2015.  It was
24 ratified in 2015.

Page 79

1  Q.  But you started working on it in 2012;
2 is that right?
3  A.  Yeah, I believe so.
4  Q.  Okay.  If you turn the page to page 5,
5 let's look at paragraph 16, it says, Argentry
6 Mitchell.  Do you see that?
7  A.  Yes.
8  Q.  You can just read that paragraph to
9 yourself.  Go ahead.
10  A.  Okay.
11  Q.  Were you involved personally, I guess I
12 would say as a union steward or as a union
13 president or vice president, in Mr. Mitchell's
14 claims in paragraph 16?
15  A.  No.
16  Q.  If you turn the paragraph to page 6,
17 hopefully these questions will be easy because they
18 are about you.  Paragraphs 21 and 22, do you see
19 that, Jason Smith?
20  A.  Uh-huh.
21  Q.  Just look at 21 and just tell me, is
22 everything in there still true about you?
23  A.  Yeah.  Yes.
24  Q.  21 is still a true statement, there's

Page 80

1 nothing wrong with paragraph 21?
2  A.  No, I'm no longer the president of
3 Local 3477.
4  Q.  Okay.  I want to look at the next one,
5 which is paragraph 22, and I'll read it, Jason
6 Smith recognized that claims of racial
7 discrimination to the EEOC, the Illinois Department
8 of Human Rights, federal courts and arbitration
9 were failing due to the failure to allege and
10 document a pattern and practice of racially
11 disparate treatment.  Do you see that?
12  A.  Uh-huh.  Yes.  I'm sorry.
13  Q.  That's fine.  And what exactly did you
14 recognize?
15  A.  A bunch.  When I first started, a group
16 of probation officers came to me regarding a
17 blackboard.
18  Q.  Sir, when you say "first started," does
19 that mean in the union or the JPD?
20  A.  No.  Let me make sure --
21  Q.  I'm sorry.  I'm going to probably
22 interrupt you and Tom may object, but I want you to
23 finish.
24  MR. GEOGHEGAN:  I am objecting.



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
81–84

Page 81

1  BY MR. HAYES:
2      Q.   Just to clarify -- sometimes I will
3  interrupt to clarify, just because I want a clean
4  record.  I'm not trying to trip you up or anything
5  like that.  So go ahead.
6      A.   So when I say when I first started, when
7  certain probation officers started bringing to my
8  attention certain unfair treatment that was taking
9  place in the juvenile probation department, I only
10  thought that it was pertaining to juvenile
11  probation.
12          I can recall the first instance that a
13  group of probation officers came to me regarding a
14  blackboard and that the deputy chief was making
15  them sign a blackboard, and this particular unit
16  consisted of several black probation officers and a
17  couple of white probation officers within the same
18  division.  And this deputy chief would ask the
19  black probation officers to sign the blackboard as
20  if to account for their time and not ask the white
21  probation officers to sign the blackboard to
22  account for their time.
23      Q.   Okay.  When was this, first of all?
24      A.   I believe it was in 2012.

Page 82

1      Q.   Who was the deputy chief?
2      A.   Virginia Caulfield.
3      Q.   And her race?
4      A.   White.
5      Q.   When you say "blackboard," is it like a
6  chalkboard?
7      A.   Uh-huh.
8      Q.   You still have to say yes.
9      A.   It's a chalkboard.  It was a chalkboard.
10      Q.   If I am understanding you correctly, she
11  was making certain officers sign -- is it like a
12  time thing on there, or what was it?
13      A.   They would come in, write their name on
14  the blackboard, saying that they was present,
15  despite the fact that they had a time sheet, that
16  they actually had to sign their signature
17  indicating that they was there at work.  But she
18  would actually create another layer of a blackboard
19  to see what probation officers was here at work
20  during that time.
21          So these probation officers brought it
22  to my attention, and I brought it to her attention
23  and said, If you are going to create a blackboard,
24  you are going to have to create the blackboard for

Page 83

1  everyone, not just the black probation officers.
2  She said -- she gave me some excuse, that these
3  probation officers was assigned to a courtroom, she
4  needed to see who was present, and I brought up the
5  time sheet and that they have a direct
6  supervisor -- or two direct supervisors who
7  actually supervise their immediate duties.
8          She refused to take down the blackboard.
9  The group asked me to file a grievance for
10  discrimination.  We went through the process, went
11  through Step 1, Step 2, Step 3, Step 4, and it was
12  all denied.
13          During that time the probation officers
14  wanted to do what we call a job action regarding
15  the differential treatment that they was
16  experiencing, and some probation officers created a
17  flier that said, Civil rights are union rights.
18  And they posted these signs saying, Stop with the
19  discrimination, and they actually sent that flier
20  to the Office of the Chief Judge.  After a while,
21  for some particular reason, the blackboard
22  disappeared.
23      Q.   And it's your understanding that white
24  probation officers never had to sign on the

Page 84

1  blackboard; is that right?
2      A.   I have firsthand knowledge, yeah.
3      Q.   Yeah.  Did you talk to the white
4  officers about it?
5      A.   Yes.
6      Q.   And they said they never had to?
7      A.   Yes.
8      Q.   Did anything -- to your knowledge, did
9  anything -- I'm going to say bad.  Did any
10  discipline or anything like that happen to these
11  black officers that had to sign the blackboard?
12      A.   I know there was discipline taking place
13  when that department -- in that unit specifically.
14  I can't recall because I don't have my records in
15  front of me, but I do recall probation officers
16  being placed under investigation because they had
17  filed a complaint for discrimination.  I also can
18  recall certain probation officers being placed
19  under investigation that they construe that as not
20  turning over a daily court call or not coming back
21  for a certain time period for their lunch period,
22  so I can recall those incidents.
23      Q.   Do you recall anything that specifically
24  happened to these officers that had to sign on the



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
85–88

Page 85

1  blackboard?

2      A.    If I had my --

3      Q.    Sorry.  As a result of signing on the

4  blackboard, did anything happen to them?

5      A.    I can't -- I'm sorry.  I can't recall

6  right offhand, but if I had my notes, I -- I just

7  remember that we filed a grievance over the

8  complaint.

9      Q.    Okay.

10     A.    But that is when -- that is when I

11  started the collection of the records.

12     Q.    Okay.  So go back to paragraph 22 of the

13  complaint here.  I was asking you what instances

14  were you recognizing.  You said a bunch.  I might

15  be paraphrasing, but you started with the

16  blackboard.

17          Could you give me more specific

18  examples?

19     A.    So there was a situation that I was

20  brought into regarding Kaletha Seay.

21     Q.    Okay.  Can you spell any of that?

22     A.    Kaletha is K-a-l-e-t-h-a.  Seay is

23  S-e-a-y.  And she was denied a transfer.

24     Q.    And she's African-American?

Page 86

1      A.    Yes.  And the department cited -- they

2  had offered Kaletha Seay the position, and she

3  accepted.  In the CBA it does not say that once a

4  probation officer accepts a position, that

5  management can come back and rescind that transfer,

6  but that is exactly what happened.  They said that

7  they made a mistake, that Kaletha Seay did not

8  exceed -- I'm sorry -- did not meet standards on

9  her performance evaluation, which directly impacted

10  her ability to transfer.

11          But because she had already accepted the

12  position, the union had taken the position that

13  it's not her fault that management did not do their

14  due diligence and that she had a right to the

15  position.  Management refused.  We filed a

16  complaint.  We went up through the whole process.

17  We brought up other instances where -- not me

18  per se but Mike Willis had actually provided me

19  documentation showing that this is a common

20  practice to waive certain provisions within the

21  collective bargaining agreement to allow probation

22  officers to transfer.  For whatever reason, they

23  refused to transfer Kaletha Seay.

24          After that there was a white probation

Page 87

1  officer who was actually disciplined.  In the CBA

2  it says that if you have been disciplined or if you

3  did not meet standards on your performance

4  evaluation, that you cannot transfer, and the

5  department transferred her not once, not twice, but

6  three times.

7      Q.    And who is that white officer?

8      A.    Susan Patla.

9      Q.    Could you spell the last name?

10     A.    P-a-t-l-a.

11     Q.    Had Ms. Seay received discipline prior

12  to the initial transfer of her?

13     A.    No.

14     Q.    Okay.

15     A.    She just did not meet standards.

16     Q.    So do you believe then that Ms. Seay's

17  transfer was rescinded then because of her race?

18     A.    Yes.

19     Q.    Did anyone ever say they are rescinding

20  her transfer because of her race?

21     A.    Not directly.  I mean, discrimination is

22  not -- they are not wearing the hoods and marching

23  and putting crosses -- burning crosses in

24  people's front lawns these days.  It's very

Page 88

1  micro-aggressions and very subtle, and even the

2  policies can sometimes have an indirect impact on

3  African-Americans, especially when they are not

4  applied consistently throughout the department.

5      Q.    Okay.  We have that one.  Back to

6  paragraph 22.  Any other instances that you were

7  recognizing at this time?

8      A.    Each time -- and I can only speak to

9  what I saw and my tenure as vice president,

10  president.

11     Q.    That is all I want.

12     A.    Information that was provided to me

13  because Mike Willis was the president for over

14  20 years of the local.  So Mike Willis turned over

15  this big box of information to me, and I actually

16  sorted through the big box and went through it line

17  by line and created certain binders, scanned it,

18  and so when it came to negotiating certain

19  restructuring of the department, I noticed that the

20  department would put on the table certain units,

21  and these certain units only consisted, the

22  majority, of African-Americans.  And each time that

23  we would question them and ask them to provide us

24  with information, they would always say, it's



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
89–92

Page 89

1  operational need, as if the department has the
2  right to run the department as they saw fit.
3      And that is their right.  That is under
4  the employer's authority, but they still have to
5  bargain over the impact.  And what we were saying
6  to the department is that when you only include
7  certain units, the makeup only consists of
8  African-Americans, how can you justify eliminating
9  this unit when this unit is more successful than a
10  unit that actually consists of white officers?  And
11  you have to be fair and consistent throughout the
12  process, and that is all we was asking.
13      They came back and they proposed
14  something else, but I think that realignment
15  proposal did have an impact on certain
16  African-American probation officers that eliminated
17  their position.
18      Q.  Okay.  You gave me a lot there.  That is
19  fine.  So I'm just going to try to unpack some of
20  that.  I want to start with maybe locking this
21  down, this paragraph 22.
22      You said, I think, early on in that
23  answer that you can only talk about what you know?
24      A.  Uh-huh.

Page 90

1      Q.  So what I'm looking for is, you know, I
2  have this complaint that can be kind of general at
3  times.  What I'm trying to do is get specifics, so
4  you gave me the blackboard, you gave me the Kaletha
5  Seay incident.  I want to know any other incidents
6  that is referred to in paragraph 22 that you were
7  personally involved in?
8      A.  Well, that realignment of 2013 I was
9  personally involved in.  Everything that I'm going
10  to talk about today, I was personally involved.
11      Q.  Okay.  Then I want to step back.  And
12  you mentioned a big box that Michael Willis gave
13  you; is that right?
14      A.  Yes.
15      Q.  And he was the president of the union
16  before you; is that right?
17      A.  Yes, for almost 20 years.
18      Q.  You say "big box."  What are we talking
19  about, bankers box, like a big moving box?
20      A.  Totes of records, so there was two totes
21  and one box of information.
22      Q.  Okay.  And you said that you sorted
23  through all of this, right?
24      A.  Yes.

Page 91

1      Q.  And you made binders and things like
2  that?
3      A.  Uh-huh.
4      Q.  Where are these binders now?
5      A.  I scanned everything and sent it over to
6  you.
7      Q.  To me?  I certainly don't have it.
8      A.  Okay.
9      Q.  Yeah, who did you send it to?
10      A.  So I sent it --
11      Q.  If you sent it to the firm, you can just
12  say, I sent it to the lawyer, that fine, but I
13  don't want to put words in your mouth.
14      A.  I'm sorry.  Well, not you per se, not
15  personally.
16      Q.  To your lawyer; is that right?
17      A.  Yes.
18      Q.  So are you still in possession of these
19  binders?
20      A.  Yes.
21      Q.  Do you keep them at your home?
22      A.  Yes.
23      Q.  Okay.  This is going to get tedious,
24  Mr. Smith, but I just want to nail down everything.

Page 92

1  Is there anything else from paragraph 22 that you
2  have not mentioned yet?
3      A.  The discipline.
4      Q.  And can you expound on that a little
5  bit?
6      A.  So it began with an admonishment, which
7  the department said was not discipline, similar to
8  the temporary suspension.  That the probation
9  officers who was receiving these admonishments had
10  somehow failed in the compliance with the
11  department policy.
12      So there was a particular incident with
13  an audit that was completed for the entire
14  department, and I believe the audit consisted of
15  from 2011 to 2012.  And I'm assuming from all of
16  the communications, because this audit was provided
17  to me from Mike Rohan, that he actually initiated
18  this audit under the authority under the chief
19  judge.
20      In this audit, there was a particular
21  officer by the name of Emily Pierce who received an
22  admonishment, and her supervisor told her that the
23  director said that she should have been
24  disciplined.



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
93–96

Page 93

1    I said okay.  I put a request of
2  information into the department.  They then told
3  me, What is the relevance?  That it had no
4  relevance, that they was not willing to turn over
5  these documents to me.
6        I then filed another complaint, put
7  another request.  Mike Rohan personally responded
8  and said that all of this information was turned
9  over to the union previously, it preceded your
10  tenure.  However, I'm going to provide the audit to
11  you for your review, and that is exactly what I
12  did.  I reviewed all of the audit reports for every
13  unit within the probation department.
14      Q.   Audit report, is that an audit of
15  discipline?  What is an audit report?
16      A.   So an audit -- so probation officers in
17  juvenile probation is very -- how can I say this --
18  unique.  I like to use those terms.  Me being a
19  field probation officer, that makes up a lot of the
20  department, but we have certain specialized units
21  within the department.
22        And Emily Pierce was a field officer,
23  and as a field officer, you are required to do
24  investigations, complete case logs, complete case

Page 94

1  plans, do YASIs, do you Type 4Es, monitor your
2  clients, make all the referrals.  I mean, a host of
3  things.  And in this particular audit -- and it's
4  cited and I brought it to the chief judge's office,
5  and I showed him personally myself.
6      Q.   You showed the chief judge?
7      A.   No, his designee, Keith Sevcik.
8      Q.   Who was it?
9      A.   Keith Sevcik.
10      Q.   Okay.
11      A.   That the department decided to admonish
12  Emily Pierce, but they was looking to discipline
13  her.  But in this audit it says that Dennis Brady
14  and Katie McGoldrick's audits was worse than Emily
15  Pierce.
16      Q.   Give me the races of these because I
17  know where you are going, but just for the record.
18      A.   So Emily Pierce is African-American, and
19  Katie and Dennis Brady are white.  And in Keith's
20  decision, he denied the grievance because he said
21  that I did not provide enough information and that
22  this author could not determine that there was
23  racial discrimination taking place.
24        If you look at Keith and all of the

Page 95

1  legal counsel for the office of the chief judge,
2  they always say that this is a summary, so they
3  don't capture the entire meeting.  They just
4  summarize.  And the department actually do the same
5  thing, and they omit certain information within
6  this write-up to the union in the response.
7        And oftentimes I will respond by saying,
8  Well, you all omitted this.  Why did you all omit
9  this?  But because it became so tedious and because
10  my primary role was not just the union president
11  but also a field probation officer, that I could
12  not respond back to the department in every
13  instance.  There was certain information that was
14  either omitted or left out or summarized during
15  these meetings.
16      Q.   And you say "these meetings."  Are these
17  the fourth level grievance hearings?  Is that what
18  you are referring to?
19      A.   First, second, third, fourth, yes.
20      Q.   Okay.  I don't think we covered this,
21  but is there a hearing meeting at the first level
22  of a grievance?
23      A.   Yes.
24      Q.   And who is present at that one

Page 96

1  generally?
2      A.   So if you review the CBA, it's supposed
3  to be the immediate supervisor, but because the
4  immediate supervisors are the same collective
5  bargaining unit as us, the department had said that
6  it is the deputy chief, which I was filing
7  grievances over that too because it says immediate
8  supervisor.  And the law says that not even an
9  arbitrator can modify or change the language in the
10  contract, so it's the deputy chief probation
11  officers.
12      Q.   Step 1?
13      A.   Yes.
14      Q.   And someone from the union, a steward?
15  Would the steward be there?
16      A.   Yes, unless I filed a grievance
17  personally.  I always wanted to be involved because
18  I noticed that there was something taking place
19  within the department, so any time that there was
20  an investigatory hearing, if there was some type of
21  discipline that was going to be imposed unless I
22  was on vacation or out of the office, I would
23  actually be present for these meetings.
24      Q.   Was the employee present at Step 1?



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
97–100

Page 97

1    A.   He can be or she can be.  But, yeah,
2    they have a right to be present.
3    Q.   Okay.  Step 2.  Who is at Step 2?
4    A.   The human resource director.
5    Q.   Of the JPD?
6    A.   Yes.
7    Q.   Okay.  And the employee?
8    A.   Yes.
9    Q.   And a union representative?
10   A.   Yes.
11   Q.   Step 3, who is there?
12   A.   The director.
13   Q.   Director of the JPD?
14   A.   Yes.
15   Q.   And the employee, right?
16   A.   And the union, yes.
17   Q.   And the union?
18   A.   Uh-huh.
19   Q.   You just have to say yes.
20   A.   Yes.
21   Q.   Step 4, who is present at that hearing?
22   A.   It says the chief judge or his designee,
23   and the majority of the time it would be just the
24   designee.

Page 98

1    Q.   And the union representative?
2    A.   Yes.
3    Q.   Is the employee there as well?
4    A.   If they choose to be there, yes.
5    Q.   Were you ever at a Step 4 grievance
6    hearing where the chief judge himself, Judge Evans,
7    was there?
8    A.   No.
9    Q.   So it was always a designee; is that
10   right?
11   A.   Yes.
12   Q.   Okay.  Back to paragraph 22, is there
13   anything else that you have not mentioned yet, kind
14   of in a general manner, that at this time you felt
15   the things that were -- strike that.  Just give me
16   a second to come up with a good question.
17   A.   Well, can I make a statement real quick?
18   Q.   Sure.  Go ahead.
19   A.   It's not that I felt, it was just the
20   evidence.  It's the facts that was presented to me,
21   and it was not me personally.  It was actually the
22   other probation officers who was bringing it to me
23   who felt this way.  If you go over to the
24   department and speak to any probation officer over

Page 99

1    there, especially African-American, they will tell
2    you that they feel that there's some racial
3    discrimination taking place within the department.
4         So it's not me personally that felt a
5    certain way.  It was certain information.  I would
6    do my due diligence and request certain information
7    from the department, and I would just present the
8    evidence and information that was given to me.  All
9    of these historical records and collection of
10   discipline records primarily came from the
11   department.  The discipline records came from the
12   department.
13   Q.   Let me put it this way.  Are there any
14   other specific instances that you can think of
15   sitting here that you were directly involved with.
16   Not that happened to you, but that you were
17   involved in regarding instances of racial
18   discrimination that you have not talked about yet?
19   MR. GEOGHEGAN:  Just for purposes of
20   clarification, that led him in paragraph 22 to
21   start looking at this information?
22   MR. HAYES:  Yes.  Thank you.
23   MR. GEOGHEGAN:  Not necessarily --
24   MR. HAYES:  Right.  We are going to be getting

Page 100

1    into all kinds of other stuff.
2    MR. GEOGHEGAN:  Not that happened.
3    BY THE WITNESS:
4    A.   There was a record number of
5    investigatory hearings, like preinvestigatory
6    hearings, investigatory hearings, discipline
7    hearings, that each time I would be present, it
8    just happened to be an African-American probation
9    officer.  And even when the African-American
10   probationary officer would be pleading, saying,
11   This is not what it is, the department would still
12   impose the discipline on that probation officer
13   despite their plea of innocence.
14        It kind of reminded me, again, of our
15   criminal justice system, where a majority of
16   African-Americans just happened to be coming
17   through and they received harsher sentences than
18   any other race within the City of Chicago.  So it
19   seemed to me that it's kind of a microscopic
20   environment or replica of our criminal justice
21   system.  I mean, I'm sure you even saw now, even
22   with the bail reform that the chief judge
23   implemented, that he now is implementing all of
24   this reform saying that African-Americans were not

JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
101–104

Page 101

1  given a fair shake and their bail amount was
2  discriminatory.  So if he has the fortitude to
3  implement reform for a system, I would think that
4  he would have the fortitude to institute a system
5  that impacts his employees directly.
6        I mean, there's no set standards.  If
7  you look at the language that was imposed on a
8  white officer compared to a black probation
9  officer, they would use different terminology and
10  say that this probation officer falsified compared
11  to this white probation officer who had poor work
12  performance and just the disparity of length of the
13  suspension, if you look at the records, you can --
14  I mean, these are the department records.  These
15  are not my records.  Again, you can see how much a
16  white probation officer received compared to a
17  black probation officer.  There's a big gap between
18  a three-month suspension and receiving a ten-day or
19  a day and a half comparable to similar offenses.
20        Q.    And when you say -- you looked at their
21  records.  Is that what you were referring to
22  before, the big box and then?
23        A.    Yeah.
24        Q.    Is that yes?

Page 102

1        A.    Yes.  It's the actual document where the
2  department or Mike Rohan would say, I'm imposing
3  this discipline because of X, Y, and Z.  But then
4  if you look at the investigation that actually took
5  place, you would see that the department was saying
6  that this particular white probation officer lied
7  or your white and green time sheet cannot be
8  reconciled.
9        What that means is that probation
10  officers are required to complete what is called a
11  green itinerary.  It's what we are supposed to do
12  that day, and, typically, sometimes we deviate from
13  that green sheet because of our clients and their
14  needs and I actually have to go and see a different
15  client than my green sheet.
16        But in a particular instance of a white
17  probation officer case, what Mike Rohan wrote was
18  that this is not an operation, that this is not --
19  meaning that this is not your first time and that
20  your time cannot be accounted for.  Instead of
21  offering this white probation officer a last chance
22  agreement, a six-month or three-month suspension,
23  he said, I'm going to give you a day and a half
24  compared to a black probation officer.  And the

Page 103

1  cases are not -- they are not saying that the black
2  probation officers did not do anything wrong.  We
3  are saying that they admit that they may have done
4  something wrong, but we are just talking about the
5  disparity of the treatment that they received.
6        Q.    What I'm looking for -- I just want to
7  know what records you reviewed kind of generally,
8  where they are, so that I can hopefully get them
9  and review them because I have not seen these yet.
10  That is where I'm trying to go with these
11  questions.
12        A.    Okay.  So it's the discipline records,
13  it's the confidential transaction list that Rose
14  sent to me in 2013.
15        Q.    Is that the bid list?
16        A.    No. The bid list is --
17        Q.    We'll get into that.
18        A.    Rose Golden had told me that she kept a
19  database of all of the discipline, and my first
20  attempt to get ahold of these records to show the
21  makeup of what these officers was accused of, what
22  they received, on this particular list is marked
23  confidential, and Rose provided that to me.  That
24  is when I started.

Page 104

1        Q.    Okay.  And where is that list now, if
2  you know?
3        A.    I mean, I have a copy.
4        Q.    You have a copy?
5        A.    Yeah.
6        Q.    And you provided it to your lawyers; is
7  that right?
8        A.    Yes.
9        Q.    Okay.
10        A.    But also the quarterly transaction list
11  that the department is supposed to turn over to the
12  union regarding medical leave, suspensions,
13  retirement, things of that nature.
14        Q.    All right.  Well, hopefully that is a
15  good segue into paragraph 23 of the complaint, and
16  I will just read it, Accordingly, in 2012 Jason
17  Smith made his first request for juvenile probation
18  officer discipline records for the preceding five
19  years.  Do you see that?
20        A.    Uh-huh.
21        Q.    Is that what you are referring to right
22  now?
23        A.    Yes.
24        Q.    So who did you make this request to?



Page 105

1    A.   To Rose Golden and then --
2    Q.   Then let's --
3    A.   I'm sorry.
4    Q.   Again, you know who she is, I know who
5  she is, but just to make a clear record, what is
6  Rose Golden?
7    A.   At the time she was the human resources
8  director.
9    Q.   Her race?
10    A.   She's white.
11    Q.   And at one time was Ms. Golden the
12  acting director of JPD?
13    A.   She was.
14    Q.   But in 2012 when you made this request,
15  she was the human resources director?
16    A.   That's correct.
17    Q.   Is that a deputy level position, is that
18  right, if you know?
19    A.   I think any time you are promoted out of
20  the bargaining unit, I think it's all a deputy
21  level.  I mean, if you look at the chief judge's
22  budget, I think it's classified as a deputy unless
23  you get into the director, but it's all kind of
24  like the same thing to me.

Page 106

1    Q.   All right.  And if you look at the next
2  paragraph, 24, it says, On several occasions the
3  defendant employer refused to turn over the
4  records.  Do you see that?
5    A.   Yes.
6    Q.   So Ms. Golden did not turn over the
7  records at your first request; is that correct?
8    A.   That's correct.  She cited that
9  something was wrong with the database, that she
10  needed some time.  Another time she said it was
11  irrelevant.  What is the relevancy of this request?
12  Can you be more specific to your request?  And that
13  is when I actually made a request to the Office of
14  the Chief Judge to have them turn over the records.
15    Q.   And did you get the records eventually?
16    A.   Yes.
17    Q.   And you still have these records in your
18  possession; is that right?
19    A.   Yes.
20    Q.   Would the union have these records or
21  no?
22    A.   They should.
23    Q.   Okay.  Let's go to the next page, 7,
24  paragraph -- sorry.  Go ahead.

Page 107

1    A.   Were we done talking about all of the
2  other instances of racial discrimination?
3    Q.   I was moving on from it, but if you want
4  to mention some more, go ahead.
5    A.   Okay.
6    Q.   Just for timing here, I'm just trying to
7  move it on.  I only have so many hours with you, so
8  I'm trying to move on as fast as I can.  What I'm
9  trying to do, what I think is going to happen is,
10  I'm going to use the records to help kind of piece
11  together things.  But as much as I can get
12  testimony from you today, that is what I'm doing.
13       If there's a specific instance that you
14  want to mention, feel free.  I'm more than happy to
15  get it on the record.
16    A.   I mean, even with the supervisor exam.
17    Q.   Yeah, we'll come to that.  And, Tom, I'm
18  just -- it's just a better way.  I am not trying to
19  cut you off.  We'll get to it.  If I don't --
20    MR. GEOGHEGAN:  I think the confusion started
21  perhaps that you asked what led him to be
22  interested in this subject.
23    MR. HAYES:  Right.
24    MR. GEOGHEGAN:  It's now turning into a

Page 108

1  compilation of everything that --
2    MR. HAYES:  Yeah, I understand.  I probably
3  should have cut it off earlier because we are
4  getting too specific.
5  BY MR. HAYES:
6    Q.   Now I think that we are going to get
7  into some specific stuff.  So starting on paragraph
8  26 of the complaint here, we are going to start
9  getting into the data and things like that and kind
10  of the more specific allegations?
11    A.   Uh-huh.
12    Q.   Are you on paragraph 26, Mr. Smith?
13    A.   Uh-huh.
14    Q.   I'm just going to read the first part.
15  In an effort to substantiate the racially disparate
16  treatment of African-American probation officers,
17  Local 3477 began to compile data reflecting
18  categories of termination, suspensions, and written
19  or verbal reprimands among the population of
20  approximately 400 juvenile probation officers for
21  the years 2008 through 2013.  Do you see that?
22    A.   Yes.
23    Q.   Were you involved in that compilation of
24  the data?



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
109–112

Page 109

1    A.    Yes.
2    Q.    Is that what you have been previously
3  talking about with all of these documents and
4  records that you were reviewing at the time?
5    A.    Yes.
6    Q.    Okay.
7    A.    And just to be clear, it was not just
8  me.  It's not just me compiling the data.
9    Q.    Right.  And this was in 2012?
10   A.    Yes.
11   Q.    Who else compiled the data?
12   A.    A lot of the union stewards.  We began
13  to have steward meetings, talking about the data.
14  Some probation officers were skeptical and afraid
15  of me requesting discipline records.
16       In one particular instance, a steward
17  asked me that if I continued to request information
18  regarding the discipline, that a probation officer
19  is afraid that the statute of limitations had not
20  expired regarding what took place with her.
21   Q.    And who was that?
22   A.    It was Shawna Varnado.
23   Q.    To your knowledge, did anything -- did
24  she receive any discipline as a result of assisting

Page 110

1  in the compilation of this data?
2    A.    No.  A lot of the probation officers,
3  especially the stewards, uncovered that they was
4  going back and providing information to management.
5    Q.    Were there any non-African-Americans
6  assisting in this compilation of data?
7    A.    Yes.
8    Q.    And who was that, if you can remember?
9    A.    Ron Dusman, Christen Loeb.  I can't
10  think of the other.  I think she retired.
11   Q.    And were these white officers?
12   A.    Yes.
13   Q.    And your role in this compilation of
14  data, would you say that you were in charge of this
15  compilation of data?
16   A.    As a chief steward, yes.
17   Q.    Now, you threw a new term at me.  What
18  is a chief steward?
19   A.    So I wore many hats when I was the vice
20  president and president because what I noticed is
21  that -- and it's not -- the union is not part of
22  the lawsuit, but what I noticed was that a lot of
23  the things was taking place under the previous
24  president, Avik Das, when it came to discipline for

Page 111

1  African-American probation officers, and I was not
2  sure who was loyal to Mr. Das at that time.  So I
3  was the chief steward, vice president, president,
4  steward, and --
5    Q.    Okay.
6    A.    -- political action committee person.
7  So I was actually in charge of all of the stewards
8  within the local.
9    Q.    That is what the chief steward does?
10   A.    Yes.  And typically the vice president
11  is the chief steward.
12   Q.    Okay.  Do you recall when you were
13  compiling this data and looking at the documents,
14  was it in there how many -- strike that.
15       Was there anywhere in these documents
16  that broke down the race of each employee in the
17  department?
18   A.    No.
19   Q.    How were you determining the race of
20  these individuals, as you looked through these
21  documents?
22   A.    As we were looking through the
23  documents, we were -- so our department is
24  1100 South Hamilton.  We have outlying courthouses,

Page 112

1  Markham, Maywood, Rolling Meadows, Skokie.  If you
2  look at the makeup of these courthouses, Maywood is
3  particularly made up of African-Americans and
4  Latinos, Bridgeview, maybe a little more mixed, and
5  Markham is more African-Americans, but if you look
6  at Rolling Meadows and Skokie, they are actually,
7  the majority, white probation officers.
8       So you can actually call -- and because
9  I was familiar with a lot of the probation
10  officers, because a lot of the probation officers
11  at one point was in jeopardy of losing their jobs,
12  and I actually organized over 150 probation
13  officers to storm the Cook County board room and a
14  mix of probation officers actually attended this
15  rally, and so I got to know a lot of these
16  probation officers.
17       When I would hold my quarterly or
18  monthly meetings with the membership, a lot of the
19  probation officers would attend, over 175 probation
20  officers would come to these meetings to hear the
21  information.  So we was actually able to look at
22  the sign-in sheet, greet a lot of the probation
23  officers, and that is how we was able to make the
24  determination.



Page 113

1    We would talk to other probation
2  officers who was familiar with a particular
3  probation officer name, who actually knew that
4  probation officer and knew -- they would say, Yes,
5  that probation officer is either African-American
6  or white. So if you look at Kelly Flanagan, who
7  was in our department, everybody would assume that
8  she's white, but she's not, she's African-American.
9  So we just did not go by the name. We actually did
10  our due diligence to make sure that this particular
11  probation officer that they was referencing was
12  actually someone of a different race.
13    Q.   So in compiling this data, you are
14  confident sitting here today that you knew the
15  correct race of every probation officer?
16    A.   Yes.
17    Q.   Okay.
18    MR. GEOGHEGAN:  Off the record for a second.
19        (WHEREUPON, discussion was had off
20        the record and a recess was had.)
21  BY MR. HAYES:
22    Q.   Mr. Smith, before we broke for lunch, we
23  were talking about the complaint, if you could get
24  that back in front of you. That is Exhibit 3, and

Page 114

1  turn back to page 7. We were talking about
2  paragraph 26, but now I want to move on to the next
3  several paragraphs that we are going to talk about,
4  27 through 33, which run from page 7 to 10. Let's
5  start with paragraph 27.
6    A.   Okay.
7    Q.   It says, For the year 2008, there are a
8  total of 12 terminations and/or suspensions. Of
9  the 12, ten were African-American, one was
10  Caucasian, one was Latino, zero was other, and then
11  it gives percentages. And then it says, For the
12  year 2007, there was a total of one written or
13  verbal reprimand. The one was Latino. Do you see
14  that?
15    A.   Yes.
16    Q.   Now, this information that is contained
17  in paragraph 27, is this the data that was compiled
18  by the union that we talked about in paragraph 26?
19    A.   Yes.
20    Q.   Okay. So this is data that you helped
21  compile as a member of the union, right?
22    A.   It's data that was compiled from the
23  information that management provided.
24    Q.   Right. The records that we have talked

Page 115

1  about previously, right?
2    A.   Uh-huh, yes.
3    Q.   Okay. Did the union compile the data in
4  the form as it is in this complaint?
5    A.   I believe so. I believe so.
6    Q.   Okay. So you see in paragraph 27 here
7  it says that ten were African-American and then it
8  has 83 percent. Do you see that?
9    A.   Uh-huh.
10    Q.   And do you know what that percentage
11  is -- what that is a percentage of?
12    A.   I'm assuming it's the percentage of the
13  termination or suspensions.
14    Q.   For that year, right?
15    A.   I believe so.
16    Q.   Okay. Did the union put percentages on
17  this data when it was compiling it, if you know?
18    A.   I would have to see the documents to
19  give a more accurate response but --
20    Q.   Okay. Then also still on paragraph 27,
21  it said, 12 terminations and/or suspensions, so
22  these set of numbers include terminations and
23  suspensions; is that right? Is that your
24  understanding?

Page 116

1    A.   Yep.
2    Q.   Do you know if the union ever separated
3  out terminations from the suspensions?
4    A.   I believe they did.
5    Q.   Do you know if there would be any record
6  of that in the data that was compiled by the union?
7    A.   Again, there's a lot of documents, so I
8  would actually have to see the documents. But I do
9  recall having a conversation with Mike Willis about
10  the terminations and suspensions and kind of
11  breaking it down.
12    Q.   Breaking it down differently, as in
13  terminations versus suspensions?
14    A.   Yes.
15    Q.   If it was in the documents, would that
16  be in your possession?
17    A.   Yes.
18    Q.   If we go -- still paragraph 27 -- and we
19  are not going to go through every one. I just want
20  to kind of get a general review of it.
21    It says at the last sentence of 27, For
22  the year 2008, there was a total of one written or
23  verbal reprimand and one was Latino. Do you see
24  that?



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
117–120

Page 117

1    A.    Yes.

2    Q.    And what is the difference between a
3  written and a verbal reprimand?

4    A.    A verbal reprimand per the collective
5  bargaining agreement stays in your file for 12
6  months.  Whereas, a written reprimand stays in your
7  file for 18 months, so it's still documented, in a
8  sense, but I guess procedurally-wise, I guess --
9  and I can only assume the department wanted to
10  document that this probation officer received a
11  verbal reprimand.

12    Q.    And then after that, the prescribed time
13  period, that is removed from the personnel file of
14  the employee?

15    A.    Yes.

16    Q.    Does the employee have to ask for it or
17  is it automatic?

18    A.    It's supposed to be automatic.  Yeah,
19  it's supposed to be automatic, but if the probation
20  officers are not reviewing their personnel file,
21  then I'm assuming that it would still be in their
22  personnel file.  There is no notification that the
23  department sent saying, This verbal or written
24  reprimand is removed from your personnel file, not

Page 118

1  that I seen through my tenure.

2    Q.    Okay.  As a result of having either one
3  of these reprimands in your personnel file, does
4  anything bad happen to the employee?

5    A.    Yes.

6    Q.    What?

7    A.    For me, it's all about character.  I
8  mean, if a person is reviewing your personnel file,
9  especially from an outside entity, they will see
10  that you have been disciplined before, similar to
11  this document.  I'm assuming that came from my
12  personnel file.

13    Q.    Can you refer to -- just say what
14  exhibit number that is, for the record.

15    A.    Exhibit 1.

16    Q.    Okay.

17    A.    Similar to this document, I'm assuming
18  it came from my personnel file.  The collective
19  bargaining agreement says that any temporary
20  suspension that didn't result in a conviction is
21  supposed to be removed from my personnel file,
22  which is not -- the reason why it is not a
23  discipline, but apparently this is in my personnel
24  file.

Page 119

1    Q.    You said outside entity reviewing your
2  personnel file.  What outside entity would review
3  personnel files?

4    A.    Any company that you may be applying
5  for, they may request certain information regarding
6  that probation officer.  If you are applying for a
7  secondary employment, you know, anything, you know,
8  of that nature.

9    Q.    Okay.  Does -- generally speaking, if
10  you know, does an employee of JPD lose any pay or
11  benefits as a result of having a written or verbal
12  reprimand in their file?

13    A.    No.

14    Q.    Is there anything in the CBA that if you
15  have so many, then maybe a suspension happens or
16  anything like that?

17    A.    No.  There is no set standards in the
18  department.

19    Q.    So someone could rack up a dozen of
20  these in their file and the only result would be
21  that you have a dozen of these in your file; is
22  that right?

23    A.    Basically, yes, in a sense there's a
24  dozen, but, again, it comes to your character.  I

Page 120

1  mean, I would think that if someone has been
2  written up so many times, if you are challenging
3  these written reprimands, it gets -- it becomes a
4  little bit -- I mean, I understand where you are
5  coming from, but from a person who takes pride in
6  the job that they do or that I do, racking up so
7  many written reprimands, especially if you feel
8  like you have not done anything wrong or they are
9  justifying it by just the slightest imposition of
10  some type of violation of department policy, I
11  mean, it can damage a person's morale, you know,
12  make them not want to come to work, feeling
13  depressed, so on and so forth.

14        So when you are looking at it from a
15  monetary perspective, I'm looking at it as a more
16  general perspective of that probation officer, how
17  they feel about their work.

18    Q.    Do you know if -- again, if you know.
19  If having a verbal or written reprimand in your
20  personnel file would cause an employee to not get a
21  transfer?

22    A.    I would have to review the CBA, but I
23  think it's only suspensions that prevent --

24    Q.    Well, are you aware of any instance



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
121–124

Page 121

1 where someone did not get a transfer because they
2 had a verbal or written reprimand in their file?
3    A.  Not that I'm aware of.
4    Q.  Okay.
5    A.  Well, let me take that back. It could
6 impact your merit pay, so it could prevent you from
7 getting merit pay at the end of the year.
8    Q.  And how would it do that?
9    A.  I mean, if you are getting a written
10 reprimand, one would say that you have been
11 disciplined, so how can you actually exceed on your
12 performance evaluation if you have been
13 disciplined. It's still up to that particular
14 supervisor, but, I mean, I would think that that would
15 call into question the integrity of the performance
16 evaluation.
17    Q.  Yeah, but that was general. Were you
18 aware of any specific instances where that
19 happened?
20    A.  I can't recall at this time.
21    Q.  Okay. I'm not going to go through all
22 of the other ones all of the way through paragraph
23 33, but if you could look at it and just confirm
24 that the union did compile data that you see here.

Page 122

1    A.  I mean, it looks correct.
2    Q.  And I understand that you don't -- I
3 understand. Does anything look off to you?
4    A.  No.
5    Q.  Okay.
6    A.  I mean, without having my document in
7 front of me.
8    Q.  That's fine.
9    A.  But it looks accurate.
10    Q.  I understand. So we talked about
11 reprimands, and termination is self-explanatory.
12       A suspension is defined as a discipline
13 in the CBA, right?
14    A.  I'm sorry. Say it again.
15    Q.  A suspension is defined as a discipline
16 in the CBA; is that right?
17    A.  Verbal, written, yes, and termination.
18    Q.  And a suspension?
19    A.  Yes.
20    Q.  Are suspensions that are considered
21 discipline, are they always without pay?
22    A.  Yes.
23    Q.  And does the CBA have kind of a set
24 step, like one, three-day, or is it up to

Page 123

1 management to decide the days?
2    A.  There's no set standards.
3    Q.  Okay. So there's no, like, progressive
4 discipline laid out in the CBA?
5    A.  Supposed to be. It's supposed to be a
6 verbal, written, suspension, and then possibly
7 termination.
8    Q.  And the CBA lays that out, or is that --
9    A.  Is how it's laid out in the CBA.
10    Q.  Okay. On page 10 there, paragraph 34 --
11    A.  Okay.
12    Q.  -- it says, Union Local 3477 also
13 performed an analysis of the labeling utilized by
14 the defendants to describe the misconduct allegedly
15 committed by juvenile probation officers during the
16 period 2008 through 2013. Do you see that?
17    A.  Uh-huh.
18    Q.  And was that done as part of the same
19 compilation of data that we talked about in
20 paragraph 26 by the union?
21    A.  Yes.
22    Q.  And this analysis was done by reviewing
23 all of the discipline and other records that you
24 had received?

Page 124

1    A.  It was done off of the records that
2 was -- that the union had available at that time.
3    Q.  You talked about this before, but you
4 know what it's referring to when it says, The
5 labeling utilized by defendants? You know what
6 this is referring to?
7    A.  Yes, because they have a -- the
8 department has a label of what the actual offense
9 was or the supposed actual offense.
10    Q.  Is that like a list somewhere?
11    A.  Again, yes, there's a list.
12    Q.  And is this laid out in the CBA or no?
13    A.  It's not laid out in the CBA. It's what
14 Rose Golden provided to the union.
15    Q.  All right.
16    A.  But maybe I'm not understanding your
17 question correctly. You said something about the
18 CBA.
19    Q.  Yeah. Does the CBA have a list of these
20 are --
21    A.  Punishable offenses?
22    Q.  Yeah.
23    A.  No. Again, there's no set standards.
24    Q.  Thanks. You asked the question better



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
125–128

Page 125

1  than I did.
2       The next paragraph, 35, says, The
3  analysis revealed that the defendant employer was
4  using its records, a descriptive label to describe
5  the character of misconduct for a
6  non-African-American probation officer that was
7  less aggravating but would use a different, more
8  aggravating label for an African-American probation
9  officer who was accused of committing a similar
10  type of misconduct.  Do you see that?
11      A.   Yes.
12      Q.   And, again, you were involved in this
13  analysis, right?
14      A.   Yes.
15      Q.   Can you give me an example of where the
16  defendant used a more aggravating label for
17  an African-American officer than for a
18  non-African-American officer?
19      A.   Yeah, Joi Basley.
20      Q.   What happened there?
21      A.   Joi Basley initially was suspended for
22  three months for falsification, under whatever
23  duress or maybe even committing the offense of
24  falsification, which she probably did.  I am not

Page 126

1  questioning that.
2       She was suspended for three months.  She
3  then returned to work, and the department had given
4  her a last chance agreement, meaning that anything
5  that you did, if you spit wrong in the department
6  bathroom, you could possibly be terminated.
7       So what happened, Joi Basley came back
8  to work.  She was under a corrective action plan,
9  and, again, probation officers are required to have
10  like a green sheet, meaning what you intend to do,
11  and a white sheet, meaning what you actually did on
12  that day.  So she put down on her green sheet --
13  and I was directly involved in this.
14      Q.   Which would be my next question.
15      A.   Yeah, I was directly involved.  She put
16  on her green sheet that she saw such-and-such
17  client.  She actually didn't, but she transferred
18  from her green sheet onto her white sheet that she
19  did, which I made that mistake because in my head,
20  you know, I have investigations, I have so many
21  things going on, I'm actually thinking, Well, I
22  possibly could have saw that kid.
23       Now, if your supervisor checks your
24  work, he'll say, Is your white sheet correct?  And

Page 127

1  he'll come back and give me an opportunity to
2  correct my mistake, and I would actually resubmit
3  an amended white sheet and say, No, I did not see
4  that kid, it's impossible because I was in the
5  office all day.  That is the point of
6  investigation.
7       Well, in this instance, Joi Basley did
8  exactly the same thing, and her supervisor in an
9  e-mail to me actually admitted that he recognized
10  that it was a mistake.  So he did not want to go to
11  discipline, but apparently Mike Rohan got wind of
12  what happened because I guess the supervisor had to
13  give a report about Joi Basley's progression, and
14  he said that was falsification and her employment
15  was terminated.
16       Whereas, you had Kevin Gavin --
17      Q.   Wait.  So she was terminated or just
18  suspended?
19      A.   She was initially suspended for three
20  months for falsification, and then the second time
21  around, her employment was terminated based off
22  that one mistake because it was a last chance
23  agreement.
24      Q.   Okay.  Did she do something wrong the

Page 128

1  second time?
2      A.   No.  She made a mistake.  She actually
3  transferred the green sheet over to a white sheet
4  mistake.
5      Q.   And you are the union steward; is that
6  right, or whatever, union representative; is that
7  right?
8      A.   Yes, yes.  But you asked for a
9  comparable.
10      Q.   Yeah.  I was going to follow up.  How is
11  that more aggravating compared to similar conduct
12  of a non-African-American employee?
13      A.   So here you have Kevin Gavin, who
14  apparently did exactly the same thing.  If you look
15  at the record for Kevin Gavin, he initially got a
16  written reprimand for something similar to Joi
17  Basley, but it was a written reprimand.
18       In that document, the second time
19  around, Mike Rohan says that, This is not
20  aberration, that this is something that has
21  happened before, and your white sheet and green
22  sheet cannot be reconciled.  Meaning that he's not
23  using the word "falsification," but he's
24  questioning the integrity of your white sheet and



Page 129

1   your green sheet, meaning that you did not do
2   something right and your time is not accountable.
3         To not have any set standards in the
4   department, how can you then make a determination
5   that that is not falsification for a white
6   probation officer, but for a black probation
7   officer, who the second time around admits to a
8   mistake, you terminate her employment by
9   classifying it as falsification.  But Kevin Gavin
10  was given just a day and a half suspension.
11  Q.   Okay.
12  A.   For his second offense.
13  Q.   So he got the same thing.  Did he get a
14  last chance agreement?
15  A.   No.
16  Q.   Okay.
17  A.   If you look at -- and hopefully you'll
18  get all of the documents.
19  Q.   Oh, I hope so too.
20  A.   You'll see the list, and on this list
21  you'll see that no white probation officer was ever
22  given a last chance agreement, no white probation
23  officer.
24  Q.   So there's a list that lists everyone

Page 130

1   that got last chance agreements?
2   A.   This came from the department.
3   Q.   And they provided it to the union?
4   A.   Yes.
5   Q.   Do you know if Kevin Gavin and Joi
6   Basley had the same supervisor?
7   A.   Not that I'm aware of.  He was not in
8   the same unit.
9   Q.   Was it around the same time?
10  A.   His was a little bit before Joi Basley.
11  Q.   What year -- I think we are getting --
12  A.   I think Joi Basley was terminated in
13  2014, if I'm not mistaken.
14  Q.   I lost the question, but it came back.
15  Were you involved as a union rep in Kevin Gavin's
16  grievance?
17  A.   No.  It was not a grievance.
18  Q.   So it was just a discipline?
19  A.   So what normally happens, the department
20  has a tendency to cut off things before it kind of
21  manifests itself, so a report is sent to Mike Rohan
22  and it's supposed to be that the deputies have the
23  authority to suspend a probation officer for three
24  days.  Anything above the three days is supposed to

Page 131

1   go to the director.
2         In this instance, Mike Rohan received a
3   report, and rather than Kevin Gavin challenging any
4   type of predisciplinary hearing, he just took the
5   day and a half and that is it.  Whereas, with
6   African-American probation officers, they usually
7   fight their discipline, and that is the reason why
8   oftentimes, and not in this -- well, let me
9   rephrase that.
10        Joi Basley did not fight her three-month
11  suspension.  She actually accepted it under duress,
12  so did Anthony Jordan.  But normally they cut it
13  off before it gets to a certain point, that they
14  just impose the discipline, and typically the white
15  probation officers, they don't file grievances.
16  And you'll see that on the list.
17  Q.   All right.  Back to 35.  Can you think
18  of any other specific examples where the labels
19  were different for African-Americans and
20  non-African-Americans?
21  A.   Judy Prophete.
22  Q.   Okay.  Are you directly involved in that
23  one?
24  A.   No.

Page 132

1   Q.   That would have been through a review of
2   the documents?
3   A.   Yes.
4   Q.   Could you just give me a kind of brief
5   overview of what the documents showed about her?
6   A.   The documents would show that she lied
7   about making certain home visits.  The document
8   would show that --
9   Q.   Sorry.  I forgot.  She's white?  Is she
10  white?
11  A.   Yeah, she's white.
12  Q.   Sorry.  Go ahead.
13  A.   The document would show that the
14  department actually thought that and believed that
15  she falsified.  There were conversations that was
16  taking place saying that this was not
17  falsification.  However, the department only
18  suspended her for seven days and never gave her a
19  last chance agreement, but it's the write-up for
20  the predisciplinary hearing and the investigatory
21  hearing.
22        But it will show that over an extended
23  period of time, she was not in compliance with the
24  department policies.



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
133–136

Page 133

1    Q.   Any other ones about the labeling that
2  you can think of as you sit here, specific
3  examples?
4    A.   Well, if you look at -- I'm never trying
5  to be rude or anything, so if it comes across that
6  way, please don't take it that way.
7    Q.   That's okay.
8    A.   If you look at the information in the
9  lawsuit, there was rarely any whites that was
10  really disciplined.  Even Mike Willis, to the
11  Illinois Human Rights Commission said that whites
12  are rarely disciplined within the department.
13      So if you can see from the data, there
14  was not a lot of whites that was being disciplined,
15  just the information that we received per the
16  union, we was able to compile these records and
17  these documents and see that certain terminologies
18  was being used to justify just a day and a half
19  suspension for these particular officers.
20    Q.   So there weren't -- I'm just trying to
21  get which notes.  You can't think of any -- or can
22  you, any other specific examples of labeling
23  disparities as you sit here?
24    A.   Well, they started to use whites as

Page 134

1  scapegoats, if that is what you are talking about.
2  They used Ed Walsh as a scapegoat to try to cover
3  up what they was trying to do as far as
4  disciplining more whites, after I started filing
5  complaints and grievances over racial
6  discrimination.
7      William Patterson said in the chief
8  judge's office, in front of Keith Sevcik, that if
9  the union wasn't complaining about discrimination,
10  you wouldn't be here.  That is verbatim.
11    Q.   You are making me jump around now.
12    A.   I'm sorry.
13    Q.   No, don't be sorry.  It's fine.
14      If you could look at page 11,
15  paragraph 38, I think that is exactly what you are
16  talking about.  Recently, the defendant, chief
17  judge, has permitted or acquiesced to actions of
18  the Cook County Department of Juvenile Probation,
19  making bad faith claims of misconduct by white or
20  non-African-American probation officers so as to
21  portray past and current disciplinary acts as
22  evenhanded for all probation officers regardless of
23  race.  Do you see that?
24    A.   Yes.

Page 135

1    Q.   Is that what you were just referring to?
2    A.   Yes.
3    Q.   Do you have any specific personal
4  knowledge of any of these bad faith claims?
5    A.   Yes.
6    Q.   Could you give me a name?
7    A.   Dan Walsh.
8    Q.   Dan Walsh who you just talked about,
9  right?
10    A.   Yes.
11    Q.   Were you the union representative on
12  that?
13    A.   Yes.
14    Q.   Sorry.  Could you again briefly describe
15  what specifically happened to Mr. Walsh?
16    A.   Ed Walsh was cited for insubordination.
17  There was an instance where the department had
18  begun to tell probation officers not to go in court
19  and advocate for certain juveniles to be held in
20  custody, despite them having serious offenses.  And
21  Ed Walsh had told his supervisor that he had to
22  give the judge all of the required information.
23      He then submitted a report to the judge
24  and to the attorney, I believe, and I can't recall

Page 136

1  verbatim the case, but he submitted a report, and
2  he then went back and took out the report out of
3  the folder on the file of the client.  And he
4  supposedly had a conversation with his supervisor
5  about it, and they said that it was insubordination
6  because he did not follow the directive of his
7  immediate supervisor, but we did not see any type
8  of insubordination.
9      And for William Patterson to actually
10  state that if it was not for the union complaining
11  about racial discrimination, it verified my belief
12  that the only reason why he was here was because of
13  them trying to cover up what had actually taken
14  place in juvenile probation because why would he
15  make that statement.
16    Q.   Did you hear Mr. Patterson make that
17  statement?
18    A.   Yes, and Ed Walsh and another union
19  steward who was present as well and Keith Sevcik.
20    Q.   This was -- was this during one of the
21  grievance step hearings?
22    A.   Yes.
23    Q.   And do you remember which step it was?
24    A.   It was Step 4 at the Office of the Chief



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
137–140

Page 137

1 Judge.
2   Q.   Okay.
3   A.   Now, Ed Walsh had never been disciplined
4 before, never received a verbal, written, and they
5 jumped immediately to suspension, and he has over
6 20 years of service in the department.
7   Q.   So it's your belief that Mr. Walsh was
8 disciplined to cover up the discipline of
9 African-Americans; is that right?
10   A.   Initially, I did not believe that.  When
11 we was going through the first, second, and third
12 steps, we was just going through the process, but
13 when William Patterson actually said what he
14 actually said to Ed Walsh, I told Keith Sevcik,
15 It's supposed to be just cause, not just because of
16 his color.
17   Q.   Now, I know that you were there.  To the
18 best of your recollection, can you give me a quote
19 of what Mr. Patterson said?
20   A.   He said if it wasn't for the union,
21 which --
22   Q.   I don't want you to speculate, just
23 exactly what he said.
24   A.   He said if it was not for the union

Page 138

1 complaining about racial discrimination, you would
2 not be here.
3   Q.   And Mr. Patterson's position is what?
4   A.   Human resource director.
5   Q.   Okay.  Of the juvenile probation
6 department?
7   A.   Yes.
8   Q.   And Mr. Patterson's race?
9   A.   He's African-American.
10   Q.   Outside of Mr. Walsh, do you have any
11 other specific examples of bad faith, claims of
12 misconduct against white or non-African-American
13 probation officers?
14   A.   I believe -- and I did not see the case
15 through because I wasn't involved in the union
16 anymore, so I want to give you another case but I
17 don't --
18   Q.   If you would give me a name, that would
19 be helpful?
20   A.   Tina Guarnuer.
21   Q.   Tina?
22   A.   Yeah.
23   Q.   And how do you spell her last name?
24   A.   G-u-a-r-n-u-e-r.

Page 139

1   Q.   But you weren't involved in that one,
2 correct?
3   A.   At the beginning and then I kind of
4 veered off of the case.
5   Q.   Are there any other ones, bad faith
6 claims of misconduct, against white or
7 non-African-American probation officers, that you
8 were involved in?
9   A.   Nancy Friedman.
10   Q.   Tell me about that one.
11   A.   She's deceased.  She was a --
12   Q.   What is her race before we start?
13   A.   She's white.  She was given a written
14 reprimand for being late to a training that she had
15 to come from Skokie into the city to attend, and
16 she was late for a training.  During the hearings,
17 Nancy Friedman explained to them the reason why she
18 was late, and the department basically said, We
19 don't want to hear it, we just want to give you a
20 written reprimand.  There was really no
21 justification for them actually giving a written
22 reprimand, in my opinion, because she was stuck in
23 traffic.  Now, if she intentionally was late or
24 somehow just was playing out on the street, but

Page 140

1 this was a 70-year-old woman who was late for a
2 training, that had been there for over 50 years, I
3 believe -- no.  She had been there for -- let's
4 see.  Nancy Friedman, I believe, was there for 38
5 years before she decided to retire.
6   Q.   Any other ones that you were involved in
7 personally?
8   A.   Not that I can remember offhand right
9 now, but, again, there was not a lot of white
10 probation officers being disciplined during that
11 time.
12   Q.   Let's see.  Still on page 11.  The next
13 one is 39.  That is Ed Walsh.  We already talked
14 about him, right?
15   A.   Yes.
16   Q.   The next one is No. 32.  It must have
17 got misnumbered.  It says, Previously actions by
18 white officers did not receive the same discipline
19 or scrutiny as actions by their African-American
20 peers.  Do you see that?
21   A.   Yes.
22   Q.   Okay.  And then it talks about four
23 white female probation officers who were
24 romantically and sexually involved with clients,



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
141—144

Page 141

1    and none were terminated or prosecuted.  Let's
2    start with that one.
3         A.   Okay.
4         Q.   Did you have any personal involvement in
5    any of those, I guess, issues?
6         A.   No.
7         Q.   Okay.  Did you review documents that
8    talked about this?
9         A.   No.
10        Q.   In the last sentence here and still in
11   the paragraph 32, asterisk, I'll call it, In
12   another case, a white probation officer was using
13   county funds to purchase purses, but she was not
14   terminated.  Do you see that?
15        A.   Yes.
16        Q.   Were you involved in that?
17        A.   No.
18        Q.   Did you ever recall reviewing documents
19   about that case?
20        A.   No.  She was not in the bargaining unit.
21        Q.   Okay.  But you know who it is referring
22   to?
23        A.   I don't deal in speculations, so
24   anything that is factual, I provide.  But of course

Page 142

1    rumors are rampant throughout the department, and
2    apparently people have access to information that
3    other people are not privy to have.  But I have
4    heard about the probation officer who used county
5    funds to purchase purses, and she actually -- and
6    it might be another reason why she was demoted.
7         Q.   Can you give me her name?
8         A.   Again, I don't deal in speculations.
9         Q.   I know, but you obviously know who it is
10   talking about, and I just need it so I can review
11   it and look it up.
12        A.   I don't deal in speculations.
13        Q.   I would really --
14        A.   You have to talk to your --
15        MR. GEOGHEGAN:  We'll take that under
16   advisement.
17        MR. HAYES:  Okay.  Thanks.
18   BY MR. HAYES:
19        Q.   Let's move on to paragraph 40 here, and
20   I'll read this one.  In 2014, with the aid of the
21   compiled records, Jason Smith sent a letter to the
22   Civil Rights Division, Employment Litigation
23   Section, Department of Justice, requesting the
24   initiation of an investigation in the racial

Page 143

1    discrimination within the Cook County Juvenile
2    Probation Department.  A copy of the letter was
3    sent to defendant, chief judge.  Do you see that?
4         A.   Yes.
5         Q.   And did you send a letter to the
6    Department of Justice?
7         A.   Yes.
8             (WHEREUPON, a certain document was
-10:-22:-47    marked Smith Deposition Exhibit
10            No. 4, for identification.)
11   BY MR. HAYES:
12        Q.   Okay.  Mr. Smith, you have been handed
13   Exhibit 4.  I know it's going to get slightly
14   confusing.  It's Bates labelled -- the first page
15   is Jordan 82, and then it goes 81, then it drops to
16   77, 78, 79, 80, 83.  Is that what you have?
17        A.   Yes.
18        Q.   Okay.  Now, I can tell you what I did
19   was, I tried to put it in what I thought was the
20   order it was probably sent, but we can talk about
21   that.  That is why the Bates labels are a little
22   off.
23        A.   Okay.
24        Q.   Is this the letter that you sent to the

Page 144

1    Department of Justice?
2         A.   Pages 1 and 2.
3         Q.   So --
4         A.   Well, no, because it does not have my
5    signature at the bottom.
6         Q.   Right.  If you look at 83, which is the
7    last page --
8         A.   Uh-huh.
9         Q.   -- does that go with this letter or is
10   this different?
11        A.   83 and 82 go together.
12        Q.   Okay.  What does 77, 78, 79, and 80 go
13   with, if you know?
14        A.   It's a report that I gave to the Office
15   of the Chief Judge and Cook County juvenile
16   probation, that I used during the grievance
17   process.
18        Q.   Okay.  So this is more than the letter
19   that you sent to the Department of Justice; is that
20   right?
21        A.   Yes.
22        Q.   Again, apologies.  I was trying to piece
23   it together.  If you recall, how long was the
24   letter that you sent to the Department of Justice?



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
145—148

Page 145

1    A.    Two pages.
2    Q.    Okay.  Do you think there's some missing
3  on 80 and 81 -- or, sorry, 82 and 81, or is it just
4  your signature there?
5    MR. GEOGHEGAN:  Off the record.
6        (WHEREUPON, discussion was had off
7        the record.)
8  BY MR. HAYES:
9    Q.    Let's try to get this cleaned up as best
10  as we can.  We talked about it off the record a
11  little bit.  It appears that Jordan deposition --
12  sorry -- Jordan Bates No. 82, 81, and 83 in that
13  order is at least some version of the letter that
14  you sent to the Department of Justice; is that
15  right?
16    A.    Yes.
17    Q.    Okay.  And at this point we are just
18  kind of going to ignore 77, 78, 79, and 80.  You
19  believe that is something different, right?
20    A.    I know it's something different.
21    Q.    Okay.  So those four pages that were
22  just 77, 78, 79, and 80, that was not sent to the
23  Department of Justice?
24    A.    No.  No.

Page 146

1    Q.    All right.  Let me ask this, do you have
2  in your possession a final version of the letter
3  that you sent to the Department of Justice?
4    A.    Yes.
5    Q.    And does the first page here, the date
6  says, May 14, 2014.  Does that sound like the right
7  date that you sent it to them?
8    A.    Yes.
9    Q.    Did you have any assistance in drafting
10  this letter?
11    A.    Yes.
12    Q.    Who helped you with that?
13    A.    Just the union.  Just people from the
14  union.
15    Q.    Do you have any specific names?
16    A.    Let's see.  There's so many.  There was
17  many people that was involved.  I believe I talked
18  to Mike Willis about it.
19    Q.    Any of the plaintiffs, to make it easier
20  to help you with this?
21    A.    No.
22    Q.    Okay.  And going back to the complaint,
23  paragraph 40, the last sentence says, A copy of the
24  letter was sent to defendant chief judge.  So you

Page 147

1  sent the chief judge a copy of this letter?
2    A.    I did.
3    Q.    How did you send it to him?
4    A.    Certified mail.
5    Q.    Okay.  Let's focus on the DOJ.  Did you
6  ever receive a response from the Department of
7  Justice to your letter?
8    A.    No.
9    Q.    Did you ever receive a response from the
10  Office of the Chief Judge to your letter?
11    A.    No.
12    Q.    Did anyone from the Office of the Chief
13  Judge ever talk to you about your letter --
14    A.    No.
15    Q.    -- to the Department of Justice,
16  Exhibit 4?
17    A.    Not that I can recall.
18    Q.    Did anyone --
19    A.    But I did have a phone conversation with
20  someone from the Department of Justice.
21    Q.    Okay.  Did I not ask that?  So tell me
22  about your phone call.  Was it after you sent the
23  letter?
24    A.    I believe so.

Page 148

1    Q.    And someone from the Department of
2  Justice called you, or did you call them?
3    A.    I called them.
4    Q.    Okay.  And you think it was after you
5  sent the letter?
6    A.    I'm sure it was because I was doing
7  follow-up.
8    Q.    Do you know approximately how long after
9  it was that you sent the letter?
10    A.    Maybe -- maybe about a month.
11    Q.    Okay.
12    A.    A month or so.
13    Q.    Do you recall who you spoke to at the
14  Department of Justice?
15    A.    I don't.  I don't have my notes with me.
16    Q.    That's all right.  Just sitting here, do
17  you know what that person said to you?
18    A.    I can recall them telling me that we did
19  not have to go through the EEOC, that we can submit
20  information to the Department of Justice and civil
21  rights, that is what they told me, and then I asked
22  them about if they had an idea of when they would
23  respond back to the letter, and the gentleman told
24  me that he did not, that he had no information if



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
149–152

Page 149

1 they even received the letter.

2 Q. Okay. Did you then send any more

3 information to the Department of Justice?

4 A. Not that I can recall, but I do remember

5 sending certified letters out.

6 Q. You mean your original letter was

7 certified, is that what you are referring to or

8 extra letters?

9 A. No, not my original letter. No,

10 priority mail.

11 Q. You said that you -- sorry. I'm trying

12 to clear this up. You said that you sent certified

13 letters, right?

14 A. Yeah, to make sure that they got to

15 their destination.

16 Q. Right. Are you referring to this

17 original letter that you sent?

18 A. Yeah.

19 Q. So you didn't send another letter, that

20 is what I'm trying to get at?

21 A. I think I did try to -- I don't know if

22 I did not follow up. I made a phone call, and then

23 I -- some investigator from the EEOC was talking to

24 me. She was conducting an investigation. So I

Page 150

1 think once the EEOC got involved, I'm not sure if I

2 followed up with another letter or not. I would

3 have to look at my records.

4 Q. Okay. Now we are going to go down

5 another path. The EEOC investigator -- well, let's

6 tie this one off first. Outside the phone call

7 that you made to the Department of Justice, was

8 there any other more contact with the Department of

9 Justice regarding your May 2014 letter?

10 A. No.

11 Q. Now let's go to the EEOC investigator

12 that you just mentioned. Was that in relation to a

13 charge of discrimination that you personally filed

14 or a different charge?

15 A. The local filed.

16 Q. So when did the local file a charge of

17 discrimination?

18 A. I believe it was maybe 2014.

19 Q. And what happened with that charge?

20 A. Certain people in the union became

21 upset. I believe that the EEOC did not come to a

22 conclusion, so I guess we kind of let it kind of

23 fall to the wayside.

24 Q. And do you recall what that charge

Page 151

1 alleged?

2 A. The same thing that is in this report.

3 Q. Sorry. In the letter that you sent to

4 the DOJ?

5 A. Uh-huh, regarding fair discipline when

6 it comes to African-Americans, different working

7 conditions, things like that.

8 Q. To your knowledge, did the EEOC conduct

9 an investigation based on that charge the local

10 filed?

11 A. Yes.

12 Q. Okay.

13 A. As far as I know.

14 Q. What is your basis of that knowledge?

15 You just said as far as you know, so I'm trying to

16 figure it out?

17 A. I was directed by the president of the

18 local at that time, Mike Willis, to file a

19 complaint for racial discrimination.

20 Q. Right. So what I'm talking about, did

21 the EEOC then investigate that complaint? Well,

22 let's -- I can ask it better.

23 So the EEOC investigator called you

24 regarding this charge; is that right?

Page 152

1 A. Yes.

2 Q. Outside of that call, did you

3 participate in anything else with the EEOC

4 investigation -- sorry -- just with the EEOC

5 regarding this charge?

6 A. No.

7 Q. Okay.

8 A. I'm sorry. Let me make sure that I'm

9 answering correctly. Are you asking me if I was

10 involved in other complaints of discrimination? Is

11 that your question?

12 Q. No, that was not my question. I just

13 wanted to know outside of that call by the

14 investigator, if you were involved personally in

15 anything else that the EEOC did regarding your

16 charge filed by the local?

17 A. She asked for information.

18 Q. Did you provide that information?

19 A. I believe I did.

20 Q. Are you personally aware of the outcome

21 of that charge of discrimination filed by the

22 local?

23 A. No. I'm not sure.

24 Q. Okay. The complaint, back to Exhibit 3



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
153–156

Page 153

1  there, back where we were, page 11, paragraph 41.
2  The union has also directly notified defendant
3  chief judge of several examples of the disparate
4  treatment of African-American juvenile probation
5  officers by subordinates in the Cook County
6  juvenile probation department.  Do you see that?
7     A.   Uh-huh.
8     Q.   And I believe we have already talked
9  about that today, but I just want to know, were
10 there any other instances where you notified the
11 defendant about disparate treatment of
12 African-American probation officers that we have
13 not talked about previously?
14    A.   I think I began to cc the chief judge on
15 grievances because his human resource director,
16 Laura Kelly, sent me an e-mail asking me why I was
17 involving the chief judge or cc'ing the chief
18 judge.
19    Q.   You mean cc'ing the chief judge on
20 e-mails?
21    A.   Yes.
22    Q.   Okay.  Do you have any of these e-mails
23 where you cc'ed him?
24    A.   Yes.

Page 154

1     Q.   Okay.  If you would turn to page 12.
2  Paragraph 46 says, These acts have resulted in
3  disparate treatment of juvenile probation officers
4  on the basis of their race, including, and then
5  over the next few pages it lists several
6  individuals.
7        So I want to go through these,
8  Mr. Smith, as fast as we can and just find out what
9  your personal knowledge is of each of these
10 individuals.  We already talked about Emily Pierce,
11 right?
12    A.   Yes.
13    Q.   Christen Loeb, we already talked about
14 her, right, didn't we?
15    A.   A little bit.  We did not talk about the
16 e-mail that Alicia Ortiz sent me regarding her
17 conversation that she had with Virginia Caulfield
18 that actually states that Christen --
19    Q.   Go ahead.
20    A.   -- that Christen Loeb would never be
21 disciplined.
22    Q.   You mentioned several people in there.
23 Alicia Ortiz?
24    A.   Yes.

Page 155

1     Q.   Who is she?
2     A.   She's a supervisor and probation
3  officer.
4     Q.   Race?
5     A.   She's Latina.
6     Q.   I believe you mentioned Virginia
7  Caulfield.
8     A.   She's white.  She's the deputy chief
9  probation officer.
10    Q.   Okay.  So my question here on this one,
11 which is B, on page 12 and 13, did you hear
12 Ms. Caulfield say that?
13    A.   No.
14    Q.   But Ms. Ortiz told you that she said
15 that?
16    A.   She sent it to me in an e-mail.
17    Q.   And do you still have that e-mail?
18    A.   Yes, and she cc'ed Mike Rohan, Rose
19 Golden, Charles -- I think it was Charles Young as
20 well, but I do have that e-mail.
21    Q.   Did you ever ask Ms. Caulfield why she
22 said she would never discipline Ms. Loeb?
23    A.   No.
24    Q.   Okay.  C on page 13 is Lauren Brown.

Page 156

1  I'm going to paraphrase these and always feel free
2  to correct me.  It says that she got a three-month
3  suspension for not placing notes into a computer
4  system; is that right?
5     A.   Yes.
6     Q.   Were you personally involved in that
7  one?
8     A.   Yes.
9     Q.   So was that grieved?
10    A.   Yes.  And she received -- she did not
11 just get a three-month suspension, she got multiple
12 suspensions.  She first got a 20-day and then she
13 got, I believe it was -- I think it was 20 days and
14 then it was three months.
15    Q.   Does she still work there?
16    A.   Yes.
17    Q.   Okay.  A sentence here in this Lauren
18 Brown says, A white probation officer would not
19 have received the same discipline.  Do you see
20 that?
21    A.   Yes.
22    Q.   Do you have any specific examples of a
23 white probation officer not receiving the same
24 discipline for the same infraction?



JASON SMITH                                    September 20, 2017
ANTHONY JORDAN vs TIMOTHY EVANS                157–160

Page 157

1   A.   Yes.
2   Q.   Okay.  Give me that.
3   A.   Sharon Throwkoc.
4   Q.   Could you spell that?
5   A.   S-h-a-r-o-n, T-h-r-o-w-k-o-c.
6   Q.   Okay.  She's white?
7   A.   Yes.
8   Q.   What happened with her?
9   A.   She did not assign Howard Brown the case
10  that was supposed to be monitored by Howard Brown,
11  who is African-American, that they initiated an
12  investigation or investigatory hearing on Mr. Brown
13  but did not initiate an investigatory hearing on
14  Sharon Throwkoc.
15  Q.   What was Sharon's position?
16  A.   She was a supervisor at that time.
17  Q.   Okay.  What was Lauren Brown's position?
18  A.   She was an adjudicator/screener.
19  Q.   What does that mean?
20  A.   Our department is unique.  The screener
21  usually deals with informal station adjustments,
22  kids who are not directly involved in the juvenile
23  justice system, so the police send them over for
24  certain services.  Out in Markham you only

Page 158

1   adjudicate maybe us once or twice out of the week,
2   meaning that you sit in the courtroom, you could
3   plead certain court orders for the judges, you
4   input certain information into the system for the
5   judges, so in essence Lauren Brown was doing two
6   jobs and only getting paid for one.
7   Q.   Okay.  And to be clear, did Sharon
8   commit the same infraction as Lauren Brown?
9   A.   I believe that Lauren Brown did not
10  commit any infraction, to be quite honest.  After
11  we went through the entire grievance process, it
12  showed that Lauren Brown actually did input the
13  information into the system, which led to the
14  department rescinding once it got to arbitration
15  and using the data that I compiled, they actually
16  reversed the decision and awarded Lauren Brown with
17  all of her days back.
18  Q.   Okay.  So she was suspended but then she
19  got her pay for that day eventually back, for those
20  days?
21  A.   For those months.
22  Q.   Those months?
23  A.   Yeah, after Mike Rohan was gone and
24  after the compiling of this data that they used at

Page 159

1   arbitration, the chief judge counsel at that time
2   decided to make a settlement offer to Lauren Brown.
3   Q.   Let's go to the next one, D, Kevin
4   Gavin, who again I believe you already talked
5   about.  Are you personally involved in Mr. Gavin's
6   case?
7   A.   No.
8   Q.   Did you learn about Mr. Gavin through a
9   review of the documents?
10  A.   Yes.
11  Q.   The next one, E, is Kaletha Seay?
12  A.   Kaletha.  It's not spelled correct, but
13  it's okay.
14  Q.   Again, we have already talked about her.
15  Let me just see if there's anything.  Is Ms. Patla,
16  P-a-t-l-a, still with the department?
17  A.   Yes.
18  Q.   And how do you know that she tested
19  positive for marijuana?
20  A.   I have the document, and I was present.
21  Q.   For her -- present for what?
22  A.   For the investigatory hearing.
23  Initially, it was an informal conversation because
24  the CBA does not require a probation officer to

Page 160

1   take drug tests, so against our advice, Ms. Patla
2   voluntarily took a drug test and I was present.
3   Q.   Okay.
4   A.   The department did not initially place
5   her on temporary suspension.  They allowed her just
6   to go home.
7   Q.   It says she was disciplined.  Was she
8   disciplined in any way?  What was her discipline?
9   A.   Well, in my opinion, she was not really
10  disciplined because they only imposed a temporary
11  suspension, which is not discipline, but because
12  she was suspended for 14 days, they allowed that to
13  stand.  So the first 14 days are without pay, and
14  after the -- after the first 14 days, you are
15  allowed to use your vacation time, compensatory
16  time, or any leave to make up for any lost pay.
17  Q.   Is that for regular suspension or
18  temporary suspension you are talking about?
19  A.   The first 14 days are without pay.
20  Q.   For what kind -- for both suspensions?
21  A.   No, just for a temporary suspension.
22  Q.   For temporary.
23  A.   Because temporary suspension is not
24  discipline according to the department.



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
161–164

Page 161

1   Q.   Right.
2   A.   But rather than filing the grievance
3  over the temporary suspension, she allowed it just
4  to stand and asked the union not to file a
5  grievance.
6   Q.   Okay.
7   A.   So they would have brought her back
8  within three days.  That would probably have been
9  her discipline, but, again, the department allowed
10  her initially to go home without the temporary
11  suspension.  Whereas, other officers, they would
12  have imposed it at the initial stage of the
13  process.
14   Q.   Okay.
15   A.   I know, it's a lot.
16   Q.   That's fine.  When Ms. Seay was not put
17  into that position that she wanted to transfer to,
18  was it at the same time that Ms. Patla then went
19  right into it, or is there some time discrepancy
20  here?
21   A.   Probably maybe six months, eight months
22  after.  Hence, the reason why Ms. Seay filed a
23  complaint of discrimination against the department.
24   Q.   Oh, Ms. Seay.  Sorry.

Page 162

1   A.   Yeah, Kaletha Seay.
2   Q.   Okay.  Let's go to the next one,
3  page 14.  F, which is Julie Montgomery.  I can't
4  remember, have we talked about her yet today?
5   A.   No.
6   Q.   No.  Okay.  So she received a last
7  chance agreement; is that right?
8   A.   Yes.
9   Q.   Were you involved in her case?
10   A.   Yes.
11   Q.   Were you involved in her getting the
12  last chance agreement?
13   A.   Yes.
14   Q.   And you advised her not to sign it?
15   A.   I did.  But under duress she asked me to
16  sign the agreement for her because the department
17  or the chief judge's office was directly involved
18  in this discipline.  If you look at the last chance
19  agreement for Julie Montgomery, Bruce Wisniewski
20  actually participated in this decision, and
21  apparently it came from the chief judge.
22   Q.   Okay.  What was the -- what was the
23  first allegation of misconduct that led to the last
24  chance agreement, if you know?

Page 163

1   A.   Falsification.
2   Q.   Okay.  Is that the official label that
3  they put on it?
4   A.   That was the official label, and she
5  probably did falsify.
6   Q.   Is this, again, the green/white sheet
7  thing, or is it something different?
8   A.   Any time there's falsification, it can
9  be a variety of things, not seeing clients, making
10  up that you sent -- you made referrals, things like
11  that.  It can be a plethora of things that actually
12  took place, but, yeah, it was -- it was not just
13  the whole green/white sheet thing.  She did put
14  certain things on her white sheet that she probably
15  did not do.
16   Q.   So being involved in the case, do you
17  think that she did falsify some records?
18   A.   Uh-huh.
19   Q.   Sorry.  Is that a yes?
20   A.   Being involved in the case that I
21  personally think that she falsified?
22   Q.   Yeah.
23   A.   I did not formulate an opinion regarding
24  Julie Montgomery.  What I do know is that a lot of

Page 164

1  probation officers -- I'll say this.  For a
2  probation officer, we have tons and tons of
3  paperwork, and sometimes things don't get done.  If
4  you go through my files today, you'll probably find
5  a mistake.  You'll probably find something in my
6  file that I probably did not do, that I probably
7  should have done.  There's a possibility that I may
8  have forgotten to do certain things for a kid.
9       That does not mean that I maliciously
10  did something wrong, that this is just the nature
11  of the job.  So being involved in Julie
12  Montgomery's case, all I can do is just take in the
13  information that management gives me and try to
14  make an informed decision about how do I represent
15  this probation officer and what standards are we
16  using to impose discipline, when compared to other
17  probation officers who did similar things.
18       So I did not -- I did not make a
19  decision that she was guilty or innocent.  I just
20  used the information that management gave me and
21  tried to use whatever mitigating factors that was
22  taking place during that time.
23   Q.   Okay.  I was just trying to get a verbal
24  yes or no.  That is fine.  That is just a reminder



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
165–168

Page 165

1  to try your best to say yes or no, if you can.
2      A.  Okay.
3      Q.  Or at least a verbal answer.  Still with
4  Julie here, it says, after her disciplinary
5  sentence, the Cook County Juvenile Probation
6  Department attempted to construct another reason to
7  create a disciplinary investigation, but it was not
8  sustained.
9          Again, just hopefully briefly, my
10  question will be, was Ms. Montgomery accused of
11  misconduct after she signed the last chance
12  agreement?
13      A.  Yes.
14      Q.  And what was that misconduct?
15      A.  Falsification.
16      Q.  Okay.  Was it for basically the same
17  type of falsification, or was it different?
18      A.  According to the department, it was the
19  same type of falsification.
20      Q.  Okay.
21      A.  What I don't understand is that, I don't
22  know how the chief judge does not see a pattern,
23  that any time that a person signs a last chance
24  agreement and just happens to be African-American,

Page 166

1  they actually say that they committed the offense
2  again.  You would think that these are professional
3  probation officers, that they would not commit the
4  same offense again.  I mean, similar to people who
5  get convicted of a crime, I guess because they have
6  been convicted once, that means they are guilty all
7  of the time because they did it the first time.  I
8  know, you want me to keep it to a yes or no.
9      Q.  Ideally, but you are allowed to say what
10  you want to say.  I think that Tom would disagree
11  with that.
12          So I just want to be clear in reading
13  this.  So we had the last chance agreement, another
14  allegation of misconduct, and then a third
15  allegation of misconduct; is that right?
16      A.  Yes.
17      Q.  And was the third one sustained or not
18  sustained like the second one?
19      A.  Well, the second allegation of
20  misconduct, they tried to create a scenario that
21  she did something wrong, and I think I have an
22  e-mail regarding that.  It was something -- it was
23  something very minor, but I assume that the
24  supervisor or maybe even the deputy chief kind of

Page 167

1  intervened during that time.
2          But then somehow Mike Rohan got ahold of
3  this third allegation of falsification, and she
4  under pressure decided just to resign her position.
5  During the course of having a conversation even
6  with Congressman Danny Davis regarding what was
7  taking place in juvenile probation, he said he was
8  close to the chief judge and that he would actually
9  have a conversation with the chief judge about that
10  regarding Julie Montgomery.
11      Q.  Were these -- I'm calling them 1, 2, and
12  3, these allegations.  We have 1, but 2 and 3, were
13  those taken all of the way through the grievance
14  process?
15      A.  The second one never manufactured.  The
16  first one did.
17      Q.  And that is the one that resulted in the
18  last chance agreement, right?
19      A.  Yes.
20      Q.  And the second and third, did those ever
21  get formal grievances or no?
22      A.  No, she did not -- despite my plea for
23  her not to resign, she decided to resign her
24  position.

Page 168

1      Q.  Did she get any discipline for what I'm
2  calling Allegations of Misconduct 2 and 3?
3      A.  No.  They told her that the chief judge
4  was going to terminate her position or that she
5  could resign.
6      Q.  Who told her that?
7      A.  People in the union, people who --
8      Q.  Did you tell her that?
9      A.  No.
10      Q.  You said people in the union.  I just
11  want to be --
12      A.  No.  Again, like I said, there was
13  certain things that was taking place as far as
14  certain stewards going rogue, certain members in
15  the union who was going rogue, but they was going
16  through the process of the investigatory hearing of
17  imposing discipline.  Typically, Mike Rohan would
18  say that he has to wait for a decision from
19  downtown to terminate your employment.
20      Q.  Did anyone from management ever tell you
21  that they were going to fire Ms. Montgomery?
22      A.  Yes.
23      Q.  Who told you that?
24      A.  Mike Rohan.  He did not believe that



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
169–172

Page 169

1 probation officers had the right to go through the
2 steps in the collective bargaining agreement
3 because of the last chance agreements.  He believed
4 that, It's the last chance agreement, I could just
5 terminate your employment.
6     Q.    But did he tell you directly that he was
7 going to fire Julie Montgomery?
8     A.    Yes.
9     Q.    Did anyone else hear -- do you know if
10 anyone else was there when he told you that?
11     A.    I don't recall the steward, if there was
12 another steward.  I usually take a second person in
13 the room with me all of the time, just to have a
14 witness, but I'm sure there was a second steward
15 that was present.  It might have been Mike Willis
16 because Mike Willis was at the Step 4 -- Step 4
17 with the chief judge's office when Julie signed
18 that last chance agreement.
19     Q.    Were you present when anyone from
20 management presented Ms. Montgomery with an option
21 of resigning or being discharged?
22     A.    Not the last time, but I do have e-mails
23 saying that this was her options.
24     Q.    Who were these e-mails from?

Page 170

1     A.    From people within the union.
2     Q.    Can you be any more specific other than
3 people from the union, if you remember?
4     A.    Lloyd Marshall, Marshon Stutley.
5     Q.    Do you still have these e-mails?
6     A.    Yes.
7     Q.    I have asked you about a lot of e-mails,
8 I think, that you still have.  Are these on your
9 work account or are they in a personal account or
10 are they printed out at home?  Where are they?
11     A.    They are on my work account.  The
12 department is going through the process of purging
13 our e-mail right now.
14     Q.    As in right this second?
15     A.    Under orders that we received, yes.
16     Q.    Thanks for letting me know that.
17     A.    So I follow Tom.
18     Q.    That is good to know.  Let's move on
19 from Ms. Montgomery.  Let's go to G, which is Joi
20 Basley?
21     A.    Yes.
22     Q.    Again, I think you already talked about
23 her?
24     A.    Yes.

Page 171

1     Q.    She received a last chance agreement,
2 right?
3     A.    Yes.
4     Q.    Were you personally involved in that
5 one?
6     A.    Yes.
7     Q.    This is the green and white time sheet,
8 right?
9     A.    So the last chance agreement, when you
10 say I'm personally involved, meaning that I knew
11 about the last chance agreement.  I was not there
12 per se when she signed the last chance agreement.
13 It was done while I was on vacation.
14     Q.    Okay.  But it was during your tenure?
15     A.    My tenure, yes.
16     Q.    In the union?
17     A.    Yes, and I talked to Joi Basley about
18 the last chance agreement.
19     Q.    So do you know if someone else from the
20 union then told her to sign the last chance
21 agreement?
22     A.    Yes.
23     Q.    Who told her to do that?
24     A.    Shawna Varnado and Jeffrey Hayes or

Page 172

1 Haynes.
2     Q.    I was going to say no relation, but go
3 ahead.  And she was fired, right?
4     A.    Yes, and we grieved her termination.
5     Q.    Did she come back?
6     A.    No.
7     Q.    So I take it you lost the grievance,
8 right?
9     A.    I lost all of the grievances throughout
10 the step process because there's no neutral party
11 involved.  All parties from Step 1 through 3 and 4
12 are all management, so of course that goes the
13 same, each one.
14          If we get to arbitration, I have won
15 arbitration decisions.  So once we get a neutral
16 party involved, that is where our victories come in
17 at.  We just recently won performance evaluations
18 for Theo Chapman and Patrick Nelson.
19     Q.    Yeah, they talked about that.  Did you
20 arbitrate any of the ones that we have talked about
21 today?
22     A.    Again, once you get to arbitration, it
23 goes to Council 31, their legal rep, and they are
24 supposed to arbitrate.  And they have not provided



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
173–176

Page 173

1  Joi Basley a date for arbitration.
2      Q.   The decision to take it to arbitration
3  is on?
4      A.   Council 31.
5      Q.   Okay.  Thanks.  Last individual here,
6  page 15, H, Angela Sneed.  I don't think that we
7  have talked about her yet?
8      A.   No.
9      Q.   Again, she got a last chance agreement.
10  Were you involved in that one?
11      A.   No.
12      Q.   Was that before or after your union
13  involvement?
14      A.   Before.  But, again, Mike Willis
15  provided the paperwork for Ms. Sneed.
16      Q.   Do you know when -- when the allegations
17  here in H regarding Ms. Sneed would have occurred?
18      A.   For Ms. Sneed?
19      Q.   Ms. Sneed, yeah?
20      A.   You said for letter A?
21      Q.   H.
22      A.   H?
23      Q.   Right here.  Yeah, Ms. Sneed, Angela,
24  right?

Page 174

1      A.   Yeah.
2      Q.   There's no time in there.  I just want
3  to know, you said it was before your union
4  involvement.  I just want to know if you know the
5  date on that at all?
6      A.   It had to be anywhere between 2008
7  because, again, her name appears on the list that
8  management provided to me, so any time between 2008
9  or during that time period, 2008 to 2013, that is
10  when her name appears.
11      Q.   Okay.  Turn to page 16.
12      MR. GEOGHEGAN:  Off the record for a second.
13          (WHEREUPON, a recess was had.)
14  BY MR. HAYES:
15      Q.   Okay.  Mr. Smith, let's continue plowing
16  through this complaint here.  Page 16.  Now what we
17  are going to do is go through the individual
18  plaintiffs here.  They have their own set of
19  allegations in the complaint.  I am just going to
20  ask you a few questions on what your knowledge is.
21  I know we have gone over probably a lot of this
22  already, but let's see if there's anything that we
23  missed.
24          Starting here on page 16, paragraphs 48

Page 175

1  through 57, refer to Anthony Jordan?
2      A.   Okay.
3      Q.   Now, I believe we have already talked
4  about that you were -- in your union roll, you were
5  directly handling his termination grievance; is
6  that right?
7      A.   I was handling 90 percent of the
8  grievances that was filed on my team, yes.  So yes.
9      Q.   So you were handling his?
10      A.   Yes.
11      Q.   And in here, I don't know what
12  paragraph, but it says that he received a last
13  chance agreement at some point.  And that would be
14  paragraph 54, which starts on 15 and goes to 17.
15          It says, paragraph 54, Although Anthony
16  Jordan had no history of discipline for failing to
17  properly monitor and respond to any alerts, Cook
18  County Juvenile Probation Department had previously
19  forced Jordan in 2011 into an unfair last chance
20  agreement based upon a prior claim of poor work
21  performance.  Do you see that?
22      A.   Yes.
23      Q.   Were you involved in Mr. Jordan's 2011
24  last chance agreement?

Page 176

1      A.   No.
2      Q.   And did you take Mr. Jordan's grievance
3  about his termination through Step 4?
4      A.   Yes.
5      Q.   And it was denied every step?
6      A.   Yes.
7      Q.   Do you know if that was arbitrated?
8      A.   The chief judge had refused to arbitrate
9  his last chance agreement.  The counsel sued the
10  chief judge somewhere in court, and a court
11  decision just came down saying that the chief judge
12  does have to arbitrate.  I guess he has an
13  arbitration date set for some time this year.
14      Q.   Were you involved in any of that, that
15  you just talked about, the lawsuit or the
16  arbitration or anything like that?
17      A.   I'm assuming that they probably used
18  whatever documents that I forwarded to you.
19      Q.   Did anyone talk to you about it or
20  anything?
21      A.   No.  No.
22      Q.   Just to make sure that we are on the
23  same page here and we are talking about the same
24  thing, Mr. Jordan was working in the electronic



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
177–180

Page 177

1  monitoring unit, right?
2      A.   Yes.
3      Q.   Okay.  And the allegations -- you can
4  disagree, but the allegations were that he failed
5  to report a juvenile that was leaving his house; is
6  that right?
7      A.   I don't necessarily think that he failed
8  to report.  I think the department tried to cite
9  that he failed to file an EM violation.
10     Q.   Okay.  And, again, correct me because
11  I'm just kind of paraphrasing here.  So he failed
12  to -- the allegation is that he failed to file the
13  violation report, right?
14     A.   Yes.
15     Q.   Okay.  And then this individual that he
16  failed to file a report on then raped someone; is
17  that right?
18     A.   Yes.
19     Q.   And then ultimately Mr. Jordan was
20  terminated for this, right?
21     A.   Yes, because of the last chance
22  agreement.
23     Q.   Okay.
24     A.   If it was not for the last chance

Page 178

1  agreement, there's a possibility that Mr. Jordan
2  probably would not have been terminated, but,
3  again, the practice of giving African-Americans
4  last chance agreements gives the department, I
5  guess, the authority to justify the decision by
6  terminating their employment.
7      Q.   Okay.  What is the basis for you just
8  saying that without the last chance agreement, he
9  probably would not have been terminated?
10     A.   Because I'm saying that the last chance
11  agreement disproportionately impacts
12  African-Americans and minorities who are in the
13  department and that only African-Americans are
14  given these last chance agreements.
15     Q.   Go ahead, if there's something else.
16     A.   No.
17     Q.   Then Mr. Jordan's specific instance,
18  did management say, Because of the last chance
19  agreement, we are going to terminate you?
20     A.   No.
21     Q.   Are you aware of any other -- sorry,
22  strike that.
23         Are you aware of any
24  non-African-American juvenile probation officers

Page 179

1  who failed to file a violation report and then that
2  individual then went out and raped someone who were
3  not fired?  It's a clunky question but --
4      MR. GEOGHEGAN:  Just for clarification, does
5  it have to be rape?
6      MR. HAYES:  That is my first part.  I might
7  back off of that.
8      MR. GEOGHEGAN:  Answer the best you can.
9  BY MR. HAYES:
10     Q.   Yeah.
11     A.   So the problem is that certain things
12  are not investigated.  So, therefore, the union
13  would never become aware of certain things that
14  have actually taken place, but we have seen reports
15  from the media about other juveniles who have
16  actually gone out and raped other individuals or
17  robbed other individuals while they was on
18  electronic monitoring.
19     Q.   Okay.  And do you know if those
20  individuals were being monitored by white
21  employees?
22     A.   Again --
23     Q.   That's fine.
24     A.   -- the report from the media says that

Page 180

1  this juvenile was on electronic monitoring.  The
2  investigation never came across my desk.  I
3  requested information regarding discipline, so,
4  therefore, I can only assume that an investigation
5  never took place.
6         But there has been other instances
7  before my time where the juveniles have gone out
8  and committed more heinous crimes than just kidnap
9  and rape.  They have actually shot individuals
10  while on electronic monitoring.  They have actually
11  did home invasions, burglaries.
12         Even myself being down in house arrest,
13  I have known that there was particular officers who
14  was monitoring certain juveniles that they actually
15  did go out and commit an offense, and those
16  officers was white and they was not disciplined.
17     Q.   Do you know the names of those officers?
18     A.   It's been almost 13 years.
19     Q.   I know.  I know.
20     A.   And those officers -- when I initially
21  came in as a trainee, those officers was veterans,
22  and a lot of those officers that was down in
23  electronic morning or home confinement at the time,
24  pretty much had 20 years of experience, even some



JASON SMITH                                           September 20, 2017
ANTHONY JORDAN vs TIMOTHY EVANS                       181—184

Page 181

1   had 30 years of experience within the department.
2   So they possibly could retire.
3       Q.   Let's flip the question and say, are you
4   aware of any other African-American officers that
5   failed to file a violation report and then the
6   juvenile then went out and committed -- and I'll
7   just say, any serious offense?
8       A.   For electronic monitoring?
9       Q.   For electronic monitoring.
10      A.   Not that I'm aware of.
11      Q.   If you can for Mr. Jordan -- I'm sorry,
12  if you are still --
13      A.   No, I'm thinking.  I'm trying to think
14  about the question that you just asked me.  I'm
15  trying to go through my head about the discipline
16  list, if there was other officers within electronic
17  monitoring that just happened to be
18  African-American.  I know Gus Sanford, he was
19  terminated, and he was African-American.  I can't
20  recall his case, but I know that he was terminated
21  as well.
22      Q.   You believe -- setting aside the last
23  chance agreement for Mr. Jordan as best you can,
24  pretend that is not out there?

Page 182

1       A.   Okay.
2       Q.   I'm going to ask him to speculate.  Do
3   you believe Mr. Jordan was terminated because of
4   his race?
5       A.   Yes.
6       Q.   Okay.  Why do you believe that?
7       A.   The data, the facts, the information
8   that the department has, that they compiled that
9   they have a propensity of giving out harsher
10  discipline to African-American probation officers.
11  This is not something that I made up.  This is
12  actually, if you look at the data itself and the
13  department records, when you give a probation
14  officer three-month suspensions, six-month
15  suspensions, and the whites are only given a max of
16  maybe ten-day of suspension, there's a disparity.
17       It's just like the sentencing laws that
18  was imposed on African-Americans compared to crack
19  cocaine and powder cocaine.  You had
20  African-Americans who were receiving harsher
21  sentences despite the fact that it was similar
22  offenses that was taking place.
23       So, again, either the department knew
24  directly what they was doing or indirectly.  Their

Page 183

1   policies, the last chance agreement, the supervisor
2   exam, even the flex schedule, if you look at the
3   flex schedule going back -- and I have the
4   e-mail -- only white female probation officers were
5   allowed to have flex time schedules.  The
6   department cannot tell me that African-American
7   women who was pregnant -- and I have spoken to some
8   of them -- actually asked for a flex time schedule
9   or a part-time schedule and they was denied.  So
10  this is a systemic issue.  This is not a one-time
11  issue.  This has been going on in the department
12  for years and has been covered.
13       If you look at the history, a lot of the
14  people in the union was not putting in requests for
15  information.  They just was not doing it.
16       So even when Mike Willis saw the record
17  himself, he was shocked that only African-Americans
18  was getting last chance agreements and was
19  receiving harsher discipline.  But I don't want you
20  to think that I was the first one to start the
21  complaining.  Jenny Wells has sent complaints to
22  the chief judge's office.  She actually sent a
23  complaint to the presiding judge.  Buford Arrington
24  sent a complaint to the chief judge.  Even some

Page 184

1   Latinos was sending complaints about unfair
2   treatment to the chief judge.
3       Q.   Let's move on to Mr. Greenlaw.  No, it's
4   fine.  Which is on page 157 here.  He has
5   paragraphs 58 through 63 of the complaint.
6       And, again, I believe we have already
7   talked about Mr. Greenlaw, but you were involved in
8   the grievance of his termination, right?
9       A.   Yes.
10      Q.   All of the way through Step 4?
11      A.   Yes.
12      Q.   Besides Mr. Greenlaw, was anyone else at
13  the JPD terminated for the same behavior?
14      A.   Ernest Boyd.  He's African-American.
15      Q.   And was he Mr. Greenlaw's partner?
16      A.   Yes.
17      Q.   Okay.  Besides those two, are you aware
18  of any other JPD employees that were terminated for
19  misuse of the gas card?
20      A.   Alleged misuse.
21      Q.   Alleged misuse of the gas card?
22      A.   No.
23      Q.   Okay.  Are you aware of any
24  non-African-American employees that did the same



JASON SMITH                                                September 20, 2017
ANTHONY JORDAN vs TIMOTHY EVANS                             185–188

Page 185

1 type of alleged misconduct and were not fired? I
2 should say exact same type of alleged misconduct.
3     A.   Fraud?
4     Q.   The gas card issue.
5     A.   Well, I mean, I think it would fall
6 under the same category of fraud that the
7 department has alleged. You have, Rosa Altamirano,
8 where there was allegations of her changing the
9 check, and the department said it was fraud and
10 they gave her a verbal reprimand.
11     Q.   Okay. When did that happen?
12     A.   I believe it was between 2008 and 2009,
13 if I'm not mistaken.
14     Q.   Were you involved in that as a union
15 rep?
16     A.   No.
17     Q.   How did you hear about Rosa?
18     A.   I have a copy of Mike Rohan's decision.
19     Q.   Is that in the bundle of documents that
20 you have been talking about?
21     A.   And is on the list that Rose Golden
22 provided to me, too, and I actually presented this
23 information in the Office of the Chief Judge.
24     Q.   To who?

Page 186

1     A.   Keith Sevcik.
2     Q.   When?
3     A.   2014, when we was going through the
4 steps.
5     Q.   Okay. Next, let's move on to
6 Mr. Chapman. It's on page 18 and 19, paragraph 64
7 through 67. Okay. Start on 65, which is on
8 page 19.
9     A.   Okay.
10     Q.   This is talking about the supervisory
11 exam, which I believe you referenced earlier.
12     A.   Uh-huh.
13     Q.   Have you ever taken the supervisory
14 exam?
15     A.   No.
16     Q.   Do you have any -- just looking on
17 paragraph 65 here, do you have any -- strike that.
18          Were you personally involved in
19 Mr. Chapman requesting copies of his test and
20 scoring method?
21     A.   No.
22     Q.   If you look at paragraph 66, on the -- I
23 think it's the second sentence. Chapman further
24 alleges that African-American probation officers

Page 187

1 are discriminated against in this manner by reason
2 of their race and that the design of the supervisor
3 examination is either intentionally or, in effect,
4 discriminatory in excluding African-Americans from
5 supervisory positions. Do you see that?
6     A.   Yes.
7     Q.   Okay. Do you have any personal
8 knowledge of the allegations that I just read?
9     A.   Yes.
10     Q.   Okay. What personal knowledge do you
11 have?
12     A.   That the department provided me a list
13 of potential supervisors.
14     Q.   Okay. And what did that tell you?
15     A.   At first glance it did not tell you
16 much, until you start looking at the names and
17 where each probation officer was positioned. If
18 you look at the exam, and you can look at the
19 first -- the first initial exam and the second
20 initial exam, when probation officers retook the
21 exam, the first time the African-American was third
22 and then the second time he was first.
23          After that there's no African-American
24 within the top ten of becoming a supervisor. All

Page 188

1 African-Americans are either starting at No. 14 all
2 of the way to the back. In the past the supervisor
3 list would expire. Once you promote off that list
4 and you have no open positions, that supervisory
5 list normally goes away and the department would
6 have to institute or introduce a new supervisory
7 exam, and people would have to retest and retake
8 the test again.
9     Q.   Have you seen the test?
10     A.   Yes.
11     Q.   How did you see it? Sorry. How did you
12 see it?
13     A.   Well, I'm sorry. I never saw the
14 supervisory test. I did see a test as a probation
15 officer trainee.
16     Q.   And how did you get to see that?
17     A.   Every probation officer who wants to
18 become a probation officer has to pass a final
19 exam.
20     Q.   That is different from the supervisory
21 test, right?
22     A.   Yes.
23     Q.   So you have never seen the supervisory
24 test?



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
189—192

Page 189

1    A.   No.
2    Q.   That is all I want to focus on here.
3    A.   Okay.
4    Q.   Sorry.  Are there currently
5  African-Americans in supervisory positions at the
6  JPD?
7    A.   Yes.  After I filed grievances saying
8  that the department has an obligation to fill those
9  open supervisory positions.  It does not give
10  management the leeway of not promoting.  In the
11  past they would always say that the chief judge did
12  not give authorization.  In the collective
13  bargaining agreement, it says that if there's an
14  open position, you must fill that open position.  I
15  did institute a grievance to have management fill
16  those open positions.
17    Q.   Just off the supervisory list?
18    A.   Yes.
19    Q.   And did these African-Americans get on
20  the supervisory list by passing the exam?
21    A.   Yes.
22    Q.   Okay.
23    A.   But if a grievance was never initiated,
24  they would have never been promoted.

Page 190

1    Q.   How do you know that?
2    A.   Because if the department wanted to
3  promote, I would not have to initiate a grievance
4  to force them to promote.  We was talking about
5  backpay and we negotiated -- I was trying to
6  negotiate with the department to give these
7  individuals backpay, but these individuals did not
8  understand the law, did not understand the point of
9  the collective bargaining agreement.  Management
10  somehow started trying to do direct dealings with
11  these individuals, and they just wanted the
12  positions and I have those e-mails.
13    Q.   In your work account e-mail?
14    A.   Yes.
15    Q.   That may currently be being purged?
16    A.   Well, they say that they are giving us a
17  couple months.
18    Q.   Okay.  Let's move on to Mr. Nelson.
19    A.   Uh-huh.
20    Q.   He's on page 19, paragraphs 68 through
21  72 of the complaint.
22    A.   Okay.
23    Q.   I honestly can't remember what you
24  testified earlier about Mr. Chapman, but were you

Page 191

1  involved in Mr. Chapman's grievances?
2    A.   Yes.
3    Q.   And in your union role, correct?
4    A.   Yes.
5    Q.   Okay.  I want to focus on the Jumpstart
6  allegations.  Do you know what Jumpstart is?
7    A.   Yes.
8    Q.   What is Jumpstart?
9    A.   It was an alternative school that
10  probation officers utilized as an alternative to
11  kids who wasn't in regular school, so we would make
12  referrals to the jump start program.  The kids
13  would come to that program from 9:00 to 1:00.
14    Q.   And Mr. Chapman and Mr. Nelson worked in
15  Jumpstart, right?
16    A.   Yes.
17    Q.   Do you know what they did in the jump
18  start unit?
19    A.   They did --
20    Q.   If you know.
21    A.   Yeah, many things.  They were teachers,
22  mentors, role models.  Their primary responsibility
23  was to teach classes.  They did outreach work.
24  They would go out into the field, visit clients,

Page 192

1  and do other responsibilities.
2    Q.   Okay.  Paragraph 69 says, In 2015 the
3  Cook County Juvenile Probation Department
4  eliminated positions occupied by Nelson and Chapman
5  in the jump start program under the guise of
6  reorganization.  Do you see that?
7    A.   Yes.
8    Q.   And do you recall grieving that issue?
9    A.   Yes.
10    Q.   In 2015 was the Jumpstart program shut
11  down?
12    A.   No.
13    Q.   All right.  What happened to the
14  Jumpstart program in 2015?
15    A.   It was restructured to eliminate the
16  teacher's position.
17    Q.   And who was in the teachers' positions
18  in 2015, if you know?
19    A.   Officer Chapman, Officer Nelson, and
20  Officer Tatanisha Jackson.
21    Q.   And what is her race?
22    A.   She's African-American.
23    Q.   Did Officer Jackson remain in the jump
24  start program after 2015?



JASON SMITH                                September 20, 2017
ANTHONY JORDAN vs TIMOTHY EVANS                    193–196

Page 193

1   A.   Yes.

2   Q.   Okay.  Prior to the teaching positions

3   being eliminated in 2015, were there any

4   discussions between the union and management about

5   restructuring of the Jumpstart program?

6   A.   Yes.

7   Q.   And were you involved in those

8   discussions?

9   A.   Yes.

10       (WHEREUPON, a certain document was

-10:-22:-47       marked Smith Deposition Exhibit

-10:-22:-47       No. 5, for identification.)

-10:-22:-47  BY MR. HAYES:

14   Q.   Okay.  Mr. Smith, you have been handed

15   what has been marked as Exhibit 5.  This is a group

16   exhibit.  We won't spend too much time on it.  This

17   is going to be referencing what we were talking

18   about, I hope.  The first page is Bates Defendant

19   2976.  Do you see that?

20   A.   Uh-huh.

21   Q.   Okay.  Then I just want to focus on the

22   e-mail that is basically in the middle of the page

23   here, from Donna Neal to many individuals, but you

24   are one of the individuals on there, right?

Page 194

1   A.   Uh-huh.

2   Q.   Could you just say yes, please, just for

3   the record?

4   A.   I'm sorry.  Yes.

5   Q.   And it is dated September 18, 2015?

6   A.   Yes.

7   Q.   Do you recall receiving this e-mail?

8   A.   Probably so.

9   Q.   And at this time, when the Jumpstart was

10   being restructured, what was your role, your exact

11   role in restructuring of the Jumpstart program?

12   A.   My exact role as the president was to

13   meet with my team and come up with a

14   counterproposal and to bargain over the impact.

15   Q.   And was there back and forth between the

16   union and management?

17   A.   Yes.

18   Q.   But, ultimately, if you look at the

19   e-mail here, No. 1 happened, right, Management will

20   eliminate Jumpstart classroom instructor positions?

21   A.   Yes.  That was after they moved

22   Tatanisha Jackson out of her teacher's position or

23   instructor position.

24   Q.   Is there --

Page 195

1   A.   Or before.

2   Q.   Sorry.  Wait a minute.

3   A.   So during the -- what the e-mail and the

4   correspondence won't show is that the department

5   intentionally fills certain positions within the

6   jump start program, knowing that they were getting

7   ready to eliminate the instructor positions.

8   Thereby filling those outreach positions with less

9   senior officers, beginning with Tatanisha Jackson

10   and Dale Womack, but then giving Officer Chapman

11   the opportunity to fill those positions who

12   actually had more seniority than Tatanisha Jackson

13   and Dale Womack.  Avik then in the bargaining

14   session said to me and my team that this is not in

15   retaliation to the lawsuit that was filed by

16   Officer Nelson and Officer Chapman.

17   Q.   I have heard that he has made that

18   comment before.  He made that directly to you?

19   A.   Yes, he made that comment directly in

20   the meeting.

21   Q.   When was that comment made?

22   A.   I believe it was -- it had to be

23   sometime in maybe July, I believe.

24   Q.   Okay.

Page 196

1   A.   We also explained to Mr. Das that

2   Mr. Chapman and Mr. Nelson was already doing the

3   outreach officer's duties and that there was

4   nothing different than what they was doing being

5   instructors.  If you look at the bid list, after

6   negotiation took place, the department then

7   designed a position on the bid list that included

8   separate positions within the Jumpstart program to

9   give the impression that these were different

10   positions within that unit.  Jumpstart was a hold.

11   It was not instructive.  It was not outreach.  It

12   was not sanctioned.  The Jumpstart bid list was

13   just Jumpstart.  So any time you bid into a jump

14   start, it's just like my unit, I cannot bid on a

15   certain position.  If there's six positions within

16   my unit, I can't bid on Position 1 or 2.  I just

17   bid within that office, if there's an opening.

18   Q.   When this restructuring happened for

19   Jumpstart in 2015, besides Ms. Jackson that we have

20   already talked about, were there any other

21   African-American officers that remained in jump

22   start?

23   A.   Yes.

24   Q.   Do you know who they are?



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
197–200

Page 197

1    A.   I can't think of his last name, but his
2    name is Vince and then Yusef Harris.
3    Q.   And I believe you mentioned Dale Womack.
4    What is his race?
5    A.   He's African-American.
6    Q.   And he remained in Jumpstart, too?
7    A.   Yes.
8    Q.   Besides Mr. Chapman and Mr. Nelson, was
9    anyone else at this time in 2015, moved out of
10   Jumpstart?
11   A.   No.  They was targeting particularly
12   Mr. Nelson and Mr. Chapman, because even the
13   supervisor that came to me, who just happened to be
14   African-American and told me that Mr. Nelson
15   made -- wanted to look for a different position.
16   Q.   If you know, do you know when the
17   discussions between management and the union about
18   the restructuring of jump start actually started --
19   if they started in 2015 or earlier, when they
20   actually started?
21   A.   I would like to say that maybe they did.
22   I can't recall without my documents, but I would
23   like to say that they probably started a little bit
24   in early 2015 because I remember Tatanisha

Page 198

1    Jackson's name appearing on the bid list in March.
2    So someone gave her the heads up that you need to
3    put in the bid list -- I mean, a bid into this
4    position in order for us to move you so you won't
5    be impacted.
6         In addition to that, they told us that
7    they were not filling the other outreach officer
8    positions.  They actually filled another position
9    with Dale O'Connell, who happens to be white, into
10   the Jumpstart program.
11   Q.   So does Jumpstart still exist to your
12   knowledge?
13   A.   It does.
14   Q.   Is it called Jumpstart?
15   A.   Yes.
16   Q.   Does Jumpstart currently do classroom
17   instruction?
18   A.   No.  Well, in a sense, but, no, not
19   really.  I mean, I guess under the guise of the
20   sanction program, they have kids that come under
21   this new program called sanctions.
22   Q.   Who made -- if you know, who made the
23   decision to reorganize Jumpstart?
24   A.   I'm assuming the director, the acting

Page 199

1    director at the time.
2    Q.   And who was that?
3    A.   Avik Das.
4    Q.   If you know, is there anyone currently
5    in the Jumpstart program doing the exact same
6    teaching duties that Mr. Chapman and Mr. Nelson
7    were doing when they moved out in 2015?
8    A.   I can only assume that the sanction
9    program is a replica of the Jumpstart program
10   because kids are coming to the program but, again,
11   the sanction and the instructional part of the
12   program is a little bit convoluted because the
13   sanction is something that the Illinois Supreme
14   Court said that the probation officers have to
15   offer a minor prior to starting the violation of
16   probation.  So I'm not sure if they come there to
17   get instructions, but I do know that a lot of
18   probation officers utilize that program if a kid is
19   out of school, if he's like in violation of his
20   probation, but there are kids that come to the
21   sanction program.
22   Q.   Do you utilize that program with your
23   kids?
24   A.   Not necessarily.  I actually utilize a

Page 200

1    program outside of the department.  We have other
2    sanctioned programs, but they are not filled by
3    probation officers.
4    Q.   Have you personally, Mr. Smith, outside
5    of -- well, besides the charge of discrimination
6    that you filed on behalf of the local, have you
7    filed any charges of discrimination with either the
8    EEOC or the Illinois Department of Human Rights
9    against your employer?
10   A.   Yes.
11   Q.   How many?
12   A.   Maybe two.
13   Q.   Do you know when these were?
14   A.   I believe the first one was back in 2010
15   for, I think my temporary suspension, they refused
16   to --
17   Q.   We don't need you to guess.  We can do
18   it this way.
19        (WHEREUPON, a certain document was
-10:-22:-47        marked Smith Deposition Exhibit
-10:-22:-47        No. 6, for identification.)
-10:-22:-47   BY MR. HAYES:
23   Q.   Okay.  Mr. Smith, you have been handed
24   what has been marked Exhibit 6.



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
201–204

Page 201

1    A.    Okay.

2    Q.    Is this the 2010 charge of

3  discrimination that you were just talking about?

4    A.    Yes.

5    Q.    And it's alleging race discrimination,

6  right?

7    A.    Yes.

8    Q.    Due to your temporary suspension in

9  2010?

10    A.    Yes.

11    Q.    What was the outcome of this charge?

12    A.    I decided to withdraw it after the

13  department agreed to give me $22,000 back for

14  backpay and to restore my time.  Mike Rohan

15  initially tried to convince me to waive my rights

16  to the money, and I was told by other union reps

17  before my involvement in the union that whites was

18  restored and that the contract actually says that

19  if you are not convicted, anything about the

20  temporary suspension is not supposed to be in your

21  personnel file and you'll be reinstated to your

22  position with all backpay and benefit time.

23    Q.    And you weren't convicted, right?

24    A.    No.

Page 202

1    Q.    And you were reinstated?

2    A.    Yes, after I file this complaint with

3  the EEOC.

4    Q.    You can say eventually.  That is fine,

5  too.

6    A.    Yes.

7    Q.    And you said you got $22,000.  Was that

8  all of the backpay that you believe you were owed?

9    A.    It was.

10    Q.    Okay.  So as you sit here, do you feel

11  that you were put back into the position you would

12  have been had you not been temporarily suspended?

13    A.    No.

14    Q.    Why not?

15    A.    Because my character was damaged, and i

16  actually was considering filing a lawsuit against

17  the State's Attorney's Office and against juvenile

18  probation.

19    Q.    But you didn't file a lawsuit, right?

20    A.    No.

21    Q.    Okay.  But you got all of the money that

22  you believed you were owed; is that right?

23    A.    Yeah, I got all of my money, vacation

24  time, compensatory time back, yes.

Page 203

1    Q.    Okay.  Any other charges of

2  discrimination that you filed against your

3  employer?

4    A.    I filed one for the flex time schedule

5  recently.

6    Q.    2016, does that sound right?

7    A.    Yes.

8    Q.    Okay.

9         (WHEREUPON, a certain document was

-10:-22:-47          marked Smith Deposition Exhibit

11         No. 7, for identification.)

12  BY MR. HAYES:

13    Q.    Okay.  You have just been handed what

14  has been marked as Exhibit 7, Mr. Smith.  Is this

15  the charge that you were just talking about?

16    A.    Yes -- no, no.  I'm sorry.  Oh, yeah,

17  this is it.

18    Q.    It's two pages.  Just for the record,

19  it's Bates Defendant 8497 and 8498.

20    A.    Yes.

21    Q.    This is regarding flex time; is that

22  right?

23    A.    Yes.  Well, flex time schedule.

24    Q.    I won't get too much into that.

Page 204

1    A.    Okay.

2    Q.    But that is your signature here on the

3  bottom, first page?

4    A.    Yes.

5    Q.    And dated November 9, 2016?

6    A.    Yes.

7    Q.    What is the current status of this?

8    A.    They issued a right to sue letter.  I

9  decided not to pursue the charges against the

10  department.

11    Q.    All right.  So as you sit here today,

12  you are not going to file a lawsuit?  I won't hold

13  you to it but --

14    A.    I'm not sure.  I know that I have a

15  certain window of time, but I do believe that I was

16  treated differently because of my activities

17  because I know other people --

18    Q.    Your activities involving complaints of

19  discrimination, right?

20    A.    Yes.

21    Q.    Okay.  I just want -- as you are sitting

22  here, this is a true and correct copy of the charge

23  that you filed, correct, the exhibit in front of

24  you?



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
205–208

Page 205

1     MR. GEOGHEGAN:  Exhibit 7?
2     MR. HAYES:  Exhibit 6 -- is it 7?  Exhibit 7.
3   BY THE WITNESS:
4     A.   I believe so.
5   BY MR. HAYES:
6     Q.   Okay.  Outside of those two we just
7   showed you, could you think of any other formal
8   charges of discrimination that you filed against
9   your employer?
10    A.   Probably the unfair labor practice
11  charges that I filed with the Illinois Labor
12  Relations Board.
13    Q.   Anything else with the EEOC or the IDHR?
14    A.   Not that I'm aware of.
15    MR. HAYES:  We are close-ish.
16    MR. GEOGHEGAN:  Off the record for a second.
17         (WHEREUPON, discussion was had off
18          the record and a certain document
19          was marked Smith Deposition Exhibit
20          No. 8, for identification.)
21  BY MR. HAYES:
22    Q.   Mr. Smith, I have been handed what has
23  been marked as Exhibit 8.  I'll represent the title
24  of this document is Theodis Chapman's Objections

Page 206

1   and Answers to Defendant's Interrogatories.  Do you
2   see that on the first page?
3     A.   Yes.
4     Q.   Have you seen this document before?
5     A.   Yes.
6     Q.   Okay.  When did you see it?
7     A.   Maybe about a week ago.
8     Q.   Okay.  Was that in conjunction with
9   preparation for your deposition?
10    A.   No.
11    Q.   Okay.  Why were you looking at this a
12  week ago?
13    A.   I think I just saw it on the desk.
14    MR. HAYES:  I know.  I was not planning on it.
15  I'm going to drop that for now.
16  BY MR. HAYES:
17    Q.   Mr. Smith, what I'm going to do is I'm
18  going to go through some of the answers in here
19  because they mention you quite a bit, and I'm just
20  going to ask you some questions.  Okay?
21    A.   Okay.
22    Q.   And I have these answers for each
23  plaintiff, but I'm going to focus most on
24  Mr. Chapman's because that is the first one that I

Page 207

1   pulled, but I will go through some other ones.
2   They are not going to be as detailed.  That is just
3   to kind of give you a roadmap of where we are going
4   here.
5     A.   Okay.
6     Q.   I want to look at No. 2, which starts on
7   the bottom of the first page, and it just asks for
8   each person who has knowledge of the facts
9   underlying your claims against defendant.  Then the
10  answer is on the next page, the second page.
11         You are listed there under A.  You are
12  also listed under B.
13    A.   Uh-huh.
14    Q.   And then the -- I want you to look at C.
15  And some of these documents are listed here in this
16  one.  I think we have talked about them.
17         The third line says, An e-mail sent by
18  Alicia Ortiz to the union with regard to blacks.
19  Do you see that?  Third line of C.
20    A.   Okay.
21    Q.   Is that the e-mail that we were talking
22  about already about what Ms. Caulfield said, or is
23  there another e-mail?
24    A.   That is another e-mail.

Page 208

1     Q.   Do you know what e-mail is referred to
2   in this interrogatory answer?
3     A.   I believe the e-mail was sent in regards
4   to blacks being favorites of the union, if I'm not
5   mistaken.
6     Q.   Okay.  Were you involved with the union
7   when Ms. Ortiz sent this e-mail?
8     A.   I believe I was cc'ed on it or Mike
9   Willis forwarded to me the document or the e-mail.
10  But I do recall she was complaining about something
11  that was taking place and that the blacks was the
12  favorites of the union, which turned out not to be
13  true.
14    Q.   Do you know if you have this e-mail in
15  your possession?
16    A.   I believe I do.
17    Q.   On your work account?
18    A.   Yes.
19    Q.   Skip the first line here.  Under C
20  again, the documents include the original bid list
21  and the modified bid list.  Do you know what that
22  is referring to?
23    A.   Yes.
24    Q.   Okay.  What is that referring to?



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
209—212

Page 209

1    A.   It's the bid list that all probation
2  officers have to submit their names to in order to
3  transfer into a different unit.
4    Q.   Okay.  What is the difference between --
5  as referred to here between the original and the
6  modified list?
7    A.   The modified bid list, after there was a
8  complaint of discrimination, as I mentioned
9  earlier.  The Jumpstart program was only one name
10  on the bid list.  After the complaint was filed,
11  you can see that three sections of the bid list was
12  created to give the -- distinguish between each
13  position within the Jumpstart program.
14    Q.   So your understanding is that this is
15  referring to the Jumpstart bid list, right?
16    A.   There's only one bid list.  Jumpstart
17  happens to be on that bid list.
18    Q.   I see.  So the modified bid list then
19  broke out different positions within Jumpstart,
20  right?
21    A.   Which was initially not there.
22    Q.   And you say "after the charges of
23  discrimination," are you referring to a lawsuit,
24  are you referring to a grievance?  What are you

Page 210

1  referring to?
2    A.   I believe that it was after or it might
3  have been even after the complaint of
4  discrimination that they modified the bid list to
5  kind of give the perception that this program or
6  this position has always existed, but it was never
7  there.  If you go back to the bid list beginning in
8  maybe 2014, '15, the Jumpstart program only has one
9  position.
10    Q.   All right.
11    A.   I'm sure you have the bid list there.  I
12  could show you, if you have it.
13    Q.   Oh, I don't have it.
14    A.   Okay.
15    Q.   I'm sure it's somewhere.  There's so
16  many documents.  Okay.  We have -- still here on
17  2C, there's a list of names.  We have Paul
18  Williams, Cheryl Anderson, and Argentry Mitchell.
19  Do you see them?
20    A.   Yes.
21    Q.   I am not concerned about them.  I am
22  concerned about the grievances and EEOC charges
23  filed by, and then it lists several individuals.
24    A.   Right.

Page 211

1    Q.   I just want you to look at those, and
2  were you involved in all of those grievances?
3    A.   I was involved in Howard Brown, Lauren
4  Brown, Kaletha Seay, Joi Basley, Kenneth Greenlaw,
5  Theo Chapman, Ernest Boyd, Emily Pierce, Buford
6  Arrington, Jeannie Wells, Tasha Montgomery,
7  Fernando Johnson.  Other individuals who are not --
8    Q.   You are going off the answer, which is
9  fine.  I just want to be clear for the record that
10  those last two names were off the answer.  That is
11  fine.
12        Going back to Ernest Boyd, he was
13  Mr. Greenlaw's partner, right?
14    A.   Yes.
15    Q.   And was terminated for the same reason
16  as Mr. Greenlaw?
17    A.   Yes.
18    Q.   Was he brought back or no?
19    A.   No.
20    Q.   Okay.  And the last -- kind of the last
21  phrase here says, E-Mails between Jason Smith and
22  the following Michael Willis and Alicia Ortiz.  Do
23  you see that is the last thing under C, second to
24  last line into the last line?

Page 212

1    A.   Okay.
2    Q.   Do you know what is being referred to
3  here when it says e-mails between you and those two
4  individuals?
5    A.   I'm assuming the e-mail that he's
6  referencing is regarding Virginia Caulfield saying
7  that Christen Loeb would rather be disciplined.
8    Q.   Okay.  Would you still have these
9  e-mails between Michael Willis and Alicia Ortiz in
10  your possession?
11    A.   Yes.
12    Q.   So it's safe to say that you don't
13  delete work e-mails; is that right?
14    A.   No, because we are public servants, and
15  I believe that the public has a right to review our
16  e-mails.
17    Q.   Okay.  I want to look at Interrogatory
18  No. 3, and it's basically asking Mr. Chapman here
19  for all persons he talked about his claims in this
20  lawsuit other than his attorneys, and he listed the
21  EEOC investigator and he lists you.
22        This is where he says, The discussions
23  were on the phone and in my home.  I believe we
24  talked about this earlier, but did you talk to



JASON SMITH                                September 20, 2017
ANTHONY JORDAN vs TIMOTHY EVANS            213—216

Page 213

1   Mr. Chapman about his claims of discrimination
2   prior to filing this lawsuit?
3       A.   I believe we had discussions about it.
4       Q.   Have you talked to him about his claims
5   in this lawsuit after he filed the lawsuit?
6       A.   I believe that we have had discussions
7   about it.
8       Q.   Okay.  Do you recall when the last time
9   was you spoke to Mr. Chapman about the lawsuit?
10      A.   Maybe over a month ago.
11      Q.   Okay.  And as long as an attorney was
12  not there, what did you talk about?
13      A.   He just talked about the unfair
14  treatment that is getting to him, that I think it's
15  wearing on him.  He's trying to do the best job he
16  can as far as the work that he's trying to produce,
17  yeah, and that he hopes that it is resolved soon,
18  that some reform is instituted within juvenile
19  probation.
20      Q.   If you turn the page and look at No.
21  5 -- and I don't want to get into the question
22  unless you need it, but what it says here in the
23  answer, it says, I understand from Jason Smith that
24  Ed Walsh signed an affidavit capturing the comments

Page 214

1   that were made during his grievance hearing that
2   justified or indicated his punishment was designed
3   to head off complaints that white officer were not
4   disciplined as harshly.  Do you see that?
5       A.   Yes.
6       Q.   And is this what we were talking about
7   previously, about Ed Walsh and the comments that
8   Mr. Williamson made?
9       A.   William Patterson.
10      Q.   William Patterson.  I was close.  Okay.
11  But that is what this is referring to, right?
12      A.   Yes.
13      Q.   Okay.  There were no other comments that
14  Mr. Patterson made regarding Ed Walsh's discipline?
15      A.   There was other comments, but that is
16  the particular one that kind of stuck out to me
17  because it kind of struck me that, especially him
18  being an African-American, that he would make that
19  type of comment and even in the presence of the
20  chief judge designee.  So that kind of stuck out to
21  me, but there was other dialogue that took place.
22      Q.   And I blame myself for the question.
23      A.   Okay.
24      Q.   Did Mr. Patterson, with Ed Walsh and you

Page 215

1   there, make other comments regarding the -- I guess
2   we can say, like, trumped up allegations against
3   white probation officers?
4       A.   I mean, he -- I don't know if it's
5   relevant, but something about having fun or
6   something that he said.  But, I mean, Ed Walsh, he
7   signed an affidavit, there was e-mails exchanged
8   between Ed Walsh and I because he was so upset that
9   the chief judge designee would allow him to make
10  that comment.
11          I think these particular issues,
12  especially when probationary officers know that
13  they have not done anything wrong, it causes undue
14  stress and it affects their mental capacity,
15  especially when you dedicate your life to a job
16  that you are only there to do, that you love.
17      Q.   And it says you said this and it also
18  says it here, that e-mails were exchanged between
19  you and Mr. Walsh; is that right?
20      A.   Yes.
21      Q.   And you still have those?
22      A.   Yes.
23      Q.   Okay.  No. 6.  It's asking to identify
24  all instances of which you are aware, and it would

Page 216

1   be asking Mr. Chapman, where actions by white
2   officers did not receive the same discipline or
3   scrutiny as actions by African-American peers.  And
4   then the answers on the next page, starting at the
5   top, and it says, I understand from Jason Smith
6   that white officers who are treated in a lenient
7   manner include, and then it lists several
8   individuals?
9       A.   Uh-huh.
10      Q.   Did you tell Mr. Chapman about these
11  individuals listed here?
12      A.   We had conversations about these
13  individuals.  As far as the accuracy of what is
14  written, there may be -- there may be one that
15  might not be right.
16      Q.   Okay.  Let me know.  Which one is that?
17      A.   I think it's Dina Randazzo.  I'm not
18  sure if it was falsification of her work records,
19  but I do know that the department did discipline
20  her.
21      Q.   So all of the officers listed here are
22  white; is that right?
23      A.   Yes.
24      Q.   Okay.  And other than Dina Randazzo, you



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
217–220

Page 217

1  relayed to Mr. Chapman that all of these white
2  officers received more lenient treatment than
3  African-American officers; is that right?
4      A.   Yes.  Mr. Chapman was a steward, so he
5  was involved in the stewards' meetings, so he knew
6  about the information as well.
7      Q.   I just want to clarify for the record,
8  and I'm going to ask your personal involvement or
9  just by reviewing the records.  Okay?
10      A.   Okay.
11      Q.   You know where I'm going with that or
12  what I want, just whether or not you were involved
13  in the grievances or if you just --
14      A.   Reviewed the records.
15      Q.   -- reviewed the records.  Okay.  Kevin
16  Gavin?
17      A.   Reviewed the records.
18      Q.   Rosa Altamirano?
19      A.   Reviewed the records.
20      Q.   Christen Loeb?
21      A.   Reviewed the e-mail.
22      Q.   Paula -- I'm sorry.  Go ahead.
23      A.   There was no investigatory hearing.
24      Q.   Paula Shanahan?

Page 218

1      A.   Reviewed the records.
2      Q.   And Brian Modjeski and William Pieroth?
3      A.   William Pieroth is a deputy, so I would
4  not be involved in that matter.  But Brian
5  Modjeski, I believe I was there.  There was an
6  investigatory hearing that was conducted, and it
7  was stated that it was unfounded, that they would
8  not proceed with discipline to him regarding
9  Anthony Jordan.
10      Q.   Just to be clear for the record, it says
11  those two are listed under no discipline in the
12  matter for which Anthony Jordan was fired, right?
13      A.   Yes.
14      Q.   What was Brian Modjeski's role in that
15  matter?
16      A.   He was the supervisor.
17      Q.   Mr. Jordan's direct supervisor?
18      A.   Yes.
19      Q.   Union employee?
20      A.   Yes.
21      Q.   And Mr. Pieroth was deputy?
22      A.   Uh-huh.  I'm sorry.
23      Q.   That's fine.  Long day.  So he was not
24  unionized, right?

Page 219

1      A.   No.  He was Mr. Modjeski's direct
2  supervisor.
3      Q.   Okay.  Still staying on the answer to
4  No. 6, B, it says, I understand from Jason Smith,
5  and this is referring to Julie Montgomery.  We
6  already talked about her, right?
7      A.   Uh-huh.
8      Q.   Joi Basley, we already talked about her,
9  right?
10      A.   Uh-huh.
11      Q.   Anthony Jordan, we already talked about.
12  Lauren Brown, we already talked about her, right?
13  She was in the complaint?
14      A.   Yes.
15      Q.   I don't think that Denise Dixon was in
16  the complaint.  Was it your understanding that
17  Ms. Dixon got a last chance agreement?
18      A.   She did not get a last chance agreement.
19      Q.   Okay.
20      A.   She got a major -- she got a 30-day
21  suspension.
22      Q.   Okay.  Were you involved in that
23  grievance?
24      A.   No, reviewed the records.

Page 220

1      Q.   Angela Stockdale, same question?
2      A.   Reviewed the records.
3      Q.   Okay.  We already talked about Angela
4  Sneed Pierce.  Is that the same person that we
5  talked about earlier?
6      A.   No, that is a different person but
7  reviewed the records.
8      Q.   So there's an Angela Sneed and an Angela
9  Sneed Pierce?
10      A.   Yes.  There's an Angela Stockdale and
11  then an Angela Sneed Pierce.  That is her married
12  name.  Angela Sneed Pierce is the same Angela
13  Sneed.
14      Q.   Okay.  That we talked about already?
15      A.   Yes.
16      Q.   That is all I wanted to know.  Augustus
17  Sanford?
18      A.   Reviewed his records.
19      Q.   And it says the grievances filed in
20  these cases provide the relevant documents relating
21  to those allegations.  Do you know where these
22  grievances would be found?
23      A.   I have the majority of the grievances.
24  Also, the union should have them, too, and the



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
221–224

Page 221

1 department.

2    Q.    How long does the union keep the
3 grievances for?

4    A.    Again, when I first became vice
5 president and president, all of the paperwork was
6 thrown into a tote, multiple totes and a box, so
7 I'm assuming that Council 31 -- I don't know if
8 they keep them or not, but I would hope that the
9 local would keep them.

10    Q.    Okay.  Let's look at Interrogatory
11 No. 7.  Again, I just want to focus on the answer
12 starting on the third line at the end, it says, I
13 understand from Jason Smith that other officers
14 were not allowed transfers to other units when
15 their units were closed.  These units were made up
16 largely of African-American officers, whites in
17 closed units could transfer.  For example,
18 comparators include Susan Patla and Susan Curcio,
19 white officers who could and did transfer to other
20 units when their own largely white units were
21 closed.

22        We already talked about Susan Patla,
23 right?

24    A.    Uh-huh.

Page 222

1    Q.    Sorry.  You just have to say yes.

2    A.    Yes.  I'm sorry.

3    Q.    Or no.  And her unit was closed when she
4 transferred?

5    A.    No.

6    Q.    All right.  Susan Curcio, white?

7    A.    Yes.

8    Q.    Was her unit closed?

9    A.    No.

10    Q.    But she transferred?

11    A.    Yes.

12    Q.    Were you involved in that transfer?

13    A.    No.

14    Q.    Reviewed documents?

15    A.    Yes.  I was involved in Susan Patla.

16    Q.    Do you know what units were closed that
17 were made up largely of African-American officers?

18    A.    Irene Porter's unit was closed.  It was
19 merged together.  There were several other units,
20 and I can't recall right off the top of my head
21 that were being proposed to close or have certain
22 supervisors impacted, particularly people like
23 Grant Carter, who is African-American, who is
24 probably the only African-American on the scope.

Page 223

1 They was talking about bringing her back into the
2 building.  Irene Porter's position was eliminated.
3 They was talking about closing down the Jumpstart
4 program at one point.  They also was talking about
5 closing the George unit, which is particularly made
6 up of African-American probation officers as well.
7 They closed down the duly involved unit, and, yeah,
8 I would have to review.

9    Q.    That is fine.  I just want to be clear
10 on one thing.  It says here that Mr. Chapman
11 learned from you that other officers were not
12 allowed transfers to other units, when their units
13 were closed.

14        Outside of Chapman and Nelson, were
15 there any other specific African-American officers
16 that were not allowed to transfer when their units
17 were closed?

18    A.    I mean, to be quite honest with you,
19 that does not make sense because if their unit is
20 closed, then where would they go?

21    Q.    That is what I'm trying to figure out.

22    A.    So I'm not sure if that is not stated
23 correctly or not.  Maybe I'm not reading it
24 correctly.

Page 224

1    Q.    You can read it.  It starts on the
2 previous page at the bottom.

3    A.    When their own largely white unit was
4 closed.  So you are saying that these units are
5 made up largely of African-American officers,
6 whites in closed units could transfer.

7    Q.    There needs to be a period there.  I don't
8 know.

9    MR. GEOGHEGAN:  It might need restructuring.

10 BY MR. HAYES:

11    Q.    That's fine.  I'm not trying to call out
12 any typos.  I'm just trying to figure out what is
13 being said here and what you conveyed to
14 Mr. Chapman.

15    A.    What I probably conveyed to Mr. Chapman
16 is that you have largely white units that had no
17 particular function, that the department was trying
18 to justify to the union as to why they were not
19 putting them on the table in order to have them
20 impacted.

21    Q.    When you say "putting them on the
22 table," what does that mean?

23    A.    It means bargaining.  If the union is
24 bringing up certain units and we are saying, Well,



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
225–228

Page 225

1  if you want to impact these bargaining members, can
2  you tell us why this unit is not being introduced
3  compared to the African-American unit that is being
4  introduced and what justification can you provide
5  to the union for closing this particular unit.
6        Particularly like, let's say the Street
7  Dreams program.  The Street Dreams program is made
8  up of African-American males who helped over 1,000
9  kids get jobs, and it was so successful.  It was
10  recognized by the media.  All of our kids was
11  getting jobs.  They was staying out of trouble, was
12  not picking up any new cases.  They was employed
13  and suddenly they restructured and closed that
14  particular program down.
15        But then you have the art therapy unit
16  that is made up of mostly white officers that our
17  kids wasn't benefitting from this program.  As a
18  probation officer, especially a field officer who
19  services these clients, how can you tell us that a
20  program that was employing our kids compared to a
21  program that is not impacting our kids should not
22  be put on the table to bargain.  So they would take
23  that particular officer, maybe fulfill a need in
24  another section of the department, and keep those

Page 226

1  white officers in their unit without closing them
2  down.
3     Q.    Okay.
4     A.    I know it's a lot.
5     Q.    That's fine.  Was it Street Dreams unit?
6     A.    Street Dreams.
7     Q.    I just want to know, when did that
8  happen?
9     A.    I believe it was 2015, maybe '16.
10     Q.    And so that was closed down, that unit?
11     A.    It was restructured.
12     Q.    Restructured.
13     A.    That is the department's favorite term.
14     Q.    Were any of the -- and you -- strike
15  that.
16        You testified it was largely
17  African-American employees, right?
18     A.    It was the only African-American male
19  there.
20     Q.    Pardon me?
21     A.    He was the only African-American male
22  there.  Like, he was the program.
23     Q.    Oh, it was just one person?
24     A.    Yes.

Page 227

1     Q.    Got it.  And what was his name?
2     A.    Mr. Ed Alexander.
3     Q.    And then what happened to Mr. Alexander
4  when it was restructured?
5     A.    He retired.
6     Q.    Do you know if Mr. Alexander asked to be
7  transferred anywhere else?
8     A.    No.  But I do know that he called me
9  upset about what they was doing and decided that
10  this might be a good time for him to leave the
11  department.
12     Q.    Okay.  So we have Jumpstart
13  restructured, right?
14     A.    Yes.
15     Q.    Street Dreams restructured, right?
16     A.    Yes.
17     Q.    What else during the relevant time
18  period, 2012 and now, that other unit departments
19  were restructured, if you know, that actually were
20  restructured?
21     A.    I believe there was a unit that was
22  merged with certain police districts that was kind
23  of merged together to keep white probation officers
24  within their unit to justify their caseload.  So

Page 228

1  like my particular unit covers the 10th and 11th
2  District.  Whereas, a particular unit may only
3  cover the 9th District, and if they don't have a
4  steady flow of cases coming through, you have some
5  probation officers that may have seven or six
6  cases.  So in order to justify not impacting them
7  and allowing them to stay in their unit, they will
8  merge certain units together to keep those
9  probation officers in their positions.  Because a
10  lot of probation officers, they are big into
11  positions, particularly if it's close to their
12  home.  So if the white officers live north, of
13  course they would want to service the north area.
14  Whereas, a black probation officer lives south or
15  the west, he would possibly be into those units.
16     Q.    Okay.
17     A.    And sometimes you are forced to go to a
18  certain area.
19        (WHEREUPON, a certain document was
-10:-22:-47        marked Smith Deposition Exhibit
-10:-22:-47        No. 9, for identification.)
-10:-22:-47  BY MR. HAYES:
23     Q.    Okay.  Mr. Smith, you have been handed
24  what has been marked as Exhibit 9 very similar to



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
229–232

Page 229

1 what we have just been talking about. These are
2 the interrogatory answers of Kenneth Greenlaw.
3         If you could turn to No. 10, which looks
4 like it's going to be -- No. 10. Are you on that
5 one?
6     A.   You said page what?
7     Q.   Interrogatory No. 10. There's no page
8 numbers on here. It's a few pages in.
9     A.   Okay.
10     Q.   It begins, In relation to Paragraph 63
11 of your complaint. Do you see that?
12     A.   Uh-huh.
13     Q.   Just to make sure that we are on the
14 same page. Just because we are talking about this
15 because the answer says, I understand from Jason
16 Smith. Do you see that down below?
17     A.   Uh-huh.
18     Q.   Is that a yes?
19     A.   Yes. I'm sorry.
20     Q.   All right. The answer here says, I
21 understand from Jason Smith that others who worked
22 at IPS, as I did, also failed to complete the
23 vehicle inspection forms on a regular or consistent
24 basis. Do you see that?

Page 230

1     A.   Yes.
2     Q.   Did you tell Mr. Greenlaw this?
3     A.   I presented it at the grievance hearing,
4 yes.
5     Q.   What does IPS mean?
6     A.   Intensive probation supervision.
7     Q.   And that is a unit within the
8 department, right?
9     A.   Yes, it's a specialized unit.
10     Q.   Okay. And does your knowledge of this,
11 what's alleged here, that others who worked in IPS
12 failed to complete the vehicle inspection forms, is
13 that from review of the documents or from personal
14 knowledge?
15     A.   I guess it's my personal knowledge
16 because I reviewed the documents that the
17 department gave to me.
18     Q.   All right. Let me ask it a different
19 way. Were you ever involved outside of
20 Mr. Greenlaw and Mr. Boyd in any grievances
21 involving failure to complete vehicle inspection
22 forms?
23     A.   There was no other investigatory
24 hearings, so no.

Page 231

1     Q.   It says further, Jason Smith requested
2 all the vehicle inspection forms and went through
3 all of them. Is that a true statement?
4     A.   Yes.
5     Q.   And it says here, what you just
6 testified to, Jason Smith presented such
7 information in the grievance hearings?
8     A.   Yes.
9     Q.   And you did do that?
10     A.   Yes, at all steps, including Office of
11 the Chief Judge?
12     Q.   Steps 1 through 4?
13     A.   Yes.
14     Q.   Okay. Outside of what it says here in
15 this answer about reviewing the vehicle inspection
16 forms -- let me rephrase that because line 4 says,
17 But Jason Smith presented such information in the
18 grievance hearings. I want to know exactly what
19 information you presented at the grievance
20 hearings?
21     A.   I presented, again, the statistics of
22 African-Americans being suspended and terminated.
23 I presented information about particular white
24 probation officers, what type of discipline that

Page 232

1 they received. I also presented vehicle inspection
2 forms showing that it was a widespread issue even
3 with myself, that being a probation officer and
4 especially working in a high-risk neighborhood,
5 like Englewood, Lawndale, sometimes you are not too
6 concerned about the vehicle inspection forms, you
7 are more concerned about your safety, and sometimes
8 getting back home and to the building is your
9 number one priority. And oftentimes, especially me
10 being in home confinement, that at times I would
11 forget to complete the vehicle inspection form. I
12 did not understand how that impacted the
13 department, per se, but they used it as a reason to
14 justify the discipline for Mr. Greenlaw, despite
15 the fact that I brought it up that other officers
16 who are in the specialized units, especially IPS,
17 was not completing those forms.
18     Q.   And you are saying that you sometimes
19 did not complete those forms?
20     A.   Yeah.
21     Q.   Were you ever disciplined for that?
22     A.   No. My supervisor would give me an
23 opportunity to make it up, so I'm not sure if
24 Mr. Greenlaw was given that opportunity or even if



JASON SMITH                                          September 20, 2017
ANTHONY JORDAN vs TIMOTHY EVANS                           233–236

Page 233

1  it was brought to his attention because he never
2  received any memo saying that he did not do X, Y,
3  and Z and -- yeah.  But we are talking about almost
4  13 years ago, me being in home confinement.  I
5  don't use a county car.  I actually use my own
6  personal vehicle to conduct my field visits.
7            (WHEREUPON, a certain document was
-10:-22:-47         marked Smith Deposition Exhibit
-10:-22:-47         No. 10, for identification.)
-10:-22:-47  BY MR. HAYES:
11     Q.    Mr. Smith, you have been handed
12  Exhibit 10.  This is another set of
13  interrogatories.  This one answered by Anthony
14  Jordan?
15     A.    Uh-huh.
16     Q.    Same drill as before.  Just ask you a
17  few questions.  Let's go to Interrogatory No. 6?
18     A.    Okay.
19     Q.    So this question is asking Mr. Jordan
20  about a certain paragraph, which you have already
21  actually talked about in the complaint, that says,
22  Actions by white officers did not receive the same
23  discipline or scrutiny as actions by their
24  African-American peers.

Page 234

1        And then the answer says, I have no
2  firsthand knowledge but I received my knowledge
3  from Mr. Smith.  Do you see that?
4     A.    Yes.
5     Q.    And I'm paraphrasing, but is that true,
6  basically what it says there?
7     A.    Yes.
8     Q.    Go ahead.
9     A.    Okay.
10     MR. GEOGHEGAN:  There's no question pending.
11     MR. HAYES:  I thought you like him to talk,
12  Tom.  Just kidding.
13     MR. GEOGHEGAN:  Off the record.
14            (WHEREUPON, discussion was had off
15            the record.)
16  BY MR. HAYES:
17     Q.    What I want to -- why I pointed you to
18  this answer is what I'm looking for is, outside of
19  what we have already talked about today -- because
20  we are getting close to wrapping everything up --
21  it says -- so the allegation in the complaint was
22  white officers did not receive the same discipline
23  or scrutiny as African-American officers, right?
24     A.    Uh-huh.

Page 235

1     Q.    And we've talked about that a lot today.
2     A.    Yes.
3     Q.    Is there anything else that we have not
4  talked about today that you want to add regarding
5  the disparity of discipline -- strike that.
6        Specific examples.  I don't want your
7  opinion.  I want specific examples of disparity in
8  discipline -- I don't want you to guess or
9  speculate -- that you can think of sitting here.
10  I'm looking at the documents and everything, but
11  I'm just trying to cover all bases here.
12        Is there anything that -- specific
13  individuals that we have not talked about today
14  that jump into your mind now as we sit here?
15     A.    Not particularly.  I mean, the mere fact
16  that these plaintiffs are citing me is accurate
17  because no probation officer would have access to
18  the data unless they make a request or put in a
19  request for information.  So each particular
20  officer would not know what any other officer
21  received as far as discipline unless their union or
22  their legal rep provided them with the information.
23     Q.    And you know this information because as
24  a union rep, you asked for it, right?

Page 236

1     A.    I had to fight for it, yes.
2     Q.    But you asked for it, right?
3     A.    Yes.
4     Q.    And you received it eventually, right?
5     A.    Yes.
6     Q.    And you still have it in your
7  possession, right?
8     A.    Yes.  And I was involved directly in the
9  majority of them.
10     Q.    Next page is No. 8.  And, again, this is
11  going to be very similar to what we just talked
12  about.  So the question is asking about
13  paragraph 46 of the complaint, disparate treatment
14  of juvenile probation officers, and then it says --
15  the answer here, last sentence, It is from Jason
16  Smith and his examination of disciplinary records
17  that I have knowledge of the breadth of the
18  racially disparate discipline.  Do you see that?
19     A.    Yes.
20     Q.    And that is basically the answer that
21  you just gave, right?
22     A.    Yes.
23     Q.    All right.  Go a couple pages to
24  Interrogatory No. 14.  It is asking about



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
237–240

Page 237

1 paragraph 56 of the complaint, and again, I just
2 want to focus on the first sentence here, I rely on
3 Jason Smith's compilation of racially disparate
4 discipline.  Do you see that?
5    A.  Yes.
6    Q.  Okay.  Other than what we have talked
7 about today, did you do any other compilation of
8 racially disparate discipline?
9    A.  What do you mean?
10    Q.  So this is Mr. Jordan's answer, so I
11 know that you did not -- you are not answering it,
12 but he's saying that he relied on your compilation
13 of racially disparate discipline, and we talked a
14 lot about the union compiling data and all of those
15 numbers.
16        Did you do any other compilation that
17 you believe maybe Mr. Jordan is referring to here?
18    A.  I don't believe so at this time.  I
19 would have to review my records, but I did talk
20 about the number of investigations or investigatory
21 hearings that was taking place.  I'm not sure if
22 that --
23    Q.  I don't want you to guess what he's
24 answering here.

Page 238

1    A.  Okay.
2    Q.  Yeah.  Sometimes statements, answers
3 allow me to ask a question about a fact, and that
4 is all I wanted.
5    A.  Okay.
6 MR. HAYES:  That's it.
7 MR. GEOGHEGAN:  No questions.
8 THE REPORTER:  Signature?
9 MR. GEOGHEGAN:  We'll probably waive it, but
10 let me get back to you on that.  Okay.
11        FURTHER DEPONENT SAITH NOT.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 239

1 STATE OF ILLINOIS )
2                   ) SS:
3 COUNTY OF C O O K )
4        I, KRISTIN C. BRAJKOVICH, a Certified
5 Shorthand Reporter of said state, do hereby
6 certify:
7        That previous to the commencement of the
8 examination of the witness, the witness was duly
9 sworn to testify the whole truth concerning the
10 matters herein;
11        That the foregoing deposition transcript
12 was reported stenographically by me,
13 was thereafter reduced to typewriting under my
14 personal direction and constitutes a true record
15 of the testimony given and the proceedings had;
16        That the said deposition was taken
17 before me at the time and place specified;
18        That I am not a relative or employee
19 or attorney or counsel, nor a relative or
20 employee of such attorney or counsel for any of
21 the parties hereto, nor interested directly or
22 indirectly in the outcome of this action.
23        IN WITNESS WHEREOF, I do hereunto set my
24 hand and affix my seal of office at Chicago,

Page 240

1 Illinois, this 5th day of October, 2017.
2
3
4
5
6
7        C.S.R. Certificate No. 84-3810.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



JASON SMITH
ANTHONY JORDAN vs TIMOTHY EVANS

September 20, 2017
241

Page 241

```
 1                    I N D E X
 2    WITNESS                    EXAMINATION
 3    JASON SMITH
 4         By Mr. Hayes              3
 5
 6
 7
 8                    E X H I B I T S
 9    NUMBER                          PAGE
10    Smith Deposition Exhibit
11    No. 1                            24
12    No. 2                            40
13    No. 3                            72
14    No. 4                           143
15    No. 5                           193
16    No. 6                           200
17    No. 7                           203
18    No. 8                           205
19    No. 9                           228
20    No. 10                          233
21
22
23
24
```

