Theodis Chapman
August 21, 2017

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ANTHONY JORDAN, KENNETH        )
GREENLAW, THEODIS CHAPMAN,     )
and PATRICK NELSON, and a      )
class of unknown persons       )
similarly situated,            )
                               )
        Plaintiffs,            )
                               )
        vs.                    ) No. 15 CV 5907
                               )
TIMOTHY EVANS, CHIEF JUDGE     ) Judge Sara Ellis
OF THE CIRCUIT COURT OF        )
COOK COUNTY, COOK COUNTY'S     )
JUVENILE PROBATION AND         )
COURT SERVICES DEPARTMENT,     )
MICHAEL ROHAN, CHARLES         )
YOUNG, ROSE MARIE GOLDEN,      )
WILLIAM PATTERSON and          )
UNKNOWN PERSONS,               )
                               )
        Defendants.            )

        The deposition of THEODIS CHAPMAN,
called by the Defendants for examination, taken
pursuant to notice and pursuant to the Federal
Rules of Civil Procedure for the United States
District Courts pertaining to the taking of
depositions, taken before Donna Wadlington
Shavers, a Certified Shorthand Reporter, at 100
West Randolph Street, 13th Floor, Chicago,
Illinois, on the 21st day of August, 2017,
commencing at the hour of 10:00 a.m.

Theodis Chapman
August 21, 2017

---

**2**

1
2  APPEARANCES:
3
4  DESPRES, SCHWARTZ & GEOGHEGAN, LTD.
5  BY: THOMAS H. GEOGHEGAN, ESQ.
6  77 West Washington Street, Suite 711
7  Chicago, Illinois 60602-3271
8  (312) 372-2511 Ext. 213
9  tgeoghegan@dsgchicago.com
10  Appeared on behalf of the Plaintiffs.
11
12
13  OFFICE OF THE ATTORNEY GENERAL
14  STATE OF ILLINOIS
15  ATTORNEY GENERAL LISA MADIGAN
16  BY: JOHN HAYES, ESQ.
17     Assistant Attorney General
18  100 West Randolph Street, 13th Floor
19  Chicago, Illinois 60601
20  (312) 814-5022
21  jhayes@atg.state.il.us
22  Appeared on behalf of the Defendants.
23
24

---

**4**

1     (Witness duly sworn.)
2     THEODIS CHAPMAN,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as
5  follows:
6     DIRECT EXAMINATION
7  BY MR. HAYES:
8     Q. Good morning, Mr. Chapman. My name is
9  John Hayes. I'm representing the Defendant in
10  this matter. I'm an Assistant Attorney General
11  with the Attorney General's office.
12     Could you state your name and
13  spell it for the record, please.
14     **A. Theodis Chapman. T-h-e-o-d, as in**
15  **David, i-s. Chapman, C-h-a-p, as in Paul,**
16  **m-a-n.**
17     MR. HAYES: All right. Let the record
18  reflect this is the deposition of Plaintiff,
19  Theodis Chapman, in the case of Jordan, et al.,
20  versus the Chief Judge of the Circuit Court of
21  Cook County filed in the U.S. District Court for
22  the Northern District of Illinois.
23     The deposition is subject to
24  all applicable federal rules.

---

**3**

1     I N D E X
2  THEODIS CHAPMAN         PAGE
3  Direct by Mr. Hayes     5
4
5
6
7     EXHIBITS
8  Chapman Deposition        ID
9  1 - Second Amended Complaint   44
10  2 - 3/14/11 Memo from DCPO Donna Neal  158
11  3 - Official Grievance Form   190
12  4 - 11/23/15 Memo from Avik Das   191
13  5 - 1/14/16 Memo from Kate Galbraith  191
14  6 - 7/21/15 Memo from Cook County
15     Juvenile Probation & Court Services
16     Labor Management Team   194
17  7 - Charge of Discrimination  216
18  8 - Amended Charge of Discrimination  225
19  9 - Interrogatories   248
20
21
22
23
24

---

**5**

1  BY MR. HAYES:
2     Q. All right. Mr. Chapman, I want to go
3  over just a couple of ground rules.
4     Have you ever been deposed
5  before?
6     **A. Yes.**
7     Q. Okay. How many times?
8     **A. I don't know. It's been a while.**
9     Q. All right. Several? Like more than
10  five?
11     **A. No.**
12     Q. All right. Less than five.
13     When was the last time, if you
14  remember?
15     **A. Let's see. My mom passed in 2009. So**
16  **it had to be around two thousand and, I'm**
17  **thinking, maybe '5 regarding my mom.**
18     Q. Okay.
19     Were you ever the plaintiff in
20  any of these depositions?
21     **A. No.**
22     Q. Okay. Were you the defendant in any
23  of these depositions?
24     **A. Well, for my mom I would have been a**

---

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

6

1    witness.
2        Q.  Okay.
3        A.  The others it's been so long I don't
4    recall.
5        Q.  Okay.  Were any of your depositions
6    employment-related?
7        A.  I think it was more so -- I don't
8    recall it being employment.  It was more so, I
9    think, accident where someone had hit me, I
10   believe.
11       Q.  Okay.
12          MR. GEOGHEGAN:  You may want to speak
13   up a little bit.
14          THE WITNESS:  Oh, I'm sorry.
15          MR. HAYES:  I will get to the nitty
16   gritty and go over some ground rules.
17   BY MR. HAYES:
18       Q.  Do you understand that you are under
19   the same obligation to tell the truth today as
20   you would in front of a judge or jury?
21       A.  Yes.
22       Q.  All right.
23          And when you are talking and
24   answering, the court reporter is going to take

7

1    down everything that we say.  So we need to make
2    sure we have a clear record.
3        A.  Okay.
4        Q.  It's a little stilted.  So what I want
5    you to do is wait for me to finish my question
6    before you answer.  Wait until I'm completely
7    done.  Don't try to anticipate where I'm going.
8    And then I'll do the same thing.  I will wait
9    for you to completely finish your answer before
10   I talk again.  Okay?
11       A.  Sounds good.
12       Q.  All right.  Also need you to be
13   audible.  We need yeses or noes.
14       A.  Okay.
15       Q.  So no nod or shaking.  Do you
16   understand that?
17       A.  Yes.
18       Q.  Okay.  If you don't understand the
19   question, tell me you don't understand it.  I'll
20   either repeat it or I'll try to rephrase it.  Do
21   you understand that?
22       A.  Yes.
23       Q.  All right.  Breaks are fine.  If you
24   need to take a break, just let me know.  All I

8

1    ask is that if there's a question pending you
2    answer the question and then we can take a
3    break.
4        A.  Yes.
5        Q.  Okay?
6        A.  Yes.
7        Q.  All right.
8           Are you taking any medication
9    that would affect your ability to testify today?
10       A.  No.
11       Q.  All right.
12           Is there any reason at all
13   that you can think you would not be able to
14   testify truthfully today?
15       A.  No.
16       Q.  Okay.
17           Outside of this lawsuit that
18   we're here for today, have you ever filed a
19   lawsuit previously?
20       A.  Yes.
21       Q.  And what was it?
22       A.  You want me to answer it in --
23       Q.  Let's --
24       A.  It was -- it was traffic-related

9

1    again.  There was -- someone had hit me.
2        Q.  Okay.  And you took them to court?
3        A.  Yes.
4        Q.  Okay.  And when was that?
5        A.  I believe 2005, I believe it was.
6        Q.  Okay.  Did that go to trial?
7        A.  No.  They went ahead and settled.
8        Q.  All right.  Any other besides that
9    one?
10       A.  No.  The previous one before that was
11   2000 where someone hit me in 2000.  But it --
12   again, it was settled.
13       Q.  Okay.  Other than those two lawsuits,
14   any other ones?
15       A.  No.
16       Q.  Besides this one?
17       A.  Yes.
18       Q.  Okay.
19           What did you do to prepare for
20   your deposition today?
21       A.  Got a good night's sleep.
22       Q.  Did you meet with your attorney?
23       A.  Not today.
24       Q.  Okay.  Did you meet with him

Theodis Chapman
August 21, 2017

10

1    previously in preparation for this deposition?
2        **A. Yes.**
3        Q. Okay. When?
4        **A. Friday.**
5        Q. Okay. For approximately how long?
6        **A. Maybe two hours.**
7        Q. Was anyone else there?
8        **A. No.**
9        Q. All right.
10           Did you speak with anyone else
11   other than your attorney about this deposition
12   today?
13       **A. My pastor.**
14       Q. Okay. And what's his or her name?
15       **A. Reverend Dale A. Lawson. Reverend Dr.**
16   **Dale A. Lawson, Sr.**
17       Q. Okay. And what did you talk to
18   Reverend Lawson about?
19       **A. He prayed for me.**
20       Q. Okay. Was this yesterday?
21       **A. Yes. Sunday.**
22       Q. All right. Okay.
23           Anyone else you talked to
24   about your deposition today?

11

1        **A. My family.**
2        Q. Okay.
3            Are you married?
4        **A. Yes.**
5        Q. I won't get too much into detail.
6    Does your wife work?
7        **A. Yes.**
8        Q. For the State or --
9        **A. No.**
10       Q. -- government? Okay.
11           Do you have children?
12       **A. Yes.**
13       Q. How many?
14       **A. One.**
15       Q. All right. How old?
16       **A. Twenty-four.**
17       Q. All right. And does that child work
18   for the State or any other governmental entity?
19       **A. No.**
20       Q. Okay.
21           Outside of your family did you
22   speak to anyone else about your deposition
23   today?
24       **A. No.**

12

1        Q. Okay.
2            Did you speak to any of your
3    co-workers about your deposition?
4        **A. They already know.**
5        Q. Okay. So you didn't specifically talk
6    to any of your co-workers about the deposition?
7        **A. No.**
8        Q. All right.
9            Did you review any documents
10   in preparation for your deposition today?
11       **A. Just the interrogatories.**
12       Q. Okay. We'll go over those.
13           All right. Let's talk a
14   little bit just about your background,
15   Mr. Chapman. What is your date of birth?
16       **A. 3/12/69.**
17       Q. All right.
18           And this is obvious based on
19   your lawsuit, but what is your race?
20       **A. Black.**
21       Q. All right.
22           How far have you gone in
23   school?
24       **A. Master's degree. I was a doctoral**

13

1    candidate.
2        Q. What is your master's degree in?
3        **A. Political and justice studies.**
4        Q. When did you receive that degree?
5        **A. 2003.**
6        Q. Okay. And where?
7        **A. Governors State University.**
8        Q. Okay. Where did you go for undergrad?
9        **A. Alabama State University.**
10       Q. And when did you graduate there?
11       **A. '97.**
12       Q. All right. And what was your degree
13   from Alabama State?
14       **A. Bachelor's degree of social work.**
15       Q. Okay.
16           Any other degrees; advanced
17   degrees?
18       **A. No.**
19       Q. Okay. When did you -- have you ever
20   been convicted of a felony?
21       **A. No.**
22       Q. When you first started working with
23   the JPD -- I'll -- I'll either call it JPD or
24   the Juvenile Probation Department. You know

4  (Pages 10 to 13)

Theodis Chapman
August 21, 2017

14

1   what I'm referring to?
2       A.  The acronym.  I got you.
3       Q.  Okay.  When did you start working for
4   the JPD?
5       A.  2003.
6       Q.  All right.
7               Was that after you received
8   your master's?
9       A.  Yes.
10      Q.  And what position did you first --
11  sorry.  Strike that.
12              What position did you start in
13  with the JPD?
14      A.  You mean when I became employed?
15      Q.  In 2003.  Yes.
16      A.  I was recruited to be a Jumpstart
17  instructor.
18      Q.  When you say "recruited," how were you
19  recruited?
20      A.  I had previously supervised a program
21  called ERC.
22      Q.  What does that stand for?
23      A.  Evening Reporting Center where I was
24  employed with Aunt Martha's Youth Services.

15

1       Q.  Okay.
2       A.  And I got a lot of critical acclaim
3   from the Casey Foundation for the way the center
4   operated.
5       Q.  How long had you been working in that
6   position?
7       A.  For Evening Reporting Center?  From, I
8   want to say, ninety -- about four years.
9       Q.  Okay.  Around '99?
10      A.  '99.  Yeah.  Around '99.
11      Q.  Was that a full-time job?
12      A.  Yes.
13      Q.  And what were your duties at the
14  Evening Reporting Center?
15      A.  Supervise the Evening Reporting
16  Center; facilitated the programs; the kids were
17  given tutoring, they were given mentoring; guest
18  speakers; outings; cultural enrichment.
19      Q.  You said you were supervising.  Who
20  were you supervising?
21      A.  I supervised from three to four
22  employees.
23      Q.  And what -- I guess, what was the
24  purpose of the ERC?

16

1       A.  It's a detention alternative program.
2       Q.  What does that mean?
3       A.  Well, in lieu of the minors being
4   locked up in the detention center, they would be
5   allowed to remain at home, and then they would
6   be picked up and brought to the center around
7   the time that they are most likely to
8   recidivate, which is the evening time, 4:00 to
9   8:00 p.m.
10              And usually between that time
11  and their next court date they would be at the
12  program, which would usually entail about 60
13  days.
14      Q.  Okay.  Prior to working at the ERC,
15  where did you work?
16      A.  I was still at Aunt Martha's, but I
17  was in a different position.  Prior to the
18  promotion to supervisor, I worked in DCFS
19  placement stabilization.
20      Q.  Why don't you tell me what's Aunt
21  Martha's.
22      A.  Aunt Martha's Youth Services is
23  probably one of the biggest social services
24  agencies in Illinois, and they do a lot of

17

1   contractual work with probation, as well as
2   DCFS, as well as, I think, IDHS now.
3       Q.  And did you start there after college?
4       A.  Yes.
5       Q.  All right.  So '97?  Does that sound
6   right?
7       A.  Yes.
8       Q.  All right.
9               Let's go back up to the JPD.
10  Again, you said you were recruited.  Who
11  recruited you?
12      A.  There was some instances where some of
13  the ERC's that I helped through Aunt Martha's to
14  open up, and there was one on the west side
15  also.  And I got my work with the judges because
16  I would actually be requested to come to court
17  on behalf of some of the kids that actually
18  finished the program, and for whatever reason,
19  DCPO Steve Eisman --
20      Q.  What does DCPO stand for?
21      A.  Deputy chief probation officer.
22      Q.  So just for the record, I'm going to
23  ask probably a lot of acronyms --
24      A.  That's fine.

Theodis Chapman
August 21, 2017

---

18

1    Q. -- because I know --
2    A. That's fine.
3    Q. -- we use a ton of them.
4    A. That's fine. Yeah. That's fine.
5    Q. All right.
6    A. And I had the pleasure of meeting
7    different individuals throughout probation,
8    including judges and including Mr. Eisman. And
9    I also interned at juvenile probation and --
10   during my -- you know, my work with my master's
11   degree. And I was asked to intern in the
12   Jumpstart program, which is where I did my
13   internship.
14   Q. Okay. Well, let's unpack that a
15   little bit.
16          When did you intern at the JP?
17   A. I graduated in 2003, so it was around
18   2002. It was a year. It was a year internship.
19   Q. Okay. And what exactly did you do in
20   that internship?
21   A. I engaged the minors, did groups --
22   Q. What does that mean by "engaging the
23   minors?"
24   A. Engage the minors meaning the kids --

---

19

1    I guess, do you need a little, small synopsis of
2    what Jumpstart is? Or are you okay?
3    Q. We can do it now. Yeah. Go ahead.
4    A. Or you got to get to it with the
5    interrogatories. Either way.
6    Q. No, no. Go ahead.
7    A. They're -- the youth that are in
8    Jumpstart have had difficulties in traditional
9    school settings. Some of these difficulties
10   sometimes entails family dynamics where they may
11   come from violent homes, homes where they are
12   impoverished. Whatever the case may be, it
13   affected their ability to receive a formal
14   education in a normal school setting.
15          So I engage those minors in
16   specific groups that address some of those
17   issues. I created an actual survey for the
18   program, which allowed the minors to give a
19   before and after when they first came into the
20   program and to engage what they learned by the
21   time they completed the program.
22   Q. All right.
23          So your internship in 2002,
24   was that solely in the Jumpstart program?

---

20

1    A. It was 95 percent in Jumpstart, and I
2    was also able to see other aspects of juvenile
3    court as well.
4    Q. Okay. And what were the other
5    aspects?
6    A. IPS, EM.
7    Q. What's IPS?
8    A. I'm sorry.
9    Q. It's all right.
10   A. Intensive probation services.
11   Q. Okay. What does that mean?
12   A. It's when a minor has almost exhausted
13   all of the other remedies that the court has and
14   so they are pretty much one step away from the
15   adult or sent to IDJJ in this case, which is
16   like the adult for juveniles.
17   Q. Prison, right, for juveniles?
18   A. Yes.
19   Q. Essentially, right?
20   A. Essentially.
21   Q. Okay. All right. And so IPS you
22   said. What else?
23   A. EM, electronic monitoring.
24   Q. Okay. That's self-explanatory. What

---

21

1    else?
2    A. Drug unit.
3    Q. What's the drug unit?
4    A. Drug unit is where minors that have
5    a -- a substance abuse issue. And that
6    specialized unit works on addressing some of
7    those issues that are underlining which are
8    causing the minor, in addition to utilizing
9    drugs, to reoffend.
10   Q. Anything else?
11   A. EM. I want to say I did -- I went out
12   in the district with some field officers, and
13   that's the current position I'm in now.
14   Q. Field probation officers?
15   A. Field probation officers. Yes.
16   Q. Okay.
17          While you were an intern, did
18   you receive any type of training in any of these
19   units?
20   A. Just from where I observed. It's all
21   training as you observe. You're given an
22   in-depth look at what entails the duties, the
23   day-to-day, things that you wouldn't otherwise
24   learn in a classroom.

---

6 (Pages 18 to 21)

Theodis Chapman
August 21, 2017

22

1    Q.  And you did that for about a year; is
2  that right?
3    A.  Yes.
4    Q.  Okay.
5      Do you remember the specific
6  date when you were first hired in 2003 with the
7  JPD?
8    A.  I believe it was April 7th, I believe.
9    Q.  So April 2003 sounds right?
10   A.  (No audible response.)
11   Q.  And what was your first position with
12 the Juvenile Probation Department?
13   A.  Jumpstart instructor.
14   Q.  Tell me what that -- what the duties
15 of Jumpstart instructor entailed.
16   A.  The duties include engaging those
17 minors that have been disconnected from
18 traditional school settings and also have a high
19 propensity to recidivate; creating an atmosphere
20 where they can be sort of reconditioned as to
21 what a student entails, knowing how to ask
22 questions, how to function in the classroom;
23 addressing some of the behavioral issues; using
24 positive reinforcement; breaking things down to

23

1  them almost -- because many of them were like at
2  a -- between a first and third grade level.  So
3  the -- they needed academic remediation.
4    Q.  And where was this done at?
5    A.  On the third floor in the Juvenile
6  Probation Department, not in the TDC, which is a
7  Temporary Detention Center, otherwise known as
8  the Audy Home.  It was done actually in the
9  probation side, third floor.
10     And we -- about 20 weeks we
11 would have them.  There's two components.
12 There's a classroom component and an outreach
13 component.  The goal was to reengage those
14 minors, increase their academic aptitude through
15 pre and post testing, engage them and help them
16 with those issues that behaviorally cause
17 disruptions in a normal class setting.
18     They learned how to coexist
19 with other students.  Many of the minors were
20 gang involved, so they learned to work with
21 other youth that were also in opposing gangs.
22 And they learned how to do conflict resolution.
23     Because many of these kids,
24 they were taught to hate each other.  Some of

24

1  them have even had individuals in the same room
2  that had shot at each other.  But for the first
3  time, people got a chance to see these kids walk
4  out of the building, actually, as kids should.
5  And then they would be reintegrated with the
6  traditional school in the neighborhood.
7    Q.  What was the outreach component?
8    A.  The outreach component is once they
9  are done with the classroom component, they
10 would then be reconnected with a traditional
11 school near their neighborhood.  And then we
12 would monitor them on a week-by-week basis to
13 assist with the transition.
14   Q.  While you were an instructor, were you
15 involved in the outreach component?
16   A.  Yes.  Yes.
17   Q.  All right.
18     When you started in 2003, how
19 many -- if you know, how many total Jumpstart
20 instructors were there?
21   A.  That have come and gone or --
22   Q.  Just when you started in 2003, how
23 many were there?
24   A.  There were --

25

1    Q.  If you know.
2    A.  Four.
3    Q.  Do you know the names of them?  Just
4  --
5    A.  Randall Strickland, Nicole Wright,
6  Patrick Nelson, and myself.
7    Q.  What is their race?
8      I know Mr. Nelson's race.
9  He's African American, right?
10   A.  Yes.
11   Q.  Okay.  What is the race of
12 Mr. Strickland --
13   A.  They were also African American.
14   Q.  Both of them?
15   A.  Both of them.  Yes.
16   Q.  Okay.
17     And you held that position of
18 Jumpstart instructor until when?
19   A.  Until I was removed in 2015.
20   Q.  So I want to, I guess, just ask a
21 couple questions on that -- on this time period,
22 2003 to 2015, while you were a Jumpstart
23 instructor.
24   A.  Right.

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

26

1    Q.  You said when you started there were
2  four instructors.  Did that number change over
3  time?
4    A.  Yes, it did.
5    Q.  All right.  How did it change?
6    A.  Nicole Wright married and moved to
7  Arizona.  Randall Strickland subsequently found
8  another position outside of the department.
9    Q.  Do you know approximately when those
10  things happened?
11    A.  I don't recall.
12    Q.  All right.
13       Were either of those two
14  individuals replaced?
15    A.  Randall was replaced.
16    Q.  Do you know by who?
17    A.  I believe it was -- I think it was
18  Johanna Almaraz.  J-o-h-a-n-n-a, Almaraz,
19  A-l-m-a-r-a-z.  Almaraz.  I believe that's it.
20    Q.  Okay.  Was Ms. Wright replaced?
21    A.  No.  It just -- then it became three
22  instructors.
23    Q.  All right.
24    A.  Patrick and I took up the bulk of the

27

1  work.
2    Q.  Do you know approximately when that
3  was when you moved down to three?
4    A.  I don't recall right now.
5    Q.  That's fine.
6    A.  Maybe later it might come back to me.
7    Q.  That's fine.
8       During this time period, 2003
9  to 2015, did that number ever change from once
10  it went to three?
11    A.  When Johanna left it actually went
12  down to two for a while.  There was just
13  Mr. Nelson and myself.
14    Q.  Okay.  Do you know when Johanna left?
15    A.  Let's see.  It may have been -- and
16  this is rough -- around 2010.
17    Q.  All right.
18       And while we are on her, what
19  was her race, Ms. Almaraz?
20    A.  She's Hispanic.  Hispanic or Latino.
21    Q.  That's fine.
22       When Ms. Almaraz left it went
23  down to two; is that right?
24    A.  Correct.

28

1    Q.  Just you and Mr. Nelson?
2    A.  Correct.
3    Q.  And did it change after that?
4    A.  I don't know how much time in between,
5  but then there was another officer came, a
6  female.  Kisha Roberts.
7    Q.  Do you know how to spell her first name?
8    A.  K-i-s-h-a.
9    Q.  Okay.
10    A.  And it may have been a year, I
11  believe, then she came.  Maybe a year, year and
12  a half then she came.
13    Q.  So maybe for a year to a year and a
14  half, it was just you and Mr. Nelson?
15    A.  Correct.
16    Q.  And Ms. Roberts' race?
17    A.  She's African American.
18    Q.  Okay.  Anyone else come after that?
19    A.  After Ms. Roberts left --
20    Q.  She left, too?
21    A.  Yes.
22    Q.  Okay.  When did she leave?
23    A.  Let's see.  I believe she left around
24  two thousand and -- it's kind of hazy right now.

29

1    Q.  That's fine.
2    A.  I'm thinking two thousand and -- may
3  have been '14 I'm thinking.  Put a question mark
4  next to it.
5    Q.  Okay.
6       And after Ms. Roberts left,
7  did anyone else come in?
8    A.  After about -- I think it was six
9  months maybe -- between six months and a year,
10  then Tatanesha Jackson came.  T-a-t-a-n-e-s-h-a
11  or it might be an n-i.
12    Q.  Okay.  Jackson?
13    A.  Jackson.
14    Q.  And her race?
15    A.  She's African American.
16    Q.  All right.  Anyone else come in?  Up
17  to -- let's go up to 2015.
18    A.  And then when Mr. Nelson and myself
19  were -- well, they brought in an officer who had
20  just came out of training.  Dale Lomax.
21    Q.  When was this?
22    A.  This was 2015.
23    Q.  All right.
24    A.  Right before they removed me and

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

30

1    **Nelson.**
2    Q.  Mr. Lomax's race?
3    **A.  African American.**
4    Q.  All right.
5         So 2015, was there anyone else
6    in the Jumpstart unit?  Right now I've got you,
7    Mr. Nelson, Ms. Jackson and Mr. Lomax.  Does
8    that sound right?
9    **A.  And now they have just brought in two**
10   **thousand and -- I believe it was the beginning**
11   **of two thousand -- it was this year sometime.**
12   **They brought in Dan O'Connell.**
13   Q.  Okay.  His race?
14   **A.  White.  Caucasian.**
15   Q.  I want to focus in -- just to be
16   clear, 2015 when you and Mr. Nelson were
17   reassigned, was it right that it was the four of
18   you?  So you, Mr. Nelson, Ms. Jackson, and
19   Mr. Lomax?  Does that sound right?
20   **A.  It was me, Mr. Nelson and Lo --**
21   **Jackson.**
22   Q.  Okay.
23   **A.  When they removed me and Nelson, then**
24   **they brought in Lomax.**

31

1    Q.  Okay.  So that was after --
2    **A.  This is all 2015.**
3    Q.  -- your transfer?
4    **A.  Yes.  Yes.**
5    Q.  Okay.  Got it.
6    **A.  Yes.**
7    Q.  Thanks.
8    **A.  The latter part of 2015.**
9    Q.  So when you and Mr. Nelson were
10   removed, the only other person was Tatanesha
11   Jackson, is that right, as a Jumpstart
12   instructor?
13   **A.  Right.  And that was short lived**
14   **because they moved her.  They changed the title**
15   **of instructor to something else, but that's how**
16   **it went.**
17   Q.  Let's focus 2015.  So when there's
18   three of you in there, including Ms. Jackson, so
19   I'm talking about --
20        Were your job duties the same
21   as what you had previously described?
22   **A.  They were.  And, of course, there were**
23   **more of those duties.  So there was more work to**
24   **be done.**

32

1    Q.  Why was there more of those duties?
2    **A.  Every time a new DCPO came in, they**
3    **would add additional duties.  Deputy chief**
4    **probation officer.**
5    Q.  Yeah.  Yeah.  I got it.
6         Can you describe what the
7    additional duties were?
8    **A.  They were changing the program.  They**
9    **shortened the weeks.**
10   Q.  Shortened it from what to what?
11   **A.  They shortened it from -- I believe it**
12   **was twelve to ten, and then it went from ten, I**
13   **believe, to eight.  The type of students that we**
14   **received were more gang involved, so there was a**
15   **lot more intense --**
16   Q.  Approximately, when did these changes
17   happen?
18   **A.  They started in 2013 with DCPO Donna**
19   **Neal.**
20   Q.  Would she have been your supervisor?
21   **A.  She's the deputy.  Supervisor was Tina**
22   **Young.**
23   Q.  Okay.  That was kind of my next line
24   of questioning.  I guess we'll work backwards.

33

1         When you were removed in 2015,
2    who was you direct supervisor?
3    **A.  My direct supervisor was Tina Young.**
4    Q.  All right.  And then how far back
5    would she have been your direct supervisor?
6    **A.  2008.**
7    Q.  All right.
8         And can you tell me about the
9    hierarchy a little bit.  So who was Ms. Young's
10   supervisor?
11   **A.  The DCPO.**
12   Q.  It would have been Ms. Neal?
13   **A.  Yes.**
14   Q.  All right.  Do you know how long she
15   was in that position?
16   **A.  Neal was there from, I believe, 2012**
17   **to 2013.**
18   Q.  All right.
19        And who was after Ms. Neal?
20   Let's get her race while we're on it.
21   **A.  African American.**
22   Q.  Okay.  Ms. Young's?
23   **A.  African American.**
24   Q.  All right.  So who was after Ms. Neal?

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

Theodis Chapman
August 21, 2017

34

1      A. After Ms. Neal then came DCPO Melissa
2  Spooner.
3      Q. Her race?
4      A. She's Caucasian.
5      Q. Thank you.
6         All right. And anyone after
7  her?
8      A. After Spooner came DCPO Dennis
9  Alexander, African American. After DCPO
10 Alexander came DCPO Johnson, also African
11 American.
12     Q. First name?
13     A. Dwayne Johnson.
14     Q. Thank you.
15         When you were removed from
16 Jumpstart in 2015, who was -- was Mr. Johnson
17 your supervisor?
18     A. He was -- Tina Young was still my
19 supervisor.
20     Q. Oh, sorry. He was DCPO.
21     A. Dwayne was still the DCPO.
22     Q. Got it. Thanks.
23         And then who does the DCPO
24 report to?

35

1      A. DCPO reports to the director or in
2  this -- in this case the director or the interim
3  director, which is Avik Das.
4      Q. A-v-i-k D-a-s.
5      A. I think he's Pakistani. I don't want
6  to mistake it, but I believe he's Pakistani.
7      Q. Do you know why these changes, like
8  more duties and length from the twelve to eight
9  weeks, why those changes were made, if you know?
10 I guess -- let me rephrase that. That was poor.
11         Was it ever conveyed to you
12 why these changes were made?
13     A. There was an underlining retaliatory
14 effect that started taking place, particularly
15 with me and Nelson.
16     Q. All right. And that would have been
17 beginning 2013?
18     A. '13.
19     Q. Okay. And that was when Ms. Neal was
20 the DCPO?
21     A. Correct.
22     Q. What do you mean when you say
23 "retaliatory?"
24     A. There was -- as we became involved in

36

1  the union at the request of then President Avik
2  Das, who's now the interim director of juvenile
3  probation, as we were defending a lot more black
4  officers from charges that did not have merit or
5  substance and it became this pattern, we then
6  started finding ourselves with an X on the back
7  of you.
8      Q. When you say "we," you mean you and
9  Mr. Nelson?
10     A. Yes.
11     Q. Okay.
12     A. It was often disparate treatment as
13 how things related to us and other people.
14     Q. When did Mr. Nelson start in
15 Jumpstart, if you know?
16     A. I started in '93. So I believe Nelson
17 started in '91 or '90. Somewhere around there.
18 '91 or '90 --
19     Q. You mean 2000, 2001?
20     A. I started in 2003. So he started in
21 2001 or -- 2000 or 2001, somewhere around there.
22     Q. Before you?
23     A. Before me, yes.
24     Q. All right.

37

1      A. He was actually -- he was actually the
2  one who helped create the program.
3      Q. Okay. Over the time period that you
4  were a Jumpstart instructor, did -- well, I
5  guess, let's backtrack.
6         How would you get, like, the
7  youth into these programs? How did you get the
8  students? Were they ordered by the Court or how
9  did they end up in the Jumpstart program?
10     A. You were right there. The judges
11 would order them. Probation officers would
12 refer them. There's an internal referral form.
13 The public defender could refer them. Even the
14 state's attorney could refer them. And a kid
15 could actually ask his PO, "Can I go?"
16     Q. Did you know this over the -- over
17 this 12-year time period, 2003 to 2015, that the
18 number of students in the Jumpstart program
19 increased or decreased over time?
20     A. It actually had increased. When I
21 first started interning, Jumpstart would have
22 sometimes 40, 45 kids. And it would -- it
23 peaked to the point where we had to open up and
24 get another classroom. And then eventually we

10 (Pages 34 to 37)

Theodis Chapman
August 21, 2017

38

1  had to have three classrooms so that the program
2  rotated just like a -- like a mock school, if
3  you would.
4     Q.  Okay.  And then in 2015, how many
5  students were there, if you know?
6     A.  2015, from what I recall, because
7  they -- there's -- there was the opening of some
8  alternative schools, I want to say, maybe around
9  20 kids, 20.
10    Q.  When you say opening of alternative
11 schools, what do you mean?
12    A.  Well, the opening of alternative
13 schools gave some kids opportunities that didn't
14 otherwise exist because crossing gang lines.
15    Q.  Okay.  I guess I'm -- just want more
16 clarification of what an alternative school is.
17    A.  Well, alternative -- the alternative
18 -- "charter schools" is the term you may know it
19 as.  Charter schools started opening.
20    Q.  Okay.
21    A.  And some were opening in the kids --
22 in their ZIP code.  And instead of them having
23 to cross sometimes gang lines, which could mean
24 life or death, coming to the court was always

39

1  the safest option.  It was in a secure facility.
2  You would have to go through security.  It was
3  always a safe option.
4     Q.  So these charter schools would open
5  within neighborhoods?
6     A.  Right.
7     Q.  And then they could go there?
8     A.  Yes.
9     Q.  All right.
10          And who would make the
11 determination of whether they would go to either
12 a charter school or to you?
13    A.  They could still come to Jumpstart.
14    Q.  Okay.
15    A.  We would still assess them.  And if a
16 minor required still some things that they --
17 that would present difficulties as it would in a
18 traditional school, which would be behavioral
19 issues, family issues, conduct disorders, then
20 we would still have them in Jumpstart first to
21 increase the opportunities for them being
22 successful, not just to dump them in a charter
23 school, per se, because it's in the
24 neighborhood.  The issues that they have many of

40

1  the charter schools still weren't prepared to
2  address.
3          And those skill sets that we
4  had and the success that we have had over time,
5  Patrick and I still have those skill sets and we
6  still provided those services, which were now
7  known throughout the court including to the
8  judges --
9     Q.  Okay.
10    A.  -- who would still order the kids to
11 start at Jumpstart.
12    Q.  And how long would they be at
13 Jumpstart before you would send them to a
14 charter school?
15    A.  After assessing them remedially, some
16 of them needed remedial instruction.  Some of
17 them had literacy issues.  Some could barely
18 read.  So it did not fair them just because a
19 charter school opened in their neighborhood that
20 they just go to their charter school and they
21 have literacy issues.
22          So we -- Nelson and I are
23 trained in multi-sensory learning.  We also
24 address those issues first before transitioning

41

1  that minor to a charter school.
2     Q.  Would a minor ever be sent right to
3  the alternative or charter school?
4     A.  That has been done.  Or yes.
5     Q.  That's fine.
6          We are -- we're going to leave
7  Jumpstart.  We'll come back.  I want to get into
8  your specific claims.  But now I want to go
9  through -- stay on your employment history.  So
10 2015 you were removed from -- as a Jumpstart
11 instructor; is that right?
12    A.  Yes.
13    Q.  All right.
14          Do you know what your salary
15 was at that time?
16    A.  In the 60s maybe.  Somewhere in the
17 60s.  Close to 70.
18    Q.  And you were -- we'll get back to
19 that.
20          So after being a Jumpstart
21 instructor, what was your next position?
22    A.  I was -- you want the information that
23 segues into that answer?  Or you just want --
24    Q.  No.  Just -- we'll get into it.

11  (Pages 38 to 41)

Theodis Chapman
August 21, 2017

**42**

1  But -- so right now just tell me what -- after
2  2015 you moved from Jumpstart?
3  **A.  Correct.**
4  Q.  What was your position?
5  **A.  I was then forced into a field**
6  **position where I currently am now.**
7  Q.  Field probation officer?
8  **A.  Field probation officer, yes.**
9  Q.  Did your salary change?
10  **A.  No.**
11  **Actually -- yes, in a way.**
12  **Because they had me working overtime that I**
13  **wasn't being paid.  So I don't know if that**
14  **means it changed or it should have went up, but**
15  **it didn't because, again, I was new in this**
16  **position.**
17  Q.  All right.  So, again, let's unpack
18  that.
19  As -- so you're saying as a
20  field probation officer, you were working
21  overtime?
22  **A.  I was being -- when you are doing**
23  **socials or investigations, you have to work over**
24  **sometimes your time because you don't -- just**

**43**

1  **like a police, you don't just stop an**
2  **investigation because it's time to clock out.**
3  **Your supervisor knows about it**
4  **because a judge has ordered the investigation.**
5  **Your deputy knows about it.  And so I was new to**
6  **the position and was unbeknown to me that when**
7  **I'm interviewing these families and it's going**
8  **over that I was supposed to be compensated for**
9  **that time.**
10  Q.  All right.
11  **A.  So I guess to your answer is, no, it**
12  **didn't change, but it should have changed.**
13  Q.  So you're saying that you should have
14  been paid for overtime that you weren't; is that
15  right?
16  **A.  Correct.  In that capacity.**
17  Q.  And how long did that happen for?
18  **A.  Almost a year.**
19  Q.  All right.  And then that changed?
20  **A.  Yes.  I became aware.**
21  Q.  Okay.  And so -- so let's say,
22  maybe --
23  Can you give me the date when
24  you were transitioned to a field probation

**44**

1  officer?
2  **A.  11/15/2015.  So it was around that.**
3  **Somewhere around November.**
4  Q.  All right.
5  **A.  They drew our names in hats.**
6  Q.  So then in -- from that until sometime
7  in 2016 -- do you know when in 2016 you became
8  aware of the overtime issue?
9  **A.  Maybe around -- maybe six months after**
10  **being in the position.  Because there was an**
11  **issue that came up with a client whose mom got**
12  **off work later.  And I found that the families**
13  **didn't fit the whole stereotype that they are**
14  **all living in public housing, and POs could just**
15  **pop in anytime.  They are working families.**
16  **Although they are struggling, they still work,**
17  **and sometimes they got off later.**
18  Q.  All right.  So approximately six
19  months in the position --
20  **A.  About six months is when --**
21  Q.  -- you realized that you should have
22  been paid overtime?
23  **A.  Yes.**
24  Q.  All right.

**45**

1  And from that period until
2  now, have you been paid overtime?
3  **A.  No.  Once I found out then they came**
4  **at a different standard for myself or a**
5  **different set of rules for me.  They forced --**
6  **tried to -- well, they, at one point, forced me**
7  **to use anytime that I worked over in some form**
8  **of a flex fashion, where instead of still paying**
9  **me to divert from paying me overtime, they would**
10  **say, well, you have to flex it.**
11  Q.  What does that mean "to flex it?"
12  **A.  Flexing -- exactly.  Flexing means**
13  **that if I work overtime -- if I worked five**
14  **hours over on a Friday doing a social with a**
15  **kid, technically that's supposed to be 7.5 hours**
16  **I've earned comp time.  They will say, well,**
17  **just take the five hours and you want to get off**
18  **early next Friday or some day or whatever, then**
19  **we'll adjust it.  But what they didn't tell me**
20  **was that the interim director --**
21  Q.  Mr. Das?
22  **A.  -- Das put in a separate provision for**
23  **me.  Whereas, if I'm busy in court, I didn't**
24  **realize it expired.  So he put an expiration**

12  (Pages 42 to 45)

Theodis Chapman
August 21, 2017

46

1  date in there for me.  That if I didn't use it
2  within the same week that I got it, it expired.
3       Q.  All right.  So when did this happen,
4  the expiration date?
5       A.  It had been happening in the last --
6  the last -- probably the last -- I want to say
7  last -- from that time I found out in that six
8  months after, I was kind of monitoring the times
9  specifically.
10           So I would want to say in the
11  last three, four months it's been happening on
12  the regular.  But I had to file a grievance
13  because, again, some of my comp time so-called
14  expired or the flex time that they were
15  so-called allowing me to.
16       Q.  You said two things.  So I just want
17  to be clear.  Overtime and comp time.
18       A.  Overtime is comp time.
19       Q.  Okay.  So you -- you weren't -- when
20  you say "overtime," you weren't being paid time
21  and a half, right?
22       A.  Right.
23       Q.  You would be basically banking extra
24  hours; is that right?  That you could then use

47

1  to take off.  Is that -- am I understanding this
2  right?
3       A.  It's supposed to be overtime, but they
4  switched it for me so that I wouldn't get
5  overtime.  And instead they made it straight
6  time to be used at a later date, if that makes
7  sense.  It's supposed to be -- by law I'm
8  supposed to receive overtime, time and a half,
9  when I worked over my -- my 40 hours.  That
10  didn't apply to me because there was a different
11  standard for me.
12       Q.  Just for you?
13       A.  Just for me.  Just based on my race
14  and the disparate treatment.
15       Q.  All right.
16           Were -- are you aware of other
17  field probation officers receiving overtime
18  during this time period --
19       A.  Yes.
20       Q.  -- 2015 to now?
21       A.  Yes.
22       Q.  So there were other field probation
23  officers that were receiving paid overtime; is
24  that right?

48

1       A.  That's right.
2       Q.  Okay.  Was it everyone else but you?
3       A.  I know I wasn't.  I know there was a
4  different standard for me, and I know some other
5  people that didn't have that same standard for
6  them.
7       Q.  Okay.  Who did not have that same
8  standard?
9       A.  Jason Smith, for example.
10       Q.  He was being paid overtime?
11       A.  Yes.
12       Q.  And Jason Smith's race?
13       A.  African American.
14       Q.  Okay.  Anyone else you can think of
15  that was being paid overtime?
16       A.  When I spoke to some officers -- and
17  I'm trying to recall, it was just some
18  general -- that were in the position before me
19  and some that are supervisors now, they never
20  heard of this flex thing.
21       Q.  All right.
22       A.  Minnie Blair.
23       Q.  Well, I don't -- I'm looking more for
24  people that either -- who had received overtime.

49

1       A.  Well, Jason Smith is current.
2       Q.  Can you think of anyone else --
3       A.  Um --
4       Q.  -- besides -- no, sorry.  Let me --
5  yeah.  I'm switching gears.
6           Anyone else besides you who is
7  under this, you know, flex time/comp time
8  program?
9       A.  Yeah, my colleague.  She's African
10  American.  Tonette Jones.
11       Q.  Okay.  Anyone else?
12       A.  The other two in my unit also who are
13  Latino.  Solamei -- I'm trying to think of her
14  last name.  Juan Arguielles, J-u-a-n
15  A-r-g-u-i-e-l-l-e-s.  And I am trying to think
16  of Solamei's last name.  I'll think of her -- it
17  will come to me.
18       Q.  That's fine.
19           So just to be clear, you came
20  up with two other individuals who -- you came up
21  with three actually.  Ms. Jones and then these
22  two other Latinos who are subject to this
23  flex-time policy; is that right?
24       A.  Correct.

13  (Pages 46 to 49)

Theodis Chapman
August 21, 2017

50

1    Q.   Okay.  And is this flex-time policy
2  still in effect for you?
3       A.   It is not a written policy.  It's
4  verbal.  I have requested an actual paper form,
5  and I have not received anything.  So it's all
6  verbal.
7       Q.   All right.  So as of right now, why
8  don't you -- if you can tell me -- what is your
9  understanding of the -- however you want to call
10  it -- flex time/comp time policy, as it applies
11  to you?
12       A.   As it applies to me.  If I -- if my
13  supervisor has -- she has notification that I'm
14  working over, the time that I worked over is to
15  be flexed later, not awarded as time and a half.
16       Q.   So straight time.  So say you worked
17  three hours over --
18       A.   It's all straight time.
19       Q.   All right.
20            You are then -- you then can
21  flex those three hours later?
22       A.   Later.
23       Q.   All right.  And --
24       A.   But for me there was an expiration on

51

1  that later.  Later meant sooner than later.
2       Q.   And what was the expiration on that?
3       A.   Within the week of.
4       Q.   Is that still in place?
5       A.   It still is in place until I filed a
6  grievance because they had expired my time again
7  and I had to file a grievance.
8       Q.   When did you do that?
9       A.   This was in the last two weeks.
10       Q.   Okay.
11       A.   Last two weeks.
12       Q.   So currently, as you sit here today,
13  do you still have to use your flex time within a
14  week?
15       A.   Now they have -- since the grievance I
16  told them I don't want any flex.  I'd rather
17  have my comp time because that doesn't expire.
18       Q.   Okay.
19       A.   Because if I'm inundated some days --
20  some weeks I have court three days a week.  And
21  if I take off on a Friday and because it's not
22  written down, if I forget, they forget.
23       Q.   All right.
24            You used the terms "comp time"

52

1  and "flex time."  I just want to know what is
2  your -- when you say those -- you seem to be
3  using those terms differently.  What is your
4  understanding of how they are different?
5       A.   Well, overtime is usually the same
6  acronym for comp time.  Flex time is something
7  that actually they create.  It's supposed to be
8  under a flex schedule, but flex time is
9  basically saying that since you have banked this
10  time from working over, instead of us giving it
11  to you in a standard overtime, time and a half,
12  we will give it to you straight time.  But you
13  can flex it somewhere later in -- when you work.
14       Q.   Okay.  Let's go back.  All right.  So
15  I think I understand flex time now.  Now let's
16  go to the comp time --
17       A.   Okay.
18       Q.   -- which you are also referring to as
19  overtime, right?
20       A.   Right.
21       Q.   All right.  All right.  And I just
22  want to be clear.
23       A.   That's fine.
24       Q.   When you are referring to that -- so

53

1  that would be like time and a half, right?
2       A.   Correct.  Correct.
3       Q.   And that -- are you getting money for
4  that?
5       A.   No.  No.
6       Q.   All right.
7       A.   It goes in the bank, you know, just
8  like the time bank now with the new system where
9  you -- there's a software program that we have
10  now where we can look at our hours and
11  everything that we have banked and there's a
12  segment for your comp time.  And it's supposed
13  to go in there if it's your comp time or your
14  overtime that you worked, time and a half.
15       Q.   Okay.
16       A.   So it's not in a monetary form, but
17  it's in your time.
18       Q.   All right.
19            So, currently, are you
20  getting -- now I think we understand the
21  difference or I do at least.
22            Are you getting flex time or
23  comp time for the hours you work over?
24       A.   They are still pushing this flex time.

14  (Pages 50 to 53)

Theodis Chapman
August 21, 2017

54

1  So --
2      Q.  So you're getting straight hours
3  for -- say you worked two hours over, you're
4  getting the two hours credit?
5      A.  Yes.  Yes.  I --
6      Q.  Is that right?  Sorry.  Is that right?
7      A.  Repeat that.
8      Q.  You get -- say you worked two hours
9  over in a week.  You are getting two hours
10  credit flex time; is that right?
11      A.  Correct.
12      Q.  Okay.
13      A.  If I am to pursue my overtime for
14  that, they have given me a separate form I need
15  to fill out that my supervisor has to sign, the
16  deputy has to sign, and then they send it to the
17  director, the interim director, Avik Das.  And
18  he still reserves the right to -- even after my
19  supervisor has approved it, my deputy has
20  approved it, but for me he still reserves the
21  right to reject it.
22      Q.  Have you done that, filled out the
23  form?
24      A.  I have it now going forward.  I have

55

1  copies of the form.
2      Q.  So you just started doing that; is
3  that right?
4      A.  Yeah.  After I filed the grievance.
5      Q.  All right.  Has it been denied yet?
6      A.  I have yet to utilize it.
7      Q.  Oh, okay.  So you haven't turned in
8  the overtime form yet?
9      A.  Not yet.  Not yet.
10      Q.  Okay.  Talking a lot about overtime.
11  How many hours -- what are your regular hours
12  per week?
13      A.  35 to 40 hours, minus the one-hour
14  lunch.
15      Q.  All right.
16          And then, approximately, how
17  many times -- or how many hours would you say
18  you're working over a week?
19      A.  See, again, when you go to court and
20  you get a minor that has a sentencing and dispo,
21  at trial the judge can order a social
22  investigation, which most times happen.  And in
23  that is when you are confronted with the reality
24  that unlike back in a decade ago where most of

56

1  the families, even though they were low income,
2  they were living in low-income housing, and you
3  could just go to the house anytime because they
4  are there.
5          Now you have parents that are
6  working.  Some are working poor.  Some are
7  juggling multiple kids, single parent.  So it's
8  not just a cookie-cutter set time.  You work
9  around them picking up kids, going to work,
10  safety issues.  So you try to make yourself
11  available for the families.
12          And when you -- when I
13  noticed, I notified my supervisor and we put
14  everything in the JEMS system.  So --
15      Q.  Was does that mean?
16      A.  JEMS kind of looks like --
17      Q.  Does that stand for something?
18      A.  It kind of looks like Commodore 64.
19      Q.  Oh, I can imagine.  What is that?
20  What is the lettering?
21      A.  J-E-M-S.
22      Q.  J-E-M-S.
23      A.  And I forgot what the acronyms mean,
24  but it's some kind of electronic management

57

1  system.  But if you could just think of
2  Commodore 64 with the green screen and the
3  light --
4      Q.  I got you.
5      A.  -- that's kind of how it looks.  It's
6  kind of that kind of -- and acronistic
7  (phonetic) too.
8          But everyone is aware that the
9  judge orders a social.  Everyone, including your
10  supervisor and your deputy, is aware that
11  there's a next court date in which this social
12  has to be done by because the judge needs to
13  look at the social to see what other options
14  that may be afforded this minor or in this case
15  what kind of probation services.
16          There's never an impromptu
17  "Oh, I gotta do this right now."  There's always
18  pre-notice.  Now, when you're out in the
19  district and you're seeing families, there's
20  those things that you can't predict that can
21  happen.
22      Q.  Right.
23      A.  There may be a shooting.  There may be
24  some police activity.  There may be something

Theodis Chapman
August 21, 2017

58

1    where the family says, "Can we meet somewhere
2    else?"  And you will make yourself available to
3    adjust so that you can see these families or, as
4    they say, "meet them where they're at."  And
5    when you're doing that, you're making -- you're
6    making the opportunity for you to engage that
7    family as their lives are the ones that are in
8    need of the services.
9            And so in those regards you
10   may go over your time.  You may go over your
11   regular time.  You may even go -- especially if
12   you're engaging the families, there's all kind
13   of things that start to come out when they
14   finally form a rapport with you and you start
15   uncovering all of these dynamics.
16   Q.  Okay.
17   A.  Yes.
18   Q.  I want to ask you, if you can, to put
19   an approximate number of how many hours you work
20   over a week.
21   A.  Again, it varies.
22   Q.  Okay.  That's fine.
23   A.  When it comes it comes because it's
24   not -- again, it's not just a cookie-cutter week

59

1    by week.  You know you're gonna -- got to see
2    your kids every month.  If they are high risk,
3    you got to see them at least twice a month.
4    There's certain things that you have to follow
5    up on.
6    Q.  All right.
7    A.  Go ahead.
8    Q.  For the time you have been a field
9    probation officer, have you always kept track of
10   your overtime hours?
11   A.  Oh, without a doubt.  Yes.
12   Q.  And that's in the JEMS system; is that
13   right?  Is that how do you it?  Or how do you
14   keep track of them?
15   A.  No.  You keep track -- since they've
16   gotten rid of the actual paper where you used to
17   sign in on a paper sheet, I still keep a journal
18   log just like this one.  (Indicating.)
19   Q.  By "this" you mean like a notepad?
20   A.  Notepad.  I still keep a copy of a
21   notepad.
22          And then there is a system
23   that it's supposed to go into, the new
24   computerized system, but they have a way of

60

1    removing your time from that, so...
2    Q.  So you're saying you could enter it in
3    and then it could be altered?
4    A.  Yeah.  When you clock in and out, it's
5    registering you what time you clocked in and
6    what time you clocked out, but they have gone
7    back and removed some of my time that I actually
8    worked over and it was justified.  My time that
9    I worked over was actually justified time.
10   Q.  Okay.  How many times were they
11   removed?
12   A.  It's been quite a few.  That's why I
13   had to file a grievance because it just got --
14   Q.  This is the recent grievance?
15   A.  This is the recent grievance.
16   Q.  Okay.
17          As you sit here are you aware
18   of any other employees where they would alter
19   their overtime hours?
20   A.  Yeah.  My worker who -- PO --
21   Probation Officer Tonette Jones, she has had
22   some issues where they have altered her time as
23   well.
24   Q.  Were you ever given a reason as to why

61

1    your time is altered?
2    A.  Because --
3    Q.  Not what you think why, but have you
4    ever been given a reason why?
5    A.  Well, no one is going to say because
6    you're black and they are discriminating against
7    you, they're retaliating, and, you know,
8    basically you're just going to have it hard from
9    here on out.  They're not going to say that.
10          And they try to use subtle
11   things like, you know, it's per the interim
12   director, but there's no real substance -- no
13   reasonable substance.
14   Q.  Okay.  Can you think of any specific
15   reason they have given you, even if it's without
16   substance?
17   A.  Any reason that they have given me?
18   Q.  Yeah.
19   A.  They haven't given me any reason.  I
20   have asked for everything in writing, and I have
21   yet to receive anything that would give reason.
22   Q.  All right.
23          And I want to go back and
24   clarify one thing while we're still on the

16  (Pages 58 to 61)

Theodis Chapman
August 21, 2017

---

62

1    overtime issue.
2        **A.  Sure.**
3        Q.  When you said Jason Smith would get
4    it -- and I think we may be talking about being
5    paid.  I just want to be clear.
6            When you said Jason Smith got
7    overtime, he was getting the bank of the days;
8    is that right?
9        **A.  Correct.  Correct.**
10       Q.  And is it time and a half?  It's,
11   like, 1.5 hours for every hour?
12       **A.  Yeah.  Yeah.**
13       Q.  Is that in a policy or CBA or anything
14   anywhere, the overtime policy?
15       **A.  That's federal.  That's labor law.**
16   **The only --**
17       Q.  We don't need to get into labor law.
18   I just want to know if it's in -- sometimes
19   these things will be in, like, the Collective
20   Bargaining Agreement.  You know what I mean when
21   I refer to the CBA, right?
22       **A.  Right.**
23       Q.  Do you know if it's in there?
24       **A.  With the CBA it's basically -- all you**

---

63

1    **need is pre-approval from your supervisor.  And,**
2    **basically, as long as the work that you're doing**
3    **is justified on behalf of the minor, the client,**
4    **and the department, that's pretty much where the**
5    **CBA is on it.  Everything else has been created**
6    **artificially.**
7        Q.  Who's your current supervisor?
8        **A.  Eileen Kentzler.**
9        Q.  Spell the last name.
10       **A.  K-e-n-t-z-l-e-r.**
11       Q.  Race?
12       **A.  She's white.  Caucasian.**
13           **The only person I know that**
14   **actually have -- that I know of that has**
15   **actually received financial compensation from**
16   **comp time is probably Phillip Loizon, and he's**
17   **known as the "Comp Time King."**
18       Q.  Okay.
19           THE REPORTER:  Spell his name, please,
20   last name.
21           THE WITNESS:  Loizon, L-o-i-z-o-n.
22   And he is with adult probation.  And I think he
23   amassed over 3,750 hours to the sum of over
24   $200,000.

---

64

1    BY MR. HAYES:
2        Q.  And he's with adult, right?
3        **A.  Adult, yes.**
4        Q.  It's fair to say they are different
5    departments from juvenile?
6        **A.  The only thing they get to carry**
7    **weapons.**
8        Q.  All right.  But they are -- would you
9    say they are different departments of --
10       **A.  We're dealing -- since they raised the**
11   **age, we're dealing with 18, 19 and 20-year-olds**
12   **also.**
13       Q.  Okay.  I'm just trying to make a clear
14   record here.
15           The Adult Probation
16   Department, would you say it's different from
17   the Juvenile Probation Department?
18       **A.  It's different.  Yeah.  It's**
19   **different.**
20       Q.  Different director, right?
21       **A.  Different director, too.  Yes.**
22       Q.  Okay.  All right.
23       **A.  Yes.**
24       Q.  Has Ms. Kentzler ever denied your

---

65

1    extra time, overtime request?
2        **A.  She's -- she's referred what she has**
3    **been told by Interim Director Das, and that kind**
4    **of removed her from it.  But she's -- all she's**
5    **done is recited what she's been told in the**
6    **management meetings to do.  So, again, she was**
7    **just following her orders as it related to me.**
8        Q.  So she's never directly told you, "I'm
9    denying this because I want to deny it?"
10       **A.  No.**
11       Q.  How long has she been your direct
12   supervisor?
13       **A.  She came in -- let's see.  Ron Dustman**
14   **left in, I want to say, in October/November of**
15   **2016.  So she's come in right around the**
16   **transition of November to December 2016 'til**
17   **now.**
18       Q.  Okay.  Who is your DCPO right now?
19       **A.  Karen Kelly.**
20       Q.  What's her race?
21       **A.  African American.**
22       Q.  What's Ms. Kelly's role in approving
23   this overtime?
24       **A.  Once the supervisor and I have our**

---

17 (Pages 62 to 65)

Theodis Chapman
August 21, 2017

66

1    conversations, then since I have to fill out
2    this form now, she signs off on the form and it
3    states the reason for the request for working
4    overtime.  And then she signs off and then she
5    sends it to the interim director, who's then
6    supposed to give it the nod yes or no.
7        Q.  Okay.
8        A.  But up until I filed a grievance, she
9    was relaying the sentiments of the interim
10   director that I was supposedly to be given not
11   comp, not overtime, but I was to be given
12   straight hours -- straight time.  So she echoed
13   whatever she was told by the interim director.
14       Q.  And did she give you a reason why this
15   was happening?
16       A.  She's the one that I requested the
17   document from to show me this policy as to how
18   and why this relates to me and me only.  Because
19   I know for a fact this did not apply to all
20   officers.
21       Q.  And did she give you a reason?
22       A.  I have never gotten anything in
23   writing.
24       Q.  But did she tell you anything?

67

1        A.  That it's just what the interim
2    director has instructed and that that --
3        Q.  Did she tell you why the interim
4    director instructed this?
5        A.  They're never going to tell me that,
6    you're -- Theo, you're black, you're gonna be --
7    you got the X on your back.
8        Q.  Right.  But did she give you any other
9    reason?
10       A.  That the interim director has directed
11   them that I am to give straight time and to flex
12   it later, and that if I want to get comp time,
13   there's this form I need to fill out.  I need to
14   state the reason for the -- working overtime.
15   Supervisor signs off.  She signs off.  He gets
16   it and he still reserves the right to reject it.
17   Doesn't say how long it's going to take him to
18   decide, when or whatever.
19           But all I know is that the
20   judge orders the social and I've exhausted all
21   efforts to try to meet with the family within my
22   time, within my normal work hours.  Then what
23   happens is, what recently happened, a case had
24   to be continued.  So a sentencing and dispo had

68

1    to be continued because the department was
2    unwilling to allow me to meet with this family
3    after my work hours, which is when the mom had
4    time to pick up -- get off work, pick up her
5    kids, and then she got them fed and settled in.
6    She was willing to do the interview, but it was
7    after.
8        Q.  So other than Ms. Kelly saying, "the
9    interim director told me to do it this way," she
10   never gave you any other reason; is that right?
11       A.  You know, there's been some sidebars
12   where she's like, you know, "Theo, you know what
13   you're up against," and no other details went
14   into that.  So that's just inferred.
15           So I take that to mean that
16   I'm going to be receiving disparate treatment.
17   I'm going to be --
18       Q.  All right.
19           I mean, did she -- I mean, did
20   she give you any other reason?
21       A.  No.  Nothing -- nothing that would
22   make sense.
23       Q.  Well, you say "nothing that would make
24   sense."  But I'm looking just for if she's

69

1    telling you "so this policy is being applied to
2    you in a particular way."
3        A.  Right.
4        Q.  Is she telling you -- other than what
5    you've already told me, is there anything else
6    that she's telling you, "Theo, this is why it's
7    being applied?"
8        A.  No.
9        Q.  Okay.  Okay.  Let's switch gears a
10   little bit.
11           Okay.  Talking about the Chief
12   Judge.  Are you familiar with the Defendant, the
13   Chief Judge of Cook County?
14       A.  Yes.
15       Q.  And who is that?
16       A.  Timothy Evans.
17       Q.  Do you consider Judge Evans your
18   employer?
19       A.  Yes.
20       Q.  All right.
21           Why do you consider him your
22   employer?
23       A.  He's in our contract as the employer.
24       Q.  By "contract" you mean, like, the

18  (Pages 66 to 69)

Theodis Chapman
August 21, 2017

70

```
 1   Collective Bargaining Agreement?
 2       A.  CBA, yes.  He signs off on everything.
 3       Q.  We'll get into that.
 4           All right.  Let's see when he
 5   says -- when you say "he signs off on
 6   everything," what do you mean that?
 7       A.  Any official documents that come
 8   through the department his signature is on
 9   there.
10       Q.  Give me an example.  I'm not sure I --
11       A.  When I was hired.  When I was hired,
12   his signature --
13       Q.  On your offer letter?
14       A.  Yes.
15       Q.  His signature?
16       A.  From what I recall, his signature.
17   He's on every piece of letterhead.
18       Q.  Not signature on the letterhead,
19   right?
20       A.  Well, not signature.  But --
21       Q.  Right.
22       A.  -- for the most part, important
23   documents that I've seen, any memos, official
24   memos, his signature is on there.  Anything
```

71

```
 1   changes in the department, department wide, I
 2   mean, throughout the whole court system, his
 3   signature is on there.
 4       Q.  So I just want to be clear.  When you
 5   say "department wide," you don't mean just the
 6   Juvenile Probation Department.  You mean the
 7   entire court system?
 8       A.  Yeah.  The court system that he
 9   oversees.
10       Q.  When you're getting just JPD memos,
11   would his signature be on those?
12       A.  Just for juvenile probation stuff?
13       Q.  Correct.
14       A.  In different capacities.
15       Q.  What do you mean?
16       A.  When I was a union steward for
17   discipline and things like terminations and
18   things like that, his signature would be on
19   them.
20       Q.  Okay.  Let's get into that a little
21   bit.
22       A.  Okay.
23       Q.  So you're saying his signature is on,
24   like, discipline letters?
```

72

```
 1       A.  No, no, no.
 2           After the termination has been
 3   accepted by him because the director has to send
 4   the request to him --
 5       Q.  For termination?
 6       A.  For termination.
 7       Q.  All right.  So I guess that's what I
 8   was getting at.
 9           So you take -- Judge Evans'
10   signature would be on termination letters?
11       A.  The director would request Judge
12   Evans' consent for this worker to be terminated,
13   and from what I recall, that gave it the green
14   light.
15       Q.  All right.
16       A.  Because he's the employer.
17       Q.  If you know, would he -- his consent,
18   as you said, would it then be him signing
19   letters?  Or when you say "consent by Judge
20   Evans," what do you mean by that?
21       A.  Well, if he's the employer, he's in
22   charge.
23       Q.  I'm looking for specific examples.
24       A.  Okay.  And I have to go back.
```

73

```
 1           But there was -- there was an
 2   African-American female that the director -- the
 3   former Director Rohan, he was really going after
 4   her.  And I believe after multiple requests and
 5   after, I believe, a Freedom of Information Act
 6   request, those correspondence between Rohan and
 7   Chief Judge, I believe they were finally
 8   received by the former union president, Jason
 9   Smith.  And in it it showed Mike Rohan
10   specifically requesting the Chief Judge.
11       Q.  And how do you know that?
12       A.  There is documentation.
13       Q.  You've seen it or were you told?
14       A.  I was told.
15       Q.  By Mr. Smith?
16       A.  Yes.
17       Q.  So you haven't seen it; is that right?
18       A.  I haven't seen that specific --
19       Q.  That specific letter?
20       A.  Yes.  Yes.
21       Q.  Okay.
22           So let me just get kind of --
23   I just want your understanding of the Chief
24   Judge's role in discipline of Juvenile Probation
```

19 (Pages 70 to 73)

Theodis Chapman
August 21, 2017

74

1 Department employees.
2    A. Chief Judge has people that he's
3 appointed to oversee different departments that
4 he's omnipotent. So when there is -- other than
5 policy changes like when the computer policy
6 changed where people -- he was making it known
7 that people could not do certain things.
8        I think there was -- something
9 happened somewhere downtown where someone was
10 doing pornography on the computer. So he sent
11 out a notice to all of the partners and his
12 signature was at the bottom. I do remember
13 that.
14    Q. All right.
15    A. So he does appoint people in the
16 different departments that he oversees.
17    Q. But I just want to know what is your
18 understanding -- and if you don't know, that's
19 fine. But what is your understanding of his
20 specific role in discipline of JPD employees?
21    A. From my understanding he has the last
22 say so.
23    Q. All right. So your understanding is
24 that he is either agreeing or disagreeing with

75

1 the discipline? Does that sound right? I --
2 I -- strike that.
3        What do you mean -- let's do
4 it a better way. What do you mean by "he has
5 the last say so?"
6    A. From my understanding he is the
7 deciding factor if this person is to be -- as
8 relates to discipline, if it's to be implemented
9 or not. That's from my understanding.
10    Q. And is it your understanding that he
11 would have that -- the last say so in all forms
12 of discipline?
13    A. That's my understanding being that
14 he's the Chief Judge.
15    Q. All right. So from, like, a reprimand
16 all the way up to termination; is that right?
17    A. From my understanding of terminations,
18 suspensions, from my understanding, those things
19 require his say so. From my understanding
20 reprimands, they can go -- a grievance process
21 can be taken to his office where he has an
22 appointee. Keith Sevick.
23    Q. Can you spell Keith's last name.
24    A. S-e-v-i -- I think it's a k -- c and

76

1 k or it's just S-e-v-i-k, I believe.
2    Q. I think it's c-k.
3    A. And that's his designee that oversees
4 those grievance matters.
5    Q. All right.
6    A. But from what I understand, when it
7 applies to suspensions and terminations -- or
8 especially terminations, from my understanding,
9 those --
10    Q. Do you have any firsthand knowledge of
11 dealing with Chief Judge Evans in termination or
12 suspension matters?
13    A. I have assisted -- as a steward I've
14 assisted Mr. Smith in some proceedings where
15 some suspensions were brought forth.
16    Q. And in those suspension proceedings,
17 what was your observation of Chief Judge Evans'
18 role?
19    A. That he had the last say so.
20    Q. All right.
21    A. Whether he consented or not consented.
22    Q. All right.
23        I'm going to ask this. Did
24 you ever hear him say, "I have the last say so

77

1 in discipline matters?"
2    A. No. I -- not that I recall ever
3 hearing him saying that.
4    Q. When you were involved in the union --
5 we'll get into that in a little bit. But just
6 for the purpose of this line of questioning,
7 when you were involved in the union -- and I
8 want to talk about the specific instance you
9 just referenced and the suspensions that you
10 were involved in.
11        Did you ever see Judge Evans,
12 like, anywhere, like, at any of the meetings or
13 the hearings or anything like that for any of
14 these suspensions?
15    A. No. It would always be his designee,
16 Keith Sevick.
17    Q. Do you know Mr. Sevick's official
18 title?
19    A. From my understanding it's the Chief
20 Judge's legal designee.
21    Q. All right.
22        To your knowledge, did Chief
23 Judge make any decisions regarding your
24 employment in anything at all? Regarding your

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

78

1    employment with JPT -- JPD did -- are you aware
2    of Judge Evans having any specific role?
3        **A.   When you fill out the application**
4    **there's, I think, three places you have to send**
5    **it.  You have to send it to Springfield.  You**
6    **have to send a copy to his office, and I**
7    **believe, you know, which counties that you would**
8    **desire to work in.  And one of the forms has to**
9    **go to his office.**
10       Q.   All right.
11       **A.   And, I believe, probation is where we**
12   **actually filled out the application, but**
13   **there's -- his office was definitely sent your**
14   **information, the package, as was Springfield.**
15   **So to my knowledge that signifies that, you**
16   **know, as --**
17       Q.   Did you ever meet with Chief Judge
18   Evans when you were applying?
19       **A.   No.**
20       Q.   All right.
21            Outside of this application,
22   anything else that you can think of that --
23   where Judge Evans was involved directly in any
24   employment decision about you?

79

1        **A.   No.**
2        Q.   Okay.
3            To your knowledge, if you
4    know, was Chief Judge involved in the decision
5    to transfer you out of Jumpstart?
6        **A.   To my knowledge, he had to consent --**
7    **from my understanding, his consent --**
8        Q.   Okay.
9        **A.   -- because a grievance was filed, it**
10   **went all the way up to the Step 4, Keith Sevick**
11   **--**
12       Q.   Which would have been his office,
13   right?  The Chief Judge's office?
14       **A.   To his office.**
15       Q.   So just to be clear, your
16   understanding of his consent was that a Step 4
17   grievance was sent to the Chief Judge's office;
18   is that right?
19       **A.   Correct.**
20       Q.   Okay.  Now I want to switch gears
21   again just a little bit.  I want to talk about
22   the other Plaintiffs in this lawsuit.
23            Are you aware that there are
24   other Plaintiffs, not just you, right?

80

1        **A.   Right.**
2        Q.   Okay.  And I'll just go through them
3    and ask you a few questions.
4            Are you familiar with Anthony
5    Jordan?
6        **A.   Yes.**
7        Q.   And who is he?
8        **A.   He's one of the Plaintiffs.**
9        Q.   And how do you know Mr. Jordan?
10       **A.   I have known Mr. Jordan -- I have**
11   **worked with him at JPD.**
12       Q.   Since 2003?
13       **A.   Yes.**
14       Q.   Mr. Jordan wasn't in Jumpstart though,
15   right?
16       **A.   No.**
17       Q.   All right.  He was a field probation
18   officer, if you know?
19       **A.   From my understanding, yes.**
20       Q.   All right.
21            So -- and you would have had
22   different supervisors; is that right?  I guess,
23   let's say immediate supervisors; is that right?
24       **A.   Uh --**

81

1        Q.   Than Mr. Jordan?
2        **A.   Yes.**
3        Q.   All right.  Probably up until the
4    director; is that right?
5        **A.   Yes.**
6        Q.   Let's go just while Mr. Jordan was
7    employed at JPD.  What -- were you friends with
8    him?
9        **A.   No.  I had a social -- I mean, you**
10   **know, you know -- when you work there, just like**
11   **people become familiar, you know, he had a, you**
12   **know -- he had referred some kids to Jumpstart**
13   **in the past.  I guess as a field officer he had**
14   **referred some kids.  So we -- you develop a**
15   **rapport with people in that manner.**
16       Q.   Did you hang out -- hang out with
17   Mr. Jordan outside of work?
18       **A.   No.  He doesn't -- he doesn't golf.**
19   **He doesn't do what I do.**
20       MR. HAYES:  All right.
21            (WHEREUPON, Chapman Deposition
22            Exhibit No. 1 was marked for
23            identification.)
24

21  (Pages 78 to 81)

Theodis Chapman
August 21, 2017

82

1    BY MR. HAYES:
2        Q.  All right.  So, Mr. Chapman, the court
3    reporter has just handed you what she's marked
4    as Exhibit 1, and we didn't really go over how
5    these work.
6            I'm going to go through
7    several, probably, documents today.  And she'll
8    mark them, hand them to you, and then I will ask
9    you a few questions on them.  So that's, you
10   know, your copy during the deposition, but it
11   will be handed back to the court reporter at the
12   end.
13       A.  Okay.
14       Q.  All right.  So just take a look at
15   that.  I will ask you -- actually, this is --
16   well, tell me what --
17           Do you recognize what this is?
18       A.  Yes.
19       Q.  All right.  What is this?
20       A.  Second Amended Complaint.
21       Q.  All right.
22           So is this your complaint in
23   this lawsuit, correct?
24       A.  It looks to be intact, yes.

83

1        Q.  Okay.  So I'll be using this exhibit
2    throughout the deposition today.  So --
3        A.  Okay.
4        Q.  -- just so you know.
5            But right now I want to ask
6    you a couple questions about Mr. Jordan that are
7    in here.  I want to focus on Paragraphs 48 to
8    57.
9        A.  What page?
10       Q.  That's going to be 16 to 17.
11       A.  All right.
12       Q.  So you see the heading there says
13   "Anthony Jordan," right?
14       A.  Correct.
15       Q.  So I want to do this for each one --
16   each one of the Plaintiffs.  But I just want you
17   to read that, his allegations, and then I'm just
18   going to --
19           All I'm going to ask you --
20   and I'll tell you right now -- I want you to
21   read it thinking that I'm going to ask you if
22   you have any specific firsthand knowledge of any
23   of the allegations.
24       A.  Against Mr. Jordan?

84

1        Q.  That Mr. Jordan is making.
2        A.  Okay.
3        Q.  Go ahead.  You want to look through
4    it?
5        A.  Yeah.
6        Q.  Go ahead and look through it.
7        A.  Okay.
8        Q.  All right.
9            Are there anything -- any
10   of -- any of his allegations in there that you
11   were specifically involved in?
12       A.  Discrimination.
13       Q.  All right.  What are you referring to?
14   Which number?  Sorry.
15       A.  56.
16       Q.  Paragraph number?
17       A.  56.
18       Q.  All right.  How are you involved in
19   that?
20       A.  Involved directly or as a steward?
21       Q.  Okay.  As a steward.  Yeah.
22       A.  As a steward there were some other
23   white officers in this unit that had far worse
24   circumstances than this, and they received --

85

1    they received not even a write-up.  And --
2        Q.  Were you involved -- strike that.
3            Were you a union steward when
4    Mr. Jordan was discharged?
5        A.  Yes.
6        Q.  All right.  Did you handle his
7    discharge?
8        A.  I assisted Mr. Smith in the case.
9        Q.  And what do you mean by "assisted?"
10       A.  Mr. Smith was the union president.  So
11   he was the -- he was the first and I was the
12   second.  You know, the --
13       Q.  So what did you do on that?
14   Let's just focus on Mr. Jordan's discharge.
15       A.  Sure.
16       Q.  What was your role in that grieve -- I
17   assume that was a grievance.
18       A.  That was a grievance.
19       Q.  So what was your role in that
20   grievance?
21       A.  Looking at the evidence; looking at
22   the charge; looking at if there were some
23   standards; looking at other similar instances;
24   whereby a kid had done something in the public

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

86

1  and it made the news; how the department reacted
2  when it was a white person as opposed to when it
3  was a black person or African American.
4          Just seeing if there was
5  disparities or disparate treatment or some form
6  of bias or racial bias.  Because this wasn't
7  uncommon for youth in this EM Department to --
8      Q.  Well, why don't you describe what the
9  EM Department is?
10     A.  Electronic Monitoring.  It wasn't --
11  what they -- initially what we found out is it
12  was misleading to the public because it did not
13  work like ADT.  ADT means if your home gets
14  broken into right now, you would get an alert on
15  your phone, something is going to go off or if
16  you've got cameras in there, you're gonna be
17  well aware in, like, less than -- in less than
18  five minutes you're going to be fully aware.
19         It didn't work like that.  EM
20  only tracked dots.  So when you got off of your
21  shift, your eight-hour shift, your kid can go
22  out doing some things like The Purge.  You
23  wouldn't know about it until the next day when
24  you got to work and you pulled up the computer

87

1  and you see all these dots all over the place.
2          And even then you might have
3  the department that says, well, just contact
4  them, but don't violate them yet because we want
5  to keep the numbers down low out of the
6  detention center under the Detention Reduction
7  Project.
8          So here you have this kid --
9  which in this case I'm fully aware of.  Aaron
10  Parks had two violent previous felonies before
11  he escalated to the case of the kidnapping and
12  aggravated rape.  In both of those cases, he
13  should have been held, but Judge Berman released
14  him back on EM per the orders of the Chief
15  Judge, as well as the board president under the
16  Detention Reduction Project.
17         He received no services unlike
18  if you had a -- if you're aware, you know, I
19  have an animal.  I have a dog.  And whenever you
20  look at rescue animals, especially pit bulls,
21  they're not just sent back to the owner who had
22  them in the backyard fighting and killing
23  another dog.  They're actually given some
24  services.  They're restored.  They're given some

88

1  restorative services.  They sent Aaron Parks
2  twice back into the same community, only for him
3  to escalate.
4          Anthony Jordan was a new
5  officer in this unit.  Why they gave him such a
6  high-profile client.  I found out later because
7  I, too, was placed in the same position, which I
8  called the "Anthony Jordan Rule."
9      Q.  What -- sorry.  Strike that.
10         Who were the other -- and I
11  believe you referenced this.  Who are the other
12  officers in the EM unit who weren't discharged
13  besides --
14     A.  Um --
15     Q.  Let me just get the question out.
16     A.  Go ahead.
17     Q.  -- who weren't discharged for the same
18  conduct?
19         And by that I mean -- I might
20  be using the terms wrong, but I don't know
21  what -- the minor that -- what -- for like --
22  the minor who is being monitored.
23     A.  Right.
24     Q.  Can you give me any other individuals

89

1  who were not discharged, who were working the EM
2  unit whose minor went off and committed a crime
3  similar to what this individual did with
4  Mr. Jordan?
5      A.  I don't have the information right
6  here in front of me.  But I do recall when
7  Mr. Smith and I were doing our investigation to
8  try to -- throughout the grievance process, we
9  were uncovering some very bigoted, if you will,
10  facts that showed that there was disparate
11  treatment in how Mr. Jordan was being treated.
12     Q.  Can you think of any specific
13  individuals, as you sit here today?
14     A.  There was a recent case where a white
15  female, Tina -- I believe it's Tina Grunauer
16  (phonetic).  She had the task of actually
17  monitoring the computer system that now, since
18  it's been updated, tracks the movement.  And on
19  many occasions she vacated her duties by failing
20  to be present.
21     Q.  And how do you know about that?
22     A.  Well, eventually the department had
23  filed a disciplinary action against her.
24         And in that discovery that

23  (Pages 86 to 89)

Theodis Chapman
August 21, 2017

90

1 they presented, they showed evidence that not
2 only was she not at her station at which time
3 her other colleagues, who were also Latino and,
4 I believe, African American, she had similar
5 hits -- hits are when a minor goes outside of
6 his parameters -- and she was not responding to
7 those when they became numerous. And when her
8 supervisor brought this to her attention, she
9 could not -- she could not account for that.
10         And when it became known to
11 the department and they moved towards
12 discipline, not only was she allowed to remain
13 at work while they were doing their interview,
14 which is different for African-American
15 officers, we found that they almost always
16 suspend an officer who's African American while
17 they are doing their investigation.
18     Q.  Did -- I can't remember her last name.
19 But did -- did any of the individuals that Tina
20 failed to monitor commit the same crime that --
21 that Parks did?
22     A.  From my understanding, there was some
23 individuals in that she was to monitor did --
24 even some instances even worse; whereby they

91

1 shot some individuals and...
2     Q.  Okay.  And I should probably clear
3 this up.  Are you currently a union steward?
4     A.  No.
5     Q.  So how do you know about this?
6     A.  This all transpired during that time
7 when I was in my tenure as a steward.
8     Q.  Were you involved in her grievance?
9     A.  No.  No.
10     Q.  Then how do you know about it?
11     A.  I still provide assistance.  Even if
12 I'm not the second chair, I still provide -- you
13 know, I may be called upon by the president just
14 as an attorney would have, you know, supportive
15 attorneys helping or paralegals helping to
16 research and try to defend an individual.
17     Q.  Since we're kind of on this, let's
18 get -- let's get this on the record.  I want to
19 talk about your union involvement.
20     A.  Okay.
21     Q.  So while you have been employed with
22 JPD, have you held any role in the union?
23     A.  Yes.
24     Q.  All right.  And what role have you

92

1 held?
2     A.  Treasurer.
3     Q.  When were you treasurer?
4     A.  2016, 2014, 2015.  Half -- I finished
5 out half of '14 and I believe the whole of '15.
6     Q.  All right.
7     A.  It's usually two years.
8     Q.  And, again, what union is this?
9     A.  Local -- AFSCME Local 3477.
10     Q.  Okay.  Anything other than treasurer?
11     A.  No.  Just union steward.  Oh, and I
12 was a people's chair.
13     Q.  All right.  What's -- what's a
14 people's chair?
15     A.  People's chair is the -- the political
16 arm whereby, you know, we -- we vet different
17 candidates that are trying to run for office
18 that are looking for union support or union
19 membership support.  And we just -- we vet --
20 you know, we vet them and ensure that they
21 are -- that they're saying what they're going to
22 do if they get our votes and support.
23     Q.  Okay.  When were you people's chair?
24     A.  From two thousand and, I believe, '13

93

1 to '15, I believe.
2     Q.  And then you also --
3     A.  Somewhere around there.
4     Q.  You were union steward, right?
5     A.  Union steward, yes.
6     Q.  And what are the dates for that?
7     A.  I believe -- let's see.  It may have
8 been two thousand and -- I'm thinking 2008, I
9 believe.  '8, '9.  Somewhere around there.  2008
10 or '9, I believe.  I can -- I can --
11     Q.  That's fine.  That's good for now.
12 Until when?
13     A.  Until '15.  '14, '15.  At the end of
14 my tenure as a treasurer and then the new
15 administration came in, this kind of took up a
16 lot of my time.
17     Q.  When you say "this," what do you mean?
18     A.  All of these proceedings.  This
19 lawsuit.
20     Q.  This lawsuit?
21     A.  Yes.
22     Q.  Okay.
23     A.  Yes.
24     Q.  What were your duties as a union

Theodis Chapman
August 21, 2017

94

1    steward?
2         A.  To assist with the grievance process
3    on behalf of members, be it as though they may
4    be accused or they had some negative impact
5    whereby their rights, according to the CBA, was
6    being violated by management and a grievance
7    needed to be filed or if negotiations needed to
8    be ensued.
9         Q.  All right.
10             Why did you become a union
11    steward, if you know?
12         A.  Not a problem.  It's ironic.  The
13    irony of it all.
14             The interim director now, Avik
15    Das, approached myself, Mr. Nelson, and Jason
16    Smith to assist him with, of all things,
17    challenging management.
18         Q.  And what was Mr. Das' union role at
19    that time?
20         A.  He was the president.
21         Q.  This was in 2008?
22         A.  This was two thousand -- I want to say
23    2008, I believe.
24         Q.  Okay.  When you first became a

95

1    steward, is that right, he was the president?
2         A.  Yes.  Yes.
3         Q.  Okay.
4             When you were treasurer in
5    2014, 2015, who was the president?
6         A.  Jason Smith.
7         Q.  Okay.  All right.  Now that we got
8    that out of the way, let's go back to the
9    complaint.
10         A.  What page?
11         Q.  Where you're at.
12         A.  17.
13         Q.  I want you to do the same thing that
14    you just did for Mr. Jordan do for Kenneth
15    Greenlaw.  Do you see where Kenneth Greenlaw
16    starts?
17         A.  Uh-huh.
18         Q.  So he's Paragraph 58 through 63, pages
19    17 to 18.  Just look that over.
20         MR. GEOGHEGAN:  Off the record for a
21    second.
22             (WHEREUPON, a discussion
23             was held off the record.)
24         MR. GEOGHEGAN:  Back on the record.

96

1    BY MR. HAYES:
2         Q.  Let's start with -- are you familiar
3    with Kenneth Greenlaw?
4         A.  Again, Mr. Greenlaw was one of those
5    individuals that I work with.  I saw him in
6    passing.  You know, I speak to everyone.  I
7    speak to him.  He kind of -- he was like a
8    business guy.  He just took care of his
9    business.
10         Q.  But you're aware that he's a Plaintiff
11    in this lawsuit as well, right?
12         A.  Yes.
13         Q.  And did you socialize with
14    Mr. Greenlaw outside of work?
15         A.  No.
16         Q.  When was the last time you saw
17    Mr. Greenlaw?
18         A.  It's been over -- maybe -- it's been a
19    long time.
20         Q.  Let's put it this way.
21             Have you seen him since his
22    termination on April 22, 2014?
23         A.  Yes.  I saw him -- I met with
24    Mr. Smith at the AFSCME office downtown

97

1    regarding the grievance that was filed on behalf
2    of Mr. Greenlaw at the time that Mr. Smith was
3    the president.
4         Q.  All right.  It's a nice segue.
5             Were you involved in
6    Mr. Greenlaw's grievance in any way?  His
7    grievance regarding his termination in any way.
8         A.  No.  I wasn't directly involved in
9    his.  I just assisted with the research and
10    compiling counter -- counter-evidence to refute
11    the charges.
12         Q.  Okay.  You said that you assisted in
13    research and compiling evidence.
14         A.  Uh-huh.
15         Q.  You said that with Mr. Jordan as well.
16    Can you be more specific about what you mean
17    when you say that?
18         A.  Well, in some of these instances, you
19    know, when you work at JPD, some of the things
20    that they charge, you have some experience in
21    it.
22             Like, for example, I have had
23    to use the vehicles as well as the card because,
24    although they have a facilities management and

25  (Pages 94 to 97)

Theodis Chapman
August 21, 2017

98

1    they have individuals, but it doesn't always
2    happen.
3            So there's -- it's not
4    uncommon to get a vehicle and it doesn't have
5    gas in it.  It's not uncommon for the director
6    to have -- actually have used the vehicle for
7    personal use and individuals that he's given
8    these vehicles to to use.
9            So it wasn't really no sign-in
10   sheet.  There was no really -- no real
11   designation.  Because there was instances where
12   I would need to use a vehicle to transport some
13   kids and there were three or four different gas
14   cards.  And my question was, "What's the
15   procedure?"  And I would be told, "Just grab
16   one."
17       Q.  For you personally?
18       A.  Yeah.  And just --
19       Q.  Okay.  When you had to use the
20   vehicle?
21       A.  When I had to use the vehicle.  My
22   thing was -- so --
23           But for me I would take a
24   picture of the gas card, and I would take a

99

1    picture of the mileage.  Because, you know, I'm
2    prior military and I've been already subjected
3    to the discrimination that I have, so...
4            But this is Mr. Greenlaw's
5    day-to-day job.  But for me, you know, whenever
6    I'm using it intermittently and I saw that there
7    was, you know, these -- there was no standards
8    as it related to how they checked these things
9    out.
10       Q.  Did you --
11           While you were working there,
12   did you interact with Mr. Greenlaw on a daily
13   basis?
14       A.  No.
15       Q.  All right.  How often would you say
16   you interacted with Mr. Greenlaw while you were
17   both employed with JPD?
18       A.  Very rarely.
19       Q.  So you don't have any firsthand
20   knowledge of Mr. Greenlaw's use of his gas card;
21   is that right?
22       A.  No.
23       Q.  All right.
24       A.  I just know from my utilizing

100

1    something.
2        Q.  If you look at 63 there where it says,
3    "Plaintiff Greenlaw was the only probation
4    officer who failed to complete his gas card
5    paperwork, but he was the only probation officer
6    terminated."
7            Do you see that?
8        A.  Yes.
9        Q.  As you are sitting here today, can you
10   think of another probation officer who failed to
11   complete his gas card paperwork but that was not
12   terminated?
13       A.  I can't think of right now, but I just
14   know that there was not a lot of standards in
15   that -- as it related to that department.
16       Q.  You say "that department."  Do you
17   mean JPD as a whole or --
18       A.  Well, I mean JPD as a whole, but also,
19   too, in the area where we got the gas cards.
20       Q.  Oh, I see.
21       A.  You know, there was not, like, really
22   a sign-in sheet in and out.  It was -- it was
23   just, you know -- there was -- it looked like it
24   was just intentionally that way where, you know

101

1    --
2        Q.  And how often would you say you had to
3    go through that process, use the gas card to get
4    a vehicle?
5        A.  Um --
6        Q.  I'm sorry.  Gas card -- it's
7    different.  Gas card is for your own vehicle; is
8    that right?  Or is it for --
9        A.  No, for the County.
10       Q.  For the County.
11       A.  Yes.  While you're using the County
12   vehicle.
13       Q.  Got it.
14       A.  When I was asked to volunteer to
15   transport families to and from Abraxas, the drug
16   treatment for minors that had to be placed by
17   the courts into drug treatment, a lot of the
18   families were indigent and they couldn't get to
19   Hinsdale or Lake Villa, which is near Wisconsin.
20   So they asked for volunteers.  And as a result,
21   you would be paid overtime because it was on the
22   weekends.  So that was the trade off.
23           You're -- where you're
24   normally off on the weekends.  You're

26 (Pages 98 to 101)

Theodis Chapman
August 21, 2017

102

1    reenergizing. You would still take the time to
2    help these families to go see their minor who's
3    probably dealing with a lot of issues in order
4    to be drug -- to be ordered to drug treatment.
5           And so those are a lot of the
6    times when I would have access to the vehicle
7    and oftentimes the gas card.
8       Q. All right.
9              How often would you say you
10   had to do that?
11      A. When the program -- when the -- before
12   they changed it, I would want to say around --
13   from two thousand and maybe '13 to 2015, I
14   believe it was a span of a year, year and a
15   half, whereby I was volunteering until cutbacks
16   and funding for the drug treatment kind of was
17   reduced, which led to reduction in that access
18   for the families.
19      Q. Okay. Do you know how often you were
20   using it?
21      A. We would sign up --
22      Q. Once a month?
23      A. No. It would be maybe like maybe
24   twice, maybe two, three, maybe twice a month.

103

1              You know, because you sign up
2    for your availability in advance so they know
3    who would be here on a Saturday. And basically
4    that -- there was no -- again, there was -- you
5    know, there's -- there could be two or three
6    different vehicles and there could be two or
7    three different cars. And who would use those
8    previous to you, you know...
9       MR. HAYES: Okay. We can break now.
10      MR. GEOGHEGAN: Okay.
11      MR. HAYES: Off the record.
12            (WHEREUPON, a brief recess
13            was held.)
14      MR. HAYES: Back on the record.
15   BY MR. HAYES:
16      Q. Mr. Chapman, are you familiar with
17   Patrick Nelson?
18      A. Yes.
19      Q. And who is he?
20      A. He's one of the Plaintiffs.
21      Q. Okay.
22             And you worked with Mr. Nelson
23   in Jumpstart; is that right?
24      A. That's right. Yes.

104

1       Q. For your entire tenure there?
2       A. Yes.
3       Q. Do you work with him now?
4       A. No.
5       Q. He's also a field probation officer;
6    is that right?
7       A. Yes. From my understanding now, he's
8    been -- due to his work injury, he's been placed
9    in a different unit, something dealing with
10   clinical support.
11      Q. Okay.
12      A. But he was like I. Our names were
13   pulled out of a hat to determine which of us
14   went to which field unit.
15      Q. Let's -- what field unit are you in
16   now?
17      A. Southeast Division.
18      Q. All right.
19             What are the areas that
20   covers?
21      A. Back of the Yards. Traditionally, it
22   was supposed to be Back of the Yards all the way
23   to fifty -- I want to say all the way to 67th.
24   But, again, due to the discriminatory way that I

105

1    have been treated, I have had kids as far as --
2    I had a kid as far as 123rd and Wallace. I have
3    a kid that's all the way over in South Shore,
4    near 85th and South Shore. I have -- actually,
5    there were two kids in the South Shore area.
6              I have a kid now that's 900
7    North on the north side. Again, due to the
8    discriminatory way that I'm treated differently,
9    there's different rules that apply to me as it
10   relates to other people because what's
11   traditionally supposed to be one district,
12   I'm -- I have kids all over.
13      Q. To your knowledge, are you the only
14   field probation officer that has kids all over?
15      A. To my knowledge.
16      Q. Okay. So the other officers in this
17   Southeast Division, they don't have to go
18   outside of it?
19      A. To my knowledge, they have their area.
20   To my knowledge, I'm the only one that has kids
21   all over.
22      Q. Have you ever been told why you have
23   kids all over?
24      A. No. Just that they were assigned to

27  (Pages 102 to 105)

Theodis Chapman
August 21, 2017

106

1    me.
2        Q.  Okay.  Was that relayed to you by your
3    supervisor?
4        A.  Yes.
5        Q.  All right.
6            Going back to Mr. Nelson, are
7    you friends with Mr. Nelson?
8        A.  We have a good working relationship.
9        Q.  All right.
10           Do you -- let's say while you
11   worked with him in Jumpstart, did you hang out
12   together socially?
13       A.  No.  Unless it was something with --
14   usually if it's something -- well, we are --
15           You know, usually if it's
16   something dealing with the job or they may have
17   had something after work, we've gotten -- you
18   know, we've gotten together like that.  If it
19   may have been something where a meeting or
20   something that pertained --
21           Because we did a lot of the
22   same work, a lot of the same volunteer work, we
23   were -- you know, we were often together beyond
24   our normal work hours, especially if we're

107

1    volunteering for the same programs.
2        Q.  This -- other than, like, work-related
3    events outside of work, would you hang out with
4    him socially?
5        A.  No.
6        Q.  We've talked a lot already about Jason
7    Smith.  Can you tell me who he is?
8        A.  Jason Smith is a probation officer.
9        Q.  All right.  Is he in your division
10   currently?
11       A.  No.
12       Q.  All right.
13           And he was a former president
14   of the union; is that right?
15       A.  Yes.
16       Q.  When you were treasurer?
17       A.  Yes.
18       Q.  Would you say you're friends with
19   Mr. Smith?
20       A.  We're -- we're acquainted.
21       Q.  All right.
22           Do you hang out with Mr. Smith
23   socially outside of work?
24       A.  No.  We -- we -- I mean, if there are

108

1    things that are going on or meetings, you know,
2    but we don't just -- we don't just hang out.
3    No.
4        Q.  When you say "meetings," what
5    meetings?
6        A.  Like if there's something -- because
7    we try to stay informed because there's --
8    sometimes there's stuff that goes on in the
9    communities.  Like, if there is resources that
10   we can -- there's something going on in the
11   communities, like a church is putting it on or
12   CPD is putting it on, or even Father Pfleger,
13   these things, they have information that
14   directly can positively impact our client.  So
15   we keep each other in the loop in that way.
16           And if there is something,
17   like Father Pfleger may have an event that we
18   feel may be beneficial to our clients, we -- you
19   know, we share that information.  And we
20   usually -- you know, we will meet up and attend
21   those type of events.
22       Q.  Have you talked to Mr. Smith about
23   this lawsuit?
24       A.  Yes.

109

1        Q.  All right.  And what have you talked
2    to him about?
3        A.  Just a little bit of everything.  You
4    know, it's a new experience.  This is a new
5    experience to me.  I don't -- I never thought I
6    would be in this position.
7        Q.  How many times would you say you have
8    spoken to Mr. Smith about this lawsuit?
9        A.  Maybe -- I don't know.  I can't really
10   say a number.
11       Q.  More than 12?
12       A.  I don't know.
13       Q.  Did -- was Mister --
14           Did Mr. Smith have a role in
15   your filing charges of discrimination with the
16   EEOC?
17       A.  Did he have a role?
18       Q.  Yeah.
19       A.  I guess he had an unintended role.  As
20   the president he took a certain oath to uphold a
21   contract and certain provisions of -- and all
22   the provisions of it.  And when he became aware
23   of the discriminatory practices that spanned,
24   you know, over a decade, and then when he

28  (Pages 106 to 109)

Theodis Chapman
August 21, 2017

110

1    initiated my assistance, I guess indirectly
2    unintendedly I also --
3        Q.  Let me ask you kind of a direct
4    question then.
5        MR. GEOGHEGAN:  If you were done.
6        MR. HAYES:  Yeah.  I'm sorry.  He can
7    keep going.  Is there anything else?  Yeah.  Go
8    ahead.
9        THE WITNESS:  And as the -- as the
10   time that went into starting to assist him with
11   what he thought may have existed, came to be
12   what not only existed but had been perpetuated
13   for years and years, it came to the point
14   where --
15           Because I do statistics also
16   being in social work, I posed the question to
17   him, "Is there a monetary issue that somehow
18   you're missing?"  And from that he went back and
19   started looking at the potential cost that this
20   type of discrimination that was specifically
21   targeted towards African Americans.
22           And when he shared with me his
23   findings and that it appeared that it was --
24   it -- the cost that these African-American

112

1        A.  No.
2        Q.  Did he have any role in finding your
3    attorney for you?
4        A.  No.
5        MR. HAYES:  Let's go off the record
6    for a second.
7           (WHEREUPON, a luncheon recess
8                was held.)
9        MR. HAYES:  Back on the record.
10   BY MR. HAYES:
11       Q.  Mr. Chapman, when we left off, we were
12   going through the complaint, which you still
13   have in front of you.  So I want to flip back a
14   little bit to Page 7.  Why don't you go to
15   Paragraph 26, please.  Do you see Paragraph 26?
16       A.  Uh-huh.
17       Q.  Okay.  It says, "In an effort to
18   substantiate the racially-disparate treatment of
19   African-American probation officers, Local 3477
20   began to compile data reflecting categories of
21   terminations, suspensions, and written or verbal
22   reprimands among population of approximately 400
23   juvenile probation officers for the years 2008
24   thru 2013."

111

1    officers had been subjected to financially was
2    close -- in excess of over half a million
3    dollars when you add up all of the disciplines,
4    and it could very well easily went back even
5    farther to even over a million.  Because this is
6    money that's being removed from their livelihood
7    and their families.
8    BY MR. HAYES:
9        Q.  Did Mr. Smith tell you directly to
10   file your charge of discrimination with the
11   EEOC?
12       A.  No.  No.  I'm fully aware of my
13   rights, and I know what discrimination looks
14   like, and the pattern that started being
15   perpetuated and the discrimination, the way I
16   started being treated, the disparate treatment,
17   the bias, the different standards.
18       Q.  So he never said anything like, "Hey,
19   Theo, you should file a charge of
20   discrimination?"
21       A.  No.
22       Q.  All right.
23           Did he tell you you should
24   file a lawsuit?

113

1           Do you see that?
2        A.  Uh-huh.  Yes.
3        Q.  All right.  Were you involved in that
4    compilation of data?
5        A.  Not directly.  I assisted with helping
6    to put this stuff together, but Mr. Smith as the
7    union president that, for the most part, fell on
8    his responsibility.
9        Q.  Okay.
10           When you said "assisting help
11   put it together," what exactly did you do, if
12   anything?
13       A.  Making copies of stuff.  Some of the
14   cases that I worked with him on with some of
15   this stuff, some of this material, and just, you
16   know, being -- being as helpful as he needed me
17   to be.
18       Q.  And then you see in the next
19   paragraph, which is 27 and goes through Page 10
20   to Paragraph 33, lists the years and gives all
21   sorts of percentages.  I don't want to go into
22   that right now, but I just want to know if you
23   had any role in compiling these percentages that
24   are in the complaint.

29 (Pages 110 to 113)

Theodis Chapman
August 21, 2017

---

114

1    A.  As needed.  Again, that -- the
2  quantifying it, Mr. Smith took a much greater
3  role as the union president.
4      Q.  So looking at Paragraph 27 there, it
5  says, for 2008 there are a total of 12
6  terminations and/or suspensions, of the 12 --
7  then it breaks down by the numbers.
8          Were you involved in any way
9  in, like, counting these?
10     A.  Not that I recall counting.  But,
11 again, I recall helping compile the information
12 as it related to being a union steward when
13 dealing with management and trying to defend our
14 members.  I do recall helping get the paperwork
15 and everything like that.  But as far as
16 quantifying the percentages, as the union
17 president, Mr. Smith had a much greater role.
18     Q.  Okay.  Turn to Page 10.  Look at
19 Paragraph 34 there.  "Union Local 3477 also
20 performed an analysis in the labeling utilized
21 by the defendants to describe misconduct
22 allegedly committed by juvenile probation
23 officers during the period 2008 through 2013."
24         Do you see that?

---

115

1      A.  Yes.
2      Q.  All right.
3          Were you involved in any way
4  in performing an analysis of the labeling as
5  outlined in Paragraph 34?
6      A.  No.  Again, as I recall, my assistance
7  in the matter was helping compile the
8  documentation.  Again, the blunt of it was in
9  the role of the president, Mr. Smith.
10     Q.  Okay.
11         All right.  Turn to Page 11.
12 In the middle there is a paragraph labeled "32."
13 It's actually between 39 and 40.  Do you see
14 that?
15     A.  Yes.
16     Q.  Okay.
17     A.  Yes.  Yes.
18     Q.  Just look that over.
19     A.  Look at No. 32 specifically?
20     Q.  Yeah.
21     A.  Okay.  Yes.
22     Q.  All right.  Second sentence says, "For
23 example, four white female probation officers,
24 three of whom are presently employed by the

---

116

1  defendant, were cited for being romantically and
2  sexually involved with clients -- yet none were
3  terminated or prosecuted."
4          Do you see that?
5      A.  Yes.
6      Q.  Outside of what's written here, do you
7  have any more information on that?  For examples,
8  do you know who these probation officers are?
9      A.  I've heard their names.  The third one
10 I'm familiar with.  That would be -- what's her
11 name?  I'm familiar with her -- I'm familiar
12 with the most recent one.  I've heard, as a
13 steward, about the other two.
14     Q.  All right.
15         Were you involved directly as
16 a steward in any of these disciplines or
17 anything?
18     A.  No.
19     Q.  Do you know if any of these four white
20 female probation officers were disciplined in
21 any way?
22     A.  From the -- from the individuals that
23 I -- that I know that work -- that work -- that
24 were around the time that this happened, some of

---

117

1  which are probably close to retirement now, they
2  indicated that nothing happened to them.
3      Q.  Okay.  So --
4      A.  They were actually --
5      Q.  Sorry.
6          So the information that you
7  have that nothing happened to them, you received
8  from other individuals; is that right?
9      A.  Some of the ones that actually worked
10 with them at that time.
11     Q.  Okay.  Can you name some names, if you
12 know?
13     A.  Carolyn Richardson, Charlie Calvin --
14 pull from my brain right now -- Argentry
15 Mitchell, Jason Smith.
16     Q.  That's fine.  That's fine.
17         Okay.  I'm going to flip the
18 question around and say, are you aware of any
19 African-American probation officers who were
20 romantically or sexually involved with a client
21 who were terminated?
22     A.  No, I'm not.
23     Q.  All right.
24         And the last sentence here,

---

30  (Pages 114 to 117)

Theodis Chapman
August 21, 2017

---

118

1    "In another case, a white probation officer was
2    using County funds to purchase purses, but she
3    was not terminated."
4            Were you directly involved in
5    that situation?
6    **A.  No.  But I've been made familiar about**
7    **it.**
8    Q.  That's fine.  I'm going to do the same
9    thing.
10           Are you aware of any
11    African-American probation officer who was using
12    County funds to purchase purses that was
13    terminated?
14    **A.  No.**
15    Q.  All right.
16           Okay.  And then if you go down
17    to Paragraph 41, just on that page.  Yeah.  I'll
18    read it.  "The union has also directly notified
19    defendant Chief Judge of several examples of the
20    disparate treatment of African-American juvenile
21    probation officers by his subordinates in the
22    Cook County Juvenile Probation Department."
23           Do you see that?
24    **A.  Yes.**

---

119

1    Q.  All right.
2           You personally, have you ever
3    directly notified Chief Judge Evans of disparate
4    treatment of African-American juvenile probation
5    officers?
6    **A.  Yes, I have.**
7    Q.  All right.  When?
8    **A.  During my own grievance hearings.**
9    Q.  All right.  And Chief Judge Evans was
10    there?
11    **A.  No.  He wasn't there.  It was always**
12    **his designee.**
13    Q.  Okay.  I just want to be clear of
14    that.
15    **A.  Yeah.**
16    Q.  Were you directly telling in person
17    Chief Judge Evans?
18    **A.  No.  No.**
19    Q.  Okay.  But you were telling -- go
20    ahead.  Tell me who you told then.
21    **A.  His designees.**
22    Q.  All right.
23    **A.  Keith Sevick.**
24    Q.  And this would have been in your

---

120

1    grievance hearings?
2    **A.  Yes.**
3    Q.  All right.  The next paragraph is 41.
4    Oh, sorry.  We were going to -- actually, we're
5    going to turn the page to forty -- sorry.  46 on
6    Page 12.
7           Okay.  46 reads, "These acts
8    have resulted in disparate treatment of juvenile
9    probation officers on the basis of their race,
10    including" -- and then it lists several
11    individuals.
12           And so I just want to go
13    through this quickly, Mr. Chapman, and just see
14    if you have any direct personal knowledge of any
15    of this.  If it's not direct or personal, you
16    know, it's -- I don't need to know about it.
17    **A.  Personal meaning I've handled the**
18    **case?**
19    Q.  You got it.
20    **A.  Or personal meaning I know the person?**
21    Q.  That you handled the case --
22    **A.  Okay.**
23    Q.  -- that allegation.
24    **A.  Got you.**

---

121

1    Q.  Okay.  So the first one is Emily
2    Pierce.  Did you handle her discipline?
3    **A.  No.**
4    Q.  Christen Loeb, L-o-e-b?
5    **A.  Loeb.**
6    Q.  Loeb, okay.
7           Did you handle that
8    discipline?
9    **A.  No.**
10    Q.  All right.  And staying on B there,
11    but it kind of bleeds into this Page 13.  It
12    says at the bottom of 12, "Deputy Chief
13    Probation Officer Virginia Caulfield stated that
14    she would never discipline Ms. Loeb."
15           Do you see that?
16    **A.  Yes.**
17    Q.  Did you hear Ms. Caulfield say that?
18    **A.  No.**
19    Q.  All right.  The next one is Lauren
20    Brown.  Were you involved in that at all?
21    **A.  No.**
22    Q.  All right.  Next one is Kevin Gavin.
23    Were you involved in that at all?
24    **A.  No.**

---

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

122

1      Q.  The next one is Kalthea,
2    K-a-l-t-h-e-a, Seay, S-e-a-y.  Were you involved
3    in that one?
4      A.  It's pronounced Kalthea.
5      Q.  Oh, thank you.
6      A.  No.
7      Q.  All right.  Next up is Julie
8    Montgomery.  Were you involved in that?
9      A.  Yes.
10     Q.  Okay.  What was your role in that one?
11     A.  I was the co-chair.
12     Q.  What does that mean?
13     A.  That means I was a second steward on
14   the case.
15     Q.  And who was the first steward?
16     A.  The first steward was Lloyd Marshall.
17     Q.  I don't think it says in here about
18   the year.  Do you know approximately when this
19   happened?
20     A.  It had to be about maybe, I'm
21   thinking, three -- three or four years ago.
22     Q.  All right.
23     A.  Yeah.  Because this is '17.  So yeah.
24   That would have been around -- around that time.

123

1      Q.  Around '14?
2      A.  Around '14, I'm thinking.
3      Q.  But you don't know for sure?
4      A.  Not for sure.
5      Q.  All right.
6          And you were in the second
7    chair.  What specifically did you do, if
8    anything, on this?
9      A.  Just so you know --
10     Q.  Yeah.
11     A.  -- there's two instances with this.
12     Q.  Okay.
13     A.  There was a time that predated my
14   involvement where she was given a Last Chance
15   Agreement.  That predated my involvement.  I
16   came in on this second -- where it says,
17   "Department attempted to construct another
18   reason to create a disciplinary investigation."
19   That's where I was in because there's two
20   different.
21     Q.  Okay.
22     A.  So just so you are aware.
23     Q.  So the sentence that begins "After her
24   disciplinary sentence?"

124

1      A.  Yes.
2      Q.  Okay.
3          All right.  So knowing that
4    that's the only time that you were involved,
5    what was your specific involvement?
6      A.  I was the co-assistant as a steward,
7    union steward.
8      Q.  And what does that mean?
9      A.  That means I was actually helping with
10   the case and compiling information to counter
11   the allegations that management were making and
12   present a defense for our member.
13     Q.  And what was the outcome of that
14   grievance?
15     A.  Management terminated her.
16     Q.  In the paragraph it says --
17     A.  She was forced to resign.
18     Q.  -- she had to resign under duress.
19     A.  Yes.
20     Q.  So she resigned, right?  She wasn't
21   discharged?
22     A.  It was kind of like what they call
23   forced coercion.
24     Q.  I mean, I don't want to get into

125

1    semantics.
2      A.  Okay.
3      Q.  But she resigned; is that right?
4      A.  Yes.
5      Q.  Okay.  I think the next one is G, Joi
6    Basley, J-o-i, B-a-s-l-e-y.
7      A.  Right.
8      Q.  Did I pronounce those right?
9      A.  Joi Basley.
10     Q.  Were you involved in that one?
11     A.  No.  This, again, is -- this is a --
12   there is a predated, which is this, the --
13     Q.  Last Chance Agreement?
14     A.  Right.  I didn't work directly on
15   Ms. Basley.  No.
16     Q.  All right.  Next one is H, Angela
17   Sneed.
18     A.  No.
19     Q.  Okay.  This term has come up recently
20   and it's in the complaint here, "Last Chance
21   Agreement."  Can you tell me what your
22   understanding is of the Last Chance Agreement?
23     A.  Last Chance Agreements actually
24   violate our Collective Bargaining Agreement in

WADLINGTON REPORTING SERVICE, INC.
(312) 372-5561

Theodis Chapman
August 21, 2017

126

1    that there is no provision in the Collective
2    Bargaining Agreement where this exists.
3            It appears to be, from my
4    tenure as a steward, something that was
5    specifically created for and -- for blacks or
6    African-American probation officers.  It has --
7    even in -- with its violation of the CBA, it
8    also presents no sunset clause or sunset data
9    upon which it's even to be removed.
10   Q.  Well, yeah.  What is it?
11       A.  It's basically -- it's kind of like a
12   mob tactic, actually.  Whereas, the next time I
13   come at you, I want your finger, I want your
14   arm.  You know, it's kind of like that.
15       Q.  I think I'm getting what your
16   opinion -- I guess what --
17           MR. GEOGHEGAN:  He wants just an
18   explanation of what the Last Chance Agreement
19   is.
20           THE WITNESS:  All right.  Well, what
21   happens is with the black officers, there's two
22   sets of standards.
23   BY MR. HAYES:
24       Q.  Again, I just want to know what a Last

127

1    Chance Agreement is.
2        A.  It's --
3        Q.  I know -- I understand your position,
4    Mr. Chapman.  We'll be here a lot longer if you
5    do that every time and I understand.  But I just
6    need you to tell me right now what a Last Chance
7    Agreement is.
8        A.  It's a condition upon remaining
9    employed.  It's a condition.
10       Q.  So maybe we can unpack it.  Is it
11   presented to an employee -- is it in place of
12   discipline or in addition to discipline?
13       A.  In addition.
14       Q.  Okay.  And I mean -- I guess, let's go
15   back.
16           Have you seen -- have you,
17   like, physically seen Last Chance Agreements?
18       A.  I have.
19       Q.  All right.  And I don't have one with
20   me, unfortunately, but can you summarize, like,
21   basically what it says.  Does it say something
22   along the lines, "If you do something again you
23   are going to be fired?"  Or am I wrong?  What
24   does it say?

128

1        A.  It's basically noting that if there's
2    anything, not necessarily you have to be guilty
3    of, but if there's anything, allegation or
4    anything, it doesn't necessarily have to be
5    founded, you can be terminated.
6        Q.  And focus on your time -- let's back
7    up.
8            Did you ever receive a Last
9    Chance Agreement?
10       A.  Oh, no.
11       Q.  Okay.  In your time as a union steward
12   or involved with the union, 2008-2015, how many
13   Last Chance Agreements would you say you saw
14   then?
15       A.  I saw Mr. Jordan's after I became a
16   steward and working on his case.  Yeah.  From my
17   recollection, Mr. Jordan's and I'm -- I don't
18   know that -- I know Mr. Jordan's.  I may have
19   saw Ms. Basley's, but I know I saw Anthony
20   Jordan's.
21       Q.  Okay.
22           To your knowledge, did any
23   non-African-American juvenile probation officer
24   ever receive a Last Chance Agreement?

129

1        A.  To my knowledge, no.
2        Q.  Okay.  We're sticking with the
3    complaint, but let's go and turn the page to
4    your section, Mr. Chapman, your specific
5    allegations, which are on Paragraphs 64 to 67, I
6    believe.  And that's Page 18 to 19.  You got
7    that?
8        A.  Yes.
9        Q.  Okay.  If you want -- if you're not
10   familiar with it, do you want to take a minute
11   to look it over or do you just want me to go?
12           MR. GEOGHEGAN:  Just for the record,
13   there are other allegations about him that
14   continue on under the Nelson section.
15           MR. HAYES:  Oh, yeah.
16           THE WITNESS:  Okay.
17   BY MR. HAYES:
18       Q.  Okay.  Now, I'm just going to ask you
19   a few questions.
20       A.  Sure.
21       Q.  So starting in Paragraph 64 -- we went
22   over a lot of your background stuff.  It says
23   you have no history of discipline.  Is that
24   still a true statement?

33 (Pages 126 to 129)

Theodis Chapman
August 21, 2017

130

1    A.  That's still true.
2    Q.  All right.  No suspensions?  No --
3    A.  Still true.
4    Q.  Okay.  And I want to talk about the
5    last sentence there.  "For these efforts,
6    Mr. Chapman has received commendations and merit
7    bonus payments."
8        Do you see that?
9    A.  Yes.
10   Q.  Okay.  What's a merit bonus payment?
11   A.  Merit is if you -- when you exceed on
12   your evaluation, with exceeding comes a merit
13   bonus.  That's kind of divided amongst all of
14   the probation officers that exceed.  It may show
15   up as a few hundred bucks on the paycheck.  But
16   more than anything, you exceed.  When you exceed
17   it comes with it.
18   Q.  How many times would you guess you
19   received a merit bonus payment?
20   A.  Out of the 14 years?  I just recently
21   went in my arbitration for my 13 and 14.  I
22   would say 13 years.
23   Q.  And that means you have an exceeded
24   level on your --

131

1    A.  Yes.
2    Q.  -- performance review?
3    A.  Yes.  Above and beyond.
4    Q.  And are you getting reviewed once a
5    year?
6    A.  Yes.
7    Q.  Every year you have gotten one?
8    A.  Annually, yes.
9    Q.  When was the last merit bonus payment
10   you got?
11   A.  2016.
12   Q.  Would that have been for your -- what
13   performance review would that have been for?
14   A.  That was for 2016.
15   Q.  2016.  Okay.
16   A.  So at the end of 2016 around November,
17   depending on fiscal -- the fiscal year, we
18   usually end the end of November.  Usually the
19   supervisors start compiling everything and
20   notating their notes throughout the monthly
21   meetings that we have with the supervisors.  And
22   then by January/February we generally get our
23   evaluations.
24   Q.  And how much was your 2016 merit

132

1    bonus, if you know?
2    A.  I believe it was maybe almost $400, I
3    think.
4    Q.  Okay.
5        All right.  Can you turn to
6    Paragraph 65, which is on the next page, Page
7    19.  All right.  And this is talking about the
8    supervisory examination.  Are you familiar with
9    that?
10   A.  Yes.
11   Q.  Okay.  It says here that you took it
12   in November of 2007 and February of 2012; is
13   that right?
14   A.  Yes.
15   Q.  Did you take it any other times?
16   A.  No.
17   Q.  Has it been offered since 2012?
18   A.  Yes.
19   Q.  How many times since 2012?  Again, I
20   got -- just once?
21   A.  Once.
22   Q.  And when was that, if you know?
23   A.  This is '17.  I believe it was offered
24   in '15.

133

1    Q.  All right.  And you didn't take that
2    one?
3    A.  No.
4    Q.  Between 2007 and 2012 was it offered,
5    if you remember?
6    A.  Say that again.
7    Q.  Let me try to get at this a different
8    way.
9        How often is it offered?
10   A.  There's no rhyme or reason.  There's
11   no, like, every three years or -- it's just
12   whenever they -- management randomly wants to do
13   it.
14   Q.  Between 2007 and 2012, do you know if
15   it was offered in between those years?
16   A.  No, it wasn't because I would have
17   taken it.
18   Q.  Okay.  Can you tell me in detail what
19   the exam process entails.
20   A.  Once they announce that they're going
21   to be giving the examination, you simply write a
22   note to management requesting that you be placed
23   on the list to take it on the date that they
24   set.  And they'll send you a notice saying

34  (Pages 130 to 133)

Theodis Chapman
August 21, 2017

134

1  you're -- giving you the date when it's going to
2  be administered, and basically you're on the
3  list to take it.
4        Q.  And it's a written exam; is that
5  right?
6        A.  Yes.  It's more so like a survey, but
7  go ahead.
8        Q.  But is it in writing?
9        A.  Yes.
10       Q.  It's a piece of paper or pieces of
11 paper?
12       A.  Yes.  Yes.
13       Q.  Okay.  Do you need to pass that exam
14 to become a supervisor at JPD?
15       A.  Yes.
16       Q.  And then what positions do you qualify
17 for if you pass this exam?
18       A.  Per?
19       Q.  Like, what title?
20       A.  Supervisor.  SPO.  Supervising
21 probation officer.
22       Q.  Okay.  And that would be, like, the
23 one level above field probation officers; is
24 that right?

135

1        A.  Numerically, it's called a PO III.
2        Q.  Okay.  Numerically, what are you now?
3        A.  PO II.
4        Q.  PO II.  Okay.
5           And when you took these exams
6  in 2007, 2012, you were at Jumpstart?
7        A.  Yes.
8        Q.  You were in Jumpstart?
9        A.  Yes.
10       Q.  All right.
11          In that Paragraph 65 at the
12 bottom there, it says, "Despite diligent
13 preparation for the examinations."
14          Do you see that?
15       A.  Yes.
16       Q.  Could you tell me what you mean by
17 "diligent preparation?"
18       A.  I --
19       Q.  And if you need to break it down for
20 each one, that's fine, or if you need to do the
21 same thing.
22       A.  Not a problem.  I went back to the
23 information that I -- that I was trained on as a
24 PO during training, which is the Juvenile Court

136

1  Act; looked at the major court cases.  There's,
2  like, at least four or five.  I looked at the
3  different court procedures, being in violations,
4  what constitutes sentencing and dispo trial, the
5  whole court process.  Looked at all the
6  different specialized units where minors can be
7  referred to for the different -- are for the
8  different issues that they may have that these
9  programs could benefit them for the services
10 that they provide like drug treatment, so on and
11 so forth.
12          So I made myself knowledgeable
13 of the different court programs, like the
14 computerized programs that are -- that are
15 utilized in the day-to-day duties as a probation
16 officer, which is the JEMS system that I talked
17 about, the YAZI (phonetic) which is an
18 assessment tool to determine the risk factor of
19 a minor, low, medium or high, which determines
20 how often a minor is to be seen and also it
21 looks at where the minor's strengths and
22 weaknesses are, where their support is and where
23 support is needed.
24          I looked at the different

137

1  programs that offer -- outside the court that
2  offer support that are in conjunction with the
3  courts.  And these include some of the
4  faith-based organizations that work with the
5  courts and what they do.  I looked at the
6  hierarchy, how the department is, the managerial
7  tree.  I looked at, also, the day-to-day
8  procedures and each of the units, whether it be
9  specialized or field -- field officer.
10       Q.  Let me stop you there.
11          Were the -- is the test geared
12 for the department as a whole or more towards
13 the field officer position?
14       A.  It's actually supposed to be
15 comprehensive.
16       Q.  After taking it what would you say?
17       A.  It was more so subjective, and it was
18 more like a survey where it was utilized --
19 because I've created surveys, and it did nothing
20 to gauge my knowledge of the department and how
21 the department and the programs and services are
22 to be centered as a supervisor that you would be
23 kind of in that role to ensure that your
24 officers or your subordinates would be utilizing

35  (Pages 134 to 137)

Theodis Chapman
August 21, 2017

138

1  or doing on a day-to-day.  It was more so a
2  survey to see if you were someone that
3  management could possibly see as being
4  management one day.
5      Q.  Okay.  When you were preparing for
6  this, did you study with anyone else?
7      A.  Oh, I studied with quite a few
8  different people.
9      Q.  All right.  Who?
10     A.  Russell Akis.
11     Q.  Anyone else?
12     A.  Russell Akis.  There was a couple
13  study groups.  I think it was one -- Kisha
14  Roberts, we may have exchanged some information.
15     Q.  Well, let me put it this way.
16     A.  But --
17     Q.  If you know anyone that you studied
18  with, did they pass the exam?
19     A.  No.
20     Q.  Okay.  And was everyone you studied
21  with African American?
22     A.  Yes.
23     Q.  Mr. Nelson took it as well, right?
24     A.  Yes.  He's taken it, I think, once.

139

1  Yes.  I think he's taken it once or twice.  It
2  may have been before my tenure.
3      Q.  Okay.  And on Paragraph 65, on both
4  occasions you requested copies of your test?
5      A.  Yes.
6      Q.  And were denied; is that right?
7      A.  That's correct.
8      Q.  So how did you request copies?
9      A.  As they were set, the standard was to
10  go to the union and ask for a copy of your test,
11  which I did.  And at that time I was informed
12  management denied the request.
13     Q.  So you went through the union?
14     A.  That was standard to go through the
15  union.  At the time, I believe, Mike Willis was
16  the president who preceded Jason, as well as
17  Avik Das.  And then the last time --
18     Q.  Were you -- were you offered any other
19  options about reviewing it?  Like sitting down
20  and looking it over or anything like that?
21     A.  I requested to actually have a sit
22  down.  And the second one I actually went up to
23  HR myself and requested it.
24     Q.  And who did you request that to?

140

1      A.  William Patterson.
2      Q.  And who's William Patterson?
3      A.  He's the HR director.
4      Q.  Okay.  What's Mr. Patterson's race?
5      A.  He's African American.
6      Q.  And what did he tell you?  This was in
7  2012?
8      A.  I believe it was -- he -- I believe he
9  was -- it might have been either him -- let's
10  see.  Who preceded him?  Charles Young, I
11  believe, preceded him.
12         It's been a while, but I went
13  directly to the source this time, which was HR.
14  And I believe it was either Mr. Patterson or
15  Mr. Young, and I was denied.  That -- that that
16  was not going to happen.  That, no, I could not
17  see it.  And I just asked, "Well, could I sit
18  down and just see my test?"
19         I even asked can I see the
20  answer sheet, just where I got the answers wrong
21  so that I can actually see myself that I got
22  these wrong.
23     Q.  What did they say?
24     A.  No.  It was denied.

141

1      Q.  Okay.  Did they give you any option at
2  all to somehow view your test or anything like
3  that?
4      A.  No.
5      Q.  Okay.  Did they give you a reason as
6  to why you couldn't do it?
7      A.  No.  Just that it's never been -- it's
8  not allowed.
9      Q.  Okay.  Do you know of anyone else who
10  asked for -- to review their test?
11     A.  Yes, I do.  Michael Porter.
12     Q.  And was he denied?
13     A.  He was denied at first, but he kind of
14  went through other channels.  I don't know --
15  and he was able to get a meeting.  And the union
16  as well as management allowed Charles Young, at
17  the time, allowed him to see his test.
18     Q.  Okay.  So Porter's race?
19     A.  African American.
20     Q.  All right.  Mr. Young's race?
21     A.  African American.
22     Q.  Okay.
23         As you are sitting here, do
24  you know of any non -- any non-African Americans

Theodis Chapman
August 21, 2017

142

1　who asked to see their test and were denied?
2　　A.　No.　Because usually non-African
3　Americans had no problems because --
4　　Q.　I just need you to answer the
5　question, Mr. Chapman.
6　　A.　No.
7　　Q.　Okay.　Thanks.
8　　　　Are you aware of any
9　non-African-American field probation officers,
10　so whites, Latinos or whatever, who also failed
11　either the 2007 or 2012 exams?
12　　A.　Any non-African American that failed
13　it?
14　　Q.　Yeah.
15　　A.　No.
16　　Q.　And did you file a grievance on this
17　issue, if you know?
18　　A.　It's -- according to them it's
19　non-grievable.
20　　Q.　You say "according to them." Who is
21　that?
22　　A.　Management.
23　　Q.　Do you remember who told you that?
24　　A.　Management.

143

1　　Q.　Who specifically?
2　　A.　Charles Young.
3　　Q.　Okay.　Okay.
4　　　　I'm sorry.　Who is Charles
5　Young?
6　　A.　He was the director of HR.　He was the
7　deputy director next to Mike Rohan who was the
8　director.
9　　Q.　Okay.　Got it.
10　　A.　And then William Patterson replaced --
11　it was Rose Golden before William Patterson.
12　She was the HR director.　That was the chain.
13　It was Charles Young, deputy director, Rose
14　Golden, and then William Patterson.　When Rose
15　retired William Patterson became the new HR
16　director.
17　　Q.　Okay.
18　　　　And when you say "HR," it's
19　just for JPD, right?
20　　A.　Yes.　JPD Human Resources Department.
21　　Q.　And human resources is the one -- they
22　are the ones that, like, administered the exam?
23　Is that your understanding?
24　　A.　All of management administers it.

144

1　　Q.　All right.
2　　A.　There's no proctor.　There's no
3　outside agency.　It's deputies and management.
4　There's no secure box.　There's no lockbox.　Put
5　it in front of them in just a little bin where
6　they collect them.
7　　Q.　Did you file -- so you said it's not
8　grievable, but did you file an EEOC charge on
9　this issue?
10　　A.　It's noted in my EEOC complaint later,
11　that came later from other discrimination that
12　--
13　　Q.　Well, we are going to go through them,
14　so that's why I just wanted to ask.
15　　A.　Okay.
16　　Q.　Next paragraph in the complaint,
17　Paragraph 66.　It says in there "that a
18　disproportionate number of African-American
19　probation officers, some with advanced graduate
20　degrees, are advised that they supposedly failed
21　the supervisory examination."
22　　　　Do you see that?
23　　A.　Yes.
24　　Q.　Other than the ones you mentioned, can

145

1　you give me any other -- can you give me
2　specific individuals who have advanced --
3　besides yourself obviously --
4　　A.　Um --
5　　Q.　Let me just get the question out so
6　it's on the record.
7　　A.　Sure.
8　　Q.　Anyone else -- any other African
9　American probation officer with an advanced
10　graduate degree who failed the supervisory exam
11　either in '7 or '12?
12　　A.　Yeah.　There was Michelle Bailey.　I
13　believe she has a master's also.　Mitchell
14　Kennard (phonetic), Richard Russell, Mike
15　Porter.
16　　Q.　And they all have advanced degrees, to
17　your knowledge?
18　　A.　To my knowledge.
19　　Q.　Okay.　And by "advanced degree" I mean
20　post bachelors.
21　　A.　Yes.　Some more names may come up, but
22　right now those definitely resonated.
23　　Q.　Okay.
24　　　　And I can't remember if I

37　(Pages 142 to 145)

Theodis Chapman
August 21, 2017

146

1　asked you this or not, Mr. Chapman, but can you
2　think of any non-African Americans who failed
3　the exam and were allowed to review it?
4　　　A.  No, I can't.
5　　　Q.  Okay.  If you know, do you know who
6　grades the exams?
7　　　A.  I've asked that and it's always
8　been -- it's always been something of secrecy.
9　There's no -- there's no knowledge of it.
10　There's no, like -- there's no proctor.  There's
11　no outside agency that's contracted.  It's
12　unknown.
13　　　Q.  All right.
14　　　　　So it's kind of -- when you go
15　and take the exam, are you in a room with other
16　officers?
17　　　A.  There's -- all of us are in there.  We
18　all come up to the desk where management is
19　sitting.  And our name is noted right there and
20　then they give us a copy of the test.
21　　　　　At one point the first -- when
22　I took it the first time, they had a little
23　scantron with a UIC watermark on it.  But as a
24　union steward, we looked into that, and there

147

1　was no identification of a contract with UIC and
2　Probation to proctor exams.
3　　　　　And then on the second one,
4　there was a booklet and then there was a paper
5　sheet which you answered.  So for the extent of
6　it, the credibility of it, you know, came into
7　question especially on the second one because it
8　was the same process.  You're giving it to
9　management and they're, like, no proctor.
10　There's no security guard.  There's --
11　　　　　And even with our union
12　elections, we had a box with a lock on it.  We
13　had at least four different people from
14　different places that actually helped give the
15　results credibility.
16　　　Q.  And staying on Paragraph 66 towards
17　the end there, it says, "And that the designing
18　of the supervisory examination is either
19　intentionally, or in effect discriminatory in
20　excluding African Americans from supervisory
21　positions."
22　　　　　Do you see that?
23　　　A.  Yes.
24　　　Q.  Okay.  How is the design of the exam

148

1　discriminatory?
2　　　A.  Good question.  The director, Mike
3　Rohan, created an in-house, supposedly, clinical
4　unit.  The unit was comprised of -- which became
5　to be comprised of all white officers.
6　　　Q.  Let's -- I will stop you because I
7　know you mentioned him and I know who he is, but
8　for the record I want -- Mike Rohan, who is he?
9　　　A.  He's the former director of
10　juvenile -- juvenile -- JPD.
11　　　Q.  When did his tenure end, if you know?
12　　　A.  I believe it was around the time we
13　filed the lawsuit, about two thousand and maybe
14　'15.
15　　　Q.  Okay.  That's fine.
16　　　　　And, again, for the record,
17　his race is?
18　　　A.  He's white.  Caucasian.
19　　　Q.  All right.
20　　　A.  And --
21　　　Q.  Go ahead.  Sorry.
22　　　A.  And the second test seemed to have an
23　insurmountable number of questions that
24　pertained to clinical knowledge or someone that

149

1　had went through some clinical training.
2　　　Q.  What do you mean by "clinical
3　training?"
4　　　A.  Well, it was more so questions that
5　gauged your knowledge of a particular type of
6　background or a particular type of knowledge
7　base.  Like, if you studied law, these
8　questions -- the questions could mostly be
9　law-based questions that someone who studied law
10　would definitely be able to understand.  In this
11　case, there was an insurmountable number of
12　questions on this particular -- the last test
13　that I took --
14　　　Q.  2012?
15　　　A.  Yes.
16　　　　　-- that were geared towards
17　those with a clinical basis of understanding.
18　　　Q.  So in your department what is a
19　clinical basis of understanding?
20　　　A.  Well, clinical is dealing with, like,
21　clinical psychology.  They created a clinical
22　unit that was supposed to address the needs of
23　minors in house by being able to refer as
24　opposed to referring them to the community in

38  (Pages 146 to 149)

Theodis Chapman
August 21, 2017

150

1　which they live for the programs that existed in
2　their community. So this was supposed to
3　address that need that existed where clients
4　might have needed more clinical services.
5　　　　There was the absence of not
6　only on the first test, but there was really an
7　absence on the second test of anything that
8　related to the day-to-day duties of which mostly
9　makes up field officer work. The department is
10　overwhelming 60 -- about 65, 70 percent field
11　officers.
12　　Q. At the time of -- let's focus -- or --
13　well, either one. 2007, 2012, you were not a
14　field probation officer, right?
15　　A. I was not a field officer. I was in
16　Jumpstart.
17　　Q. Okay. At the time --
18　　A. Which was a specialized unit.
19　　Q. Yeah.
20　　　　But at the time of these
21　exams, were you aware of what field probation
22　officers had to do?
23　　A. I was. Because I actually -- with
24　Jumpstart, many of the field officers referred

151

1　clients to Jumpstart. That's how their clients
2　came. Many a times they shared the information,
3　whether it be the social, different other
4　services the minor might be receiving at the
5　time in addition to Jumpstart.
6　　　　So it was more so Jumpstart
7　became a wraparound service, but it was also one
8　of the major components because school is
9　mandatory. When judges order school and it's
10　mandatory, we're talking about a minor, so they
11　have to be in school. Otherwise, they are just
12　out there during the time when they could
13　recidivate very easily.
14　　　　So I became acquainted with
15　pretty much, you know, working with these
16　different officers. And so many of them
17　referred kid after kid because of the success
18　that we had with some of their most difficult
19　clients.
20　　Q. And you said you reviewed field
21　materials, right, as well?
22　　A. Right.
23　　Q. In preparation for the exam?
24　　A. Yes.

152

1　　Q. And that -- did you say you
2　received --
3　　　　When you started you
4　received -- did you receive field training as
5　well when you started?
6　　A. Well, when you receive training,
7　you're actually trained to be a probation
8　officer in all aspects of the department. The
9　field officer just goes into a day-to-day of it.
10　Specialized units may create a specialty
11　specific to the needs of a client as it relates
12　to the department. But when you are trained,
13　you are trained to be an officer, for the most
14　part as a field officer.
15　　Q. Okay.
16　　A. You always need to be retrained when
17　you go into a specialized unit because there's a
18　lot of specificity with that. Like the drug
19　unit, that's something we were, you know, given
20　information about during training. But for the
21　most part, our training consisted of being a
22　field probation officer because that entails
23　most of the department.
24　　Q. Okay.

153

1　　　　Is there any other way that
2　you believe that the design of the exam was
3　discriminatory other than the clinical thing we
4　talked about?
5　　A. It almost -- for me a 70 would have
6　been just my base score. I have military
7　experience, which that would have boosted me up
8　another 20 points. Then my year of service in
9　the department, that would have given me another
10　10 points. So I could have very well been
11　number one on the list with just a 70.
12　　Q. In the Juvenile Probation Department,
13　are there African-American supervisors?
14　　A. Yes.
15　　Q. All right. So, presumably, these
16　individuals have passed the exam; is that right?
17　　A. Yes. But there's a side part to that
18　as well.
19　　Q. Why don't you give me the side part.
20　　A. Sure. Having now endured the
21　discrimination that I have entailed, I went back
22　to some of these officers and asked them what
23　was their experience. And many of them used to
24　talk about how, even before my tenure, there

39 (Pages 150 to 153)

Theodis Chapman
August 21, 2017

154

1    was, like, an open joke with African Americans
2    taking the supervisor exam because you had
3    back -- even back then, you had African
4    Americans even with doctoral degrees and juris
5    doctorates. One in particular, Charlie Calvin,
6    who had a juris doctorate during the time that
7    he supposedly failed the exam three, four times
8    before finally passing.
9        Q. Let's not put too much stock into the
10   JD degree.
11       A. Well, I'm just saying. It's a lot of
12   money that goes into degrees like that.
13       Q. I'm just kidding. I know. Okay.
14           MR. GEOGHEGAN: We can stipulate to
15   that.
16           MR. HAYES: Yes, we can.
17           THE WITNESS: And they mentioned the
18   same thing, that many of them weren't allowed --
19   none of them were allowed to see their tests.
20   So it's been an --
21   BY MR. HAYES:
22       Q. Even the ones that passed, they don't
23   get to see it? Is that your understanding?
24       A. No. No. And respectively, there has

155

1    been some people along the way who have admitted
2    that they didn't study and they passed, and many
3    of them were whites.
4        Q. Do you know any names of those?
5        A. This is just when I was talking to
6    them, asking them, trying to gauge some
7    understanding about this.
8        Q. Who were they?
9        A. I don't know right -- recollect right
10   now, but many of them are deputy chiefs now.
11   One in particular, I think, was Virginia
12   Caulfield, who many of them indicated, you know,
13   she was like -- she used to come to work drunk.
14   I don't know for sure but -- and they indicated
15   she knew nothing about being a supervisor or --
16       Q. She's white?
17       A. She's white. Bill --
18       Q. Sorry.
19           But you don't have any
20   firsthand knowledge of her test, exam or
21   anything?
22       A. This is me --
23       Q. We don't need to get into that.
24       A. Okay.

156

1        Q. That's fine. Okay.
2           Now, let's get back to the
3    complaints. We'll continue down to Patrick
4    Nelson because your attorney is right. Some of
5    these do apply to you as well.
6           So let's -- still on Page 19,
7    Paragraph 69 and 68 through 72. If you want to
8    take a look at that. I'll ask you some
9    questions on this stuff as well.
10       A. Where do you want me to stop?
11       Q. Just read through -- just the Nelson
12   section through 72. Up here, maybe.
13       A. Okay.
14       Q. Yeah. Okay.
15       A. Okay.
16       Q. All right. Go to Paragraph 68, first
17   one under Mr. Nelson. Okay. The second
18   sentence, "Both Plaintiffs, Nelson and Chapman,
19   filed grievances with their union claiming that
20   they were denied compensation for time spent
21   doing job-related training out of state when
22   white probation officers did receive
23   compensation for similar out-of-state training.
24   The grievances were denied by the Defendant."

157

1           Do you see that?
2        A. Yes.
3        Q. All right. What training is referred
4    to here?
5        A. There's a training -- when we were in
6    Jumpstart, there was a training that took place
7    in San Antonio. I believe it was in 2011. And
8    it involved what the agency called COPA, and it
9    was an advocacy group. It's counselors,
10   attorneys, parents, principals, and advocates or
11   something to that nature. And this is where the
12   deputy chief at that time, Donna Neal, when she
13   came in as our deputy, everything with me and
14   Mr. Chapman was having to validate our position
15   and to prove our worth.
16           And so this is one of those
17   situations where this was kind of forced upon
18   us, that if we wanted to validate our position,
19   we needed substantive trainings and so forth as
20   though -- we always exceeded our training every
21   year, but this training was kind of just pushed
22   and pushed. And, again, we complied and
23   attended --
24       Q. And this was in 2011?

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

158

1    A.  I believe it was 2011.
2        MR. HAYES:  Let's see if this helps.
3        (WHEREUPON, Chapman Deposition
4        Exhibit No. 2 was marked for
5        identification.)
6        THE WITNESS:  Donna Neal was there in
7    '13, '14.  So maybe in 2014.
8        MR. HAYES:  This will help.
9        THE WITNESS:  Yeah.  Okay.
10   BY MR. HAYES:
11       Q.  You've been handed what's been marked
12   Exhibit 2.
13       A.  Yeah.
14       Q.  Do you recognize this email?
15       A.  Yes.
16       Q.  All right.  And it's from you,
17   correct?
18       A.  No.  It's to me.
19       Q.  Oh, sorry.  You're right.  To you,
20   correct?
21       A.  Right.
22       Q.  And from Donna Neal?
23       A.  Yes.
24       Q.  Okay.  And is this referring to the

159

1    training that you were just talking about?
2        A.  Yes.
3        Q.  And as you sit here, is this an
4    accurate reflection of the compensatory time
5    that you were awarded?
6        A.  No.
7        Q.  So you weren't awarded this
8    compensatory time?
9        A.  This is what we call straight time.
10   It wasn't compensatory.  It was straight.
11       Q.  It does say "compensatory time at
12   straight hourly time."  Is that right?
13       A.  That's a -- that's word play, but it's
14   actually --
15       Q.  Okay.  I want to be clear on it.
16       A.  Yeah.
17       Q.  So you are awarded ten-and-a-half
18   hours compensatory, but that would be an actual
19   ten-and-a-half hours; is that right?
20       A.  Yes.  That's time for time.
21       Q.  And are you saying you should have
22   gotten time and a half?
23       A.  Yes.  That's what the grievance came
24   after because the grievance was for -- to

160

1    contest this.
2        Q.  Okay.  All right.  I think I got it
3    now.
4        A.  Not a problem.
5        Q.  All right.
6        So your allegation is that you
7    received straight time and you should have
8    received true compensatory time, which is 1.5,
9    right?
10       A.  And not to mention, she even stated on
11   here, where we were working on the weekends when
12   our Collective Bargaining Agreement clearly
13   states that any work on the weekends constitutes
14   time and a half.
15       Q.  And then did you grieve -- strike
16   that.
17       Was this e-mail -- did this
18   spur your grievance or did you grieve before
19   this e-mail?
20       A.  It spurred the grievance.
21       Q.  All right.
22       And so who attended this
23   training; you and Mr. Nelson?
24       A.  Me and Mr. Nelson and -- it was

161

1    some -- it was -- she was at the time sheets.
2    She was deputy chief over Jumpstart.
3        Q.  Who is "she?"  Ms. Neal?
4        A.  Deputy Chief Donna Neal.  She was over
5    at Jumpstart, educational advocacy and, I think,
6    one other unit.  And there was some -- some
7    officers also from educational advocacy also
8    that were on this trip, this training.
9        Q.  Okay.
10       And do you know of anyone else
11   who was on that specific trip, training trip,
12   anyone specifically that received the 1.5
13   compensatory time?
14       A.  I believe Carolyn Conway did receive
15   hers because she's one of the individuals that
16   indicated that -- after we found out later that
17   they had went on previous trips because Carolyn
18   was in education --
19       See, before Jumpstart came
20   under Donna Neal, there was an educational
21   advocacy unit, and because Jumpstart dealt with
22   education remediation, she absorbed us under her
23   unit.  So these trips were normal for
24   educational advocacy to go on, which was

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

162

1   predominantly a white unit.
2           And so now that we were under
3   Donna Neal's -- DCPO Donna Neal's umbrella, she
4   now was telling us in order to validate our
5   position and so forth, basically to earn our
6   worth, that we needed to attend these
7   conferences.  But what she didn't tell us is
8   that previously before we were brought under her
9   umbrella is that the officers that were in this
10  advocacy unit, they received time and a half.
11      Q.  I'm not concerned about previously.  I
12  want to know this specific trip, San Antonio,
13  March 2011.
14      A.  Okay.
15      Q.  Were there -- was there anyone else
16  that came down with you and Mr. Nelson from JPD?
17  Let's start with that.
18      A.  Yes.
19      Q.  All right.
20          And are you specifically aware
21  of any of those individuals receiving the
22  compensatory time of 1.5 hours?
23      A.  To my knowledge, Carolyn Conway
24  received her time and a half.

163

1       Q.  And what was her position at that
2   time?
3       A.  She was an educational advocate.
4       Q.  Anyone else?
5       A.  That's just to my knowledge.
6       Q.  All right.
7       A.  Prior to that --
8       Q.  Her race?
9       A.  She's white.  She's Caucasian.
10      Q.  Were there any other white -- let's
11  say non-African American individuals that went
12  on this specific trip with you?
13      A.  There was some Latino officers also
14  that were in educational advocacy.  And to my
15  knowledge they also -- I believe they received
16  time and a half.
17      Q.  What's the basis of your knowledge of
18  that?
19      A.  After speaking with Officer Rick
20  Tekip, who also was in educational advocacy,
21  kind of referenced that it was standard to get
22  time and a half on these trips.
23      Q.  Okay.
24      A.  And the individuals that went with us

164

1   on this trip had also went on previous trips and
2   they were awarded their time and a half.
3       Q.  Okay.  Did anyone who went on this
4   trip specifically tell you that they got
5   time-and-a-half compensatory time?
6       A.  No.  But once I addressed it with the
7   deputy -- with Donna -- with DCPO Donna Neal
8   prior to filing a grievance, her response to me
9   and Mr. Nelson is, what makes you think we
10  should get what other people get, end quote.
11      Q.  Was that part of your grievance?
12      A.  This is what sparked the grievance.
13      Q.  Okay.
14      A.  The goal was not to file a grievance.
15  The goal was to just get what we earned and what
16  we rightfully were supposed to.
17      Q.  And then going back to Exhibit 2 here,
18  did you get the 10-and-a-half hours and the
19  13-and-a-half hours straight time?
20      A.  This we did receive.  Yes.
21      Q.  So what you're missing out was the
22  times that times .5?
23      A.  Yes.
24      Q.  Okay.

165

1           Going back to the complaint
2   here, the job-related training.  Is there any
3   other training that you were referring to or is
4   it just this specific 2011 training where you
5   didn't get the proper payment?
6       A.  This was -- this was one of the --
7   this was the major one right here where we
8   actually did all this work and didn't get the
9   pay for it.
10      Q.  Were there any other ones?
11      A.  Any other trainings?
12      Q.  Trainings.
13      A.  No.  No.
14      Q.  Okay.
15      A.  Oh, yeah.  There was one other
16  instance.
17      Q.  Sure.
18      A.  We had a minor in Jumpstart who, when
19  he first came to us, he had a plethora of
20  issues.  Not only did we get the minor reading
21  sustainably, his comprehension level increased
22  to the point where the minor not only went on to
23  get his GED but he also got a Project Lifeline
24  Scholarship, which is awarded to those minors

42 (Pages 162 to 165)

Theodis Chapman
August 21, 2017

---

**166**

1  that were former wards of the court who went on
2  to get their high school diplomas and can enroll
3  in whatever high -- college or junior college or
4  trade program. Not only did he successfully get
5  his associate's degree but he went on to receive
6  what was called the BARJ award, Balance and
7  Restorative Justice.
8          And in my work with the minor
9  and helping him compose his letter, taking him
10 to, you know, get a suit -- because this is a
11 prestigious award given by the judges -- my
12 supervisor was aware of the extra time that I
13 was gonna devote, as was Mr. Nelson, in
14 preparing this minor for this momentous
15 occasion.
16         But after we had did the work,
17 DCPO Donna Neal contested it and denied the time
18 that was supposedly allotted to help this minor
19 prepare for this -- this award.
20 Q.  That wasn't a training, was it?
21 A.  No.
22 Q.  I know. It's fine.
23 A.  It was my first time -- well, training
24 in the sense of -- yes -- no. This was

---

**167**

1  my first.
2  Q.  All right. What I want to focus on --
3  just because I want to make sure we get
4  everything that you're alleging in the complaint
5  out today. This is my shot.
6  A.  Got you.
7  Q.  Okay. So was there any other
8  trainings that you -- that you are alleging that
9  you feel -- that you believe you were not
10 properly compensated for while working at JPD?
11 A.  I would say this is the one that --
12 this --
13 Q.  When you say "this is the one," you
14 mean Exhibit 2, right, that training in 2011?
15 A.  Yes. Yes.
16 Q.  And just for the record -- it drives
17 me crazy when I review my transcripts and I
18 don't have this in there, but it's Bates
19 Defendant's 2008.
20         Now, we're going to get -- the
21 next three paragraphs are actually pretty -- you
22 know, all relate to the Jumpstart
23 reorganization, whatever. So I want to ask you
24 some questions on that.

---

**168**

1          So the allegations in the
2  complaint from 69 through 71 it's -- even though
3  it's under Mr. Nelson, they apply to you as
4  well; is that correct?
5  A.  Correct.
6  Q.  All right.
7          So let's start with 69. "In
8  2015, the Cook County Juvenile Probation
9  Department eliminated positions occupied by
10 Nelson and Chapman in the 'Jumpstart' program
11 under guise of reorganization."
12         All right. So tell me what
13 happened to the Jumpstart program in 2015.
14 A.  Sure. 2015 Deputy Chief Dennis
15 Alexander came in at the helm asking Nelson and
16 myself to assist him in working to revamp, in
17 some cases, some areas where they can possibly
18 draw some improvements to continue on those --
19 those successes that we already were having with
20 the minors. He asked us to kind of put aside
21 the way we have been treated in an attempt to,
22 let's see what we can do for the kids because,
23 you know, he knew we were big advocates for
24 the kids --

---

**169**

1  Q.  Just to be clear, I just want to --
2  A.  Yes.
3  Q.  I might interrupt you a few times.
4  A.  That's fine.
5  Q.  I want to clear up some things.
6  Alexander, he's after Donna Neal, right?
7          That same position but he took
8  her --
9  A.  Yes.
10 Q.  Okay. Go ahead.
11 A.  And so after Donna Neal came, then
12 there was DCPO Spooner. She did so many changes
13 that it actually -- it was counter-productive.
14         So when DCPO Alexander came
15 in, he wanted to try to correct some of those
16 things without saying it was her fault, but he
17 just wanted to correct some things and kind of
18 put the ship back afloat, and we were on board
19 because we're team players.
20         And so with that, he asked us
21 to lean on our relationships with officers that
22 we had previous relationships with. So not only
23 did we go out office to office, you know, notify
24 --

Theodis Chapman
August 21, 2017

170

1    Q.   When you say "we," who are you
2    referring to?
3        A.   Patrick Nelson.
4        Q.   Just the two of you?
5        A.   We would actually go out and --
6        Q.   I'm sorry.  Was there anyone else?
7            MR. GEOGHEGAN:  Just -- you've got a
8    question.  But you're kind of interrupting him,
9    and it's getting a little confusing.
10           MR. HAYES:  I know.  He's giving a
11   narrative, and I understand why he has to, but
12   I'm just trying to take on the steer of the ship
13   a little bit here.
14           THE WITNESS:  We were asked to kind of
15   take the lead on this because we were the most
16   tenured officers in the program.
17   BY MR. HAYES:
18       Q.   All right.  By Deputy Chief Alexander?
19       A.   Alexander, yes.
20       Q.   So this was in 2015?
21       A.   Yes.
22       Q.   All right.  So -- and I just want to
23   clarify.  Who is in the Jumpstart program?  Who
24   was working in the Jumpstart program?

171

1        A.   Nelson, myself, and Tatanesha Jackson.
2        Q.   Okay.
3        A.   And there was one outreach officer,
4    Yusef Harris.  Officer Vincent Samuel was now in
5    a pilot program called Sanctions, which is like
6    a two-hour-a-day program where the minors are
7    just, like, shown prison videos.  And they're
8    given snacks because they may be suspended from
9    school and then they're released to go home.
10       Q.   All right.
11           So 2015 Alexander comes in and
12   wants to revamp things and you and Mr. Nelson go
13   out and -- is it outreach that you're doing at
14   that point?
15       A.   We're doing everything.  We're doing
16   instructors -- we are instructors.  We're doing
17   outreach because there was only one outreach
18   officer now.  We're doing tutoring.  We're doing
19   mentoring.  We are also doing -- at this point
20   now we are still doing a little bit of advocacy
21   work, enrolling the minors in school.  So we're
22   pretty much doing it all.
23       Q.   All right.
24           Just the two of you or is

172

1    Ms. Jackson involved in this as well?
2        A.   Ms. Jackson, her role was more so
3    reduced to just the classroom component where
4    she would -- she would just teach a little bit
5    of -- maybe -- it may have been a little bit of
6    math.  But for the most part, me and Nelson
7    taught everything anyway.
8        Q.   And at this time, 2015, how many
9    minors were enrolled in the program?
10       A.   Anywhere from -- again, it varied.
11   You know, we had three -- we had four cycles --
12   five cycles now because we were doing it now
13   every eight weeks as opposed to twelve weeks.
14   And the time in between each cycle now was much
15   shorter.  So there was a smaller time to prepare
16   for the next group.  And eventually it would be
17   ongoing.  Kids would be coming in -- dropped --
18   it was like a drop-in program.  So there was no
19   set beginning and no set ending.
20       Q.   Approximately how many?
21       A.   Anywhere from -- anywhere from 15 to
22   25.
23       Q.   All right.
24       A.   15 to 28.  15 to 30.

173

1        Q.   All right.
2        A.   Now, mind you, at 15 might not be the
3    Catholic schoolboy 15.  We're talking about 15
4    gangbangers, you know.
5        Q.   I hear you.
6        A.   The intensity of those 15 far
7    outweighed the number of 15 kids.  Because one
8    kid might require the attention that three kids
9    would normally require.
10       Q.   Well, what I want to focus on is the
11   allegation here when the JPD eliminated the
12   positions.
13       A.   Okay.
14       Q.   So tell -- when were your positions
15   eliminated?  Let's start there.
16       A.   November 2015 we were officially
17   removed.
18       Q.   All right.  All right.
19           When you say "we," I just want
20   to know --
21       A.   Patrick Nelson and myself.
22       Q.   Okay.
23       A.   Patrick Nelson and myself.  Theodis
24   Chapman.  We were officially removed.

44  (Pages 170 to 173)

Theodis Chapman
August 21, 2017

174

1      Q. Okay. Was -- what about Ms. Jackson?
2      A. No. Ms. Jackson was allowed to stay.
3      Q. Did -- November 2015 she was allowed
4  to stay. Did her job duties change at all, to
5  your knowledge?
6      A. No. We were -- actually we --
7  actually, Mr. Nelson and myself had more -- not
8  only did we have seniority, we had -- not
9  only --
10         Go ahead. What's your
11  question?
12     Q. No. I was saying you're not answering
13  the question.
14     A. All right.
15         MR. GEOGHEGAN: Can I make a
16  suggestion?
17         MR. HAYES: Yeah.
18         MR. GEOGHEGAN: Maybe we can take a
19  break for about five minutes.
20         MR. HAYES: Yeah. That's fine. We
21  can do that. Yeah.
22         (WHEREUPON, a discussion
23          was held off the record.)
24

175

1  BY MR. HAYES:
2      Q. Mr. Chapman, I just want to clarify my
3  last question.
4      A. Okay.
5      Q. November 2015, when you and Mr. Nelson
6  were removed from Jumpstart, Ms. Jackson stayed;
7  is that right?
8      A. Yes.
9      Q. Okay. Did her duties change in any
10  way from before November 2015 until after 2015,
11  to your knowledge?
12     A. To my knowledge, I'm not sure.
13     Q. Okay.
14         After November 2015 do you
15  know if Ms. Jackson was still doing classroom
16  instruction at Jumpstart?
17     A. I'm not sure.
18     Q. After November of 2015 was anyone put
19  into yours or Mr. Nelson's positions in
20  Jumpstart?
21     A. Yes.
22     Q. All right. And who was that?
23     A. Dale Lomax and Dan O'Connell.
24     Q. Okay. So Paragraph 69 says the

176

1  positions were eliminated. Were your positions
2  eliminated?
3      A. Based -- that's what they told us.
4  Yes. That's what they told us. Yes.
5      Q. Okay.
6         After November 2015 did
7  Jumpstart continue to operate?
8      A. Yes.
9      Q. All right. In the exact same way it
10  had prior to November 2015?
11     A. No.
12     Q. All right. And how was it different?
13     A. There's -- how are they doing it now?
14     Q. Well, let's put it this way. Is there
15  still a program called Jumpstart at JPD?
16     A. Yes.
17     Q. All right.
18         Is there still on-site
19  classroom instruction of Jumpstart at JPD?
20     A. I don't know.
21     Q. Do you know who currently works in the
22  Jumpstart program?
23     A. Yes.
24     Q. Who?

177

1      A. Tatanesha Jackson, Dale Lomax, Dan
2  O'Connell, Yusef Harris.
3      Q. Who's the last one?
4      A. Yusef Harris.
5      Q. Okay. And I don't think we've heard
6  that one before. What's his race?
7      A. African American.
8      Q. All right.
9         So back to Paragraph 69. It
10  says you were eliminated -- sorry. I'll just
11  read it again.
12         "In 2015, the Cook County
13  Juvenile Probation Department eliminated
14  positions occupied by Nelson and Chapman in the
15  'Jumpstart' program under guise of
16  reorganization."
17         Is that right? That's what
18  that says, right?
19     A. Yes.
20     Q. Okay. To your knowledge -- let's
21  start with the first question.
22         You were told that it was a
23  reorganization; is that right?
24     A. Yes.

45 (Pages 174 to 177)

Theodis Chapman
August 21, 2017

---

178

1    Q. All right. And who told you that?
2    A. During labor -- Avik Das.
3    Q. And as you're sitting here now, do you
4  believe that the Jumpstart program was
5  reorganized in any way?
6        MR. GEOGHEGAN: Technically or in a
7  good faith manner?
8        THE WITNESS: That's what I'm saying.
9        MR. HAYES: I want to say technically.
10       THE WITNESS: No.
11  BY MR. HAYES:
12    Q. All right.
13         And do you know what current
14  position, job title of Mr. Lomax and
15  Mr. O'Connell is?
16    A. Jumpstart -- Jumpstart advocacy --
17  Jumpstart educational advocacy is one of the
18  components that we did. When -- if I may?
19    Q. Yeah. Go ahead.
20    A. When the program, as I mentioned, with
21  Mr. Alexander and subsequently DCPO Johnson took
22  over after Alexander and the program was adding
23  all these other duties, that was one of them,
24  educational advocacy.

---

179

1    Q. And what does that mean?
2    A. Reenrolling the minors back in school.
3    Q. At regular schools or charter schools
4  even?
5    A. Whichever one.
6    Q. Okay.
7    A. Finding the best fit.
8    Q. Okay. Let's go to Paragraph 70, which
9  is the next page.
10        All right. It says, "Rather
11  than allow them to exercise their seniority and
12  be reassigned to other positions within the
13  Jumpstart program, the Cook County Juvenile
14  Probation Department moved Nelson and Chapman to
15  a field position, outside their experience
16  within the Jumpstart program and without
17  adequate training, in gross derogation of
18  established standards."
19         Do you see that?
20    A. Yes.
21    Q. All right. So let's talk about the
22  first part here talking about reassignment. In
23  November 2015 did you want to remain in
24  Jumpstart?

---

180

1    A. Yes.
2    Q. All right. Did you want one of these
3  educational advocate positions?
4    A. Yes.
5    Q. All right. So you wanted one of the
6  positions that Mr. Lomax and Mr. O'Connell has;
7  is that right?
8    A. Yes.
9    Q. Okay. Which they still hold?
10    A. Yes.
11    Q. All right. Did you bid for those
12  positions?
13    A. There was no bid.
14    Q. There's no bid.
15         Do you know when those two,
16  Mr. Lomax or Mr. O'Connell, were put into those
17  positions?
18    A. Mr. Lomax was put in there before me
19  and Nelson -- well, his name appeared on the
20  sign-in sheet. He was put in as me and Nelson
21  were being removed.
22    Q. All right. So around November of
23  2015?
24    A. Yes.

---

181

1    Q. All right. Mr. O'Connell, do you know
2  when that happened?
3    A. Mr. O'Connell just came in about,
4  maybe -- he told me in court one day. I believe
5  may have been six, eight months ago.
6    Q. Okay.
7    A. Actually, that's how I found out he
8  was in there.
9    Q. Who did you tell you wanted to
10  reassign to that -- who did -- sorry.
11         Who did you tell you wanted to
12  be reassigned to another position within
13  Jumpstart?
14    A. Avik Das, William Patterson, Donna
15  Neal, Mark Warner, Jennifer Nunez, all DCPOs.
16  They were at labor management.
17    Q. Okay.
18    A. I even addressed Avik Das directly.
19    Q. In person or in writing?
20    A. Person and in writing. The union
21  forwarded it also in writing. It was even asked
22  that he could reconsider, considering our
23  seniority, the fact that we had been in the
24  position --

---

46 (Pages 178 to 181)

Theodis Chapman
August 21, 2017

182

1    Q. So these other Jumpstart positions,
2  there was never a bid for them?
3    A. No. If I may?
4    Q. Sure.
5    A. That's where the grievance also was
6  filed in regards to management doctoring the bid
7  list to look as though Jumpstart was divided up
8  into these separate units when, in fact, it was
9  one unit. They give the impression, according
10 to the bid list, as though there was this
11 separate instructional Jumpstart. It's
12 Jumpstart outreach and Jumpstart advocacy when
13 it was all one unit.
14   Q. Yeah. Who did that? Who --
15   A. Management.
16   Q. Management.
17   A. Yes. Because we had a copy -- the
18 union had a copy of the bid list before Nelson
19 and I was all of a sudden targeted and
20 discriminately removed. And then they had a
21 copy of the bid list after it was tampered.
22   Q. Wait. Wait. Let me -- sorry. What
23 was -- the bid list was tampered?
24   A. The bid list was tampered and

183

1  redesigned to look like Jumpstart specifically
2  was these three separate units.
3    Q. I see. Okay.
4    A. When, in fact, it's one unit.
5    Q. All right. Who changed this bid list,
6  to your knowledge?
7    A. Management is the only one that
8  actually puts the bid list together.
9    Q. And when did that happen?
10   A. This happened, like, right before --
11 it had to be, like, November -- late October,
12 November.
13   Q. Of '15?
14   A. '15, yes.
15   Q. All right.
16        So were -- was there a bid
17 list for these other positions or no?
18   A. No.
19   Q. There wasn't?
20   A. There was no list.
21   Q. What was on this tampered bid list?
22   A. It just -- it made Jumpstart look like
23 it was three different units, like it was an EM,
24 an IPS. It was --

184

1    Q. Were there open positions on that bid
2  list?
3    A. Not to my knowledge. If so, I would
4  have bidded.
5    Q. So let me ask you this way. On this
6  time period, October/November of 2015, were
7  there any open positions in Jumpstart that you
8  could have bid on?
9    A. Yes.
10   Q. All right. And what were those?
11   A. Every position in Jumpstart. I was
12 already doing the job. Outreach, I was doing --
13   Q. Maybe I didn't ask that right.
14   A. Okay. Reask it.
15   Q. I'm sorry.
16        During this time period, two
17 thousand -- October or November 2015 --
18   A. 2015.
19   Q. Yeah.
20        -- were there other positions
21 in Jumpstart that were available to be bid on?
22   A. Not to my --
23        MR. GEOGHEGAN: I'm not sure I
24 understand the question.

185

1        MR. HAYES: Yeah. I'm having a hard
2  time with this, too.
3        THE WITNESS: Can I give you some
4  clarification?
5        MR. HAYES: Sure. Yeah. That would
6  be great. That would be great.
7        THE WITNESS: Okay?
8        MR. GEOGHEGAN: Sure.
9        THE WITNESS: Yeah. Yeah. Nelson and
10 I were already doing every job there was
11 possibly to be had in Jumpstart, from outreach,
12 advocacy, instruction. We were doing all the
13 jobs because --
14        MR. HAYES: Well --
15        MR. GEOGHEGAN: Let him finish.
16        MR. HAYES: Well, I'm just trying to
17 clarify as he goes along.
18        MR. GEOGHEGAN: If that helps. If
19 that helps.
20        MR. HAYES: Yeah. I know. I don't
21 mean to cut him off.
22        MR. GEOGHEGAN: No, no, no. Go ahead.
23        MR. HAYES: I'm just trying to get
24 clarification as we go along.

47 (Pages 182 to 185)

Theodis Chapman
August 21, 2017

186

BY MR. HAYES:
Q. Was it your understanding then that --
that -- that this tampered bid list was to
separate out your job duties, your and
Mr. Nelson's job duties?
A. This was just part of the
discrimination, as far as Mr. Nelson and myself.
Q. I understand that. Okay. That's
fine. That's fine.
Were you ever given a reason
why Jumpstart was being reorganized?
A. Operational need.
Q. That's all they said?
A. That's all they said.
Q. All right. And who said that to you?
A. Avik Das.
Q. There's no other explanation?
A. No. And he didn't have to expound on
that, he said.
Q. He actually said that?
A. He said, I don't have to -- in his
words, I don't have to give it reason. Just
note that it's operational need and management
reserves the right.

187

Q. Okay.
A. Something to that nature.
Q. Yeah. Well, what I'm trying to get at
here is that -- maybe I just don't understand
the process. But I -- and I understand your
position that you were doing all job duties.
A. That's right.
Q. At this time was there ever a bid list
put up for any position in Jumpstart?
A. No. No.
Q. All right.
A. No. There was never a posting for an
opening in Jumpstart.
Q. All right.
A. You could bid on whatever unit you
want, but that doesn't necessarily mean that
there's an opening.
Q. Oh, I see. Okay. Now that clarifies
it a little bit.
A. Okay.
Q. So there doesn't have to be an opening
for someone to bid on another position?
A. No. You can bid. You can waste your
bid however --

188

Q. How does that -- explain what a bid
is.
A. For example -- and I will try to keep
it --
Q. Please.
A. -- brief. IPS probably has one of the
highest bid lists. There's almost always at
least 20 people with a bid in for IPS.
Q. What's IPS?
A. Intensive Probation Services.
Q. Okay.
A. If you're way down on the list of
seniority, it will be maybe years before you
even think about getting in there.
There was never any bids in
Jumpstart. Jumpstart always has been pretty
much -- because you're in closed settings with
the kids and most officers don't like to be in
closed settings. That's why it took a
particular skill set to work with this type of
group because you are not able to go out and
come and go. You're in there with them until
the time they get there until the time they
leave. So there was never a lot of bidding to

189

get into Jumpstart. So our bid list was always
empty. It was always --
Q. I see.
A. Yes.
Q. And that process, is that outlined in
the CBA?
A. Yes.
Q. And it goes by seniority?
A. Seniority, yes.
Q. All right.
And as you say in the
complaint, and you had more seniority than the other
two, Mr. Lomax and Mr. O'Connell?
A. Oh, yes. Mr. Lomax just came out of
training.
Q. Okay.
A. Not Mr. O'Connell. But Tatanesha
Jackson, she had just came out of the field
unit. She was still new, three years.
So when they cited operational
need, she had just came out of the field. Lomax
just came out of training. Nelson and I had
never been in a field unit.

Theodis Chapman
August 21, 2017

190

```
 1              (WHEREUPON, Chapman Deposition
 2         Exhibit No. 3 was marked for
 3         identification.)
 4  BY MR. HAYES:
 5      Q.  Okay.  You have been handed what's
 6  been marked as Exhibit 3.  For the record,
 7  that's Defendant's 002035.
 8              Do you recognize this
 9  document, Mr. Chapman?
10      A.  Yes.
11      Q.  All right.  What is it?
12      A.  It's my grievance for being removed in
13  violation of my seniority.
14      Q.  And is this --
15      A.  And --
16      Q.  Go ahead.
17      A.  -- treated in a discriminatory manner.
18      Q.  All right.
19              And is this the grievance that
20  you filed after you were reassigned away from
21  Jumpstart?
22      A.  Yes.
23      Q.  All right.  And what happened with
24  this grievance procedurally?
```

191

```
 1      A.  I went through the steps all the way
 2  to Step 2, 3, 4, to the Chief Judge's level.
 3  And, you know, we're just waiting now on an
 4  arbitration date.
 5          MR. HAYES:  Okay.
 6              (WHEREUPON, Chapman Deposition
 7         Exhibit No. 4 was marked for
 8         identification.)
 9  BY MR. HAYES:
10      Q.  Okay.  Look at what's been marked as
11  Exhibit 4, and that is Defendant's 002033 to 34.
12              Do you recognize this
13  document?
14      A.  Yes.
15      Q.  All right.  And what is this?
16      A.  This is their grievance response.
17      Q.  All right.  And what step is this?
18      A.  Step 3.
19      Q.  And who is this from?
20      A.  Avik Das.
21          MR. HAYES:  All right.
22              (WHEREUPON, Chapman Deposition
23         Exhibit No. 5 was marked for
24         identification.)
```

192

```
 1  BY MR. HAYES:
 2      Q.  Mr. Chapman, you have been handed
 3  Exhibit 5.  This is Defendant's 2031 through
 4  2032, and it is to Mr. Smith.  It's not to you,
 5  so I was wondering if you had seen this before.
 6      A.  I have seen this.  It's been a while.
 7      Q.  And then RE it says, "Step 4 Grievance
 8  Response -- P.O. Theodis Chapman & P.O. Patrick
 9  Nelson."
10              Do you see that?
11      A.  Yes.
12      Q.  Yeah.  And you can look through this
13  if you want, but it's your understanding that
14  this is the Step 4 response to your grievance,
15  which we have been talking about?
16      A.  Yes.  Yes.
17      Q.  All right.
18              And is it a normal procedure
19  to give the Step 4 grievance response to the
20  president of the union?  Looking at the top, it
21  says it's to Jason Smith.
22      A.  Yeah.  I mean, from what I understand,
23  they can -- this is where protocols and
24  standards --
```

193

```
 1      Q.  Okay.
 2      A.  Some things apply differently to some
 3  people.
 4      Q.  And were you at the Step 4 grievance
 5  here?
 6      A.  Yes.
 7      Q.  And it says it's from Kate Galbraith,
 8  Counsel, Office of the Chief Judge.  Do you see
 9  that?
10      A.  Yes.
11      Q.  All right.
12              And is that what you mean
13  before when you say, like, the Chief Judge's?
14      A.  Yes.  This is the Step 4.
15      Q.  Yes.
16      A.  Designee.  Which used to be Keith.  So
17  Kate is also on board now.
18      Q.  All right.
19              And the Chief Judge was not
20  there, right?
21      A.  No.
22      Q.  All right.
23      A.  Whether he was in the building or -- I
24  don't know.
```

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

194

1     Q.  He wasn't in your actual hearing
2  meeting?
3     A.  No.  No.
4     Q.  All right.
5         And then the Step 4 was
6  denied; is that right?
7     A.  Yes.
8     Q.  And then after that you took it to
9  arbitration?
10    A.  It's waiting -- pending an arbitration
11 date.
12    Q.  Oh, pending.  Oh, you haven't had it
13 yet?
14    A.  Not yet.
15    Q.  All right.
16    A.  They're -- they're almost always
17 denied at Step 4.
18    Q.  All right.
19    A.  That's the discrimination we are
20 citing.
21         (WHEREUPON, Chapman Deposition
22         Exhibit No. 6 was marked for
23         identification.)
24

195

1  BY MR. HAYES:
2     Q.  Mr. Chapman, you have been handed
3  what's been marked as Exhibit 6.  It's Defendant
4  2149.
5         Have you seen this document
6  before?
7     A.  Yes.
8     Q.  All right.  And can you tell me what
9  this is?
10    A.  This was during the labor management
11 meetings where the so-called movement or
12 proposed movement was being outlined.
13    Q.  All right.  And the date is July 21,
14 2015?
15    A.  Yes.
16    Q.  You see that, right?
17        Were you involved in these
18 discussions in any way at this time?
19    A.  Yes.  I was on the labor management.
20    Q.  So at the top it says, "AFSCME Local
21 3477 Labor Management Team."  And you were on
22 that?
23    A.  Yes.
24    Q.  All right.

196

1         It says, "Movement Outline."
2  Do you see that under RE at the top?
3  "Preliminary Proposal for Movement Outline for
4  mid-August."  Do you see that?
5     A.  Yes.
6     Q.  If you know, "movement outline," is
7  that -- is that what the -- is that referring to
8  the reorganization that we're talking about?
9     A.  Correct.
10    Q.  All right.
11    A.  That has many, many terms.  Movement
12 outline can be reorganized and it could be
13 operational need.  It could also be
14 discrimination.
15    Q.  All right.
16        Is there -- this looks like --
17 actually, it's kind of confusing to me because
18 there's a lot of acronyms.  Is there anywhere on
19 this sheet of paper that says you and
20 Mr. Nelson's positions were being either
21 eliminated or you were going to be reassigned?
22 Anything like that?
23    A.  Just No. 2 at the bottom.  "Reserve
24 for reassignment as of yet to be determined, the

197

1  two remaining Jumpstart traditional/instructor
2  PO's."
3     Q.  All right.  So that's you and
4  Mr. Nelson?
5     A.  Correct.
6     Q.  All right.
7         So what was your understanding
8  at this time of what was going to happen to you
9  based on No. 2 here?
10    A.  That we would still remain in
11 Jumpstart, that whatever they configured it to
12 be, considering we were the two more senior
13 officers there, that we were probably in the
14 best position to help move whatever goals they
15 wanted to achieve forward.
16    Q.  Now, the first -- the first sentence
17 says, "Management offers the following for
18 consideration with regards to the reassignment
19 of some employees who are bargaining unit
20 members of AFSCME Local 3477."
21        Do you see that?
22    A.  Yes.
23    Q.  All right.
24        What is your understanding --

50 (Pages 194 to 197)

Theodis Chapman
August 21, 2017

198

1 I guess what I'm trying to figure out is --
2       Well, why was this being
3 submitted for consideration?  What is the
4 process here that this is part of?
5       **A.  Management is supposed to negotiate**
6 **whenever they have to do reassigning or**
7 **redeploying officers to different parts of the**
8 **department, whatever the case may be.  They're**
9 **supposed to bargain and negotiate with the union**
10 **in good faith to use -- so that they don't**
11 **violate seniority, so that they don't commit any**
12 **discriminatory acts, so that they actually do it**
13 **right.  But -- go ahead.**
14      Q.  Okay.
15           So would you have been
16 involved -- as part of the labor management
17 team, would you have been involved in, like,
18 this reorganization if it involved a different
19 department or different unit?
20      **A.  Rephrase your question.**
21      Q.  Yeah.  What I'm trying to get at is,
22 would you -- as part of the labor management
23 team, would you -- at this time would you be
24 involved in a reorganization like this if it

199

1 didn't involve your specific unit where you were
2 working?
3       **A.  Oh, yeah.  Definitely.**
4      Q.  Okay.
5       **A.  Whatever expertise or whatever**
6 **information and knowledge base I have, yes.  It**
7 **would be utilized.**
8      Q.  So at this time you were part of the
9 management team, but it was also affecting you
10 personally in your job?
11      **A.  Yes.**
12      Q.  Okay.
13           And here under these numbers
14 on Exhibit 6 here, is that -- No. 1, consolidate
15 educational advocacy with Jumpstart outreach, is
16 that where you were saying before where they
17 were trying to separate out?
18      **A.  Exactly.  Yes.**
19      Q.  Is this the first time that they had
20 been doing this, trying to separate out these
21 positions?  Or had it been done before?
22      **A.  Traditionally, when they were**
23 **targeting predominantly African-American units,**
24 **it had -- management had, you know, under**

200

1 **discriminatory means, they had did it before,**
2 **and it kind of was working in this.**
3      Q.  Well, I guess I want to know more
4 specifically just for Jumpstart.
5       **A.  Sure.**
6      Q.  Yeah.  So had --
7           Was this the first time, you
8 know, July 21, 2015, that you saw in writing
9 that management was trying to, you know, create
10 different -- I guess, you want to call them
11 sub-units.  I don't know how you --
12      **A.  This is my first time seeing this.**
13 **Yeah.  Where they were doing that.**
14      Q.  Okay.
15      **A.  Yes.**
16      Q.  Okay.
17           And were there meetings
18 between the union and management regarding this?
19      **A.  Yes.  That's what the whole process**
20 **was supposed to be about.**
21      Q.  Do you know approximately how many
22 meetings were there?
23      **A.  There were -- I believe, maybe --**
24 **July -- there may have been three, two, maybe --**

201

1 **July, there may have been two.  And after the**
2 **third meeting is when they just came and they**
3 **had -- they already made their mind up, and they**
4 **just discontinued the talks.**
5      Q.  Okay.
6      **A.  So there may have been another meeting**
7 **in August -- like, August, September.  And by**
8 **the time October, I believe, they just went**
9 **ahead and initiated it; that this is what we're**
10 **going to do.**
11      Q.  And is that is -- is that what is in
12 this document?
13      **A.  They --**
14      Q.  Did they do what's in this document?
15      **A.  No.  This document denotes that it's**
16 **open for discussion.**
17      Q.  All right.
18           Well, let's go through it.
19 Number 1, did they consolidate those educational
20 advocacy, 3 PO's, with the Jumpstart outreach, 4
21 PO's?  Do you know if they did that?
22      **A.  Education -- yes.  But it had already**
23 **been done with me and Nelson.**
24      Q.  Okay.

Theodis Chapman
August 21, 2017

202

1          And then -- I mean, I know the
2  answer to this.  But No. 2, that's you and
3  Mr. Nelson?
4          **A.  Yes.**
5          Q.  So you guys were reassigned, correct?
6          **A.  Yes.**
7          Q.  All right.  Did No. 3 happen?  I don't
8  even know what that means.  SPO Rivera
9  reassigned.
10         **A.  Yeah.**
11         Q.  What's the difference between --
12  what's RUR?
13         **A.  RUR is release upon request.  And
14  that's when a minor is being released from the
15  Temporary Detention Center, the Audy Home.  The
16  judge usually specifies where that minor -- who
17  that minor is to be released to and SPO
18  Rivera -- I don't want to get too far into it.**
19         Q.  Yeah.  No.  That's fine.  I just --
20         **A.  Yeah.**
21         Q.  I just wanted a little bit
22  clarification for the record.
23         **A.  Release upon request.**
24         Q.  Got it.

203

1          **A.  Okay.**
2          Q.  Thank you.
3          Okay.  And then looking to 4,
4  did that happen?
5          **A.  I guess you can see I'm used to
6  talking to kids.**
7          Q.  That's fine.
8          **A.  No. 5?**
9          Q.  4 and 5.  Do you know if those
10  happened?
11         Sorry, 4.  Do you know if that
12  happened; which was "Assign the clinical intake
13  staff."  I guess it looks like that was just
14  reassigning it to a different supervisor.
15         **A.  No.  What was supposed to take place
16  in No. 4, both of those are white officers.
17  That was totally not done and it actually --
18  they came -- actually, they made out very well
19  because Parysz doesn't, to my knowledge,
20  supervise anyone.  And Petchenik, she
21  supervises, but she actually -- not to that
22  degree.**
23         Q.  Okay.
24         **A.  Yeah.**

204

1          Q.  All right.  No. 5, do you know if that
2  happened?
3          It just looks, again,
4  reassigning Roberts to a different supervisor,
5  right?
6          **A.  She -- she was under Meehan for a
7  short bit.  Where she is now, I don't know.**
8          Q.  Okay.  And the SPO means supervisory
9  probation officer?
10         **A.  Supervisory probation officer,
11  correct.**
12         Q.  All right.  We can move off that
13  document.
14         Back onto the complaint, which
15  is Exhibit 1, Paragraph 71.  "This
16  reassignment" -- which is the reassignment we
17  have been talking about -- "was taken in
18  retaliation against Nelson and Chapman for their
19  former complaints of race discrimination and
20  their association in defense of their right to
21  be free from race discrimination."
22         Do you see that?
23         **A.  Yes.**
24         Q.  All right.  What formal complaints are

205

1  you referring to there?
2          **A.  We -- we -- grievances.  We have
3  written actual -- the union has written on our
4  behalf, not only to management but to the office
5  of the Chief Judge, to the Chief Judge; tried to
6  set up meetings with the Chief Judge personally.
7  Nelson and I have both also written Keith Sevick
8  personally.**
9          Q.  Complaining of discrimination?
10         **A.  Of course.  Yes.**
11         Q.  All right.
12         **A.  Uh --**
13         Q.  And did -- had you --
14         I think I know the answer to
15  this, but had you filed an EEOC charge prior to
16  this reassignment?
17         **A.  Yes.**
18         Q.  All right.
19         **A.  This is part of the retaliation that
20  came from that.**
21         Q.  All right.
22         **A.  Our lives changed drastically after
23  that.**
24         Q.  All right.  We'll go over those next

52  (Pages 202 to 205)

Theodis Chapman
August 21, 2017

206

1   to clarify it.
2        A.  Okay.
3        Q.  All right.  I think you testified to
4   this a little bit, but I just want to be clear.
5             Was your salary reduced when
6   you were reassigned out of Jumpstart?
7        A.  No.
8        Q.  All right.
9             And is the Jumpstart program
10  still called Jumpstart or is it called something
11  different?
12       A.  Still called Jumpstart.
13       Q.  All right.
14            And to your knowledge, who
15  made the decision for -- put in quotes -- "the
16  reorganization of Jumpstart?"
17       A.  Avik Das and William Patterson.
18       Q.  So we've gone through your
19  allegations, yours and Mr. Chapman's allegations
20  that are in the complaint --
21       A.  Mr. Nelson's.
22       Q.  I'm sorry.  You're Mr. Chapman.
23       A.  That's okay.
24       Q.  It was supposed to be Mr. Nelson

207

1   today.
2             So is there anything else, any
3   other specific allegations of discrimination
4   against you personally that you believe happened
5   to you that we haven't talked about yet?
6        A.  The more recent stuff that just
7   recently happened to me?
8        Q.  Sure.
9        A.  I was moved into this field unit with
10  only one-and-a-half day of training, which posed
11  a threat to myself.  When I named it earlier
12  "The Anthony Jordan rule," I was not adequately
13  trained.  I was given one-and-a-half day of
14  training when an actual field officer received
15  no less than eight weeks of training.
16            Considering I had been in a
17  specialized unit for over 13 years, there was
18  certain things that had changed as related to
19  being a field officer, certain programs and
20  different things had been in place.  Just giving
21  me a day and a half of PowerPoint did not
22  adequately provide me the training that I needed
23  to dispense my duties as a field officer.
24            After being placed in the unit

208

1   for one week, I recommended myself for more
2   training because I saw that there was a
3   liability that could be incurred on me as well
4   as the case with Anthony Jordan, because I
5   initially asked to receive only three cases
6   until I became acclimated with being a field
7   officer and all the duties -- to execute all of
8   the duties.  But when I got to the unit, I had
9   30 cases.  At least five of those were
10  high-profile cases, one of which the minor
11  eventually ended up incarcerated for killing a
12  lady.  That could have easily been another
13  "Anthony Jordan" situation for me.
14            I was brought there for
15  operational need.  I would have -- I would have
16  thought that after that so-called operational
17  need had no longer been, that I could have been
18  afforded the opportunity to be transferred out
19  into some other unit.  But, unfortunately, they
20  allowed a white female officer with far less
21  seniority than me who had only been in the
22  department, I believe, two years -- less than
23  two years.  She was allowed to transfer out of
24  the unit that I was forced into based on

209

1   operational need.
2        Q.  Okay.  What was her name?
3        A.  Patty Calderon.
4        Q.  Okay.  And where did she go?
5        A.  She went to EM, I believe.  EM or IPS.
6   I think it's IPS.
7        Q.  Just before -- so let's focus on this
8   and then if there's more, that's fine.
9        A.  Sure.  Sure.
10       Q.  So about your training, you testified
11  before -- and always correct me if I misspeak --
12  that all employees coming to JPD are basically
13  trained like field officers, correct?
14       A.  Correct.
15       Q.  So did you receive that when you
16  started?
17       A.  When I started, yes.
18       Q.  And I know that was a long time ago
19  but...
20       A.  Yes.  Yes.
21       Q.  All right.
22            And is that the eight weeks of
23  training you're referring to?
24       A.  It was about 12 -- about 12 --

53 (Pages 206 to 209)

Theodis Chapman
August 21, 2017

210

1  about 12 -- it's about three months of training.
2  Yes.
3      Q.  Okay.
4          All right.  And so then when
5  you are reassigned as a field officer, did you
6  want to then, like, redo that initial training?
7      A.  Not the whole training, but I would
8  have hoped that I would have been at least given
9  to be able to shadow a field officer.  I would
10 have been able to be given an outline of what we
11 mostly deal with, which is a family folder which
12 constitutes the whole client's existence from
13 front to back; from their initial court order,
14 the docket; the family background; you flip that
15 over, their assessment; and then you flip that
16 over, you have different notes that a probation
17 officer may leave; and then you flip that over,
18 then you have all of their documentation from
19 school, psychological records, any DNA that they
20 may have had done.
21         And then on the final sheet,
22 you have their social -- the social evaluation
23 that should actually be outlined in a normal
24 format to where you know what -- how to compose

211

1  it and what it's supposed to read to the judge,
2  to the state's attorney, to the PD, so that you
3  know, actually, what all the relevancy of
4  everything in this important-otherwise folder
5  that they have used to suspend and terminate
6  African-American officers discriminately.  I did
7  not receive any of that.
8      Q.  So what training did you get when this
9  happened?
10     A.  I received --
11     Q.  Sorry.
12         When I say "this happened," I
13 meant when the reassignment to the field.
14     A.  That's a good question.
15         I received questions on what
16 they considered the money training.  Money
17 training is how the department can reimburse for
18 services that we do that they can get
19 reimbursement for.  One of which is the YAZI.
20 YAZI is an assessment tool that was customarily
21 used by social service agencies.
22         Under this the government --
23 the -- our department is able to get Federal
24 funds reimbursed to them for services that we

212

1  utilized.
2      Q.  Okay.
3      A.  We also have JEMS, that antiquated
4  system I was talking about, similar to the
5  Commodore 64.  When we put the things in JEMS,
6  contacts denote, just like in a social service
7  agency, you're able to bill.  For billing you
8  get reimbursed.  Those are the two main things
9  that was emphasized.  Not the actual family
10 folder.  Not this is what it looks like.  You
11 may have had this training 14 years ago, but
12 there's some things that has changed that you
13 should know about it.
14         This is what they use when
15 they are auditing you or when they are doing --
16 pulling your files or your folders.  These are
17 what the supervisor or deputy or management is
18 looking for in the event that you are targeted
19 for -- to have your folders audited.
20         None of that was brought to
21 where I thought, now that I know being a field
22 officer -- even now when interns come in, I make
23 sure that they know what a family folder is, how
24 it's supposed to be composed, and the relevancy

213

1  of each document.  I just do that out of
2  consideration because I would have wanted it
3  done for me.
4      Q.  Okay.  During the 12 years you were in
5  Jumpstart, did you ever go out in the field with
6  a field probation officer?
7      A.  If I had to it was to -- where the
8  officer thought that my presence may motivate
9  the minor to come to the program to attend
10 school.
11     Q.  And how often would you said you'd do
12 that?
13     A.  I just made myself available.  As long
14 as it didn't conflict with my normal duties, I
15 would make myself available.  That's one of the
16 reasons why I received a lot of commendations
17 from my fellow officers because I made myself
18 available as they needed.
19         If I needed to talk to one of
20 their clients, I would and vice versa.  That's
21 where the tutoring came in.  We would tutor
22 other officer's clients.
23     Q.  Okay.
24         Again, I know it's hard to put

54  (Pages 210 to 213)

Theodis Chapman
August 21, 2017

214

1  a number on it. How often would you do
2  something like that?
3      A. For going out in the field?
4      Q. Yeah.
5      A. As it became a regular occurrence, it
6  was -- it could happen weekly. Not every day
7  during the week, but it could happen weekly.
8      Q. I think I've got enough for the
9  training when you were reassigned.
10         Is there anything else? Any
11  other specific instances of discrimination that
12  we haven't talked about?
13      A. Just recently I had to file a
14  grievance because Avik -- well, I think we
15  talked about it. Avik has denied my comp time.
16      Q. Right. We did.
17         But is there anything else you
18  want to add?
19      A. Okay. It's just that now going
20  forward I'm a lot more cognizant of how
21  undermining and how discriminatory this is as it
22  relates to the disparate treatment to me.
23      Q. Any other specific disparate treatment
24  that we haven't talked about?

215

1      A. We've covered a lot. Yep. But we're
2  good.
3      Q. All right.
4      MR. GEOGHEGAN: Sure. I'm sorry. I'm
5  recovering from a cold. I'm a little out of it.
6  How much longer are you going to go? I want to
7  take a break.
8      MR. HAYES: Yes. We can take a break.
9  Yeah. I'm switching gears. We can take a
10  break.
11      MR. GEOGHEGAN: Okay.
12      MR. HAYES: Let's go off the record.
13         (WHEREUPON, a brief recess
14            was held.)
15      MR. HAYES: Back on the record.
16      THE WITNESS: You said was there
17  anything that I left off?
18      MR. HAYES: Yes.
19      THE WITNESS: That I missed?
20      MR. HAYES: Right.
21  BY MR. HAYES:
22      Q. Okay. Is there anything else? You
23  said --
24      A. Will there be another opportunity

216

1  later to -- because you may answer it in some of
2  your questions.
3      Q. Oh. No. If there's something else, I
4  mean, we're gonna go through your
5  interrogatories but...
6      A. Let's go. Let's go.
7      MR. HAYES: Okay. All right. I want
8  to go through your EEOC charges.
9      THE WITNESS: All right.
10         (WHEREUPON, Chapman Deposition
11            Exhibit No. 7 was marked for
12            identification.)
13  BY MR. HAYES:
14      Q. Okay. Mr. Chapman, you have been
15  handed what's been marked Exhibit 7. Do you
16  recognize this?
17      A. Yes.
18      Q. All right. It's Bates-stamped
19  Defendant 2137 and 2138.
20         And what is this?
21      A. It's a Charge of Discrimination, an
22  EEOC complaint.
23      Q. And at the bottom of the first page,
24  is that your signature?

217

1      A. Yes.
2      Q. And the date is August 18, 2014?
3      A. Yes.
4      Q. And under "Discrimination Based On,"
5  you have both "Race" and "Retaliation" checked.
6  Is that right?
7      A. Yes.
8      Q. All right. And you have the
9  "Continuing Action" box checked, right?
10      A. Yes.
11      Q. All right.
12         So I want to just kind of ask
13  you a couple questions on "The Particulars Are."
14  Do you see the box for the -- you write in what
15  the particulars are of your charges. Do you see
16  that?
17      A. Yes.
18      Q. Okay.
19         It says, "I have been
20  subjected to different terms and conditions of
21  employment, including, but not limited to,
22  regulations regarding compensatory time and
23  lowered performance evaluations." Do you see
24  that?

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

---

218

1      A.  Yes.
2      Q.  All right.
3          So what are you referring to
4  here when you say "compensatory time
5  regulations?"
6      A.  Is that an open-ended question or is
7  that something specific?
8      Q.  No.  It can be open-ended.  What
9  specifically -- well, both.
10         What specifically are you
11 referring to here in this charge when you're
12 saying you were "subjected to different terms
13 and conditions of employment."  And one of the
14 things you list is your compensatory time
15 regulations.
16         And keep in mind this is
17 August 18, 2014.
18     A.  I was always -- with the retaliation
19 and also with the discrimination and disparate
20 treatment, the bias, I was always having new
21 conditions placed upon my being afforded the
22 same rights and privileges that my white
23 colleagues had but did not have to go through or
24 jump through all these other extra hurdles and

---

219

1  all these other stipulations that had to be
2  added.  And the difficulties that -- that was
3  being placed on me, they didn't have to go
4  through that.  And so that's -- I was noting
5  that.
6      Q.  What specifically are you referring to
7  when you say "compensatory time?"
8      A.  Well, initially, it was just a
9  discussion, according to the contract, between
10 you and your supervisor.  And basically your
11 supervisor, according to the contract, was made
12 knowledgeable of the time that you would work
13 beyond your work hours, the reason and the
14 nature of it, and that was enough for me.
15         Then it became the deputy had
16 to sign off.  Then it had to be where then Avik
17 reserved the right to still -- even after those
18 checks and balances, he still somehow put in a
19 provision that he could still reject it even
20 after it's already been vetted.
21     Q.  Is this referring to what happened in
22 2014?
23     A.  It's been ongoing.
24     Q.  Okay.  I just want to -- and I

---

220

1  understand you checked "continuing action," but
2  I guess I wanted to know what -- when you wrote
3  this, what specific compensatory time regulation
4  were you referring to?
5      A.  There was -- I believe the deputy
6  chief probation officer who was now -- I believe
7  it was Melissa Spooner, who came and perpetuated
8  even more of the racial discrimination that had
9  been experienced prior to.  And she was putting
10 in even more provisions that was so-called not
11 just regulating but preventing me from obtaining
12 comp time.  Or when I did do the job, she then
13 also could reject it even if it had been vetted
14 and it had been found credible and there was
15 reason for it to be obtained.
16     Q.  All right.  So you weren't getting
17 comp time at this time?
18     A.  I was not only denied comp time, I was
19 denied the use of my comp time.  And that -- I
20 used to be able to as other officers -- white
21 officers -- be able to use it in one-hour
22 increments, I was forced to use mine now in 3.5
23 hour increments, which was to exhaust my time
24 that I had on the books even more expediently.

---

221

1      Q.  So let's talk about that.  So you were
2  told at this time that you had to use your comp
3  time in three-and-a-half-hour increments?
4      A.  Yes.  Even when there were white
5  officers like Marty Gleason and Steve Kaspersky
6  who was still using theirs in one-hour
7  increments.
8      Q.  All right.
9          Were you aware of any
10 African-American employees that were allowed to
11 use their comp time in one-hour increments?
12     A.  No.  Not that -- not that I could
13 recollect.
14         I just referenced the
15 statement that DCPO Neal made to me that was,
16 "what makes you think you should get what other
17 people get."  So that -- that there was a
18 different standard for some than others.
19     Q.  All right.
20         And then the next thing you
21 say is "lowered performance evaluation."
22     A.  Yes.
23     Q.  What specifically are you referring to
24 when you wrote that here?

---

56 (Pages 218 to 221)

Theodis Chapman
August 21, 2017

222

1      A.  During the retaliatory treatment that
2  I was receiving, my evaluations eventually
3  started becoming -- they were intentionally
4  missing information.  They had misrepresented
5  information.
6      Q.  Who was doing your performance
7  evaluations at this time?
8      A.  Tina Young.
9      Q.  And so you believe that they were
10  lower than they should have been?
11      A.  Oh, definitely.
12      Q.  And that's because of, one, because
13  you're African American?
14      A.  Definitely.
15      Q.  And the second is because you had
16  complained about race discrimination?
17      A.  Yes.
18      Q.  All right.  So prior to this -- sorry.
19  Let's back up for a second.
20          Lowered performance
21  evaluation.  I assume if you get a lower
22  performance evaluation, based on what we talked
23  about earlier, you don't get your merit bonus,
24  right?

223

1      A.  Right.
2      Q.  Is there any other negative
3  consequence from a lower -- a lowered
4  performance evaluation?
5      A.  It doesn't reflect your true body of
6  work.
7      Q.  So -- but what I'm asking is, is there
8  any other tangible consequence of a lowered
9  performance evaluation?
10      A.  That's tangible to me.
11  Notwithstanding the merit, I want what I've done
12  to reflect in my evaluation.
13      Q.  Outside of the merit bonus, do you
14  lose any money because of a lowered performance
15  evaluation?
16      A.  No, not money.
17      Q.  All right.
18          And when you say "lowered
19  performance evaluation," like, how low were
20  they?
21      A.  Oh, they were very low.  Like 400.
22      Q.  I don't know what that means.
23      A.  Well, mine was a scale of -- the
24  highest was -- exceeding was 600 and above.

224

1  Meeting standards is between 400 and 599.  Below
2  standards is below 400.
3      Q.  Were you getting below standards or
4  meeting standards?
5      A.  I was still meeting standards, but it
6  was the low end of meeting standards which is --
7  I take myself -- I'm a consummate professional.
8  And I don't have to have that just be my
9  objective to exceed.  I just do my job and it
10  comes natural for me.
11      Q.  Prior to the filing of this EEOC
12  charge -- which we'll state for the record is
13  440-2014-05395 -- had you filed an EEOC charge
14  prior to this?
15      A.  Yes.  Because this is a continuation.
16  I don't have the date right off but yes.
17      Q.  All right.
18          Can you tell me how many
19  individual EEOC charges you have filed against
20  Office of the Chief Judge, Circuit Court of Cook
21  County?
22      A.  I'm thinking -- I may have lost count
23  at probably five.
24      Q.  Okay.

225

1      A.  And I won this arbitration, by the
2  way.
3          (WHEREUPON, Chapman Deposition
4          Exhibit No. 8 was marked for
5          identification.)
6  BY MR. HAYES:
7      Q.  All right.  You have been handed
8  Exhibit 8, but you just said something.
9          MR. HAYES:  Did you get that
10  arbitration --
11          THE REPORTER:  Yes, I did.
12  BY MR. HAYES:
13      Q.  All right.  I just want to follow up
14  on that.
15          Mr. Chapman, when you said you
16  won the arbitration, is that a grievance you're
17  talking about?
18      A.  Well, the grievance was moved after
19  the Chief Judge said -- struck it down or his
20  designee that said that I didn't have grounds or
21  didn't have -- the grievance didn't have merit.
22  And remember when I told you whenever African
23  Americans file grievances, they never get
24  resolved at the Chief Judge's level.

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

226

1       So a neutral arbitrator heard
2   my case and Mr. Nelson's case, and we
3   actually -- not only did we not -- not only did
4   we show that we -- our performance standards
5   exceeded, but we were also worthy of the merit
6   pay.
7       Q.  Okay.  So you're talking about for
8   your performance evaluation?
9       A.  Yes.
10      Q.  So your performance evaluations, they
11  were changed?
12      A.  They were not.  The arbitrator can't
13  change them, but he makes a note that there was
14  things that management failed to execute their
15  duties.  As -- I don't want to be long winded.
16  I don't want to be long winded.
17      Q.  No.  You're good.  You're doing fine.
18  You're over thinking him just leaning back.
19      A.  Okay.  I don't want to be long winded
20  but...
21      Q.  And I'm just trying to understand,
22  like, what the process of what happened.
23      A.  We went through the steps.  Step 2,
24  Step 3, Step 4, Chief Judge.

227

1       Q.  Arbitration is part of the process,
2   right?
3       A.  Arbitration is after Step 4.
4       Q.  As outlined in the CBA?
5       A.  Correct.
6       Q.  All right.  Got it.
7       A.  And a neutral arbitrator.
8       Q.  And you received your merit bonus pay
9   for these evaluations?
10      A.  It should be forthcoming.
11      Q.  Sorry.  Is that a yes?
12      A.  Yes.
13      Q.  You haven't got it yet?
14      A.  Not yet.
15      Q.  But you plan on getting it?
16      A.  It's forthcoming.  Yes.
17      Q.  For how many years is that for?
18      A.  This is '13 and '14.
19      Q.  All right.
20      A.  And now management is negotiating with
21  Patrick and I for the 2015.
22      Q.  All right.  And you said you received
23  the '16 though, right?
24      A.  '16, I exceeded.

228

1       Q.  But you received the merit pay?
2       A.  Yes.  Yes.
3       Q.  All right.
4           Do you expect to receive it
5   for 2015?
6       A.  Oh, definitely now.
7       Q.  Okay.  Well, let's turn -- we can put
8   Exhibit 7 away, hopefully, for good, and go to
9   Exhibit 8, which she just handed you.
10          This is another EEOC charge.
11  Do you recognize this?
12      A.  Yes.
13      Q.  All right.
14          Is that your signature at the
15  bottom there?
16      A.  Yes.
17      Q.  And for the record, it's Defendant
18  2134 through 2133.  So let's just say it's 2134.
19      A.  Yes.
20      Q.  Okay.
21          And the date is December 4,
22  2015, is that right, at the bottom there?
23      A.  Yes.  Yes.
24      Q.  Okay.

229

1           And you also here checked
2   "Race" and "Retaliation," correct?
3       A.  Yes.
4       Q.  "Continuing Action," correct?
5       A.  Yes.
6       Q.  And here you refer in your -- in "The
7   Particulars Are" box, you refer to your EEOC
8   charge we just were discussing; is that right?
9       A.  Yes.
10      Q.  All right.
11          All right.  So I want to go
12  through kind of the same thing we did before
13  where it says, "Subsequently, I was subjected to
14  different terms and conditions, including, but
15  not limited to, scrutiny, policy changes,
16  inaccurate performance evaluations and being
17  placed in a field probation officer position."
18          We talked about the
19  reassignment.
20      A.  Yes.
21      Q.  The inaccurate performance
22  evaluations, are you still referring to the same
23  ones that we talked about?
24      A.  This is 2015 now.

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

230

1     Q.  Okay.
2     A.  This is for -- this covered 2015 in
3  which --
4     Q.  So we have three years that you say
5  they were lower --
6     A.  '13, '14, '15.
7     Q.  -- than they should be?
8     A.  Yes.  Yes.
9     Q.  All right.
10        And they have all, at least,
11  are close to subsequently being --
12     A.  '13 and '14 is done.
13     Q.  All right.
14     A.  We're just waiting on the merit pay to
15  appear on our paychecks.  We've gotten notice
16  from the union; the e-mail, we won, and you
17  guys, congratulations, you were successful.
18     Q.  And, again, you say "we."  It's you
19  and Mr. Nelson, correct?
20     A.  Me and Mr. Nelson.  Correct.
21     Q.  And you guys had the same supervisor,
22  right, at this time?
23     A.  Correct.
24     Q.  Tina Young?

231

1     A.  Yes, and the same deputy chief.
2     Q.  How far did Ms. Young go back?
3     A.  2008.
4     Q.  All right.
5        So there were times when she
6  was giving you exceeds, right?
7     A.  Up until this retaliation and her
8  friend, William Patterson, got promoted to HR
9  Director.
10     Q.  And so just to be clear, you believe
11  that your -- these 2013, 2014 and '15
12  performance evaluations were because you
13  complained of discrimination?
14     A.  Correct.
15     Q.  Okay.
16     A.  And the filing of the lawsuit for
17  discrimination.
18     Q.  Okay.
19        All right.  So here -- back to
20  the -- the EEOC charge.  You say you're subject
21  to scrutiny.  What do you mean by "scrutiny?"
22     A.  You know, it was always now I was
23  being watched, micromanaged, couldn't do
24  anything right although I -- again, I was a

232

1  consummate professional.  If I'm trained
2  adequately, I'm going to do my job and then
3  some.
4     Q.  But you weren't disciplined during
5  this time, right?
6     A.  No.  I'm that guy that will work four
7  or five hours late to make sure that my stuff is
8  up to par.
9     Q.  But no discipline, right?
10     A.  No.
11     Q.  Okay.
12        Other than the merit pay we
13  talked about, no -- was there any loss of pay?
14     A.  No.  Other than the scrutiny is
15  denying me the opportunity to obtain comp time,
16  forcing me to use my comp time in hours of
17  three-and-a-half, which I'm losing money that
18  way because I might not necessarily need to use
19  three-and-a-half hours.  I may only need to use
20  one hour.
21     Q.  And when you refer in your charge here
22  to "policy changes," are you talking about the
23  comp time changes?
24     A.  That and when they were doing the

233

1  policy changes is when they make up stuff and
2  there's nothing written.  And then --
3     Q.  I don't know what that means.
4     A.  Well, just like now where they are
5  making up a different policy for me to see my
6  families.  If I gotta work and do overtime,
7  there's this imaginary policy.  But when I ask
8  for it, it doesn't exist.  It's just verbal
9  instructions for me.
10     Q.  Yeah.
11        So in this charge, what policy
12  changes are you referring to?
13     A.  Well, the same thing goes.  As I was
14  trying to dispense my duties even then as the
15  Jumpstart instructor, they would continuously
16  change things.
17     Q.  Give me an example.
18     A.  They changed it from -- the time span
19  from 12 weeks to 10 to 8.  And then they changed
20  it to -- instead of having four or five cycles,
21  where we had time to take some time off, you
22  know, if we had to go to doctor's appointments,
23  now it was ongoing.
24     Q.  And that was just you in Jumpstart or

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

234

1  everyone in Jumpstart?
2      A.  It was me and Nelson for the most
3  part.  Because they had -- they even divided the
4  room up in half and that was just -- that was
5  just inhumane, actually.  They divided the room
6  in half.  We came to work one day, and the room
7  was actually divided in half.  It's already
8  close -- close quarters.  Now they divided it in
9  half.
10          And so we are in this room and
11  half of the room with minors that already are
12  coming in with animosity towards each other.  So
13  it created a very, very, you know, almost a
14  hard -- hostile work environment.
15      Q.  And when was this room divided in
16  half?
17      A.  It was -- it was around this time.
18      Q.  So around 2015?
19      A.  2014, '15, yeah.
20      Q.  Oh, '14.
21      A.  Yeah.  And it continued on.  It was,
22  like, the end of '14.  It was throughout this
23  whole time.
24      Q.  All right.

235

1          So December 4, 2015, you had
2  already been reassigned out of Jumpstart; is
3  that right?
4      A.  Right.  I'm out.
5      Q.  All right.
6          I'm looking, again, for any --
7  other than the comp time, which you've talked
8  about, but any specific policy.  And you just
9  talked about the cycling and how that -- the
10  cycles and how that changed.
11      A.  Right.  Right.
12      Q.  Is there any other specific policy
13  changes that you felt were directed towards you
14  because of either your race or because you
15  complained of race discrimination?
16      A.  Well, again, we already covered the
17  comp time.  We covered them forcing me to use
18  more comp time than I needed.  They were
19  changing the policies with the program of
20  Jumpstart.  But for the most part, it applied to
21  me and Nelson.
22          They were also changing the
23  policies that applied throughout the department
24  that negatively impacted blacks, while the

236

1  privileged and the good 'ole boy and the -- it
2  did not affect whites in the same manner.  It
3  almost always had a negative impact on black
4  officers, African-American officers, whereas
5  somehow --
6      Q.  What department-wide policy are you
7  referring to?
8      A.  There was -- like with -- oh, I'll
9  give you an example.
10          With my time sheets, I found
11  that my time sheets had been tampered with,
12  whereby I had loss of comp time that I had
13  accrued.  Now, this is comp time I'm speaking
14  of, but it's dealing with time sheets.
15          And until I did an audit of my
16  time, which I kept a log -- and this is before
17  we went to the electronic system.  And I went to
18  personnel and asked them for an update on my
19  time, and I found out that I was short almost
20  59, maybe 60 hours of comp time.  And I asked,
21  how can that be?
22          So I went to the union, who
23  then requested my records, my time sheet where
24  we signed in and out daily.  And after obtaining

237

1  those, it was found that my time had been
2  tampered with.  Time had been scratched out.
3      Q.  When was this?
4      A.  This was in -- this was in -- around
5  this time also.  In the --
6      Q.  Can you be a little more specific, if
7  you can?
8      A.  I don't have my exact date right now,
9  but this is all in this same retaliatory motion.
10  It's all going on and on.  It was before -- it
11  was before -- it was before November.  It was
12  before October.  So it had to be, like, right
13  around -- I'm thinking maybe June -- somewhere
14  before 2015, June 2015.
15      Q.  Okay.
16      A.  And -- actually, no.  It was in 2014
17  because I believe Charles Young was still there.
18  Yes.  I believe it was 2014.
19      Q.  Okay.
20      A.  And that was the theft of my time.
21  Whereas, if it was a black officer, he or she
22  would have been recommended for termination.
23  But they never ever told me how my time got
24  stolen.  They just somehow miraculously returned

WADLINGTON Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

238

1    it.
2    Q.  So you got it back?
3    A.  I got it back.
4    Q.  Okay.  So you're saying "your policy
5    changes."  I would say that wasn't a policy
6    change.
7    A.  Well --
8    Q.  What -- can you think of any other
9    policy change?
10   A.  I'm trying to think of one
11   specifically because I don't have those notes
12   with me right now.  But if --
13   Q.  What notes are you referring to?
14   A.  Well, I try to have mental notes of
15   things that have occurred.  You know, when
16   you're traumatized by certain things, you know,
17   you kind of leave a mental note, but then
18   sometimes you block it out.  So I'm trying to
19   pull it from the back somewhere to the front.
20   Q.  All right.
21       So you don't have -- do you
22   have written notes about any of these?
23   A.  No.  These are -- anytime you're
24   traumatized by something and you're living with

239

1    it, you kind of either suppress it, you know, or
2    it's a day-to-day thing.  It will come to me,
3    but there were policies that I know specifically
4    that had a negative impact on the -- on
5    African-American officers like myself as well as
6    others.
7    Q.  Okay.  If you don't know specifics,
8    that's fine.  Just say it.  I'm not looking for
9    you to guess.
10   A.  Yes.
11   Q.  All right.  So the last part here, it
12   says -- last sentence of the first paragraph
13   under charge.  "I was not considered for a newly
14   created position for which I performed the
15   duties."
16       Is that referring to the
17   Jumpstart position?
18   A.  Yeah.  They tried to -- go ahead.  I'm
19   sorry.  Did you finish your question?
20   Q.  Well, just say is that -- answer the
21   question "yes" or "no."
22   A.  Yes.  Yes.  I'm sorry.  Yes.
23   Q.  And then I will ask you.  What
24   position are you referring to specifically?

240

1    A.  They just tried to rename those
2    positions that -- that were created in
3    Jumpstart, but they were still the educational
4    advocacy portion that Mr. Nelson and I had
5    already assumed those duties before we were
6    reassigned.
7    Q.  Before we move on to that, so the
8    newly created position, did you apply for that
9    position?
10   A.  I was never told that I had to apply
11   for a position that never had existed.
12   Q.  Okay.  It says -- I'm --
13       It says you weren't considered
14   for a newly created position.  Did you apply for
15   that newly created position?
16   A.  Well, after we were removed then they
17   so-called created and gave these positions now
18   what -- that Mr. O'Connell have and these other
19   people are -- given Ms. Jackson, when we left
20   and they retained her, they just came up with a
21   new name for her position.  But when we were
22   being removed, they never notified us that there
23   were going to be these new positions.
24   Q.  So November 2015 when you were

241

1    reassigned, you're saying that the position
2    didn't exist?
3    A.  It didn't exist.  They just --
4    Q.  But by December 4, 2015 it did?
5    A.  Yes.
6    Q.  Okay.
7       All right.  So we talked about
8    these -- your two charges that I have are
9    from -- the first one is August 18, 2014.  The
10   other one is December 4, 2015.  And you said you
11   thought you may have filed about five?
12   A.  I may have filed some -- let's see.
13   There's one for the initial.
14   Q.  I guess -- well, first I just want to
15   know if they are before or after these.
16   A.  Before.
17   Q.  Okay.
18   A.  And then there's some after.
19   Q.  There's more after.  Okay.
20   A.  Yes.
21   Q.  When -- what's your latest charge that
22   you filed?
23   A.  I believe it may be just may be -- it
24   may be two -- just maybe one or two more.

Theodis Chapman
August 21, 2017

242

1    Q.  Okay.
2    A.  I'm thinking.
3    Q.  After December --
4    A.  It may have been --
5    Q.  -- 2015?
6    A.  Or did they combine these?  Let's see.
7    Because this is a continuation.  So there should
8    be one before this one.  And there may be --
9    should be one behind this one.  But for right
10   now --
11   Q.  Okay.  We can maybe sort that out in a
12   document request.
13   A.  Yeah.
14   Q.  Okay.
15        But you're pretty sure that
16   you filed at least one after December 4, 2015?
17   A.  I'm almost certain.  You know, the
18   discrimination has been so repetitive.
19   Q.  And then did you file anywhere else?
20   Like the Department of Human Rights or --
21   A.  I filed a lot of Illinois Labor
22   Relations charges.
23   Q.  I guess, specifically, did you file
24   any charges of discrimination with the Illinois

243

1    Department of Human Rights?
2    A.  I may have, but right now I don't --
3    I'm at a loss.
4    Q.  Okay.
5        Outside of your charges of
6    discrimination with the EEOC and anything else
7    that you mentioned today -- because I have asked
8    you about complaints or other discrimination --
9    is there anything you haven't mentioned that
10   you --
11        Specifically, are there any
12   other complaints of discrimination that you
13   made, either formally or informally, that we
14   have not discussed today?
15   A.  I believe that this -- is that the one
16   that was most recently submitted?
17        Are you done?
18   Q.  With?
19   A.  With this right at this point.
20   Q.  Yeah.  I'm just trying to close the
21   loop here.
22   A.  Okay.  All right.
23   Q.  Just for -- as you sit here today, are
24   there any other complaints that you can think of

244

1    alleging race, discrimination, or retaliation
2    that we have not talked about?
3    A.  We've covered a lot.  There was
4    some -- I just want to try to make sure I
5    covered the most recent stuff that has happened
6    to me.  And I think I mentioned this -- with the
7    comp time issue.
8    Q.  Well, let me ask you this.  Did you
9    file a charge of discrimination based on the
10   comp time issue?  The recent comp time issue.
11   A.  It's going to be forthcoming.  It's a
12   lot on the plate already.
13   Q.  But you haven't filed one yet?
14   A.  Not yet.  I still have some time to
15   formulate it.
16   Q.  All right.
17   A.  But it's forthcoming.  Just some
18   things have to come off the plate first.
19   Q.  Okay.  I will move on unless you think
20   of anything else.
21   A.  Yes.
22   Q.  If anything else comes up, just let me
23   know.
24   A.  Okay.

245

1    Q.  All right.
2        Let's go back to the
3    complaints, which should be where you were.
4    Page 20 there, Paragraph 23 through 79 under the
5    heading "Class Allegations."  Do you see that?
6    A.  Yes.
7    Q.  All right.
8        So you are aware that this
9    lawsuit that you're a Plaintiff in, it's -- that
10   it's potentially a class action.  Do you
11   understand that?
12   A.  Yes.  Yes.
13   Q.  All right.
14        And that it's making claims on
15   behalf of all African-American juvenile
16   probation department employees; is that right?
17   A.  Yes.
18   Q.  If you know, as you sit here today, do
19   you know how many total employees are in the
20   JPD?
21   A.  Roughly, maybe a little bit over maybe
22   420.  420.
23   Q.  All right.  And this will be an even
24   more difficult question.  How many of them,

62  (Pages 242 to 245)

Theodis Chapman
August 21, 2017

246

1  either numbers or percentage, are African
2  American?
3      **A.  African Americans now make up about, I**
4  **think, 40 percent of the department.  So that**
5  **may be around 180, I'm thinking.**
6      Q.  But 40 percent, roughly?
7      **A.  I'm thinking it's around 40-something**
8  **percent.**
9      Q.  All right.
10          Is that just a guess or have
11  you seen any numbers?
12      **A.  That's a guess.  That's a guess.**
13      Q.  Okay.
14          All right.  As you're sitting
15  here, do you think you could adequately
16  represent the interest of the class?
17      **A.  I do.**
18      Q.  Okay.  And you are willing to do that?
19      **A.  Yes.**
20      Q.  All right.
21          So at the JPD who makes the
22  decisions to impose discipline?
23      **A.  The director.  And there have been**
24  **issues where DCPOs have done it and until --**

247

1  **President Jason Smith has also done a lot of**
2  **contesting of that.**
3      Q.  Contesting of what?
4      **A.  Of DCPOs --**
5      Q.  Imposing discipline?
6      **A.  -- imposing discipline also.**
7      Q.  Okay.
8          Who at JPD would make transfer
9  reassignment decisions?
10      **A.  Director.**
11      Q.  Okay.
12          Who at JPD does performance
13  evaluations?
14      **A.  Supervisor is the first step and then**
15  **it goes to the deputy.**
16      Q.  DCPO?
17      **A.  DCPO, yes.**
18      Q.  And then does it go up the chain or is
19  the DCPO the last one to sign off on them?
20      **A.  After the DCPO then the actual**
21  **employee is -- then signs or not signs.**
22      Q.  Okay.  So you've got supervisor, DCPO,
23  employee signing them; right?
24      **A.  Right.**

248

1      Q.  Does the director usually get involved
2  on performance evaluations?
3      **A.  If the employee disagrees with the**
4  **score of his evaluation, then he files a**
5  **grievance.  Management, according to the CBA,**
6  **has an obligation to meet in order to try to**
7  **resolve --**
8      Q.  But other than the grievance process,
9  does the director have any say in it?
10      **A.  Not according to the arbitration**
11  **agreement that's now been instituted.  The**
12  **director can't.  Is not supposed to.  Can't.  Is**
13  **not supposed to.**
14      Q.  All right.
15      **A.  But we know that.**
16          MR. HAYES:  Okay.  Getting closer.
17          (WHEREUPON, Chapman Deposition
18          Exhibit No. 9 was marked for
19          identification.)
20  BY MR. HAYES:
21      Q.  Let's do -- okay.
22          Mr. Chapman, you have been
23  handed what's been marked as Exhibit 9.  And if
24  you look on the first page, it says, "Theodis

249

1  Chapman's Objections and Answers to Defendant's
2  Interrogatories."
3          Do you see that?
4      **A.  Yes.**
5      Q.  Do you recognize this document?
6      **A.  Yes.**
7      Q.  All right.
8          I want you to go to the second
9  to last page.  It says "Verification" at the
10  top.
11      **A.  Yes.**
12      Q.  Do you see that?
13      **A.  Yes.**
14      Q.  Is that your signature?
15      **A.  Yes.**
16      Q.  Dated 7/18/17?
17      **A.  Yes.**
18      Q.  All right.
19          So is it fair to say you
20  reviewed these answers before you signed that?
21      **A.  Yes.**
22      Q.  All right.
23          When was the last time you
24  reviewed this Mr. Chapman?

63  (Pages 246 to 249)

Theodis Chapman
August 21, 2017

250

1    **A.  Say it again.**
2    Q.  Pardon me?
3    **A.  Say it again.**
4    Q.  When was the last time you reviewed
5    these interrogatories?
6    **A.  The date of.  7/18.**
7    Q.  Okay.  So as you sit here today, would
8    you agree everything is true and correct in
9    here?
10   **A.  It doesn't look tamperable.  It looks**
11   **intact.**
12   Q.  Okay.
13        I'm going to go through a
14   couple specific ones in here.
15   **A.  Okay.**
16   Q.  I want to start with No. 2.  I'm not
17   going to read the whole thing, but it says, "For
18   each person you believe has knowledge of any of
19   the facts underlying your claims against
20   Defendant, please state their full name" and
21   other things.
22        And you answered Jason Smith.
23   **A.  Yes.**
24   Q.  Okay.

251

1        And what information would he
2    have regarding discrimination with respect to
3    discipline?
4    **A.  He would have not just the**
5    **information, but the actual dates, the times,**
6    **the occurrences, the repetitive nature.  He**
7    **would have the extensive -- or plethora of**
8    **information as it related to the allegations,**
9    **the discriminatory practices on behalf of the**
10   **department against the black officer, the**
11   **pervasive nature, the retaliatory nature.  He**
12   **would have everything.**
13   Q.  All right.
14        On C it just kind of lists
15   documents that you answer that you think are
16   relevant to your claims.
17        What I want to ask, as you sit
18   here today -- and we talked kind of about those
19   EEOC charges, and I don't think I have all of
20   them.
21        But as you sit here today,
22   Mr. Chapman, are there any documents in your
23   possession that you think are relevant to your
24   claims that you haven't turned over to your

252

1    attorney and that hasn't been produced to me?
2    **A.  No.**
3    Q.  And in C here it says, "EEOC charges
4    filed by", and it lists several individuals.
5    "Howard Brown, Lauren Brown," etc.
6        Do you see that?
7    **A.  Yes.**
8    Q.  Yes.
9        You wouldn't have those in
10   your possession, would you?
11   **A.  No.**
12   Q.  Now, No. 3, basically kind of what I
13   asked you already.  But "Except for any of your
14   attorneys, identify all persons not identified
15   in 1 with whom you have discussed your claims
16   against Defendant."
17        And, again, down here on the
18   answer you list your "EEOC investigators," and
19   that's fine.  And then you list "Jason Smith."
20   And then the next sentence is, "discussions were
21   on the phone and in my home."
22        Did you have Mr. Smith in your
23   home to talk about your claims against
24   Defendant?

253

1    **A.  No.  I was on the phone at home.  So**
2    **there was times where I was at the phone mobile**
3    **where I was out of my home and the phone at**
4    **times --**
5    Q.  All right.  Did the EEOC investigators
6    ever come to your home?
7    **A.  No.  No.  I don't think they do**
8    **home visits.**
9    Q.  That would shock and awe me.
10        Okay.  Still on the answer
11   here, No. 3, it says -- it's after the semicolon
12   there on the one, two, third line.  "And why the
13   Chief Judge and his designees refuse to address
14   the claims of such officers."
15        Do you see that?
16   **A.  Yes.**
17   Q.  Yeah.  Who are the designees you're
18   referring to here?  Is that who we talked about
19   already?
20   **A.  Keith Sevick and Kate Galbraith.**
21   Q.  Okay.
22   **A.  It's also dealing with management.**
23   **Going through the steps of the grievance**
24   **process.  Those are his designees, the director.**

64  (Pages 250 to 253)

Theodis Chapman
August 21, 2017

254

1    Q.  And here it also says, "A written
2  grievance was filed and presented to the Office
3  of the Chief Judge."
4         Do you know which grievance
5  that's referring to there?
6    A.  You can pick one, but they're all
7  relevant to these proceedings.
8    Q.  Okay.  Yeah.
9    A.  And I'm not being facetious when I say
10 "that."  I'm just saying there was just so many.
11   Q.  Oh, no, no.  I didn't think you were.
12        When you filed this lawsuit --
13 I'm kind of looking at No. 4.  But when you
14 filed this lawsuit, you were still in the
15 Jumpstart program; is that right?
16   A.  Yes.
17   Q.  You were still working in the
18 Jumpstart program?
19   A.  Yes.
20   Q.  All right.
21   A.  That's where the relevancy of scrutiny
22 also marks.  Because after we filed it, there
23 was a lot more scrutiny placed on us in the
24 Jumpstart program from --

255

1    Q.  And I should probably know this, but
2  when did -- do you know when you filed the
3  original complaint?
4    A.  I believe it was two thousand and --
5  was it 2014, I believe.  '13, '14.  I think it
6  was 2014, I believe.
7    Q.  Okay.
8    A.  Maybe --
9         MR. GEOGHEGAN:  '15.
10        MR. HAYES:  '15, yeah.
11        THE WITNESS:  '15.
12 BY MR. HAYES:
13   Q.  I can look at the number, but do you
14 know approximately when in 2015?
15        If you know, it's fine.  I
16 mean, it's public record.  I can look it up.
17 But if you have it in your head, that would be
18 nice.
19   A.  No, I don't.
20   Q.  Okay.  That's fine.
21   A.  I just know we filed it as soon as we
22 could.
23   Q.  All right.  And No. 4 is talking about
24 Jumpstart.  Are you on -- the page is not marked

256

1  but where you answer in bold at the top here.
2  Do you see that?
3    A.  Yes.
4    Q.  Do you have the highlighted one?
5    A.  Yes.
6    Q.  You shouldn't have the highlighted
7  one.  I should have the highlighted one.  Not
8  that it matters that much, but that's just like
9  --
10        MR. GEOGHEGAN:  Off the record.
11        (WHEREUPON, a discussion
12        was held off the record.)
13 BY MR. HAYES:
14   Q.  Okay.  So it's going to be -- they are
15 not numbered, but it's going to be the top of
16 Page 3, which is your answer to No. 4.  It
17 starts "previously."  Do you see that,
18 Mr. Chapman?
19   A.  What number -- interrogatory No. 4?
20   Q.  No. 4, the answer.  Yes.  It says
21 "previously" at the top.
22   A.  Okay.  All right.  I got you.
23   Q.  Okay.  I just want you to look that
24 answer over real quick.

257

1    A.  Oh, okay.
2    Q.  Please.
3    A.  Okay.
4    Q.  All right.
5         In the first paragraph, does
6  it effectively reflect what your job duties were
7  in Jumpstart?
8    A.  Yes.  There's -- there's additional
9  but that's -- that's -- this is one of the
10 duties.  But go ahead.  Okay.
11   Q.  Well, what are the additional duties?
12   A.  The mission -- and this is describing
13 the mission of the program, which is correct.
14   Q.  All right.
15        And then the next paragraph
16 talks about "no adequate time to train, assigned
17 to be a field probation officer."  Do you see
18 that?
19   A.  Yes.
20   Q.  And we already talked about that,
21 right?
22   A.  Yes, we did.
23   Q.  Is there anything else you want to add
24 about that?

65 (Pages 254 to 257)

Theodis Chapman
August 21, 2017

258

1     A. No.
2     Q. All right.
3          And No. 5, we've talked about
4  this one. We went over the complaint, but you
5  answer that your information is from Jason
6  Smith; is that right?
7     A. For?
8     Q. For your -- for paragraph -- we can go
9  to Paragraph 38 of the complaint.
10    A. What's your question?
11    Q. Is it still true that your information
12  about Paragraph 38 from the complaint comes from
13  Jason Smith?
14    A. Yes.
15    Q. Okay.
16    A. Now, you say your information -- my
17  information for --
18    Q. What I'm trying to get at is because
19  there are allegations in the complaint, and I
20  know because we have four Plaintiffs here and so
21  it can get, you know, kind of messy. And I just
22  want to narrow down as to what specifically Theo
23  Chapman's knowledge is of some of these
24  allegations. And that's what -- and here,

259

1  that's what the interrogatory is asking, and
2  your answer is that "I got it from Jason Smith."
3  Is that right?
4     A. Yes.
5     Q. Okay.
6          No. 6, is that the same thing?
7  The information from Paragraph 32 of the
8  complaint comes from Jason Smith; is that right?
9     A. Yes. Yes.
10    Q. All right. Is that the same thing,
11  your information comes from Jason Smith?
12    A. Yes.
13    Q. All right.
14          All right. No. 8, I want to
15  focus -- I know we talked about this in the
16  complaint, but what I want to focus on is the
17  second paragraph of your answer. "The language
18  used in disciplines of African-American officers
19  is harsher than language used for the same
20  offenses committed by white officers; and the
21  language used in disciplining white officers for
22  the same offense is typically less harsh, so as
23  to justify either a more lenient punishment or a
24  verbal reprimand or no punishment."

260

1          Do you see that?
2     A. Yes.
3     Q. Can you give me any specific examples
4  of your -- in your personal knowledge of when
5  harsher language was used in the discipline of
6  an African-American officer as compared to a
7  white officer?
8     A. Yeah. There was an incidence where
9  there was an officer who was an adjudicator and
10  she was instructed by DCPO Virginia Caulfield to
11  stand in in another courtroom -- every Judge
12  does things differently.
13    Q. Oh, I know.
14    A. And so -- so she -- she followed her
15  deputy's orders and instructions. At the end
16  of the -- at the end of the court call, the
17  judge had placed a file instead of right, he
18  placed it left. And that minor, as a result,
19  was not RUR, which is release upon request, was
20  not released for maybe another two hours. So,
21  in essence, instead of the minor being released
22  at, let's say, 3 o'clock, the minor was released
23  at 5:00.
24          The DCPO located the error,

261

1  but instead of thanking the officer for working
2  and doing what she requested, that officer was
3  then brought up on disciplinary charges for
4  neglective duties. Subsequently, they were
5  trying to suspend her for five days, but out of
6  the kindness of their hearts they only suspended
7  her three for following the directives of her
8  DCPO and not being liable for what a judge does.
9          Then now -- that's an African
10  American. Now it shifted. You have this white
11  officer who was given an RUR, specifically, that
12  this minor -- by the judge, that this minor was
13  not to be released to his mother who was on
14  drugs, who also had instances where she owed
15  drug dealers money, and she had affiliations
16  with a gang that, for all intentional purposes,
17  was placing her and the minor's life in danger,
18  which is why the judge did not want the minor
19  released to her.
20          Paula Shanahan changed the
21  judge's RUR and put the mother down as the minor
22  to be released to the mother. Paula Shanahan is
23  white. That minor eventually ended up getting
24  shot seven times. Nothing happened to her. Not

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

262

1  even a write-up.
2       Q.  When did these two incidents happen,
3  if you know?
4       A.  Paula Shanahan was the more recent.
5  That had to have happened in the last, maybe,
6  year and a half.  The issue with the
7  adjudicator, that had to have been maybe --
8  maybe -- I want to say almost -- it had -- time
9  flies.  It may have been almost two years now,
10  I'm thinking.
11       Q.  Okay.
12       A.  But I was a steward at the time, and
13  that was one of the most heart-wrenching things
14  because the lady had no -- she had a perfect
15  personnel file.  Not one write-up.  Exceeded.
16       Q.  And what's the name of that -- of that
17  woman?
18       A.  I forgot her name right now.  I didn't
19  even know she was a PO.  She was just that
20  much -- just coming every day doing her job.
21       Q.  And you were involved in that -- in
22  that discipline as a union steward?
23       A.  Yes.
24       Q.  Okay.  Were you involved in the Paula

263

1  Shanahan?
2       A.  It never made it to -- it never made
3  it to a discipline.
4       Q.  And how do you know about that?
5       A.  I'm familiar with that because that
6  information -- that's -- former President
7  Jason Smith was made aware of that information.
8       Q.  And he shared it with you?
9       A.  Of course, yes.
10       Q.  All right.
11           Do you have any firsthand
12  knowledge of Paula Shanahan?  We'll call it the
13  "Paula Shanahan incident."  Do you have any
14  firsthand knowledge of that?
15       A.  That the kid who got shot, it was on
16  the -- it made the news.
17       Q.  But do you have any firsthand
18  knowledge of her receiving or not receiving
19  discipline, other than from Mr. Smith?
20       A.  Other than Mr. Smith.  But there's no
21  record of her ever being disciplined for that.
22  Even the records that were requested, there's no
23  record of her ever being disciplined for that.
24  Good luck.

264

1       Q.  So just to be clear on Paula Shanahan,
2  Mr. Smith told you she wasn't disciplined,
3  right?
4       A.  She was not.  Yes.
5       Q.  And then you have not seen any records
6  where she was disciplined, right?
7       A.  Not a one.
8       Q.  Okay.  And you were reviewing
9  disciplinary records?
10       A.  As I was working on cases, yes.  Yes.
11       Q.  As a union steward, is that when you
12  --
13       A.  As a union steward, yes.
14       Q.  Okay.
15       A.  It's a voluntary thing.  So you don't
16  want to just be looking through disciplinary
17  records, if it's not something that you have to
18  do.  Being a steward is not -- you don't get
19  paid for it.
20       Q.  Okay.  Let's get No. 9, which is the
21  bottom there.  And then it's asking about the
22  supervisory exam, which I think we've covered in
23  detail.
24       A.  Yeah.  Oh, yeah.

265

1       Q.  Where you're saying Michael Porter was
2  allowed to review it, right?
3       A.  Right.
4       Q.  Okay.
5       A.  And he found an error on their part.
6       Q.  But he still wasn't passed, right?
7       A.  Still did not pass.  They just told
8  him to take it again.
9       Q.  And was this the 2012 test or a more
10  recent one?
11       A.  This was the two thousand and -- the
12  first one.
13       Q.  Seven?
14       A.  I think it was 2007.  I think it was
15  that one.
16       Q.  Okay.  We've covered most of that.
17           Let's look at No. 10, and I
18  want you to look at your answer for that.
19       A.  Okay.
20       Q.  All right.
21           And I think you testified
22  pretty much in accord with this, but is there
23  anything else that you want to add to this
24  answer?

67 (Pages 262 to 265)

Theodis Chapman
August 21, 2017

266

1      A.  It was just -- I think it was one
2  question I recall.  It was really -- again, it
3  was so subjective.
4          If you walked into a room and
5  two -- two employees were having a verbal
6  disagreement, and then the answers were what
7  would you do as a supervisor?  Would you kind of
8  sit the officers down and ascertain what the
9  disagreement was about to try to resolve it?
10  Would you notify management immediately and
11  proceed with discipline -- with a disciplinary
12  investigation?
13          That's -- that's, you know --
14  and then there was one other answer that was
15  specifically management.  And I forgot -- and I
16  forgot what that was.  But it was not -- it
17  wasn't a question that -- where it was testing
18  your ability as a supervisor.  It was more so
19  looking at would you be pro-management and
20  directing these officers for discipline.
21      Q.  Okay.  Yeah.
22          And here it says -- it's the
23  second paragraph.  "Clerical employees who are
24  largely white."  It's the second line of the --

267

1  second paragraph.
2          Is that what you were
3  referring to earlier --
4      A.  I was.
5      Q.  -- the clinical employees?
6      A.  Those -- those questions.
7      Q.  Same employees you were talking about?
8      A.  Yeah.  They would definitely know what
9  to look for when they saw those questions.
10      Q.  Okay.
11          And then right after that --
12  and says -- it says, "and because it leaves the
13  determination of right or wrong answers to the
14  subjective beliefs of management."
15          Do you see that?
16      A.  Yes.
17      Q.  All right.
18          And there are African
19  Americans in management, right?
20      A.  Yes.
21      Q.  Okay.
22          Would you be referring -- I
23  just want to be clear.  Is Mr. Patterson someone
24  you're referring to in management?

268

1      A.  Yes.
2      Q.  Okay.
3          So we might as well -- when
4  you say "management," who are you referring to?
5      A.  I'm referring to Avik Das and his
6  assistants, which are DCPOs, deputy chief
7  probation officers.
8      Q.  I see.
9          And Mr. Patterson who is in
10  human resources?
11      A.  Right.  He was a DCPO of human
12  resources.
13      Q.  Oh, he's a DCPO?  Okay.
14      A.  Yeah.  He's a DCPO.
15      Q.  And he's not the only African-American
16  DCPO, right?
17      A.  No.
18      Q.  All right.
19          All right.  11 is the next
20  one, and that's just the job training.  And I
21  believe we've already talked about that.  And it
22  was the March 2011 San Antonio, Texas training,
23  right?
24      A.  Right.

269

1      Q.  That goes on to -- yeah.  That goes on
2  to the top of the next page.  I just want to
3  make sure we're on the same page here.
4      A.  No.  That's fine.  I was just asking
5  about something you said.  That's all.
6      Q.  Okay.
7          Is there anything else you
8  want to add about that, that we haven't talked
9  about?
10      A.  No.  No.  Just in reference to your
11  noting that Mr. Patterson is African American --
12      Q.  Uh-huh.
13      A.  -- and there are other
14  African-American DCPOs.  But that's -- that does
15  not negate them from discriminating.  Whereby
16  there's a practice of those that are appointed,
17  they perpetuate discriminatory practices that
18  benefit whites while at the same time punishes
19  African Americans.  So it does not remove them
20  from that.
21      Q.  Okay.
22      A.  Period.  That was it.
23      Q.  That's all right.
24          Then back to 11, the training,

68  (Pages 266 to 269)

Theodis Chapman
August 21, 2017

270

1  your answer, I want you to focus on that. I
2  want to make sure we're on the same page here,
3  literally.
4           Is it -- that answer that you
5  gave there, I just want to make sure there's
6  nothing that you want to add that we haven't
7  talked about regarding your denial of comp time
8  for that March 2011 training?
9      A.  No.  That's good.
10     Q.  All right.
11          And then 12 is the --
12  continuing on that training, I believe you
13  already mentioned these two individuals, right?
14     A.  Yes.
15     Q.  Okay.
16          You said Richard Tekip; is
17  that right?
18     A.  Tekip.
19     Q.  He went to that training as well?
20     A.  No.  No.  Not that training.  He was
21  in the unit before -- before Jumpstart became
22  under the umbrella of DCPO Neal, he was already
23  in educational advocacy, and they were already
24  going to these different trainings, and they

271

1  were receiving comp time.
2      Q.  So but he -- going directly to the San
3  Antonio training, he did not go to that, right?
4      A.  He was not at that.
5      Q.  But Carolyn Conway did?
6      A.  Yes.
7      Q.  All right.  Got it.
8           Thirteen is talking about
9  Paragraph 70 of your complaint, which we
10  covered.  It was how your reassignment outside
11  of Jumpstart and how your allegation is that you
12  didn't receive adequate training, right?
13     A.  Right.
14     Q.  Okay.
15          Look at your answer and let me
16  know if there's anything else that we haven't
17  talked about or you want to add to it.
18     A.  It just was -- yeah.  It just noted
19  that it was ironic that during one of the labor
20  meetings when Avik made the statement, "You all
21  are not being removed because of the lawsuit."
22  That was kind of ironic that he would mention
23  that.
24     Q.  Does that say that in here?

272

1      A.  Yes.  It's -- he put it.  Avik Das
2  told us in a meeting that I was not being
3  removed because I had filed a lawsuit.
4      Q.  Okay.  Was that in response to you
5  saying you were being removed because of a
6  lawsuit?
7      A.  No.  I don't think it was that.
8      Q.  All right.
9           That would have been when?
10  October or November of 2015?
11     A.  That would have been around October
12  prior to that November removal.
13     Q.  All right.
14          We already talked about the --
15  there were three employees who remained in
16  Jumpstart, right, who -- after you and
17  Mr. Nelson were reassigned?
18     A.  Right.
19     Q.  We have -- kind of been talking about
20  Lomax, O'Connell, Jackson.
21     A.  O'Connell was just brought on.
22     Q.  Sorry.
23     A.  It was Jackson, Lomax, and Harris.
24     Q.  Oh, Harris.  Okay.  Sorry.

273

1      A.  Yusef Harris.  Yusef Harris.  You
2  remember that name?
3      Q.  Yes.  I do remember Yusef now.
4      A.  Mr. O'Connell was just recently was
5  sent to the --
6      Q.  When was Yusef in the unit?
7      A.  He was -- he came in after Tekip left.
8  I think Tekip left around 2009.
9      Q.  All right.  Okay.
10     A.  He was an outreach officer because
11  there was -- remember the Jumpstart program had
12  the instruction part and outreach.
13     Q.  Yeah.
14          And Yusef remained in
15  Jumpstart after November 2015?
16     A.  Yes.  He's still there.
17     Q.  Okay.  Did we get his race?  I don't
18  remember.
19     A.  He's African American.
20     Q.  Okay.
21          If you know, did Yusef have
22  more or less seniority than you?
23     A.  He has more seniority as it relates to
24  having been in the department -- employed with

69 (Pages 270 to 273)

Theodis Chapman
August 21, 2017

274

1    the department longer than me.  As it relates to
2    Jumpstart, I had more seniority in that unit.
3        Q.  All right.
4            Did the other individuals we
5    talked about -- so Lomax, you had more
6    seniority, right?  Total seniority.
7        A.  Yeah.  Lomax had just came out of
8    training.
9        Q.  And Ms. Jackson, the same way?
10       A.  Yeah.  She had just came out of the
11   field in the three years -- two years.  Two or
12   three years.  Yeah.
13       Q.  Okay.
14       A.  So the irony in that was if you talk
15   about operational need and you need to place
16   some officers in a field unit, how was it that
17   you just had an officer who has three years in
18   the field, but you removed them out and placed
19   officers who had no field experience?
20       Q.  You're talking about Ms. Jackson?
21       A.  Yes.
22       Q.  Okay.  So she had been a field
23   probation officer before?
24       A.  Yes.

275

1        Q.  And then went to Jumpstart?
2        A.  Yes.
3        Q.  And then you were taken out of
4    Jumpstart but she wasn't, right?
5        A.  Correct.
6        Q.  Yeah.
7            What was your official job
8    title when you were working in Jumpstart?
9        A.  Jumpstart instructor.
10       Q.  And if you know, what was
11   Ms. Jackson's title prior to the reassignment?
12       A.  Jumpstart instructor.
13       Q.  She was, too.  Okay.
14           And I assume Mr. Nelson was
15   Jumpstart instructor?
16       A.  Jumpstart instructor.
17       Q.  And at the time, 2015, were there any
18   other individuals with the title Jumpstart
19   instructor?
20       A.  No.
21       Q.  Do you know if Ms. Jackson is still --
22   if her title is still Jumpstart instructor?
23       A.  No.  I don't know.
24       Q.  You don't know.  Okay.

276

1        A.  They play with titles.
2        Q.  All right.
3            No. 14, that is the next page,
4    Mr. Chapman.  Are we on -- I don't know if you
5    turned the page.
6        A.  Yes.
7        Q.  Okay.  All right.
8            I want you to look at the
9    second paragraph.  "I was forced into the field
10   service position for operational need when a
11   less senior white female coworker was permitted
12   to transfer out of the field service unit into
13   electronic monitoring -- a position I would have
14   preferred."
15           Do you see that?
16       A.  Yes.
17       Q.  Is that what you were talking about
18   before?
19       A.  Yes.  Patty Calderon.
20       Q.  And you thought she might have gone to
21   IPS, but here it says EM; is that right?
22       A.  EM.
23       Q.  Okay.
24           And you would rather go to

277

1    electronic monitoring?
2        A.  I would like to.
3        Q.  Have you put in a bid on electronic
4    monitoring?
5        A.  If they told me I needed to bid out,
6    considering I was forced in under operational
7    needs, I would have.
8        Q.  I'm sorry.
9            Did you bid on an electronic
10   monitoring position?
11       A.  I never bidded on it.  No.
12       Q.  Okay.
13       A.  Just to add to that, which I didn't
14   do.  After Ms. Calderon was permitted to leave,
15   I was then given her files, her caseload.
16       Q.  All of them?
17       A.  Half.  Half of her 25 went to me and
18   another half went to another African-American
19   officer.
20       Q.  Okay.  And Ms. Calderon is white; is
21   that right?
22       A.  Yes.
23       Q.  All right.
24           And do you know -- if you

70  (Pages 274 to 277)

Theodis Chapman
August 21, 2017

278

1    know. Don't speculate. But if you know, did
2    Ms. Calderon bid on that position to go to the
3    EM unit?
4         **A.  From --**
5         Q.  I don't know what you mean.
6         **A.  Just a small tidbit.**
7         Q.  Sure.
8         **A.  Her mom works for William Patterson in**
9    **the HR department, and the way I understand it,**
10   **it was insider information. So she knew to go**
11   **ahead and bid it and so they created the**
12   **position.**
13        Q.  Okay. Okay. Let's jump down to 15
14   here, and we're moving on to the final portion
15   of the deposition here. Okay.
16             So just to kind of make clear
17   to you where I'm kind of going here. What I
18   want to kind of suss out here is that -- the
19   claim of damages in this case. So just answer
20   as best you can to what you're claiming here.
21   So that's kind of where these questions are
22   going.
23             So No. 15 is asking you for
24   any medical, psychological, or psychiatric --

279

1    basically treatment or anything that you've
2    received since November 2007. And then your
3    answer begins on the next page. It says,
4    "Reverend Dr. Dale A. Lawson Sr., Pastor Christ
5    Temple Baptist Church, where the congregation
6    have provided support, spiritual guidance,
7    counseling, prayers and a support group
8    throughout this ordeal."
9             Do you see that?
10        **A.  Yes.**
11        Q.  Okay. Is that any type of medical
12   treatment or anything like that that you're
13   receiving there?
14        **A.  Not from my pastor.**
15        Q.  Right. We'll get to the next one. So
16   yeah.
17             Then you say, "Nurse Gwenn
18   Jackson has provided ongoing counseling for
19   emotional distress I've been subjected to as a
20   result of the conduct alleged in the complaint."
21        All right. Is it -- are you
22   seeing Nurse Gwenn Jackson in -- I guess, is it,
23   like, a formal, kind of doctor/patient
24   arrangement? Or is it more of an informal

280

1    thing?
2         **A.  No. It's more so informal.**
3         Q.  Okay. And how do you know
4    Ms. Jackson?
5         **A.  Ms. Jackson --**
6         Q.  Different Ms. Jackson, right?
7         **A.  Yeah. Different Ms. Jackson.**
8         Q.  Gwenn Jackson.
9         **A.  Gwen Jackson.**
10        Q.  Two N's on Gwenn.
11        **A.  She -- she runs the actual ministry at**
12   **the church also that it deals with. Because she**
13   **deals with a lot of trauma in her job.**
14        Q.  And what's her job?
15        **A.  She works at the hospital. I think**
16   **she works in the actual trauma unit, and I think**
17   **she's a supervisor. Real very knowledgeable and**
18   **thorough. So she's dealt with a lot more severe**
19   **cases of not even just what I'm going through**
20   **but just what I'm going through.**
21        Q.  All right.
22             So you talked to Nurse Jackson
23   in more of an informal setting about what you
24   have been going through?

281

1         **A.  Yes. Well, it's more so informal**
2    **because we do it at the church. She also makes**
3    **it available for -- you know, if you need to**
4    **reach her on the phone.**
5         Q.  She's not a therapist, right?
6         **A.  No.**
7         Q.  Okay. Or a psychologist?
8         **A.  No.**
9         Q.  She's not a psychiatrist?
10        **A.  No. She's just a caring person.**
11        Q.  Okay.
12             All right. You say and write
13   still here emotional distress. Do you see that?
14        **A.  Yes.**
15        Q.  Can you describe what emotional
16   distress you're alleging to have suffered as a
17   result of your allegations in the complaint?
18        **A.  There's days where -- when I'm dealing**
19   **with this -- this -- this madness, there was**
20   **days when you -- you get home and you're --**
21   **you're up and down. You're angry. You're**
22   **frustrated. You know, you feel alone. You**
23   **know, you want -- you know, you want to release**
24   **somehow. You're mad at the world. You're**

71 (Pages 278 to 281)

Theodis Chapman
August 21, 2017

282

1 also -- you want to be forgiving. You want to
2 hope that these people aren't just -- not just
3 truly this evil and that they just do this just
4 for kicks or just because.
5          So, you know, all of these
6 things play out in your mind as you're trying to
7 compartmentalize these things. And the more I
8 witnessed it the more it just became that much
9 more distressful. Because it's like, you know,
10 you see people always come together when there
11 is natural disasters. Race doesn't matter.
12 Where this white community totally wiped out by
13 a hurricane or tornado. But then you see this
14 going on at work and you're like, "Why?"
15          So it does -- it affects you
16 emotionally. It affects, you know, my marriage.
17 It affects my family. You know, you become
18 isolated. It has a trickle-down effect.
19     Q. Outside of these two individuals,
20 Reverend and Nurse Jackson, are you seeing any
21 other medical professional?
22     A. I saw my doctor, Dr. Abraham Matthew.
23     Q. And is he an internist?
24     A. No, no. He's a family practitioner.

283

1     Q. Okay.
2          And -- okay. So you saw Dr.
3 Matthew?
4     A. Yeah. For awhile, you know, high
5 blood pressure had ran in my family. I had lost
6 weight after -- and I was totally managed. That
7 was totally managed. But then when I started
8 going through this, it's like my -- you know, my
9 blood pressure was just -- it was going up and
10 there was no reason for it because I worked out,
11 golfed. My job -- I'm very, you know, outgoing.
12 And he just couldn't understand why when I come
13 in for my checkups and stuff, my blood pressure
14 would be high. So I --
15     Q. When was this?
16     A. It was throughout -- throughout this
17 time from '14, '15. Even up until probably the
18 middle of last year have -- have I now kind of
19 gotten it to where I can take the medicine on an
20 as-needed basis. But during that time it was --
21     Q. Were you taking your blood pressure
22 medicine prior to that? 2014.
23     A. When I initially was prescribed blood
24 pressure medicine because, you know, I had the

284

1 weight. And when I lost --
2     Q. When was that?
3     A. It had to be, like, around two
4 thousand and, I think, '11. Yeah. 2010, 2011.
5     Q. Okay.
6     A. I was hit in an accident, and I
7 couldn't work out, and I used to be a lot more
8 buff than this. And when you can't work out,
9 muscle tends to what? Turns into fat. And
10 levels started shooting up, cholesterol,
11 everything.
12          So after I lost the weight, I
13 had no problems. And then when this stuff
14 started, my blood pressure was just -- it wasn't
15 due to weight. It wasn't due to -- it was
16 just -- couldn't figure it out.
17     Q. Okay. Any other -- other than high
18 blood pressure, any other, like, medical
19 symptoms that you are alleging you suffered
20 because of your allegations?
21     A. Anxiety. Sometimes sleepless nights,
22 but I didn't -- thank goodness I didn't have to
23 take any medication for that. That was kind
24 of -- kind of, you know --

285

1          Thank goodness for Google or
2 You Tube. There's some helpful information on
3 how sometimes when you're dealing with some
4 things that aren't necessarily caused by
5 genetics or -- but sometimes external factors.
6          I found some teas and
7 different things like that and ways to kind of
8 sit in the tub for an hour or two or whatever
9 just letting, you know, kind of relaxation kick
10 in. So there's ways that I found to counter it
11 without medication.
12     Q. Okay.
13          Any other medical treaters
14 that you were seeing for any emotional distress
15 or anything like that?
16     A. No. You laughed when I said I was a
17 lot more buff than this.
18     Q. Well, I can't tell in that very fancy
19 suit you're wearing.
20     A. No, no. Okay.
21     Q. All right.
22          Okay. We're almost done. I
23 want to go through a few more questions.
24     A. All right.

72  (Pages 282 to 285)

Theodis Chapman
August 21, 2017

286

1    Q.  Currently employed at JPD, right?
2    **A.  Yes.**
3    Q.  What is your current salary?
4    **A.  I'm -- I think I'm right around, like,**
5  **72, 73.**
6    Q.  72 or 73,000 per year?
7    **A.  Yeah.**
8    Q.  Okay.
9         And is that more than when you
10  left Jumpstart in November 2015?
11  **A.  Yes.  Yes.**
12    Q.  Okay.  So you received a raise or
13  raises?
14  **A.  Yes.  I have received a raise.**
15    Q.  Just one?
16  **A.  The union in our last contract had**
17  **negotiated.**
18    Q.  That was going to be my next question.
19  So it was contractually negotiated raises?
20  **A.  Yes.**
21    Q.  Would you have received those raises
22  if you were still in Jumpstart, you think, if
23  you know?
24  **A.  Yes.  That's different than merit.**

287

1    Q.  Right.
2    **A.  That's part of the CBA.**
3    Q.  All right.  Okay.
4         All right.  We're going to
5  jump just a little bit between the complaint and
6  the interrogatories.  So just a couple more.
7         Complaint, I want to go to 22.
8  Paragraph 22, not Page 22.  No, sorry.  It is
9  Page 22.  I'm sorry.
10         Page 22.  And Paragraph G,
11  middle of the page there.  It says, "Grant
12  damages to Plaintiff Nelson and Chapman and
13  other African-American juvenile probation
14  officers who were denied compensation for
15  out-of-state job training."
16         Do you see that?
17  **A.  Yes.**
18    Q.  All right.
19         And is -- I just want to be
20  clear.  When you are asking for the compensation
21  for out-of-state job training, is that to get
22  those 1.5 hours?  Sorry.  I'm saying that
23  inartfully.
24         To get comp time rather than

288

1  straight time for the time you were in San
2  Antonio; is that what you are referring to
3  there?
4  **A.  Right.**
5    Q.  Okay.  Anything else for the
6  out-of-state job training compensation that
7  you're asking for there?
8  **A.  I believe that was it.**
9    Q.  All right.
10         Okay.  Jump to Page 23, under
11  Count 2, which is your retaliation claim.
12  Paragraph 83(a) says, "Order their reinstatement
13  to positions within the Jumpstart program."
14         Do you see that?
15  **A.  Yes.**
16    Q.  So is that a true statement that you
17  want to be reinstated to the Jumpstart program?
18  **A.  To Jumpstart or something -- something**
19  **compensory [sic].**
20    Q.  And what would be compensory [sic] to
21  the Jumpstart program?
22  **A.  That's negotiable.**
23    Q.  All right.
24  **A.  Or give me a nonsupervisory III, which**

289

1  **is a position that I can actually be able to**
2  **create something that is beneficial.**
3    Q.  If you were reinstated to somewhere in
4  the Jumpstart program, if you know, would you be
5  making the same salary?
6  **A.  Yes.**
7    Q.  All right.
8         And a PO III, that would be
9  your -- would that be an increase in salary?
10  **A.  Nonsupervisory III, nonsupervisory PO**
11  **III.**
12    Q.  Would that be an increase in salary?
13  **A.  Yes.**
14    Q.  Okay.
15         Are there other nonsupervisory
16  PO IIIs?
17  **A.  Yes.**
18    Q.  Okay.  And what do they do?
19  **A.  Corolla Scott has a technical skill.**
20  **She has IT skills.**
21    Q.  And what's her name?  Sorry.
22  **A.  Corolla Scott.  And I think --**
23    Q.  Race?
24  **A.  She's African American, but I think**

73 (Pages 286 to 289)

Theodis Chapman
August 21, 2017

290

1    there may be -- I don't know that they -- I
2    think there may be one or two others. I don't
3    know their names, but I think they're white.
4        Q. All right.
5            So it's not a lot of
6    nonsupervisory POs right now?
7        A. Not now. They have removed them but
8    not now.
9        Q. Okay.
10       A. We have --
11       Q. All right. I just want to focus on
12   the Jumpstart program.
13           Do you know -- is there a
14   specific position that you would want in
15   Jumpstart?
16       A. I was fine with the advocacy position
17   or the outreach position, either one of those.
18       Q. All right.
19           And this -- I don't want to
20   change your testimony, but do you know -- are
21   there instructors now in Jumpstart?
22       A. I don't know that there are.
23       Q. You don't know. Okay.
24       A. No. But I would be willing to resume

291

1    those duties were I placed back in there.
2        Q. All right.
3            And this is going to be
4    relatively open ended, but keep it as brief --
5    if you can.
6        A. I will do that.
7        Q. Why do you want to go back to
8    Jumpstart?
9        A. Again, just -- it was out of
10   retaliation that I was removed. I still have a
11   relationship with many of those students that
12   have benefited from my mentoring them and the
13   changing of their lives, some of which now have
14   gone on to become very involved individuals in
15   the community and successful.
16           One of the young men, he's
17   managing his own Jimmy John's. Another one has
18   gone on to become an engineer. And I run into
19   these young men and they -- and my number has
20   never changed, so they will call me sometimes
21   out of the blue. In the last year, I ran into
22   four young men who I did not know the impact
23   that I've changed their lives and their
24   families.

292

1            I have one young man, he's a
2    barber. He has his own -- he's opened his own
3    shop now. And this was a young man that was --
4    at one point because his mom was on drugs, he
5    was stealing stuff to try to provide for his
6    brother. He has a younger brother who had
7    special needs. He called me out of the blue and
8    just thanked me, you know.
9            There was a young man, Ed
10   Rangel (phonetic) who's -- as a result of us,
11   he's involved with the Illinois Juvenile Justice
12   Commission as a junior commissioner. He's an
13   assistant manager at one restaurant, and he's
14   actually a manager at another one. And he's now
15   just called me and Nelson inviting us because
16   he's going to be giving birth to his first
17   child, him and his fiance.
18           These are -- you know, these
19   are things that we just -- we just can't make
20   up. And the list goes on and on.
21       Q. And it's not something that you can
22   get as a field officer?
23       A. Well, you know, my skill sets are
24   going to go wherever I go. They are not just

293

1    limited to Jumpstart. Things that I was doing
2    there, I'm still doing. But wherever I go,
3    those skill sets are gonna go. Because you just
4    don't stop caring just because you go from one
5    place to another or forced discriminately. It
6    doesn't matter when you care.
7        Q. Back to interrogatories.
8        A. Sure.
9        Q. No. 18. It should be close to where
10   you were.
11           So this is just asking if you
12   have any other employment and then -- because
13   you're still a JPD employee. And it says you
14   have "sought and obtained part-time work with
15   Monterrey Security." Do you see that?
16       A. Yes.
17       Q. And when did you start with them?
18       A. I have been with Monterrey now, I
19   think, about maybe three -- two, three years.
20   About two or three years.
21       Q. All right.
22           And it says, "in part to pay
23   for legal fees in this matter."
24       A. Definitely.

74  (Pages 290 to 293)

Theodis Chapman
August 21, 2017

294

1      Q.  Is that why you sought outside
2  employment at this time?
3      A.  Definitely.
4      Q.  That would have been around when you
5  filed your lawsuit?
6      A.  Correct.
7      Q.  Okay.  And how often do you work for
8  them?
9      A.  It used to be just during the Bears
10  season.  Now it's whenever I can pick up hours
11  because, you know, it's needed.
12      Q.  How many hours are you working there?
13      A.  It varies.  You know, they'll e-mail
14  me with different job availabilities.  And if I
15  can work it in, I will.  They can e-mail me
16  something -- like, during the summer there's a
17  lot of different concerts that goes on.  There's
18  marathons and stuff that happens at different
19  times.  It varies.
20      Q.  It sounds like it's an event security;
21  is that right?
22      A.  Yes.  And, you know, you have the
23  Bears and then -- you know, they're contracted
24  with the Bears.  And then they are also

295

1  contracted with other events that goes on --
2  that go on in and around the Chicago --
3      Q.  Are you going to work this upcoming
4  season then?
5      A.  Yeah.  Yeah.
6      Q.  All right.
7          During the Bears season, how
8  many hours are you getting?
9      A.  The game usually starts at noon.  So I
10  usually will get there around, like, maybe
11  10:00.  And then it's usually over at 5:00.
12      Q.  Okay.
13      A.  By 5:00.
14      Q.  And what do they pay you?
15      A.  Twenty bucks an hour.
16      Q.  Any other outside employment?
17      A.  No.
18      Q.  All right.
19          Okay.  Let's to go the last
20  page of the interrogatories which would be --
21      MR. GEOGHEGAN:  Are we done soon?
22          (WHEREUPON, a discussion
23          was held off the record.)
24

296

1  BY MR. HAYES:
2      Q.  So do you see No. 23?
3      A.  23.
4      Q.  Last page.  The last -- yeah, there
5  you go.
6          Okay.  It says, "Describe in
7  detail the basis for any damages you claim to be
8  entitled to, included but not limited to the
9  damages articulated in your Prayer for Relief."
10          And we've already talked about
11  all these.
12      A.  Right.
13      Q.  And your answer is "I have suffered
14  acute emotional and mental distress from working
15  in a racially hostile work place.  I have had
16  physical symptoms including elevated blood
17  pressure, sleeplessness and fatigue."
18          I believe you've mentioned all
19  of these things.  Is there anything else that
20  you want to mention in response to that
21  question?
22      A.  I didn't -- I didn't put anxiety in
23  there.  I didn't put, I guess, angry, isolated,
24  in some instances, less than a human.

297

1          There's days where it's just
2  like, you know, this is -- is this what they
3  went through in the '60s.  Probably worse.  But
4  it's still here today.
5      Q.  Outside of JPD and this part-time
6  security job, do you have any other sources of
7  income?
8      A.  No.  I'm hoping to be finished with my
9  third book and release it and maybe I can
10  generate some revenue from that.
11      MR. HAYES:  Okay.  I'm done.  Just a
12  minute to review and then we should be good.
13          If you want to go, you can
14  take your break, you can.
15      MR. GEOGHEGAN:  I'm okay.
16          (WHEREUPON, a brief pause
17          was held.)
18      MR. HAYES:  All right.  I think I'm
19  good.
20          All right.  I'm done.
21      MR. GEOGHEGAN:  Good.  No questions.
22      THE REPORTER:  Signature?  Reserve or
23  waive?
24      MR. GEOGHEGAN:  I think so for now.

75 (Pages 294 to 297)

Theodis Chapman
August 21, 2017

298

```
1          THE REPORTER:  Reserve?
2      MR. GEOGHEGAN:  Yes.
3
4          (WHEREUPON, the deposition
5          concluded at 5:07 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

300

```
1              ERRATA SHEET
2      Examination of:  Theodis Chapman
       Date taken:  8-21-17
3
4      Page Line
5      ____ ____  Change: _____
6             Reason: _____
7      ____ ____  Change: _____
8             Reason: _____
9      ____ ____  Change: _____
10            Reason: _____
11     ____ ____  Change: _____
12            Reason: _____
13     ____ ____  Change: _____
14            Reason: _____
15     ____ ____  Change: _____
16            Reason: _____
17     ____ ____  Change: _____
18            Reason: _____
19     ____ ____  Change: _____
20            Reason: _____
21     ____ ____  Change: _____
22            Reason: _____
23     Deponent's
       Signature_____ Date _____
24
```

299

```
1       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3
4     ANTHONY JORDAN, KENNETH    )
      GREENLAW, THEODIS CHAPMAN, )
5     and PATRICK NELSON, and a  )
      class of unknown persons   )
6     similarly situated,        )
                                 )
7        Plaintiffs,             )
                                 )
8        vs.            ) No. 15 CV 5907
                                 )
9     TIMOTHY EVANS, CHIEF JUDGE ) Judge Sara Ellis
      OF THE CIRCUIT COURT OF    )
10    COOK COUNTY, et al.,       )
                                 )
11       Defendants.             )
12
          I hereby certify that I have read the
13    foregoing transcript of my deposition given on
      August 21, 2017, consisting of pages 1 through
14    303, inclusive, and I do again subscribe and
      make oath that the same is a true, correct and
15    complete transcript of my deposition given as
      aforesaid, with corrections, if any, appearing
16    on the attached correction sheet(s).
17        _____ Correction sheet(s) attached.
18
19    _____
20          THEODIS CHAPMAN
21    Subscribed and sworn to
      before me this _____ day
22    of _____, 2018.
23    _____
24    Notary Public
```

301

```
1              ERRATA SHEET
2      Examination of:  Theodis Chapman
       Date taken:  8-21-17
3
4      Page Line
5      ____ ____  Change: _____
6             Reason: _____
7      ____ ____  Change: _____
8             Reason: _____
9      ____ ____  Change: _____
10            Reason: _____
11     ____ ____  Change: _____
12            Reason: _____
13     ____ ____  Change: _____
14            Reason: _____
15     ____ ____  Change: _____
16            Reason: _____
17     ____ ____  Change: _____
18            Reason: _____
19     ____ ____  Change: _____
20            Reason: _____
21     ____ ____  Change: _____
22            Reason: _____
23     Deponent's
       Signature_____ Date _____
24
```

76 (Pages 298 to 301)

Theodis Chapman
August 21, 2017

302

1    STATE OF ILLINOIS )
           ) SS:
2    COUNTY OF C O O K )
3
4          I, DONNA WADLINGTON SHAVERS, a
5    Certified Shorthand Reporter within and for the
6    County of Cook and State of Illinois, do hereby
7    certify that heretofore, to-wit, on the 21st day
8    of August, 2017, personally appeared before me
9    at 100 West Randolph Street, 13th Floor, in the
10   City of Chicago, County of Cook and State of
11   Illinois, THEODIS CHAPMAN, produced as a witness
12   for examination in said cause.
13          I further certify that the
14   said witness, THEODIS CHAPMAN, was by me first
15   duly sworn to testify the truth, the whole truth
16   and nothing but the truth in the cause aforesaid
17   before the taking of the examination under oath;
18   that the testimony was reduced to writing in the
19   presence of said witness by means of machine
20   shorthand and afterwards transcribed into
21   typewriting, and that the foregoing is a true
22   and correct transcript of the testimony given by
23   said witness.
24          I further certify that I am

303

1    not counsel for nor in any way related to any of
2    the parties to this suit, nor am I in any way
3    interested in the outcome thereof.
4          I further certify that my
5    certificate annexed hereto applies to the
6    original and court-reporter produced copies of
7    transcripts only.  I assume no responsibility
8    for the accuracy of any reproduced copies not
9    made under my control or direction.
10          In testimony whereof, I have
11   hereunto set my hand this 15th day of July,
12   2018.
13
14
15
16   DONNA WADLINGTON SHAVERS
     CSR #084-002443
17
18
19
20
21
22
23
24

77 (Pages 302 to 303)

Wadlington Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

| A | | | |
|---|---|---|---|
| **A-l-m-a-r-a-z** 26:19 | **acronyms** 17:23 56:23 196:18 | 58:3 | 110:21 138:21 140:5 141:19 |
| **A-r-g-u-i-e-l-l-...** 49:15 | **Act** 73:5 136:1 **action** 89:23 | **administered** 134:2 143:22 | 141:21 145:8 147:20 154:1,3 |
| **A-v-i-k** 35:4 | 217:9 220:1 | **administers** 143:24 | 177:7 222:13 |
| **a.m** 1:24 | 229:4 245:10 | **administration** | 225:22 246:1,3 |
| **Aaron** 87:9 88:1 | **activity** 57:24 | 93:15 | 261:9 267:18 |
| **ability** 8:9 19:13 | **acts** 120:7 | **admitted** 155:1 | 269:11,19 |
| 266:18 | 198:12 | **ADT** 86:13,13 | 273:19 289:24 |
| **able** 8:13 20:2 | **actual** 19:17 | **adult** 20:15,16 | **African-Amer...** |
| 141:15 149:10 | 50:4 59:16 | 63:22 64:2,3 | 73:2 90:14 |
| 149:23 188:21 | 159:18 194:1 | 64:15 | 110:24 112:19 |
| 210:9,10 | 205:3 207:14 | **advance** 103:2 | 117:19 118:11 |
| 211:23 212:7 | 212:9 247:20 | **advanced** 13:16 | 118:20 119:4 |
| 220:20,21 | 251:5 280:11 | 144:19 145:2,9 | 126:6 144:18 |
| 289:1 | 280:16 | 145:16,19 | 153:13 199:23 |
| **Abraham** | **acute** 296:14 | **advised** 144:20 | 211:6 221:10 |
| 282:22 | **add** 32:3 111:3 | **advocacy** 157:9 | 236:4 239:5 |
| **Abraxas** 101:15 | 214:18 257:23 | 161:5,7,21,24 | 245:15 259:18 |
| **absence** 150:5,7 | 265:23 269:8 | 162:10 163:14 | 260:6 268:15 |
| **absorbed** 161:22 | 270:6 271:17 | 163:20 171:20 | 269:14 277:18 |
| **abuse** 21:5 | 277:13 | 178:16,17,24 | 287:13 |
| **academic** 23:3 | **added** 219:2 | 182:12 185:12 | **AFSCME** 92:9 |
| 23:14 | **adding** 178:22 | 199:15 201:20 | 96:24 195:20 |
| **accepted** 72:3 | **addition** 21:8 | 240:4 270:23 | 197:20 |
| **access** 102:6,17 | 127:12,13 | 290:16 | **age** 64:11 |
| **accident** 6:9 | 151:5 | **advocate** 163:3 | **agencies** 16:24 |
| 284:6 | **additional** 32:3 | 180:3 | 211:21 |
| **acclaim** 15:2 | 32:7 257:8,11 | **advocates** | **agency** 144:3 |
| **acclimated** | **address** 19:16 | 157:10 168:23 | 146:11 157:8 |
| 208:6 | 40:2,24 149:22 | **affect** 8:9 236:2 | 212:7 |
| **accord** 265:22 | 150:3 253:13 | **affiliations** | **aggravated** |
| **account** 90:9 | **addressed** 164:6 | 261:15 | 87:12 |
| **accrued** 236:13 | 181:18 | **afforded** 57:14 | **ago** 55:24 |
| **accuracy** 303:8 | **addressing** 21:6 | 208:18 218:21 | 122:21 181:5 |
| **accurate** 159:4 | 22:23 | **afloat** 169:18 | 209:18 212:11 |
| **accused** 94:4 | **adequate** 179:17 | **aforesaid** 299:15 | **agree** 250:8 |
| **achieve** 197:15 | 257:16 271:12 | 302:16 | **agreeing** 74:24 |
| **acquainted** | **adequately** | **African** 25:9,13 | **agreement** |
| 107:20 151:14 | 207:12,22 | 28:17 29:15 | 62:20 70:1 |
| **acronistic** 57:6 | 232:2 246:15 | 30:3 33:21,23 | 123:15 125:13 |
| **acronym** 14:2 | **adjudicator** | 34:9,10 48:13 | 125:21,22,24 |
| 52:6 | 260:9 262:7 | 49:9 65:21 | 126:2,18 127:1 |
| | **adjust** 45:19 | 86:3 90:4,16 | 127:7 128:9,24 |
| | | | 160:12 248:11 |
| | | | **Agreements** |
| | | | 125:23 127:17 |
| | | | 128:13 |
| | | | **ahead** 9:7 19:3,6 |
| | | | 59:7 84:3,6 |
| | | | 88:16 110:8 |
| | | | 119:20 134:7 |
| | | | 148:21 169:10 |
| | | | 174:10 178:19 |
| | | | 185:22 190:16 |
| | | | 198:13 201:9 |
| | | | 239:18 257:10 |
| | | | 278:11 |
| | | | **Akis** 138:10,12 |
| | | | **al** 4:19 299:10 |
| | | | **Alabama** 13:9 |
| | | | 13:13 |
| | | | **alert** 86:14 |
| | | | **Alexander** 34:9 |
| | | | 34:10 168:15 |
| | | | 169:6,14 |
| | | | 170:18,19 |
| | | | 171:11 178:21 |
| | | | 178:22 |
| | | | **allegation** |
| | | | 120:23 128:3 |
| | | | 160:6 173:11 |
| | | | 271:11 |
| | | | **allegations** |
| | | | 83:17,23 84:10 |
| | | | 124:11 129:5 |
| | | | 129:13 168:1 |
| | | | 206:19,19 |
| | | | 207:3 245:5 |
| | | | 251:8 258:19 |
| | | | 258:24 281:17 |
| | | | 284:20 |
| | | | **alleged** 279:20 |
| | | | **allegedly** 114:22 |
| | | | **alleging** 167:4,8 |
| | | | 244:1 281:16 |
| | | | 284:19 |
| | | | **allotted** 166:18 |

Theodis Chapman
August 21, 2017

305

allow 68:2
179:11
allowed 16:5
19:18 90:12
141:8,16,17
146:3 154:18
154:19 174:2,3
208:20,23
221:10 265:2
allowing 46:15
Almaraz 26:18
26:18,19 27:19
27:22
alter 60:18
altered 60:3,22
61:1
alternative 16:1
38:8,10,12,16
38:17,17 41:3
amassed 63:23
Amended 3:9,18
82:20
American 25:9
25:13 28:17
29:15 30:3
33:21,23 34:9
34:11 48:13
49:10 65:21
86:3 90:4,16
138:21 140:5
141:19,21
142:12 145:9
163:11 177:7
222:13 246:2
261:10 269:11
273:19 289:24
Americans
110:21 141:24
142:3 146:2
147:20 154:1,4
225:23 246:3
267:19 269:19
analysis 114:20
115:4

and/or 114:6
Angela 125:16
angry 281:21
296:23
animal 87:19
animals 87:20
animosity
234:12
annexed 303:5
announce
133:20
Annually 131:8
answer 7:6,9 8:2
8:22 41:23
43:11 140:20
142:4 202:2
205:14 216:1
239:20 251:15
252:18 253:10
256:1,16,20,24
258:5 259:2,17
265:18,24
266:14 270:1,4
271:15 278:19
279:3 296:13
answered 147:5
250:22
answering 6:24
174:12
answers 140:20
249:1,20 266:6
267:13
Anthony 1:4
80:4 83:13
88:4,8 128:19
207:12 208:4
208:13 299:4
anticipate 7:7
antiquated
212:3
Antonio 157:7
162:12 268:22
271:3 288:2
anxiety 284:21

296:22
anytime 44:15
45:7 56:3
238:23
anyway 172:7
appear 230:15
APPEARAN...
2:2
appeared 2:10
2:22 110:23
180:19 302:8
appearing
299:15
appears 126:3
applicable 4:24
application 78:3
78:12,21
applied 69:1,7
235:20,23
applies 50:10,12
76:7 303:5
apply 47:10
66:19 105:9
156:5 168:3
193:2 240:8,10
240:14
applying 78:18
appoint 74:15
appointed 74:3
269:16
appointee 75:22
appointments
233:22
approached
94:15
approved 54:19
54:20
approving 65:22
approximate
58:19
approximately
10:5 26:9 27:2
32:16 44:18
55:16 112:22

122:18 172:20
200:21 255:14
April 22:8,9
96:22
aptitude 23:14
arbitration
130:21 191:4
194:9,10 225:1
225:10,16
227:1,3 248:10
arbitrator 226:1
226:12 227:7
area 100:19
105:5,19
areas 104:19
168:17
Argentry 117:14
Arguielles 49:14
Arizona 26:7
arm 92:16
126:14
arrangement
279:24
articulated
296:9
artificially 63:6
as-needed
283:20
ascertain 266:8
aside 168:20
asked 18:11
61:20 101:14
101:20 140:17
140:19 141:10
142:1 146:1,7
153:22 168:20
169:20 170:14
181:21 208:5
236:18,20
243:7 252:13
asking 155:6
168:15 223:7
259:1 264:21
269:4 278:23

287:20 288:7
293:11
aspects 20:2,5
152:8
assess 39:15
assessing 40:15
assessment
136:18 210:15
211:20
Assign 203:12
assigned 105:24
257:16
assist 24:13 94:2
94:16 110:10
168:16
assistance 91:11
110:1 115:6
assistant 2:17
4:10 292:13
assistants 268:6
assisted 76:13
76:14 85:8,9
97:9,12 113:5
assisting 113:10
associate's 166:5
association
204:20
assume 85:17
222:21 275:14
303:7
assumed 240:5
atmosphere
22:19
attached 299:16
299:17
attempt 168:21
attempted
123:17
attend 108:20
162:6 213:9
attended 157:23
160:22
attention 90:8
173:8

Theodis Chapman
August 21, 2017

**attorney** 2:13,15
2:17 4:10,11
9:22 10:11
37:14 91:14
112:3 156:4
211:2 252:1
**attorneys** 91:15
157:10 252:14
**audible** 7:13
22:10
**audit** 236:15
**audited** 212:19
**auditing** 212:15
**Audy** 23:8
202:15
**August** 1:23
201:7,7 217:2
218:17 241:9
299:13 302:8
**Aunt** 14:24
16:16,20,22
17:13
**availabilities**
294:14
**availability**
103:2
**available** 56:11
58:2 184:21
213:13,15,18
281:3
**Avik** 3:12 35:3
36:1 54:17
94:14 139:17
178:2 181:14
181:18 186:16
191:20 206:17
214:14,15
219:16 268:5
271:20 272:1
**award** 166:6,11
166:19
**awarded** 50:15
159:5,7,17
164:2 165:24

**aware** 43:20
44:8 47:16
57:8,10 60:17
78:1 79:23
86:17,18 87:9
87:18 96:10
109:22 111:12
117:18 118:10
123:22 142:8
150:21 162:20
166:12 221:9
245:8 263:7
**awe** 253:9
**awhile** 283:4

**B**

**B** 121:10
**B-a-s-l-e-y** 125:6
**Bachelor's**
13:14
**bachelors**
145:20
**back** 17:9 27:6
33:4 36:6 41:7
41:18 52:14
55:24 60:7
61:23 67:7
72:24 82:11
87:14,21 88:2
95:8,24 103:14
104:21,22
106:6 110:18
111:4 112:9,13
127:15 128:6
135:22 153:21
154:3,3 156:2
164:17 165:1
169:18 177:9
179:2 204:14
210:13 215:15
222:19 226:18
231:2,19 238:2
238:3,19 245:2
269:24 291:1,7

293:7
**background**
12:14 129:22
149:6 210:14
**backtrack** 37:5
**backwards**
32:24
**backyard** 87:22
**Bailey** 145:12
**Balance** 166:6
**balances** 219:18
**bank** 53:7,8
62:7
**banked** 52:9
53:11
**banking** 46:23
**Baptist** 279:5
**barber** 292:2
**barely** 40:17
**bargain** 198:9
**bargaining**
62:20 70:1
125:24 126:2
160:12 197:19
**BARJ** 166:6
**base** 149:7 153:6
199:6
**based** 12:18
47:13 176:3
197:9 208:24
217:4 222:22
244:9
**basically** 46:23
52:9 61:8
62:24 63:2
103:3 126:11
127:21 128:1
134:2 162:5
209:12 219:10
252:12 279:1
**basis** 24:12
99:13 120:9
149:17,19
163:17 283:20

296:7
**Basley** 125:6,9
125:15
**Basley's** 128:19
**Bates** 167:18
**Bates-stamped**
216:18
**Bears** 294:9,23
294:24 295:7
**becoming** 222:3
**began** 112:20
**beginning** 30:10
35:17 172:19
**begins** 123:23
279:3
**behalf** 2:10,22
17:17 63:3
94:3 97:1
205:4 245:15
251:9
**behavioral**
22:23 39:18
**behaviorally**
23:16
**beliefs** 267:14
**believe** 6:10 9:5
9:5 22:8,8
26:17,19 28:11
28:23 30:10
32:11,13 33:16
35:6 36:16
73:4,5,7 76:1
78:7,11 88:11
89:15 90:4
92:5,24 93:1,7
93:9,10 94:23
102:14 129:6
132:2,23
139:15 140:8,8
140:11,14
145:13 148:12
153:2 157:7
158:1 161:14
163:15 167:9

178:4 181:4
200:23 201:8
207:4 208:22
209:5 220:5,6
222:9 231:10
237:17,18
241:23 243:15
250:18 255:4,5
255:6 268:21
270:12 288:8
296:18
**beneficial**
108:18 289:2
**benefit** 136:9
269:18
**benefited** 291:12
**Berman** 87:13
**best** 179:7
197:14 278:20
**better** 75:4
**beyond** 106:23
131:3 219:13
**bias** 86:6,6
111:17 218:20
**bid** 180:11,13,14
182:2,6,10,18
182:21,23,24
183:5,8,16,21
184:1,8,21
186:3 187:8,15
187:22,23,24
188:1,7,8
189:1 277:3,5
277:9 278:2,11
**bidded** 184:4
277:11
**bidding** 188:24
**bids** 188:15
**big** 168:23
**biggest** 16:23
**bigoted** 89:9
**bill** 155:17 212:7
**billing** 212:7
**bin** 144:5

Theodis Chapman
August 21, 2017

307

birth 12:15
292:16
bit 6:13 12:14
18:15 33:9
69:10 71:21
77:5 79:21
109:3 112:14
170:13 171:20
172:4,5 187:19
202:21 204:7
206:4 245:21
287:5
black 12:20 36:3
61:6 67:6 86:3
126:21 236:3
237:21 251:10
blacks 126:5
235:24
Blair 48:22
bleeds 121:11
block 238:18
blood 283:5,9,13
283:21,23
284:14,18
296:16
blue 291:21
292:7
blunt 115:8
board 87:15
169:18 193:17
body 223:5
bold 256:1
bonus 130:7,10
130:13,19
131:9 132:1
222:23 223:13
227:8
book 297:9
booklet 147:4
books 220:24
boosted 153:7
bottom 74:12
121:12 135:12
196:23 216:23

228:15,22
264:21
box 144:4
147:12 217:9
217:14 229:7
boy 236:1
brain 117:14
break 7:24 8:3
103:9 135:19
174:19 215:7,8
215:10 297:14
breaking 22:24
breaks 7:23
114:7
brief 103:12
188:6 215:13
291:4 297:16
broken 86:14
brother 292:6,6
brought 16:6
29:19 30:9,12
30:24 76:15
90:8 162:8
208:14 212:20
261:3 272:21
Brown 121:20
252:5,5
bucks 130:15
295:15
buff 284:8
285:17
building 24:4
193:23
bulk 26:24
bulls 87:20
business 96:8,9
busy 45:23

_____
C
c 75:24 251:14
252:3 302:2
C-h-a-p 4:15
c-k 76:2
Calderon 209:3

276:19 277:14
277:20 278:2
call 13:23 50:9
124:22 159:9
200:10 260:16
263:12 291:20
called 1:16 4:3
14:21 88:8
91:13 135:1
157:8 166:6
171:5 176:15
206:10,10,12
292:7,15
Calvin 117:13
154:5
cameras 86:16
candidate 13:1
candidates
92:17
capacities 71:14
capacity 43:16
card 97:23
98:24 99:20
100:4,11 101:3
101:6,7 102:7
cards 98:14
100:19
care 96:8 293:6
caring 281:10
293:4
Carolyn 117:13
161:14,17
162:23 271:5
carry 64:6
cars 103:7
case 4:19 19:12
20:15 35:2
57:14 67:23
85:8 87:9,11
89:14 118:1
120:18,21
122:14 124:10
128:16 149:11
198:8 208:4

226:2,2 278:19
caseload 277:15
cases 87:12
113:14 136:1
168:17 208:5,9
208:10 264:10
280:19
Casey 15:3
categories
112:20
Catholic 173:3
Caucasian 30:14
34:4 63:12
148:18 163:9
Caulfield
121:13,17
155:12 260:10
cause 23:16
302:12,16
caused 285:4
causing 21:8
CBA 62:13,21
62:24 63:5
70:2 94:5
126:7 189:6
227:4 248:5
287:2
center 14:23
15:3,7,14,16
16:4,6 23:7
87:6 202:15
centered 137:22
certain 59:4
74:7 109:20,21
207:18,19
238:16 242:17
certificate 303:5
Certified 1:21
302:5
certify 299:12
302:7,13,24
303:4
chain 143:12
247:18

chair 91:12
92:12,14,15,23
123:7
challenging
94:17
chance 24:3
123:14 125:13
125:20,22,23
126:18 127:1,6
127:17 128:9
128:13,24
change 26:2,5
27:9 28:3 42:9
43:12 174:4
175:9 226:13
233:16 238:6,9
290:20 300:5,7
300:9,11,13,15
300:17,19,21
301:5,7,9,11
301:13,15,17
301:19,21
changed 31:14
42:14 43:12,19
74:6 102:12
183:5 205:22
207:18 212:12
226:11 233:18
233:19 235:10
261:20 291:20
291:23
changes 32:16
35:7,9,12 71:1
74:5 169:12
229:15 232:22
232:23 233:1
233:12 235:13
238:5
changing 32:8
235:19,22
291:13
channels 141:14
Chapman 1:4
1:15 3:2,8 4:2

Theodis Chapman
August 21, 2017

4:8,14,15,19
5:2 12:15
81:21 82:2
103:16 112:11
120:13 127:4
129:4 130:6
142:5 146:1
156:18 157:14
158:3 168:10
173:24 175:2
177:14 179:14
190:1,9 191:6
191:22 192:2,8
194:21 195:2
204:18 206:22
216:10,14
225:3,15
248:17,22
249:24 251:22
256:18 276:4
287:12 299:4
299:20 300:2
301:2 302:11
302:14
**Chapman's**
206:19 249:1
258:23
**charge** 3:17,18
72:22 85:22
97:20 111:10
111:19 144:8
205:15 216:21
218:11 224:12
224:13 228:10
229:8 231:20
232:21 233:11
239:13 241:21
244:9
**charges** 36:4
97:11 109:15
216:8 217:15
224:19 241:8
242:22,24
243:5 251:19

252:3 261:3
**Charles** 1:11
140:10 141:16
143:2,4,13
237:17
**Charlie** 117:13
154:5
**charter** 38:18,19
39:4,12,22
40:1,14,19,20
41:1,3 179:3
**checked** 99:8
217:5,9 220:1
229:1
**checks** 219:18
**checkups** 283:13
**Chicago** 1:22
2:7,19 295:2
302:10
**chief** 1:9 4:20
17:21 32:3
69:11,13 73:7
73:10,23 74:2
75:14 76:11,17
77:19,22 78:17
79:4,13,17
87:14 118:19
119:3,9,17
121:12 157:12
161:2,4 168:14
170:18 191:2
193:8,13,19
205:5,5,6
220:6 224:20
225:19,24
226:24 231:1
253:13 254:3
268:6 299:9
**chiefs** 155:10
**child** 11:17
292:17
**children** 11:11
**cholesterol**
284:10

**Christ** 279:4
**Christen** 121:4
**church** 108:11
279:5 280:12
281:2
**Circuit** 1:9 4:20
224:20 299:9
**circumstances**
84:24
**cited** 116:1
189:20
**citing** 194:20
**City** 302:10
**Civil** 1:18
**claim** 278:19
288:11 296:7
**claiming** 156:19
278:20
**claims** 41:8
245:14 250:19
251:16,24
252:15,23
253:14
**clarification**
38:16 185:4,24
202:22
**clarifies** 187:18
**clarify** 61:24
170:23 175:2
185:17 206:1
**class** 1:5 23:17
245:5,10
246:16 299:5
**classroom** 21:24
22:22 23:12
24:9 37:24
172:3 175:15
176:19
**classrooms** 38:1
**clause** 126:8
**clear** 7:2 30:16
46:17 49:19
52:22 62:5
64:13 71:4

79:15 91:2
119:13 159:15
169:1,5 206:4
231:10 264:1
267:23 278:16
287:20
**clearly** 160:12
**Clerical** 266:23
**client** 44:11 63:3
88:6 108:14
117:20 152:11
**client's** 210:12
**clients** 108:18
116:2 150:3
151:1,1,19
213:20,22
**clinical** 104:10
148:3,24 149:1
149:2,17,19,20
149:21,21
150:4 153:3
203:12 267:5
**clock** 43:2 60:4
**clocked** 60:5,6
**close** 41:17
111:2 117:1
230:11 234:8,8
243:20 293:9
**closed** 188:17,19
**closer** 248:16
**co-assistant**
124:6
**co-chair** 122:11
**co-workers** 12:3
12:6
**code** 38:22
**coercion** 124:23
**coexist** 23:18
**cognizant**
214:20
**cold** 215:5
**colleague** 49:9
**colleagues** 90:3
218:23

**collect** 144:6
**Collective** 62:19
70:1 125:24
126:1 160:12
**college** 17:3
166:3,3
**combine** 242:6
**come** 17:16
19:11 24:21
27:6 28:18
29:7,16 39:13
41:7 49:17
58:13 65:15
70:7 125:19
126:13 145:21
146:18 155:13
188:22 212:22
213:9 239:2
244:18 253:6
282:10 283:12
**comes** 58:23,23
130:12,17
171:11 224:10
244:22 258:12
259:8,11
**coming** 38:24
172:17 209:12
234:12 262:20
**commencing**
1:24
**commendations**
130:6 213:16
**Commission**
292:12
**commissioner**
292:12
**commit** 90:20
198:11
**committed** 89:2
114:22 259:20
**Commodore**
56:18 57:2
212:5
**communities**

Theodis Chapman
August 21, 2017

309

108:9,11
community 88:2
149:24 150:2
282:12 291:15
comp 45:16
46:13,17,18
51:17,24 52:6
52:16 53:12,13
53:23 63:16,17
66:11 67:12
214:15 220:12
220:17,18,19
221:2,11
232:15,16,23
235:7,17,18
236:12,13,20
244:7,10,10
270:7 271:1
287:24
compared 260:6
compartment...
282:7
compensated
43:8 167:10
compensation
63:15 156:20
156:23 287:14
287:20 288:6
compensatory
159:4,8,10,11
159:18 160:8
161:13 162:22
164:5 217:22
218:4,14 219:7
220:3
compensory
288:19,20
compilation
113:4
compile 112:20
114:11 115:7
compiling 97:10
97:13 113:23
124:10 131:19

complained
222:16 231:13
235:15
Complaining
205:9
complaint 3:9
82:20,22 95:9
112:12 113:24
125:20 129:3
144:10,16
165:1 167:4
168:2 189:12
204:14 206:20
216:22 255:3
258:4,9,12,19
259:8,16 271:9
279:20 281:17
287:5,7
complaints
156:3 204:19
204:24 243:8
243:12,24
245:3
complete 100:4
100:11 299:15
completed 19:21
completely 7:6,9
complied 157:22
component
23:12,13 24:7
24:8,9,15
172:3
components
23:11 151:8
178:18
compose 166:9
210:24
composed
212:24
comprehension
165:21
comprehensive
137:15
comprised 148:4

148:5
computer 74:5
74:10 86:24
89:17
computerized
59:24 136:14
concerned
162:11
concerts 294:17
concluded 298:5
condition 127:8
127:9
conditions
217:20 218:13
218:21 229:14
conduct 39:19
88:18 279:20
conferences
162:7
configured
197:11
conflict 23:22
213:14
confronted
55:23
confusing 170:9
196:17
congratulations
230:17
congregation
279:5
conjunction
137:2
consent 72:12
72:17,19 79:6
79:7,16
consented 76:21
76:21
consequence
223:3,8
consider 69:17
69:21
consideration
197:18 198:3

213:2
considered
211:16 239:13
240:13
considering
181:22 197:12
207:16 277:6
consisted 152:21
consisting
299:13
consolidate
199:14 201:19
constitutes
136:4 160:13
210:12
construct
123:17
consummate
224:7 232:1
contact 87:3
contacts 212:6
contest 160:1
contested
166:17
contesting 247:2
247:3
continuation
224:15 242:7
continue 129:14
156:3 168:18
176:7
continued 67:24
68:1 234:21
continuing
217:9 220:1
229:4 270:12
continuously
233:15
contract 69:23
69:24 109:21
147:1 219:9,11
286:16
contracted
146:11 294:23

295:1
contractual 17:1
contractually
286:19
control 303:9
conversations
66:1
conveyed 35:11
convicted 13:20
Conway 161:14
162:23 271:5
Cook 1:10,10
3:14 4:21
69:13 118:22
168:8 177:12
179:13 224:20
299:10 302:6
302:10
cookie-cutter
56:8 58:24
COPA 157:8
copies 55:1
113:13 139:4,8
303:6,8
copy 59:20 78:6
82:10 139:10
146:20 182:17
182:18,21
Corolla 289:19
289:22
correct 27:24
28:2,15 35:21
42:3 43:16
49:24 53:2,2
54:11 62:9,9
71:13 79:19
82:23 83:14
139:7 158:17
158:20 168:4,5
169:15,17
196:9 197:5
202:5 204:11
209:11,13,14
227:5 229:2,4

Theodis Chapman
August 21, 2017

310

230:19,20,23
231:14 250:8
257:13 275:5
294:6 299:14
302:22
**correction**
299:16,17
**corrections**
299:15
**correspondence**
73:6
**cost** 110:19,24
**counsel** 193:8
303:1
**counseling**
279:7,18
**counselors**
157:9
**count** 224:22
288:11
**counter** 97:10
124:10 285:10
**counter-evide...**
97:10
**counter-prod...**
169:13
**counties** 78:7
**counting** 114:9
114:10
**County** 1:10
3:14 4:21
69:13 101:9,10
101:11 118:2
118:12,22
168:8 177:12
179:13 224:21
299:10 302:2,6
302:10
**COUNTY'S**
1:10
**couple** 5:3 25:21
83:6 138:12
217:13 250:14
287:6

**course** 31:22
205:10 263:9
**court** 1:1,9,11
3:15 4:20,21
6:24 9:2 16:11
17:16 20:3,13
37:8 38:24
40:7 45:23
51:20 55:19
57:11 71:2,7,8
82:2,11 135:24
136:1,3,5,13
137:1 166:1
181:4 210:13
224:20 260:16
299:1,9
**court-reporter**
303:6
**courtroom**
260:11
**courts** 1:19
101:17 137:3,5
**covered** 215:1
230:2 235:16
235:17 244:3,5
264:22 265:16
271:10
**covers** 104:20
**coworker**
276:11
**CPD** 108:12
**crazy** 167:17
**create** 37:2 52:7
123:18 152:10
200:9 289:2
**created** 19:17
63:5 126:5
137:19 148:3
149:21 234:13
239:14 240:2,8
240:14,15,17
278:11
**creating** 22:19
**credibility** 147:6

147:15
**credible** 220:14
**credit** 54:4,10
**crime** 89:2 90:20
**critical** 15:2
**cross** 38:23
**crossing** 38:14
**CSR** 303:16
**cultural** 15:18
**current** 21:13
49:1 63:7
178:13 286:3
**currently** 42:6
51:12 53:19
91:3 107:10
176:21 286:1
**customarily**
211:20
**cut** 185:21
**cutbacks** 102:15
**CV** 1:8 299:8
**cycle** 172:14
**cycles** 172:11,12
233:20 235:10
**cycling** 235:9

---

**D**

**D** 3:1
**D-a-s** 35:4
**daily** 99:12
236:24
**Dale** 10:15,16
29:20 175:23
177:1 279:4
**damages** 278:19
287:12 296:7,9
**Dan** 30:12
175:23 177:1
**danger** 261:17
**Das** 3:12 35:3
36:2 45:21,22
54:17 65:3
94:15 139:17
178:2 181:14

181:18 186:16
191:20 206:17
268:5 272:1
**Das'** 94:18
**data** 112:20
113:4 126:8
**date** 12:15 16:11
22:6 43:23
46:1,4 47:6
57:11 133:23
134:1 191:4
194:11 195:13
217:2 224:16
228:21 237:8
250:6 300:2,23
301:2,23
**Dated** 249:16
**dates** 93:6 251:5
**David** 4:15
**day** 1:23 45:18
86:23 138:4
181:4 207:10
207:13,21
214:6 234:6
262:20 299:21
302:7 303:11
**day-to-day**
21:23 99:5
136:15 137:7
138:1 150:8
152:9 239:2
**days** 16:13
51:19,20 62:7
261:5 281:18
281:20 297:1
**DCFS** 16:18
17:2
**DCPO** 3:10
17:19,20 32:2
32:18 33:11
34:1,8,9,10,20
34:21,23 35:1
35:20 65:18
162:3 164:7

166:17 169:12
169:14 178:21
221:15 247:16
247:17,19,20
247:22 260:10
260:24 261:8
268:11,13,14
268:16 270:22
**DCPOs** 181:15
246:24 247:4
268:6 269:14
**deal** 210:11
**dealers** 261:15
**dealing** 64:10,11
76:11 102:3
104:9 106:16
114:13 149:20
236:14 253:22
281:18 285:3
**deals** 280:12,13
**dealt** 161:21
280:18
**death** 38:24
**decade** 55:24
109:24
**December** 65:16
228:21 235:1
241:4,10 242:3
242:16
**decide** 67:18
**deciding** 75:7
**decision** 78:24
79:4 206:15
**decisions** 77:23
246:22 247:9
**decreased** 37:19
**defend** 91:16
114:13
**defendant** 4:9
5:22 69:12
116:1 118:19
156:24 195:3
216:19 228:17
250:20 252:16

Theodis Chapman
August 21, 2017

311

252:24
**Defendant's**
167:19 190:7
191:11 192:3
249:1
**defendants** 1:14
1:16 2:22
114:21 299:11
**defender** 37:13
**defending** 36:3
**defense** 124:12
204:20
**definitely** 78:13
145:22 149:10
199:3 222:11
222:14 228:6
267:8 293:24
294:3
**degree** 12:24
13:2,4,12,14
18:11 145:10
145:19 154:10
166:5 203:22
**degrees** 13:16
13:17 144:20
145:16 154:4
154:12
**denial** 270:7
**denied** 55:5
64:24 139:6,12
140:15,24
141:12,13
142:1 156:20
156:24 166:17
194:6,17
214:15 220:18
220:19 287:14
**Dennis** 34:8
168:14
**denote** 212:6
**denotes** 201:15
**deny** 65:9
**denying** 65:9
232:15

**department**
1:11 13:24
22:12 23:6
26:8 63:4
64:16,17 68:1
70:8 71:1,1,5,6
74:1 86:1,7,9
87:3 89:22
90:11 100:15
100:16 118:22
123:17 137:6
137:12,20,21
143:20 149:18
150:9 152:8,12
152:23 153:9
153:12 168:9
177:13 179:14
198:8,19
208:22 211:17
211:23 235:23
242:20 243:1
245:16 246:4
251:10 273:24
274:1 278:9
**department-w...**
236:6
**departments**
64:5,9 74:3,16
**depending**
131:17
**Deponent's**
300:23 301:23
**deposed** 5:4
**deposition** 1:15
3:8 4:18,23
9:20 10:1,11
10:24 11:22
12:3,6,10
81:21 82:10
83:2 158:3
190:1 191:6,22
194:21 216:10
225:3 248:17
278:15 298:4

299:13,15
**depositions** 1:20
5:20,23 6:5
**deputies** 144:3
**deputy** 17:21
32:3,21 43:5
54:16,19 57:10
121:12 143:7
143:13 155:10
157:12,13
161:2,4 164:7
168:14 170:18
212:17 219:15
220:5 231:1
247:15 268:6
**deputy's** 260:15
**derogation**
179:17
**describe** 32:6
86:8 114:21
281:15 296:6
**described** 31:21
**describing**
257:12
**design** 147:24
153:2
**designation**
98:11
**designee** 76:3
77:15,20
119:12 193:16
225:20
**designees**
119:21 253:13
253:17,24
**designing**
147:17
**desire** 78:8
**desk** 146:18
**Despite** 135:12
**DESPRES** 2:4
**detail** 11:5
133:18 264:23
296:7

**details** 68:13
**detention** 16:1,4
23:7 87:6,6,16
202:15
**determination**
39:11 267:13
**determine**
104:13 136:18
**determined**
196:24
**determines**
136:19
**develop** 81:14
**devote** 166:13
**difference** 53:21
202:11
**different** 16:17
18:7 45:4,5
47:10 48:4
52:4 64:4,9,16
64:18,19,20,21
71:14 74:3,16
80:22 90:14
92:16 98:13
101:7 103:6,7
104:9 105:9
111:17 123:20
133:7 136:3,6
136:7,8,13,24
138:8 147:13
147:14 151:3
151:16 176:12
183:23 198:7
198:18,19
200:10 203:14
204:4 206:11
207:20 210:16
217:20 218:12
221:18 229:14
233:5 270:24
280:6,7 285:7
286:24 294:14
294:17,18
**differently** 52:3

105:8 193:2
260:12
**difficult** 151:18
245:24
**difficulties** 19:8
19:9 39:17
219:2
**diligent** 135:12
135:17
**diplomas** 166:2
**direct** 3:3 4:6
33:2,3,5 65:11
110:3 120:14
120:15
**directed** 67:10
235:13
**directing** 266:20
**direction** 303:9
**directives** 261:7
**directly** 65:8
78:23 84:20
97:8 108:14
111:9 113:5
116:15 118:4
118:18 119:3
119:16 125:14
140:13 181:18
271:2
**director** 35:1,2,3
36:2 45:20
54:17,17 61:12
64:20,21 65:3
66:5,10,13
67:2,4,10 68:9
72:3,11 73:2,3
81:4 94:14
98:5 140:3
143:6,7,8,12
143:13,16
148:2,9 231:9
246:23 247:10
248:1,9,12
253:24
**disagreeing**

Theodis Chapman
August 21, 2017

312

| | | | | |
|---|---|---|---|---|
| 74:24 | **discriminating** | **dispense** 207:23 | 70:7,23 82:7 | 101:15,17 |
| **disagreement** | 61:6 269:15 | 233:14 | 251:15,22 | 102:4,4,16 |
| 266:6,9 | **discrimination** | **dispo** 55:20 | **dog** 87:19,23 | 136:10 152:18 |
| **disagrees** 248:3 | 3:17,18 84:12 | 67:24 136:4 | **doing** 42:22 | 261:15 |
| **disasters** 282:11 | 99:3 109:15 | **disproportion...** | 45:14 55:2 | **drugs** 21:9 |
| **discharge** 85:7 | 110:20 111:10 | 144:18 | 58:5 63:2 | 261:14 292:4 |
| 85:14 | 111:13,15,20 | **disruptions** | 74:10 86:22 | **drunk** 155:13 |
| **discharged** 85:4 | 144:11 153:21 | 23:17 | 89:7 90:13,17 | **due** 104:8,24 |
| 88:12,17 89:1 | 186:7 194:19 | **distress** 279:19 | 138:1 156:21 | 105:7 284:15 |
| 124:21 | 196:14 204:19 | 281:13,16 | 171:13,15,15 | 284:15 |
| **disciplinary** | 204:21 205:9 | 285:14 296:14 | 171:16,18,18 | **duly** 4:1,4 |
| 89:23 123:18 | 207:3 214:11 | **distressful** 282:9 | 171:19,20,22 | 302:15 |
| 123:24 261:3 | 216:21 217:4 | **district** 1:1,1,19 | 172:12 175:15 | **dump** 39:22 |
| 264:9,16 | 218:19 220:8 | 4:21,22 21:12 | 176:13 184:12 | **duress** 124:18 |
| 266:11 | 222:16 231:13 | 57:19 105:11 | 184:12 185:10 | **Dustman** 65:13 |
| **discipline** 71:17 | 231:17 235:15 | 299:1,1 | 185:12 187:6 | **duties** 15:13 |
| 71:24 73:24 | 242:18,24 | **divert** 45:9 | 199:20 200:13 | 21:22 22:14,16 |
| 74:20 75:1,8 | 243:6,8,12 | **divided** 130:13 | 212:15 222:6 | 31:20,23 32:1 |
| 75:12 77:1 | 244:1,9 251:2 | 182:7 234:3,5 | 226:17 232:24 | 32:3,7 35:8 |
| 90:12 121:2,8 | **discriminatory** | 234:7,8,15 | 261:2 262:20 | 89:19 93:24 |
| 121:14 127:12 | 104:24 105:8 | **division** 1:2 | 293:1,2 | 136:15 150:8 |
| 127:12 129:23 | 109:23 147:19 | 104:17 105:17 | **dollars** 111:3 | 174:4 175:9 |
| 232:9 246:22 | 148:1 153:3 | 107:9 299:2 | **Donna** 1:20 3:10 | 178:23 186:4,5 |
| 247:5,6 251:3 | 190:17 198:12 | **DNA** 210:19 | 32:18 157:12 | 187:6 207:23 |
| 260:5 262:22 | 200:1 214:21 | **docket** 210:14 | 158:6,22 161:4 | 208:7,8 213:14 |
| 263:3,19 | 251:9 269:17 | **doctor** 282:22 | 161:20 162:3,3 | 226:15 233:14 |
| 266:11,20 | **discussed** | **doctor's** 233:22 | 164:7,7 166:17 | 239:15 240:5 |
| **disciplined** | 243:14 252:15 | **doctor/patient** | 169:6,11 | 257:6,10,11 |
| 116:20 232:4 | **discussing** 229:8 | 279:23 | 181:14 302:4 | 261:4 291:1 |
| 263:21,23 | **discussion** 95:22 | **doctoral** 12:24 | 303:16 | **Dwayne** 34:13 |
| 264:2,6 | 174:22 201:16 | 154:4 | **dots** 86:20 87:1 | 34:21 |
| **disciplines** | 219:9 256:11 | **doctorate** 154:6 | **doubt** 59:11 | **dynamics** 19:10 |
| 111:3 116:16 | 295:22 | **doctorates** 154:5 | **downtown** 74:9 | 58:15 |
| 259:18 | **discussions** | **doctoring** 182:6 | 96:24 | |
| **disciplining** | 195:18 252:20 | **document** 66:17 | **Dr** 10:15 279:4 | **E** |
| 259:21 | **disorders** 39:19 | 190:9 191:13 | 282:22 283:2 | **E** 3:1 |
| **disconnected** | **disparate** 36:12 | 195:5 201:12 | **drastically** | **e-mail** 160:17,19 |
| 22:17 | 47:14 68:16 | 201:14,15 | 205:22 | 230:16 294:13 |
| **discontinued** | 86:5 89:10 | 204:13 213:1 | **draw** 168:18 | 294:15 |
| 201:4 | 111:16 118:20 | 242:12 249:5 | **drew** 44:5 | **earlier** 207:11 |
| **discovery** 89:24 | 119:3 120:8 | **documentation** | **drives** 167:16 | 222:23 267:3 |
| **discriminately** | 214:22,23 | 73:12 115:8 | **drop-in** 172:18 | **early** 45:18 |
| 182:20 211:6 | 218:19 | 210:18 | **dropped** 172:17 | **earn** 162:5 |
| 293:5 | **disparities** 86:5 | **documents** 12:9 | **drug** 21:2,3,4 | **earned** 45:16 |

Theodis Chapman
August 21, 2017

313

easily 111:4
  151:13 208:12
EASTERN 1:2
  299:2
echoed 66:12
Ed 292:9
education 19:14
  161:18,22
  201:22
educational
  161:5,7,20,24
  163:3,14,20
  178:17,24
  180:3 199:15
  201:19 240:3
  270:23
EEOC 109:16
  111:11 144:8
  144:10 205:15
  216:8,22
  224:11,13,19
  228:10 229:7
  231:20 243:6
  251:19 252:3
  252:18 253:5
effect 35:14 50:2
  147:19 282:18
effectively 257:6
effort 112:17
efforts 67:21
  130:5
eight 32:13 35:8
  172:13 181:5
  207:15 209:22
eight-hour
  86:21
Eileen 63:8
Eisman 17:19
  18:8
either 7:20
  13:23 19:5
  26:13 39:11
  48:24 74:24
  140:9,14

142:11 145:11
  147:18 150:13
  196:20 235:14
  239:1 243:13
  246:1 259:23
  290:17
elections 147:12
electronic 20:23
  56:24 86:10
  236:17 276:13
  277:1,3,9
elevated 296:16
eliminated
  168:9 173:11
  173:15 176:1,2
  177:10,13
  196:21
Ellis 1:9 299:9
EM 20:6,23
  21:11 86:7,9
  86:19 87:14
  88:12 89:1
  183:23 209:5,5
  276:21,22
  278:3
email 158:14
Emily 121:1
emotional
  279:19 281:13
  281:15 285:14
  296:14
emotionally
  282:16
emphasized
  212:9
employed 14:14
  14:24 81:7
  91:21 99:17
  115:24 127:9
  273:24 286:1
employee
  127:11 247:21
  247:23 248:3
  293:13

employees 15:22
  60:18 74:1,20
  197:19 209:12
  221:10 245:16
  245:19 266:5
  266:23 267:5,7
  272:15
employer 69:18
  69:22,23 72:16
  72:21
employment 6:8
  41:9 77:24
  78:1,24 217:21
  218:13 293:12
  294:2 295:16
employment-r—
  6:6
empty 189:2
ended 208:11
  261:23 291:4
endured 153:20
engage 18:24
  19:15,20 23:15
  58:6
engaged 18:21
engaging 18:22
  22:16 58:12
engineer 291:18
enrichment
  15:18
enroll 166:2
enrolled 172:9
enrolling 171:21
ensued 94:8
ensure 92:20
  137:23
entail 16:12
entailed 22:15
  153:21
entails 19:10
  21:22 22:21
  133:19 152:22
enter 60:2
entire 71:7

104:1
entitled 296:8
entity 11:18
environment
  234:14
ERC 14:21
  15:24 16:14
ERC's 17:13
ERRATA 300:1
  301:1
error 260:24
  265:5
escalate 88:3
escalated 87:11
especially 58:11
  76:8 87:20
  106:24 147:7
ESQ 2:5,16
essence 260:21
Essentially
  20:19,20
established
  179:18
et 4:19 299:10
evaluation
  130:12 210:22
  221:21 222:21
  222:22 223:4,9
  223:12,15,19
  226:8 248:4
evaluations
  131:23 217:23
  222:2,7 226:10
  227:9 229:16
  229:22 231:12
  247:13 248:2
Evans 1:9 69:16
  69:17 72:20
  76:11 77:11
  78:2,18,23
  119:3,9,17
  299:9
Evans' 72:9,12
  76:17

evening 14:23
  15:7,14,15
  16:8
event 108:17
  212:18 294:20
events 107:3
  108:21 295:1
eventually 37:24
  89:22 172:16
  208:11 222:2
  261:23
evidence 85:21
  90:1 97:13
evil 282:3
exact 176:9
  237:8
exactly 18:19
  45:12 113:11
  199:18
exam 133:19
  134:4,13,17
  138:18 143:22
  145:10 146:3
  146:15 147:24
  151:23 153:2
  153:16 154:2,7
  155:20 264:22
examination
  1:16 4:6 132:8
  133:21 144:21
  147:18 300:2
  301:2 302:12
  302:17
examinations
  135:13
examined 4:4
example 48:9
  70:10 97:22
  115:23 116:7
  188:3 233:17
  236:9
examples 72:23
  118:19 260:3
exams 135:5

Theodis Chapman
August 21, 2017

314

142:11 146:6
147:2 150:21
**exceed** 130:11
130:14,16,16
224:9
**exceeded** 130:23
157:20 226:5
227:24 262:15
**exceeding**
130:12 223:24
**exceeds** 231:6
**excess** 111:2
**exchanged**
138:14
**excluding**
147:20
**execute** 208:7
226:14
**exercise** 179:11
**exhaust** 220:23
**exhausted** 20:12
67:20
**exhibit** 81:22
82:4 83:1
158:4,12
164:17 167:14
190:2,6 191:7
191:11,23
192:3 194:22
195:3 199:14
204:15 216:11
216:15 225:4,8
228:8,9 248:18
248:23
**EXHIBITS** 3:7
**exist** 38:14
233:8 241:2,3
**existed** 110:11
110:12 150:1,3
240:11
**existence** 210:12
**exists** 126:2
**expect** 228:4
**expediently**

220:24
**experience**
97:20 109:4,5
153:7,23
179:15 274:19
**experienced**
220:9
**expertise** 199:5
**expiration** 45:24
46:4 50:24
51:2
**expire** 51:17
**expired** 45:24
46:2,14 51:6
**explain** 188:1
**explanation**
126:18 186:17
**expound** 186:18
**Ext** 2:8
**extensive** 251:7
**extent** 147:5
**external** 285:5
**extra** 46:23 65:1
166:12 218:24

————————
**F**
**facetious** 254:9
**facilitated** 15:16
**facilities** 97:24
**facility** 39:1
**fact** 66:19
181:23 182:8
183:4
**factor** 75:7
136:18
**factors** 285:5
**facts** 89:10
250:19
**failed** 90:20
100:4,10
142:10,12
144:20 145:10
146:2 154:7
226:14

**failing** 89:19
**fair** 40:18 64:4
249:19
**faith** 178:7
198:10
**faith-based**
137:4
**familiar** 69:12
80:4 81:11
96:2 103:16
116:10,11,11
118:6 129:10
132:8 263:5
**families** 43:7
44:12,15 56:1
56:11 57:19
58:3,12 101:15
101:18 102:2
102:18 111:7
233:6 291:24
**family** 11:1,21
19:10 39:19
58:1,7 67:21
68:2 210:11,14
212:9,23
282:17,24
283:5
**fancy** 285:18
**far** 12:22 33:4
84:23 105:1,2
114:15 173:6
186:7 202:18
208:20 231:2
**farther** 111:5
**fashion** 45:8
**fat** 284:9
**Father** 108:12
108:17
**fatigue** 296:17
**fault** 169:16
**February**
132:12
**fed** 68:5
**federal** 1:17

4:24 62:15
211:23
**feel** 108:18
167:9 281:22
**fees** 293:23
**fell** 113:7
**fellow** 213:17
**felonies** 87:10
**felony** 13:20
**felt** 235:13
**female** 28:6 73:2
89:15 115:23
116:20 208:20
276:11
**fiance** 292:17
**field** 21:12,14,15
42:5,7,8,20
43:24 47:17,22
59:8 80:17
81:13 104:5,14
104:15 105:14
134:23 137:9,9
137:13 142:9
150:9,10,14,15
150:21,24
151:20 152:4,9
152:14,22
179:15 189:18
189:21,23
207:9,14,19,23
208:6 209:13
210:5,9 211:13
212:21 213:5,6
214:3 229:17
257:17 274:11
274:16,18,19
274:22 276:9
276:12 292:22
**fifty** 104:23
**fighting** 87:22
**figure** 198:1
284:16
**file** 46:12 51:7
60:13 111:10

111:19,24
142:16 144:7,8
164:14 214:13
225:23 242:19
242:23 244:9
260:17 262:15
**filed** 4:21 8:18
51:5 55:4 66:8
79:9 89:23
94:7 97:1
148:13 156:19
182:6 190:20
205:15 224:13
224:19 241:11
241:12,22
242:16,21
244:13 252:4
254:2,12,14,22
255:2,21 272:3
294:5
**files** 212:16
248:4 277:15
**filing** 109:15
164:8 224:11
231:16
**fill** 54:15 66:1
67:13 78:3
**filled** 54:22
78:12
**final** 210:21
278:14
**finally** 58:14
73:7 154:8
**financial** 63:15
**financially**
111:1
**finding** 36:6
112:2 179:7
**findings** 110:23
**fine** 7:23 17:24
18:2,4,4 27:5,7
27:21 29:1
41:5 49:18
52:23 58:22

Theodis Chapman
August 21, 2017

315

74:19 93:11
117:16,16
118:8 135:20
148:15 156:1
166:22 169:4
174:20 186:9,9
202:19 203:7
209:8 226:17
239:8 252:19
255:15,20
269:4 290:16
**finger** 126:13
**finish** 7:5,9
185:15 239:19
**finished** 17:18
92:4 297:8
**fired** 127:23
**first** 4:3 13:22
14:10 19:19
22:6,11 23:2
24:2 28:7
34:12 37:21
39:20 40:24
85:11 94:24
121:1 122:15
122:16 141:13
146:21,22
150:6 156:16
165:19 166:23
167:1 177:21
179:22 197:16
197:16 199:19
200:7,12
216:23 239:12
241:9,14
244:18 247:14
248:24 257:5
265:12 292:16
302:14
**firsthand** 76:10
83:22 99:19
155:20 263:11
263:14,17
**fiscal** 131:17,17

**fit** 44:13 179:7
**five** 5:10,12
45:13,17 86:18
136:2 172:12
174:19 208:9
224:23 232:7
233:20 241:11
261:5
**flex** 45:8,10,11
46:14 48:20
49:7 50:10,21
51:13,16 52:1
52:6,8,8,13,15
53:22,24 54:10
67:11
**flex-time** 49:23
50:1
**flexed** 50:15
**Flexing** 45:12,12
**flies** 262:9
**flip** 112:13
117:17 210:14
210:15,17
**floor** 1:22 2:18
23:5,9 302:9
**focus** 30:15
31:17 83:7
85:14 128:6
150:12 167:2
173:10 209:7
259:15,16
270:1 290:11
**folder** 210:11
211:4 212:10
212:23
**folders** 212:16
212:19
**follow** 59:4
225:13
**followed** 260:14
**following** 65:7
197:17 261:7
**follows** 4:5
**forced** 42:5 45:5

45:6 124:17,23
157:17 208:24
220:22 276:9
277:6 293:5
**forcing** 232:16
235:17
**foregoing**
299:13 302:21
**forget** 51:22,22
**forgiving** 282:1
**forgot** 56:23
262:18 266:15
266:16
**form** 3:11 37:12
45:7 50:4
53:16 54:14,23
55:1,8 58:14
66:2,2 67:13
86:5
**formal** 19:13
204:24 279:23
**formally** 243:13
**format** 210:24
**former** 73:3,8
107:13 148:9
166:1 204:19
263:6
**forms** 75:11
78:8
**formulate**
244:15
**forth** 76:15
136:11 157:19
162:5
**forthcoming**
227:10,16
244:11,17
**forty** 120:5
**forward** 54:24
197:15 214:20
**forwarded**
181:21
**found** 26:7
44:12 45:3

46:7 86:11
88:6 90:15
161:16 181:7
220:14 236:10
236:19 237:1
265:5 285:6,10
**Foundation** 15:3
**founded** 128:5
**four** 15:8,21
25:2 26:2
30:17 46:11
98:13 115:23
116:19 122:21
136:2 147:13
154:7 172:11
232:6 233:20
258:20 291:22
**free** 204:21
**Freedom** 73:5
**Friday** 10:4
45:14,18 51:21
**friend** 231:8
**friends** 81:7
106:7 107:18
**front** 6:20 89:6
112:13 144:5
210:13 238:19
**frustrated**
281:22
**full** 250:20
**full-time** 15:11
**fully** 86:18 87:9
111:12
**function** 22:22
**funding** 102:16
**funds** 118:2,12
211:24
**further** 302:13
302:24 303:4

——————
**G**
——————

**G** 125:5 287:10
**Galbraith** 3:13
193:7 253:20

**game** 295:9
**gang** 23:20
32:14 38:14,23
261:16
**gangbangers**
173:4
**gangs** 23:21
**gas** 98:5,13,24
99:20 100:4,11
100:19 101:3,6
101:7 102:7
**gauge** 137:20
155:6
**gauged** 149:5
**Gavin** 121:22
**geared** 137:11
149:16
**gears** 49:5 69:9
79:20 215:9
**GED** 165:23
**general** 2:13,15
2:17 4:10
48:18
**General's** 4:11
**generally** 131:22
**generate** 297:10
**genetics** 285:5
**GEOGHEGAN**
2:4,5 6:12
95:20,24
103:10 110:5
126:17 129:12
154:14 170:7
174:15,18
178:6 184:23
185:8,15,18,22
215:4,11 255:9
256:10 295:21
297:15,21,24
298:2
**getting** 53:3,20
53:22 54:2,4,9
62:7 71:10
72:8 126:15

Theodis Chapman
August 21, 2017

316

131:4 170:9
188:14 220:16
224:3 227:15
248:16 261:23
295:8
**give** 19:18 43:23
52:12 61:21
66:6,14,21
67:8,11 68:20
70:10 88:24
141:1,5 145:1
145:1 146:20
147:14 153:19
182:9 185:3
186:22 192:19
233:17 236:9
260:3 288:24
**given** 15:17,17
21:21 54:14
60:24 61:4,15
61:17,19 66:10
66:11 87:23,24
98:7 123:14
152:19 153:9
166:11 171:8
186:10 207:13
210:8,10
240:19 261:11
277:15 299:13
299:15 302:22
**gives** 113:20
**giving** 52:10
133:21 134:1
147:8 170:10
207:20 231:6
292:16
**Gleason** 221:5
**go** 5:2 6:16 9:6
12:12 13:8
17:9 19:3,6
29:17 37:15
39:2,7,11
40:20 41:8
52:14,16 53:13

55:19 56:3
58:10,10,11
59:7,23 61:23
72:24 75:20
78:9 80:2 81:6
82:4,6 84:3,6
86:15,21 88:16
95:8 101:3
102:2 105:17
110:7 112:5,14
113:21 118:16
119:19 120:12
127:14 129:3
129:11 134:7
139:10,14
144:13 146:14
148:21 152:17
156:16 161:24
169:10,23
170:5 171:9,12
174:10 178:19
179:8 185:22
185:24 188:21
188:22 190:16
198:13 201:18
205:24 209:4
213:5 215:6,12
216:4,6,6,8
218:23 219:3
228:8 229:11
231:2 233:22
239:18 245:2
247:18 249:8
250:13 257:10
258:8 271:3
276:24 278:2
278:10 285:23
287:7 291:7
292:24,24
293:2,3,4
295:2,19 296:5
297:13
**goal** 23:13
164:14,15

**goals** 197:14
**goes** 53:7 90:5
108:8 113:19
152:9 154:12
185:17 189:8
233:13 247:15
269:1,1 292:20
294:17 295:1
**going** 6:24 7:7
17:22 41:6
43:7 54:24
56:9 61:5,8,9
67:5,17 68:16
68:17 73:3
76:23 82:6
83:10,18,19,21
86:15,18 92:21
106:6 108:1,10
110:7 112:12
117:17 118:8
120:4,5 127:23
129:18 133:20
134:1 140:16
144:13 164:17
165:1 167:20
196:21 197:8
201:10 214:3
214:19 215:6
232:2 237:10
240:23 244:11
250:13,17
253:23 256:14
256:15 270:24
271:2 278:17
278:22 280:19
280:20,24
282:14 283:8,9
286:18 287:4
291:3 292:16
292:24 295:3
**Golden** 1:12
143:11,14
**golf** 81:18
**golfed** 283:11

**gonna** 59:1 67:6
86:16 166:13
216:4 293:3
**good** 4:8 7:11
9:21 93:11
106:8 148:2
178:7 198:10
211:14 215:2
226:17 228:8
236:1 263:24
270:9 297:12
297:19,21
**goodness** 284:22
285:1
**Google** 285:1
**gotta** 57:17
233:6
**gotten** 59:16
66:22 106:17
106:18 131:7
159:22 230:15
283:19
**government**
11:10 211:22
**governmental**
11:18
**Governors** 13:7
**grab** 98:15
**grade** 23:2
**grades** 146:6
**graduate** 13:10
144:19 145:10
**graduated** 18:17
**Grant** 287:11
**great** 185:6,6
**greater** 114:2,17
**green** 57:2 72:13
**Greenlaw** 1:4
95:15,15 96:3
96:4,14,17
97:2 99:12,16
100:3 299:4
**Greenlaw's** 97:6
99:4,20

**grievable** 144:8
**grievance** 3:11
46:12 51:6,7
51:15 55:4
60:13,14,15
66:8 75:20
76:4 79:9,17
85:17,18,20
89:8 91:8 94:2
94:6 97:1,6,7
119:8 120:1
124:14 142:16
159:23,24
160:18,20
164:8,11,12,14
182:5 190:12
190:19,24
191:16 192:7
192:14,19
193:4 214:14
225:16,18,21
248:5,8 253:23
254:2,4
**grievances**
156:19,24
205:2 225:23
**grieve** 85:16
160:15,18
**gritty** 6:16
**gross** 179:17
**ground** 5:3 6:16
**grounds** 225:20
**group** 157:9
172:16 188:21
279:7
**groups** 18:21
19:16 138:13
**Grunauer** 89:15
**guard** 147:10
**guess** 15:23 19:1
25:20 32:24
35:10 37:5
38:15 43:11
72:7 80:22

Theodis Chapman
August 21, 2017

317

81:13 109:19
110:1 126:16
127:14 130:18
198:1 200:3,10
203:5,13 220:2
239:9 241:14
242:23 246:10
246:12,12
279:22 296:23
**guest** 15:17
**guidance** 279:6
**guilty** 128:2
**guise** 168:11
177:15
**guy** 96:8 232:6
**guys** 202:5
230:17,21
**Gwen** 280:9
**Gwenn** 279:17
279:22 280:8
280:10

_____

**H**
**H** 2:5 125:16
**half** 28:12,14
46:21 47:8
50:15 52:11
53:1,14 62:10
92:4,5 102:15
111:2 159:22
160:14 162:10
162:24 163:16
163:22 164:2
207:21 234:4,6
234:7,9,11,16
262:6 277:17
277:17,18
**hand** 82:8
303:11
**handed** 82:3,11
158:11 190:5
192:2 195:2
216:15 225:7
228:9 248:23

**handle** 85:6
121:2,7
**handled** 120:17
120:21
**hang** 81:16,16
106:11 107:3
107:22 108:2
**happen** 32:17
43:17 46:3
55:22 57:21
98:2 140:16
183:9 197:8
202:7 203:4
214:6,7 262:2
**happened** 26:10
67:23 74:9
116:24 117:2,7
122:19 168:13
181:2 183:10
190:23 203:10
203:12 204:2
207:4,7 211:9
211:12 219:21
226:22 244:5
261:24 262:5
**happening** 46:5
46:11 66:15
**happens** 67:23
126:21 294:18
**hard** 61:8 185:1
213:24 234:14
**Harris** 171:4
177:2,4 272:23
272:24 273:1,1
**harsh** 259:22
**harsher** 259:19
260:5
**hat** 104:13
**hate** 23:24
**hats** 44:5
**Hayes** 2:16 3:3
4:7,9,17 5:1
6:15,17 64:1
81:20 82:1

96:1 103:9,11
103:14,15
110:6 111:8
112:5,9,10
126:23 129:15
129:17 154:16
154:21 158:2,8
158:10 170:10
170:17 174:17
174:20 175:1
178:9,11 185:1
185:5,14,16,20
185:23 186:1
190:4 191:5,9
191:21 192:1
195:1 215:8,12
215:15,18,20
215:21 216:7
216:13 225:6,9
225:12 248:16
248:20 255:10
255:12 256:13
296:1 297:11
297:18
**hazy** 28:24
**head** 255:17
**heading** 83:12
245:5
**hear** 76:24
121:17 173:5
**heard** 48:20
116:9,12 177:5
226:1
**hearing** 77:3
194:1
**hearings** 77:13
119:8 120:1
**heart-wrenchi...**
262:13
**hearts** 261:6
**held** 25:17 87:13
91:22 92:1
95:23 103:13
112:8 174:23

215:14 256:12
295:23 297:17
**helm** 168:15
**help** 23:15 102:2
113:10 158:8
166:18 197:14
**helped** 17:13
37:2 147:14
**helpful** 113:16
285:2
**helping** 91:15,15
113:5 114:11
114:14 115:7
124:9 166:9
**helps** 158:2
185:18,19
**hereto** 303:5
**heretofore** 302:7
**hereunto** 303:11
**Hey** 111:18
**hierarchy** 33:9
137:6
**high** 22:18 59:2
136:19 166:2,3
283:4,14
284:17
**high-profile**
88:6 208:10
**highest** 188:7
223:24
**highlighted**
256:4,6,7
**Hinsdale** 101:19
**hired** 22:6 70:11
70:11
**Hispanic** 27:20
27:20
**history** 41:9
129:23
**hit** 6:9 9:1,11
284:6
**hits** 90:5,5
**hold** 180:9
**home** 16:5 23:8

86:13 171:9
202:15 252:21
252:23 253:1,3
253:6,8 281:20
**homes** 19:11,11
**hope** 282:2
**hoped** 210:8
**hopefully** 228:8
**hoping** 297:8
**hospital** 280:15
**hostile** 234:14
296:15
**hour** 1:24 62:11
220:23 232:20
285:8 295:15
**hourly** 159:12
**hours** 10:6
45:14,15,17
46:24 47:9
50:17,21 53:10
53:23 54:2,3,4
54:8,9 55:11
55:11,13,17
58:19 59:10
60:19 62:11
63:23 66:12
67:22 68:3
106:24 159:18
159:19 162:22
164:18,19
219:13 232:7
232:16,19
236:20 260:20
287:22 294:10
294:12 295:8
**house** 56:3
149:23
**housing** 44:14
56:2
**Howard** 252:5
**HR** 139:23
140:3,13 143:6
143:12,15,18
231:8 278:9

Theodis Chapman
August 21, 2017

318

human 143:20
143:21 242:20
243:1 268:10
268:11 296:24
hundred 130:15
hurdles 218:24
hurricane
282:13

**I**

i-s 4:15
ID 3:8
identification
81:23 147:1
158:5 190:3
191:8,24
194:23 216:12
225:5 248:19
identified
252:14
identify 252:14
IDHS 17:2
IDJJ 20:15
II 135:3,4
III 135:1 288:24
289:8,10,11
IIIs 289:16
Illinois 1:1,23
2:7,14,19 4:22
16:24 242:21
242:24 292:11
299:1 302:1,6
302:11
imaginary 233:7
imagine 56:19
immediate
80:23
immediately
266:10
impact 94:4
108:14 236:3
239:4 291:22
impacted 235:24
implemented

75:8
important 70:22
important-oth...
211:4
impose 246:22
imposing 247:5
247:6
impoverished
19:12
impression
182:9
impromptu
57:16
improvements
168:18
in-depth 21:22
in-house 148:3
inaccurate
229:16,21
inartfully
287:23
incarcerated
208:11
incidence 260:8
incident 263:13
incidents 262:2
include 22:16
137:3
included 296:8
including 18:8,8
31:18 40:7
57:9 120:10
217:21 229:14
296:16
inclusive 299:14
income 56:1
297:7
increase 23:14
39:21 289:9,12
increased 37:19
37:20 165:21
increments
220:22,23
221:3,7,11

incurred 208:3
indicated 117:2
155:12,14
161:16
Indicating 59:18
indigent 101:18
indirectly 110:1
individual 89:3
91:16 224:19
individuals 18:7
24:1 26:14
49:20 88:24
89:13 90:19,23
91:1 96:5 98:1
98:7 116:22
117:8 120:11
145:2 153:16
161:15 162:21
163:11,24
252:4 270:13
274:4 275:18
282:19 291:14
inferred 68:14
informal 279:24
280:2,23 281:1
informally
243:13
information
41:22 73:5
78:14 89:5
108:13,19
114:11 116:7
117:6 124:10
135:23 138:14
151:2 152:20
199:6 222:4,5
251:1,5,8
258:5,11,16,17
259:7,11 263:6
263:7 278:10
285:2
informed 108:7
139:11
inhumane 234:5

initial 210:6,13
241:13
initially 86:11
208:5 219:8
283:23
initiated 110:1
201:9
injury 104:8
insider 278:10
instance 77:8
165:16
instances 17:12
85:23 90:24
97:18 98:11
123:11 214:11
261:14 296:24
instituted
248:11
instructed 67:2
67:4 260:10
instruction
40:16 175:16
176:19 185:12
273:12
instructional
182:11
instructions
233:9 260:15
instructor 14:17
22:13,15 24:14
25:18,23 31:12
31:15 37:4
41:11,21
233:15 275:9
275:12,15,16
275:19,22
instructors
24:20 26:2,22
171:16,16
290:21
insurmountable
148:23 149:11
intact 82:24
250:11

intake 203:12
intense 32:15
intensity 173:6
Intensive 20:10
188:10
intentional
261:16
intentionally
100:24 147:19
222:3
interact 99:12
interacted 99:16
interest 246:16
interested 303:3
interim 35:2
36:2 45:20
54:17 61:11
65:3 66:5,9,13
67:1,3,10 68:9
94:14
intermittently
99:6
intern 18:11,16
21:17
internal 37:12
interned 18:9
interning 37:21
internist 282:23
interns 212:22
internship 18:13
18:18,20 19:23
interrogatories
3:19 12:11
19:5 216:5
249:2 250:5
287:6 293:7
295:20
interrogatory
256:19 259:1
interrupt 169:3
interrupting
170:8
interview 68:6
90:13

Theodis Chapman
August 21, 2017

319

interviewing
43:7
inundated 51:19
investigation
43:2,4 55:22
89:7 90:17
123:18 266:12
investigations
42:23
investigators
252:18 253:5
inviting 292:15
involve 199:1
involved 23:20
24:15 32:14
35:24 77:4,7
77:10 78:23
79:4 84:11,18
84:20 85:2
91:8 97:5,8
113:3 114:8
115:3 116:2,15
117:20 118:4
121:20,23
122:2,8 124:4
125:10 128:12
157:8 172:1
195:17 198:16
198:17,18,24
248:1 262:21
262:24 291:14
292:11
involvement
91:19 123:14
123:15 124:5
IPS 20:6,7,21
183:24 188:6,8
188:9 209:5,6
276:21
ironic 94:12
271:19,22
irony 94:13
274:14
isolated 282:18

296:23
issue 21:5 44:8
44:11 62:1
110:17 142:17
144:9 244:7,10
244:10 262:6
issues 19:17
21:7 22:23
23:16 39:19,19
39:24 40:17,21
40:24 56:10
60:22 102:3
136:8 165:20
246:24

_____

**J**

J-E-M-S 56:21
56:22
J-o-h-a-n-n-a
26:18
J-o-i 125:6
J-u-a-n 49:14
Jackson 29:10
29:12,13 30:7
30:18,21 31:11
31:18 171:1
172:1,2 174:1
174:2 175:6,15
177:1 189:18
240:19 272:20
272:23 274:9
274:20 275:21
279:18,22
280:4,5,6,7,8,9
280:22 282:20
Jackson's
275:11
January/Febr...
131:22
Jason 48:9,12
49:1 62:3,6
73:8 94:15
95:6 107:6,8
117:15 139:16

192:21 247:1
250:22 252:19
258:5,13 259:2
259:8,11 263:7
JD 154:10
JEMS 56:14,16
59:12 136:16
212:3,5
Jennifer 181:15
jhayes@atg.st...
2:21
Jimmy 291:17
job 15:11 31:20
99:5 106:16
174:4 178:14
184:12 185:10
186:4,5 187:6
199:10 220:12
224:9 232:2
257:6 262:20
268:20 275:7
280:13,14
283:11 287:15
287:21 288:6
294:14 297:6
job-related
156:21 165:2
jobs 185:13
Johanna 26:18
27:11,14
John 2:16 4:9
John's 291:17
Johnson 34:10
34:13,16
178:21
Joi 125:5,9
joke 154:1
Jones 49:10,21
60:21
Jordan 1:4 4:19
80:5,9,10,14
81:1,6,17 83:6
83:13,24 84:1
85:4 88:4,8

89:4,11 95:14
97:15 207:12
208:4,13 299:4
Jordan's 85:14
128:15,17,18
128:20
journal 59:17
JP 18:16
JPD 13:23,23
14:4,13 17:9
22:7 71:10
74:20 78:1
80:11 81:7
91:22 97:19
99:17 100:17
100:18 134:14
143:19,20
148:10 162:16
167:10 173:11
176:15,19
209:12 245:20
246:21 247:8
247:12 286:1
293:13 297:5
JPT 78:1
Juan 49:14
judge 1:9,9 4:20
6:20 43:4
55:21 57:9,12
67:20 69:12,13
69:17 72:9,11
72:19 73:7,10
74:2 75:14
76:11,17 77:11
77:23 78:2,17
78:23 79:4
87:13,15
118:19 119:3,9
119:17 193:8
193:19 202:16
205:5,5,6
211:1 224:20
225:19 226:24
253:13 254:3

260:11,17
261:8,12,18
299:9,9
judge's 73:24
77:20 79:13,17
191:2 193:13
225:24 261:21
judges 17:15
18:8 37:10
40:8 151:9
166:11
juggling 56:7
Julie 122:7
July 195:13
200:8,24 201:1
303:11
jump 218:24
278:13 287:5
288:10
Jumpstart 14:16
18:12 19:2,8
19:24 20:1
22:13,15 24:19
25:18,22 30:6
31:11 34:16
36:15 37:4,9
37:18,21 39:13
39:20 40:11,13
41:7,10,20
42:2 79:5
80:14 81:12
103:23 106:11
135:6,8 150:16
150:24 151:1,5
151:6 157:6
161:2,5,19,21
165:18 167:22
168:13 170:23
170:24 175:6
175:16,20
176:7,15,19,22
178:4,16,16,17
179:13,16,24
181:13 182:1,7

Theodis Chapman
August 21, 2017

320

182:11,12,12
183:1,22 184:7
184:11,21
185:11 186:11
187:9,13
188:16,16
189:1 190:21
197:1,11
199:15 200:4
201:20 206:6,9
206:10,12,16
213:5 233:15
233:24 234:1
235:2,20
239:17 240:3
254:15,18,24
255:24 257:7
270:21 271:11
272:16 273:11
273:15 274:2
275:1,4,8,9,12
275:15,16,18
275:22 286:10
286:22 288:13
288:17,18,21
289:4 290:12
290:15,21
291:8 293:1
**Jumpstart'**
168:10 177:15
**June** 237:13,14
**junior** 166:3
292:12
**juris** 154:4,6
**jury** 6:20
**justice** 13:3
166:7 292:11
**justified** 60:8,9
63:3
**justify** 259:23
**juvenile** 1:10
3:15 13:24
18:9 20:2
22:12 23:5

36:2 64:5,17
71:6,12 73:24
112:23 114:22
118:20,22
119:4 120:8
128:23 135:24
148:10,10
153:12 168:8
177:13 179:13
245:15 287:13
292:11
**juveniles** 20:16
20:17

---

**K**
**k** 75:24 76:1
302:2
**K-a-l-t-h-e-a**
122:2
**K-e-n-n-t-z-l-e-r**
63:10
**K-i-s-h-a** 28:8
**Kalthea** 122:1,4
**Karen** 65:19
**Kaspersky**
221:5
**Kate** 3:13 193:7
193:17 253:20
**keep** 59:14,15
59:17,20 87:5
108:15 110:7
188:3 218:16
291:4
**Keith** 75:22
77:16 79:10
119:23 193:16
205:7 253:20
**Keith's** 75:23
**Kelly** 65:19 68:8
**Kelly's** 65:22
**Kennard** 145:14
**Kenneth** 1:4
95:14,15 96:3
299:4

**Kentzler** 63:8
64:24
**kept** 59:9 236:16
**Kevin** 121:22
**kick** 285:9
**kicks** 282:4
**kid** 37:14 45:15
85:24 86:21
87:8 105:2,3,6
151:17,17
173:8 263:15
**kidding** 154:13
**kidnapping**
87:11
**kids** 15:16 17:17
18:24 23:23
24:3,4 37:22
38:9,13,21
40:10 56:7,9
59:2 68:5
81:12,14 98:13
105:1,5,12,14
105:20,23
168:22,24
172:17 173:7,8
188:18 203:6
**killing** 87:22
208:11
**kind** 28:24
32:23 46:8
56:16,18,24
57:5,6,6,15
58:12 65:3
73:22 91:17
93:15 96:7
102:16 110:3
121:11 124:22
126:11,14
130:13 137:23
141:13 146:14
157:17,21
163:21 168:20
169:17 170:8
170:14 196:17

200:2 217:12
229:12 238:17
239:1 251:14
251:18 252:12
254:13 258:21
266:7 271:22
272:19 278:16
278:17,18,21
279:23 283:18
284:23,24
285:7,9
**kindness** 261:6
**King** 63:17
**Kisha** 28:6
138:13
**knew** 155:15
168:23 278:10
**know** 5:8 7:24
12:4 13:24
18:1,10 24:19
25:1,3,8 26:9
26:16 27:2,14
28:4 33:14
35:7,9 36:15
37:16 38:5,18
41:14 42:13
44:7 48:3,3,4
49:7 52:1 53:7
59:1 61:7,11
62:18,20,23
63:13,14 66:19
67:19 68:11,12
68:12 72:17
73:11 74:17,18
77:17 78:7,16
79:4 80:9,18
81:10,10,11,12
82:10 83:4
85:12 86:23
87:18 88:20
89:21 91:5,10
91:13,14 92:16
92:20 94:11
96:6 97:19

99:1,5,7,24
100:14,21,23
100:24 102:19
103:1,2,5,8
106:15,18,23
108:1,19,20
109:4,9,12,24
111:13 113:16
113:22 116:8
116:19,23
117:12 120:16
120:16,20
122:18 123:3,9
126:14,24
127:3 128:18
128:18,19
132:1,22
133:14 138:17
141:9,14,24
142:17 146:5,5
147:6 148:7,7
148:11 151:15
152:19 154:13
155:4,9,12,14
161:10 162:12
166:10,22
167:22 168:23
169:23 170:10
172:11 173:4
173:20 175:15
176:20,21
178:13 180:15
181:1 185:20
191:3 193:24
196:6 199:24
200:3,8,9,11
200:21 201:21
202:1,8 203:9
203:11 204:1,7
205:14 209:18
210:24 211:3
212:13,21,23
213:24 220:2
223:22 231:22

Theodis Chapman
August 21, 2017

321

233:3,22
234:13 238:15
238:16 239:1,3
239:7 241:15
242:17 244:23
245:18,19
248:15 254:4
255:1,2,14,15
255:21 258:20
258:21 259:15
260:13 262:3
262:19 263:4
266:13 267:8
271:16 273:21
275:10,21,23
275:24 276:4
277:24 278:1,1
278:5 280:3
281:3,22,23,23
282:5,9,16,17
283:4,8,11,24
284:24 285:9
286:23 289:4
290:1,3,13,20
290:22,23
291:22 292:8
292:18,23
294:11,13,22
294:23 297:2
**knowing** 22:21
124:3
**knowledge**
76:10 77:22
78:15 79:3,6
83:22 99:20
105:13,15,19
105:20 120:14
128:22 129:1
137:20 145:17
145:18 146:9
148:24 149:5,6
155:20 162:23
163:5,15,17
174:5 175:11

175:12 177:20
183:6 184:3
199:6 203:19
206:14 250:18
258:23 260:4
263:12,14,18
**knowledgeable**
136:12 219:12
280:17
**known** 23:7 40:7
63:17 74:6
80:10 90:10
**knows** 43:3,5

—————————— **L** ——————————

**L-o-e-b** 121:4
**L-o-i-z-o-n**
63:21
**labeled** 115:12
**labeling** 114:20
115:4
**labor** 3:16 62:15
62:17 178:2
181:16 195:10
195:19,21
198:16,22
242:21 271:19
**lady** 208:12
262:14
**Lake** 101:19
**language** 259:17
259:19,21
260:5
**largely** 266:24
**late** 183:11
232:7
**latest** 241:21
**Latino** 27:20
49:13 90:3
163:13
**Latinos** 49:22
142:10
**laughed** 285:16
**Lauren** 121:19

252:5
**law** 47:7 62:15
62:17 149:7,9
**law-based** 149:9
**Lawson** 10:15
10:16,18 279:4
**lawsuit** 8:17,19
12:19 79:22
82:23 93:19,20
96:11 108:23
109:8 111:24
148:13 231:16
245:9 254:12
254:14 271:21
272:3,6 294:5
**lawsuits** 9:13
**lead** 170:15
**lean** 169:21
**leaning** 226:18
**learn** 21:24
**learned** 19:20
23:18,20,22
**learning** 40:23
**leave** 38:22 41:6
188:24 210:17
238:17 277:14
**leaves** 267:12
**led** 102:17
**left** 27:11,14,22
28:19,20,23
29:6 65:14
112:11 215:17
240:19 260:18
273:7,8 286:10
**legal** 77:20
293:23
**length** 35:8
**lenient** 259:23
**let's** 5:15 8:23
12:13 17:9
18:14 27:15
28:23 29:17
31:17 33:20
37:5 42:17

43:21 52:14,15
65:13 69:9
70:4 71:20
75:3 80:23
81:6 85:14
91:17,18 93:7
95:8 96:2,20
104:15 106:10
112:5 127:14
128:6 129:3
140:9 148:6
150:12 154:9
156:2,6 158:2
162:17 163:10
168:7,22
173:15 176:14
177:20 179:8
179:21 201:18
209:7 215:12
216:6,6 221:1
222:19 228:7
228:18 241:12
242:6 245:2
248:21 260:22
264:20 265:17
278:13 295:19
**letter** 70:13
73:19 166:9
**letterhead** 70:17
70:18
**lettering** 56:20
**letters** 71:24
72:10,19
**letting** 285:9
**level** 23:2
130:24 134:23
165:21 191:2
225:24
**levels** 284:10
**liability** 208:3
**liable** 261:8
**lieu** 16:3
**life** 38:24 261:17
**Lifeline** 165:23

**light** 57:3 72:14
**limited** 217:21
229:15 293:1
296:8
**line** 32:23 77:6
253:12 266:24
300:4 301:4
**lines** 38:14,23
127:22
**LISA** 2:15
**list** 133:23 134:3
153:11 182:7
182:10,18,21
182:23,24
183:5,8,17,20
183:21 184:2
186:3 187:8
188:12 189:1
218:14 252:18
252:19 292:20
**lists** 113:20
120:10 188:7
251:14 252:4
**literacy** 40:17
40:21
**literally** 270:3
**little** 6:13 7:4
12:14 18:15
19:1 33:9
69:10 71:20
77:5 79:21
109:3 112:14
144:5 146:22
170:9,13
171:20 172:4,5
187:19 202:21
206:4 215:5
237:6 245:21
287:5
**live** 150:1
**lived** 31:13
**livelihood** 111:6
**lives** 58:7 205:22
291:13,23

Theodis Chapman
August 21, 2017

**living** 44:14 56:2
238:24
**Lloyd** 122:16
**Lo** 30:20
**Local** 92:9,9
112:19 114:19
195:20 197:20
**located** 260:24
**lock** 147:12
**lockbox** 144:4
**locked** 16:4
**Loeb** 121:4,5,6
121:14
**log** 59:18 236:16
**Loizon** 63:16,21
**Lomax** 29:20
30:7,19,24
175:23 177:1
178:14 180:6
180:16,18
189:13,14,21
272:20,23
274:5,7
**Lomax's** 30:2
**long** 6:3 10:5
15:5 33:14
40:12 43:17
63:2 65:11
67:17 96:19
209:18 213:13
226:15,16,19
**longer** 127:4
208:17 215:6
274:1
**look** 21:22 53:10
57:13 82:14
84:3,6 87:20
95:19 100:2
114:18 115:18
115:19 129:11
156:8 182:7
183:1,22
191:10 192:12
248:24 250:10

255:13,16
256:23 265:17
265:18 267:9
271:15 276:8
**looked** 100:23
136:1,2,5,24
137:5,7 146:24
**looking** 48:23
68:24 72:23
85:21,21,22,23
92:18 110:19
114:4 139:20
192:20 203:3
212:18 235:6
239:8 254:13
264:16 266:19
**looks** 56:16,18
57:5 82:24
111:13 136:21
196:16 203:13
204:3 212:10
250:10
**loop** 108:15
243:21
**lose** 223:14
**losing** 232:17
**loss** 232:13
236:12 243:3
**lost** 224:22
283:5 284:1,12
**lot** 15:2 16:24
17:23 32:15
36:3 55:10
93:16 100:14
101:17 102:3,5
106:21,22
107:6 127:4
129:22 152:18
154:11 188:24
196:18 213:16
214:20 215:1
242:21 244:3
244:12 247:1
254:23 280:13

280:18 284:7
285:17 290:5
294:17
**low** 56:1 87:5
136:19 223:19
223:21 224:6
**low-income** 56:2
**lower** 222:10,21
223:3 230:5
**lowered** 217:23
221:21 222:20
223:3,8,14,18
**luck** 263:24
**lunch** 55:14
**luncheon** 112:7

**M**

**m-a-n** 4:16
**machine** 302:19
**mad** 281:24
**MADIGAN**
2:15
**madness** 281:19
**main** 212:8
**major** 136:1
151:8 165:7
**making** 58:5,6
74:6 84:1
113:13 124:11
233:5 245:14
289:5
**man** 292:1,3,9
**managed** 283:6
283:7
**management**
3:16 56:24
65:6 94:6,17
97:24 114:13
124:11,15
133:12,22
138:3,4 139:12
141:16 142:22
142:24 143:24
144:3 146:18

147:9 181:16
182:6,15,16
183:7 186:23
195:10,19,21
197:17 198:5
198:16,22
199:9,24 200:9
200:18 205:4
212:17 226:14
227:20 248:5
253:22 266:10
266:15 267:14
267:19,24
268:4
**manager** 292:13
292:14
**managerial**
137:6
**managing**
291:17
**mandatory**
151:9,10
**manner** 81:15
178:7 190:17
236:2
**marathons**
294:18
**March** 162:13
268:22 270:8
**MARIE** 1:12
**mark** 29:3 82:8
181:15
**marked** 81:22
82:3 158:4,11
190:2,6 191:7
191:10,23
194:22 195:3
216:11,15
225:4 248:18
248:23 255:24
**marks** 254:22
**marriage** 282:16
**married** 11:3
26:6

**Marshall** 122:16
**Martha's** 14:24
16:16,21,22
17:13
**Marty** 221:5
**master's** 12:24
13:2 14:8
18:10 145:13
**material** 113:15
**materials**
151:21
**math** 172:6
**matter** 4:10
115:7 282:11
293:6,23
**matters** 76:4,12
77:1 256:8
**Matthew** 282:22
283:3
**mean** 14:14 16:2
18:22 20:11
35:22 36:8,19
38:11,23 45:11
56:15,23 59:19
62:20 68:15,19
68:19 69:24
70:6 71:2,5,6
71:15 72:20
75:3,4 81:9
85:9 88:19
93:17 97:16
100:17,18
107:24 122:12
124:8,24
127:14 135:16
145:19 149:2
167:14 179:1
185:21 187:16
192:22 193:12
202:1 216:4
231:21 255:16
278:5
**meaning** 18:24
120:17,20

Theodis Chapman
August 21, 2017

323

means 42:14
45:12 86:13
122:13 124:9
130:23 200:1
202:8 204:8
223:22 233:3
302:19
meant 51:1
211:13
medical 278:24
279:11 282:21
284:18 285:13
medication 8:8
284:23 285:11
medicine 283:19
283:22,24
medium 136:19
Meehan 204:6
meet 9:22,24
58:1,4 67:21
68:2 78:17
108:20 248:6
meeting 18:6
106:19 141:15
194:2 201:2,6
224:1,4,5,6
272:2
meetings 65:6
77:12 108:1,4
108:5 131:21
195:11 200:17
200:22 205:6
271:20
Melissa 34:1
220:7
member 124:12
members 94:3
114:14 197:20
membership
92:19
Memo 3:10,12
3:13,14
memos 70:23,24
71:10

men 291:16,19
291:22
mental 238:14
238:17 296:14
mention 160:10
271:22 296:20
mentioned
144:24 148:7
154:17 178:20
243:7,9 244:6
270:13 296:18
mentoring 15:17
171:19 291:12
merit 36:4 130:6
130:10,11,12
130:19 131:9
131:24 222:23
223:11,13
225:21 226:5
227:8 228:1
230:14 232:12
286:24
messy 258:21
met 96:23
Michael 1:11
141:11 265:1
Michelle 145:12
micromanaged
231:23
mid-August
196:4
middle 115:12
283:18 287:11
Mike 73:9
139:15 143:7
145:14 148:2,8
mileage 99:1
military 99:2
153:6
million 111:2,5
mind 173:2
201:3 218:16
282:6
mine 220:22

223:23
ministry 280:11
Minnie 48:22
minor 20:12
21:8 39:16
41:1,2 55:20
57:14 63:3
88:21,22 89:2
90:5 102:2
136:19,20
151:4,10
165:18,20,22
166:8,14,18
202:14,16,17
208:10 213:9
260:18,21,22
261:12,12,18
261:21,23
minor's 136:21
261:17
minors 16:3
18:21,23,24
19:15,18 21:4
22:17 23:14,19
101:16 136:6
149:23 165:24
168:20 171:6
171:21 172:9
179:2 234:11
minus 55:13
minute 129:10
297:12
minutes 86:18
174:19
miraculously
237:24
misconduct
114:21
misleading
86:12
misrepresented
222:4
missed 215:19
missing 110:18

164:21 222:4
mission 257:12
257:13
misspeak 209:11
mistake 35:6
Mister 109:13
Mitchell 117:15
145:13
mob 126:12
mobile 253:2
mock 38:2
mom 5:15,17,24
44:11 68:3
278:8 292:4
momentous
166:14
monetary 53:16
110:17
money 53:3
111:6 154:12
211:16,16
223:14,16
232:17 261:15
monitor 24:12
90:20,23
monitored 88:22
monitoring
20:23 46:8
86:10 89:17
276:13 277:1,4
277:10
Monterrey
293:15,18
Montgomery
122:8
month 59:2,3
102:22,24
monthly 131:20
months 29:9,9
44:9,19,20
46:8,11 181:5
210:1
morning 4:8
mother 261:13

261:21,22
motion 237:9
motivate 213:8
move 197:14
204:12 240:7
244:19
moved 26:6 27:3
31:14 42:2
90:11 179:14
207:9 225:18
movement 89:18
195:11,12
196:1,3,6,11
moving 278:14
multi-sensory
40:23
multiple 56:7
73:4
muscle 284:9

**N**

N 3:1
N's 280:10
n-i 29:11
name 4:8,12
10:14 28:7
34:12 49:14,16
63:9,19,20
75:23 90:18
116:11 117:11
146:19 180:19
209:2 240:21
250:20 262:16
262:18 273:2
289:21
named 207:11
names 25:3 44:5
104:12 116:9
117:11 145:21
155:4 290:3
narrative
170:11
narrow 258:22
natural 224:10

Theodis Chapman
August 21, 2017

324

282:11
nature 157:11
  187:2 219:14
  251:6,11,11
Neal 3:10 32:19
  33:12,16,19,24
  34:1 35:19
  157:12 158:6
  158:22 161:3,4
  161:20 164:7
  166:17 169:6
  169:11 181:15
  221:15 270:22
Neal's 162:3,3
near 24:11
  101:19 105:4
necessarily
  128:2,4 187:16
  232:18 285:4
need 7:1,12,13
  7:24 19:1
  54:14 58:8
  62:17 63:1
  67:13,13 98:12
  120:16 127:6
  134:13 135:19
  135:20 142:4
  150:3 152:16
  155:23 186:12
  186:23 189:21
  196:13 208:15
  208:17 209:1
  232:18,19
  274:15,15
  276:10 281:3
needed 23:3
  40:16 94:7,7
  113:16 114:1
  136:23 150:4
  157:19 162:6
  207:22 213:18
  213:19 235:18
  277:5 294:11
needs 57:12

149:22 152:11
277:7 292:7
negate 269:15
negative 94:4
  223:2 236:3
  239:4
negatively
  235:24
neglective 261:4
negotiable
  288:22
negotiate 198:5
  198:9
negotiated
  286:17,19
negotiating
  227:20
negotiations
  94:7
neighborhood
  24:6,11 39:24
  40:19
neighborhoods
  39:5
Nelson 1:5 25:6
  27:13 28:1,14
  29:18 30:1,7
  30:16,18,20,23
  31:9 35:15
  36:9,14,16
  40:22 94:15
  103:17,22
  106:6,7 129:14
  138:23 156:4
  156:11,17,18
  160:23,24
  162:16 164:9
  166:13 168:3
  168:10,15
  170:3 171:1,12
  172:6 173:21
  173:23 174:7
  175:5 177:14
  179:14 180:19

180:20 182:18
185:9 186:7
189:22 192:9
197:4 201:23
202:3 204:18
205:7 206:24
230:19,20
234:2 235:21
240:4 272:17
275:14 287:12
292:15 299:5
Nelson's 25:8
  175:19 186:5
  196:20 206:21
  226:2
neutral 226:1
  227:7
never 48:19
  57:16 65:8
  66:22 67:5
  68:10 109:5
  111:18 121:14
  141:7 182:2
  187:12 188:15
  188:24 189:23
  225:23 237:23
  240:10,11,22
  263:2,2 277:11
  291:20
new 32:2 42:15
  43:5 53:8
  59:23 88:4
  93:14 109:4,4
  143:15 189:19
  218:20 240:21
  240:23
newly 239:13
  240:8,14,15
news 86:1
  263:16
nice 97:4 255:18
Nicole 25:5 26:6
night's 9:21
nights 284:21

ninety 15:8
nitty 6:15
nod 7:15 66:6
noes 7:13
non 141:24
non-African
  141:24 142:2
  142:12 146:2
  163:11
non-African-...
  128:23 142:9
non-grievable
  142:19
nonsupervisory
  288:24 289:10
  289:10,15
  290:6
noon 295:9
normal 19:14
  23:17 67:22
  106:24 161:23
  192:18 210:23
  213:14
normally 101:24
  173:9
north 105:7,7
Northern 1:1
  4:22 299:1
Notary 299:24
notating 131:20
note 133:22
  186:23 226:13
  238:17
noted 144:10
  146:19 271:18
notepad 59:19
  59:20,21
notes 131:20
  210:16 238:11
  238:13,14,22
notice 1:17
  74:11 133:24
  230:15
noticed 56:13

notification
  50:13
notified 56:13
  118:18 119:3
  240:22
notify 169:23
  266:10
noting 128:1
  219:4 269:11
Notwithstandi...
  223:11
November 44:3
  65:16 131:16
  131:18 132:12
  173:16 174:3
  175:5,10,14,18
  176:6,10
  179:23 180:22
  183:11,12
  184:17 237:11
  240:24 272:10
  272:12 273:15
  279:2 286:10
number 26:2
  27:9 37:18
  58:19 84:14,16
  109:10 144:18
  148:23 149:11
  153:11 173:7
  201:19 214:1
  255:13 256:19
  291:19
numbered
  256:15
numbers 87:5
  114:7 199:13
  246:1,11
Numerically
  135:1,2
numerous 90:7
Nunez 181:15
Nurse 279:17,22
  280:22 282:20

Theodis Chapman
August 21, 2017

| **O** | | | |
|---|---|---|---|
| **O** 302:2,2 | **offense** 259:22 | 277:19 292:22 | 120:4 122:5 |
| **o'clock** 260:22 | **offenses** 259:20 | **officer's** 213:22 | 128:10 129:15 |
| **O'Connell** 30:12 | **offer** 70:13 | **officers** 21:12,14 | 138:7 158:19 |
| 175:23 177:2 | 137:1,2 | 21:15 36:4 | 165:15 187:18 |
| 178:15 180:6 | **offered** 132:17 | 37:11 47:17,23 | 189:14 194:12 |
| 180:16 181:1,3 | 132:23 133:4,9 | 48:16 66:20 | 194:12 199:3 |
| 189:13,17 | 133:15 139:18 | 84:23 88:12 | 216:3 222:11 |
| 240:18 272:20 | **offers** 197:17 | 90:15 105:16 | 223:21 228:6 |
| 272:21 273:4 | **office** 2:13 4:11 | 111:1 112:19 | 234:20 236:8 |
| **oath** 109:20 | 75:21 78:6,9 | 112:23 114:23 | 254:11 257:1 |
| 299:14 302:17 | 78:13 79:12,13 | 115:23 116:8 | 260:13 264:24 |
| **Objections** | 79:14,17 92:17 | 116:20 117:19 | 268:13 272:24 |
| 249:1 | 96:24 169:23 | 118:21 119:5 | **okay** 5:7,18,22 |
| **objective** 224:9 | 169:23 193:8 | 120:9 126:6,21 | 6:2,5,11 7:3,10 |
| **obligation** 6:19 | 205:4 224:20 | 130:14 134:23 | 7:14,18 8:5,16 |
| 248:6 | 254:2 | 137:24 142:9 | 9:2,4,6,13,18 |
| **observation** | **officer** 17:21 | 144:19 146:16 | 9:24 10:3,5,14 |
| 76:17 | 28:5 29:19 | 148:5 150:11 | 10:17,20,22 |
| **observe** 21:21 | 32:4 42:7,8,20 | 150:22,24 | 11:2,10,20 |
| **observed** 21:20 | 44:1 59:9 | 151:16 153:22 | 12:1,5,12 13:6 |
| **obtain** 232:15 | 60:21 80:18 | 156:22 161:7 | 13:8,15,19 |
| **obtained** 220:15 | 81:13 88:5 | 162:9 163:13 | 14:3 15:1,9 |
| 293:14 | 90:16 100:4,5 | 169:21 170:16 | 16:14 18:14,19 |
| **obtaining** | 100:10 104:5 | 188:18 197:13 | 19:2 20:4,11 |
| 220:11 236:24 | 105:14 107:8 | 198:7 203:16 | 20:21,24 21:16 |
| **obvious** 12:18 | 118:1,11 | 209:13 211:6 | 22:4 25:11,16 |
| **obviously** 145:3 | 121:13 128:23 | 213:17 220:20 | 26:20 27:14 |
| **occasion** 166:15 | 134:21 136:16 | 220:21 221:5 | 28:9,18,22 |
| **occasions** 89:19 | 137:9,13 145:9 | 236:4,4 239:5 | 29:5,12 30:13 |
| 139:4 | 150:9,14,15 | 253:14 259:18 | 30:22 31:1,5 |
| **occupied** 168:9 | 152:8,9,13,14 | 259:20,21 | 32:23 33:22 |
| 177:14 | 152:22 163:19 | 266:8,20 268:7 | 35:19 36:11 |
| **occurred** 238:15 | 171:3,4,18 | 274:16,19 | 37:3 38:4,15 |
| **occurrence** | 204:9,10 | 287:14 | 38:20 39:14 |
| 214:5 | 207:14,19,23 | **official** 3:11 | 40:9 43:21 |
| **occurrences** | 208:7,20 210:5 | 70:7,23 77:17 | 46:19 48:2,7 |
| 251:6 | 210:9,17 | 275:7 | 48:14 49:11 |
| **October** 183:11 | 212:22 213:6,8 | **officially** 173:16 | 50:1 51:10,18 |
| 184:17 201:8 | 220:6 229:17 | 173:24 | 52:14,17 53:15 |
| 237:12 272:10 | 237:21 251:10 | **oftentimes** 102:7 | 54:12 55:7,10 |
| 272:11 | 257:17 260:6,7 | **oh** 6:14 34:20 | 58:16,22 60:10 |
| **October/Nove...** | 260:9 261:1,2 | 55:7 56:19 | 60:16 61:14 |
| 65:14 184:6 | 261:11 273:10 | 57:17 59:11 | 63:18 64:13,22 |
| | 274:17,23 | 92:11 100:20 | 65:18 66:7 |
| | | | 69:9,9,11 |
| | | | 71:20,22 72:24 |
| | | | 73:21 79:2,8 |
| | | | 79:20 80:2 |
| | | | 82:13 83:1,3 |
| | | | 84:2,7,21 91:2 |
| | | | 91:20 92:10,23 |
| | | | 93:22 94:24 |
| | | | 95:3,7 97:12 |
| | | | 98:19 102:19 |
| | | | 103:9,10,21 |
| | | | 104:11 105:16 |
| | | | 106:2 112:17 |
| | | | 113:9 114:18 |
| | | | 115:10,16,21 |
| | | | 117:3,11,17 |
| | | | 118:16 119:13 |
| | | | 119:19 120:7 |
| | | | 120:22 121:1,6 |
| | | | 122:10 123:12 |
| | | | 123:21 124:2 |
| | | | 125:2,5,19 |
| | | | 127:14 128:11 |
| | | | 128:21 129:2,9 |
| | | | 129:16,18 |
| | | | 130:4,10 |
| | | | 131:15 132:4 |
| | | | 132:11 133:18 |
| | | | 134:13,22 |
| | | | 135:2,4 138:5 |
| | | | 138:20 139:3 |
| | | | 140:4 141:1,5 |
| | | | 141:9,18,22 |
| | | | 142:7 143:3,3 |
| | | | 143:9,17 |
| | | | 144:15 145:19 |
| | | | 145:23 146:5 |
| | | | 147:24 148:15 |
| | | | 150:17 152:15 |
| | | | 152:24 154:13 |
| | | | 155:24 156:1 |
| | | | 156:13,14,15 |
| | | | 156:17 158:9 |
| | | | 158:24 159:15 |

Theodis Chapman
August 21, 2017

160:2 161:9
162:14 163:23
164:3,13,24
165:14 167:7
169:10 171:2
173:13,22
174:1 175:4,9
175:13,24
176:5 177:5,20
179:6,8 180:9
181:6,17 183:3
184:14 185:7
186:8 187:1,18
187:20 188:11
189:16 190:5
191:5,10 193:1
198:14 199:4
199:12 200:14
200:16 201:5
201:24 203:1,3
203:23 204:8
206:2,23 209:2
209:4 210:3
212:2 213:4,23
214:19 215:11
215:22 216:7
216:14 217:18
219:24 224:24
226:7,19 228:7
228:20,24
230:1 231:15
231:18 232:11
237:15,19
238:4 239:7
240:12 241:6
241:17,19
242:1,11,14
243:4,22
244:19,24
246:13,18
247:7,11,22
248:16,21
250:7,12,15,24
253:10,21

254:8 255:7,20
256:14,22,23
257:1,3,10
258:15 259:5
262:11,24
264:8,14,20
265:4,16,19
266:21 267:10
267:21 268:2
268:13 269:6
269:21 270:15
271:14 272:4
272:24 273:9
273:17,20
274:13,22
275:13,24
276:7,23
277:12,20
278:13,13,15
279:11 280:3
281:7,11 283:1
283:2 284:5,17
285:12,20,22
286:8,12 287:3
288:5,10
289:14,18
290:9,23 294:7
295:12,19
296:6 297:11
297:15
**old** 11:15
**ole** 236:1
**omnipotent** 74:4
**on-site** 176:18
**once** 24:8 27:9
45:3 65:24
102:22 131:4
132:20,21
133:20 138:24
139:1 164:6
**one-and-a-half**
207:10,13
**one-hour** 55:13
220:21 221:6

221:11
**ones** 9:14 58:7
117:9 143:22
144:24 154:22
165:10 229:23
250:14
**ongoing** 172:17
219:23 233:23
279:18
**open** 17:14
37:23 39:4
154:1 184:1
201:16 291:4
**open-ended**
218:6,8
**opened** 40:19
292:2
**opening** 38:7,10
38:12,19,21
187:13,17,21
**operate** 176:7
**operated** 15:4
**operational**
186:12,23
189:20 196:13
208:15,16
209:1 274:15
276:10 277:6
**opinion** 126:16
**opportunities**
38:13 39:21
**opportunity**
58:6 208:18
215:24 232:15
**opposed** 86:2
149:24 172:13
**opposing** 23:21
**option** 39:1,3
141:1
**options** 57:13
139:19
**ordeal** 279:8
**order** 37:11
40:10 55:21

102:3 151:9
162:4 210:13
248:6 288:12
**ordered** 37:8
43:4 102:4
**orders** 57:9 65:7
67:20 87:14
260:15
**organizations**
137:4
**original** 255:3
303:6
**out-of-state**
156:23 287:15
287:21 288:6
**outcome** 124:13
303:3
**outgoing** 283:11
**outings** 15:18
**outline** 196:1,3,6
196:12 210:10
**outlined** 115:5
189:5 195:12
210:23 227:4
**outreach** 23:12
24:7,8,15
171:3,13,17,21
182:12 184:12
185:11 199:15
201:20 273:10
273:12 290:17
**outside** 8:17
11:21 26:8
78:21 81:17
90:5 96:14
105:18 107:3
107:23 116:6
137:1 144:3
146:11 179:15
223:13 243:5
271:10 282:19
294:1 295:16
297:5
**outweighed**

173:7
**oversee** 74:3
**oversees** 71:9
74:16 76:3
**overtime** 42:12
42:21 43:14
44:8,22 45:2,9
45:13 46:17,18
46:20 47:3,5,8
47:17,23 48:10
48:15,24 52:5
52:11,19 53:14
54:13 55:8,10
59:10 60:19
62:1,7,14 65:1
65:23 66:4,11
67:14 101:21
233:6
**overwhelming**
150:10
**owed** 261:14
**owner** 87:21

---

**P**

**p.m** 16:9 298:5
**P.O** 192:8,8
**package** 78:14
**page** 3:2 83:9
95:10 112:14
113:19 114:18
115:11 118:17
120:5,6 121:11
129:3,6 132:6
132:6 156:6
179:9 216:23
245:4 248:24
249:9 255:24
256:16 269:2,3
270:2 276:3,5
279:3 287:8,9
287:10,11
288:10 295:20
296:4 300:4
301:4

Theodis Chapman
August 21, 2017

327

**pages** 95:18
299:13
**paid** 42:13 43:14
44:22 45:2
46:20 47:23
48:10,15 62:5
101:21 264:19
**Pakistani** 35:5,6
**paper** 50:4
59:16,17
134:10,11
147:4 196:19
**paperwork**
100:5,11
114:14
**par** 232:8
**paragraph**
84:16 95:18
112:15,15
113:19,20
114:4,19 115:5
115:12 118:17
120:3 124:16
129:21 132:6
135:11 139:3
144:16,17
147:16 156:7
156:16 175:24
177:9 179:8
204:15 239:12
245:4 257:5,15
258:8,9,12
259:7,17
266:23 267:1
271:9 276:9
287:8,10
288:12
**paragraphs** 83:7
129:5 167:21
**paralegals** 91:15
**parameters** 90:6
**Pardon** 250:2
**parent** 56:7
**parents** 56:5

157:10
**Parks** 87:10
88:1 90:21
**part** 31:8 70:22
113:7 152:14
152:21 153:17
153:19 164:11
172:6 179:22
186:6 198:4,16
198:22 199:8
205:19 227:1
234:3 235:20
239:11 265:5
273:12 287:2
293:22
**part-time**
293:14 297:5
**particular** 69:2
149:5,6,12
154:5 155:11
188:20
**particularly**
35:14
**particulars**
217:13,15
229:7
**parties** 303:2
**partners** 74:11
**parts** 198:7
**Parysz** 203:19
**pass** 134:13,17
138:18 265:7
**passed** 5:15
153:16 154:22
155:2 265:6
**passing** 96:6
154:8
**pastor** 10:13
279:4,14
**Patrick** 1:5 25:6
26:24 40:5
103:17 156:3
170:3 173:21
173:23 192:8

227:21 299:5
**pattern** 36:5
111:14
**Patterson** 1:12
140:1,2,14
143:10,11,14
143:15 181:14
206:17 231:8
267:23 268:9
269:11 278:8
**Patterson's**
140:4
**Patty** 209:3
276:19
**Paul** 4:15
**Paula** 261:20,22
262:4,24
263:12,13
264:1
**pause** 297:16
**pay** 165:9 226:6
227:8 228:1
230:14 232:12
232:13 293:22
295:14
**paycheck**
130:15
**paychecks**
230:15
**paying** 45:8,9
**payment** 130:10
130:19 131:9
165:5
**payments** 130:7
**PD** 211:2
**peaked** 37:23
**pending** 8:1
194:10,12
**people** 24:3
36:13 48:5,24
74:2,6,7,15
81:11,15
105:10 138:8
147:13 155:1

164:10 188:8
193:3 221:17
240:19 282:2
282:10
**people's** 92:12
92:14,15,23
**percent** 20:1
150:10 246:4,6
246:8
**percentage**
246:1
**percentages**
113:21,23
114:16
**perfect** 262:14
**performance**
131:2,13
217:23 221:21
222:6,20,22
223:4,9,14,19
226:4,8,10
229:16,21
231:12 247:12
248:2
**performed**
114:20 239:14
**performing**
115:4
**period** 25:21
27:8 37:3,17
45:1 47:18
114:23 184:6
184:16 269:22
**permitted**
276:11 277:14
**perpetuate**
269:17
**perpetuated**
110:12 111:15
220:7
**person** 31:10
63:13 75:7
86:2,3 119:16
120:20 181:19

181:20 250:18
281:10
**personal** 98:7
120:14,15,17
120:20 260:4
**personally** 98:17
119:2 199:10
205:6,8 207:4
302:8
**personnel**
236:18 262:15
**persons** 1:5,13
252:14 299:5
**pertained**
106:20 148:24
**pertaining** 1:19
**pervasive**
251:11
**Petchenik**
203:20
**Pfleger** 108:12
108:17
**Phillip** 63:16
**phone** 86:15
252:21 253:1,2
253:3 281:4
**phonetic** 57:7
89:16 136:17
145:14 292:10
**physical** 296:16
**physically**
127:17
**pick** 68:4,4
254:6 294:10
**picked** 16:6
**picking** 56:9
**picture** 98:24
99:1
**piece** 70:17
134:10
**pieces** 134:10
**Pierce** 121:2
**pilot** 171:5
**pit** 87:20

Theodis Chapman
August 21, 2017

328

| | | | | |
|---|---|---|---|---|
| **place** 35:14 51:4 | **point** 37:23 45:6 | 157:14,18 | 282:24 | 114:3,17 115:9 |
| 51:5 87:1 | 110:13 146:21 | 162:5 163:1 | **prayed** 10:19 | 139:16 192:20 |
| 127:11 157:6 | 165:22 171:14 | 169:7 178:14 | **Prayer** 296:9 | 247:1 263:6 |
| 203:15 207:20 | 171:19 243:19 | 179:15 181:12 | **prayers** 279:7 | **pressure** 283:5,9 |
| 274:15 293:5 | 292:4 | 181:24 184:11 | **pre** 23:15 | 283:13,21,24 |
| 296:15 | **points** 153:8,10 | 187:6,9,22 | **pre-approval** | 284:14,18 |
| **placed** 88:7 | **police** 43:1 | 197:14 229:17 | 63:1 | 296:17 |
| 101:16 104:8 | 57:24 | 239:14,17,24 | **pre-notice** 57:18 | **prestigious** |
| 133:22 207:24 | **policies** 235:19 | 240:8,9,11,14 | **preceded** 139:16 | 166:11 |
| 218:21 219:3 | 235:23 239:3 | 240:15,21 | 140:10,11 | **presumably** |
| 229:17 254:23 | **policy** 49:23 | 241:1 276:10 | **predated** 123:13 | 153:15 |
| 260:17,18 | 50:1,3,10 | 276:13 277:10 | 123:15 125:12 | **pretty** 20:14 |
| 274:18 291:1 | 62:13,14 66:17 | 278:2,12 289:1 | **predict** 57:20 | 63:4 151:15 |
| **placement** 16:19 | 69:1 74:5,5 | 290:14,16,17 | **predominantly** | 167:21 171:22 |
| **places** 78:4 | 229:15 232:22 | **positions** 134:16 | 162:1 199:23 | 188:16 242:15 |
| 147:14 | 233:1,5,7,11 | 147:21 168:9 | **preferred** | 265:22 |
| **placing** 261:17 | 235:8,12 236:6 | 173:12,14 | 276:14 | **preventing** |
| **plaintiff** 4:18 | 238:4,5,9 | 175:19 176:1,1 | **Preliminary** | 220:11 |
| 5:19 96:10 | **political** 13:3 | 177:14 179:12 | 196:3 | **previous** 9:10 |
| 100:3 245:9 | 92:15 | 180:3,6,12,17 | **preparation** | 87:10 103:8 |
| 287:12 | **poor** 35:10 56:6 | 182:1 183:17 | 10:1 12:10 | 161:17 164:1 |
| **Plaintiffs** 1:7 | **pop** 44:15 | 184:1,7,20 | 135:13,17 | 169:22 |
| 2:10 79:22,24 | **population** | 196:20 199:21 | 151:23 | **previously** 8:19 |
| 80:8 83:16 | 112:22 | 240:2,17,23 | **prepare** 9:19 | 10:1 14:20 |
| 103:20 156:18 | **pornography** | 288:13 | 166:19 172:15 | 31:21 162:8,11 |
| 258:20 299:7 | 74:10 | **positive** 22:24 | **prepared** 40:1 | 256:17,21 |
| **plan** 227:15 | **Porter** 141:11 | **positively** | **preparing** 138:5 | **principals** |
| **plate** 244:12,18 | 145:15 265:1 | 108:14 | 166:14 | 157:10 |
| **play** 159:13 | **Porter's** 141:18 | **possession** | **prescribed** | **prior** 16:14,17 |
| 276:1 282:6 | **portion** 240:4 | 251:23 252:10 | 283:23 | 99:2 163:7 |
| **players** 169:19 | 278:14 | **possibly** 138:3 | **presence** 213:8 | 164:8 176:10 |
| **please** 4:13 | **POs** 44:14 290:6 | 168:17 185:11 | 302:19 | 205:15 220:9 |
| 63:19 112:15 | **posed** 110:16 | **post** 23:15 | **present** 39:17 | 222:18 224:11 |
| 188:5 250:20 | 207:10 | 145:20 | 89:20 124:12 | 224:14 272:12 |
| 257:2 | **position** 14:10 | **posting** 187:12 | **presented** 90:1 | 275:11 283:22 |
| **pleasure** 18:6 | 14:12 15:6 | **potential** 110:19 | 127:11 254:2 | **prison** 20:17 |
| **plethora** 165:19 | 16:17 21:13 | **potentially** | **presently** 115:24 | 171:7 |
| 251:7 | 22:11 25:17 | 245:10 | **presents** 126:8 | **privileged** 236:1 |
| **PO** 37:15 60:20 | 26:8 33:15 | **PowerPoint** | **president** 36:1 | **privileges** |
| 135:1,3,4,24 | 41:21 42:4,6 | 207:21 | 73:8 85:10 | 218:22 |
| 262:19 289:8 | 42:16 43:6 | **practice** 269:16 | 87:15 91:13 | **pro-managem...** |
| 289:10,16 | 44:10,19 48:18 | **practices** 109:23 | 94:20 95:1,5 | 266:19 |
| **PO's** 197:2 | 88:7 109:6 | 251:9 269:17 | 97:3 107:13 | **probably** 16:23 |
| 201:20,21 | 127:3 137:13 | **practitioner** | 109:20 113:7 | 17:23 46:6 |

Theodis Chapman
August 21, 2017

329

63:16 81:3
82:7 91:2
102:3 117:1
188:6 197:13
224:23 255:1
283:17 297:3
**probation** 1:10
3:15 13:24
17:1,21 18:7,9
20:10 21:14,15
22:12 23:6,9
32:4 36:3
37:11 42:7,8
42:20 43:24
47:17,22 57:15
59:9 60:21
63:22 64:15,17
71:6,12 73:24
78:11 80:17
100:3,5,10
104:5 105:14
107:8 112:19
112:23 114:22
115:23 116:8
116:20 117:19
118:1,11,21,22
119:4 120:9
121:13 126:6
128:23 130:14
134:21,23
136:15 142:9
144:19 145:9
147:2 150:14
150:21 152:7
152:22 153:12
156:22 168:8
177:13 179:14
188:10 204:9
204:10 210:16
213:6 220:6
229:17 245:16
257:17 268:7
274:23 287:13
**problem** 94:12

135:22 160:4
**problems** 142:3
284:13
**procedurally**
190:24
**procedure** 1:18
98:15 192:18
**procedures**
136:3 137:8
**proceed** 266:11
**proceedings**
76:14,16 93:18
254:7
**process** 75:20
89:8 94:2
101:3 133:19
136:5 147:8
187:5 189:5
198:4 200:19
226:22 227:1
248:8 253:24
**proctor** 144:2
146:10 147:2,9
**produced** 252:1
302:11 303:6
**professional**
224:7 232:1
282:21
**program** 14:20
16:1,12 17:18
18:12 19:18,20
19:21,24 32:8
37:2,9,18 38:1
49:8 53:9
102:11 166:4
168:10,13
170:16,23,24
171:5,6 172:9
172:18 176:15
176:22 177:15
178:4,20,22
179:13,16
206:9 213:9
235:19 254:15

254:18,24
257:13 273:11
288:13,17,21
289:4 290:12
**programs** 15:16
37:7 107:1
136:9,13,14
137:1,21 150:1
207:19
**Project** 87:7,16
165:23
**promoted** 231:8
**promotion**
16:18
**pronounce**
125:8
**pronounced**
122:4
**propensity**
22:19
**proper** 165:5
**properly** 167:10
**Proposal** 196:3
**proposed** 195:12
**prosecuted**
116:3
**protocols** 192:23
**prove** 157:15
**provide** 91:11
91:12 136:10
207:22 292:5
**provided** 40:6
279:6,18
**provision** 45:22
126:1 219:19
**provisions**
109:21,22
220:10
**psychiatric**
278:24
**psychiatrist**
281:9
**psychological**
210:19 278:24

**psychologist**
281:7
**psychology**
149:21
**public** 37:13
44:14 85:24
86:12 255:16
299:24
**pull** 117:14
238:19
**pulled** 86:24
104:13
**pulling** 212:16
**punishes** 269:18
**punishment**
259:23,24
**purchase** 118:2
118:12
**Purge** 86:22
**purpose** 15:24
77:6
**purposes** 261:16
**purses** 118:2,12
**pursuant** 1:17
1:17
**pursue** 54:13
**pushed** 157:21
157:22
**pushing** 53:24
**put** 29:3 45:22
45:24 56:13
58:18 96:20
113:6,11
138:15 144:4
154:9 168:20
169:18 175:18
176:14 180:16
180:18,20
187:9 206:15
212:5 213:24
219:18 228:7
261:21 272:1
277:3 296:22
296:23

**puts** 183:8
**putting** 108:11
108:12 220:9

---
**Q**
---
**qualify** 134:16
**quantifying**
114:2,16
**quarters** 234:8
**question** 7:5,19
8:1,2 29:3
88:15 98:14
110:4,16
117:18 142:5
145:5 147:7
148:2 170:8
174:11,13
175:3 177:21
184:24 198:20
211:14 218:6
239:19,21
245:24 258:10
266:2,17
286:18 296:21
**questioning**
32:24 77:6
**questions** 22:22
25:21 80:3
82:9 83:6
129:19 148:23
149:4,8,8,9,12
156:9 167:24
211:15 216:2
217:13 267:6,9
278:21 285:23
297:21
**quick** 256:24
**quickly** 120:13
**quite** 60:12
138:7
**quote** 164:10
**quotes** 206:15

---
**R**
---

Theodis Chapman
August 21, 2017

330

race 12:19 25:7
25:8,11 27:19
28:16 29:14
30:2,13 33:20
34:3 47:13
48:12 63:11
65:20 120:9
140:4 141:18
141:20 148:17
163:8 177:6
204:19,21
217:5 222:16
229:2 235:14
235:15 244:1
273:17 282:11
289:23
racial 86:6
220:8
racially 296:15
racially-dispa...
112:18
raise 286:12,14
raised 64:10
raises 286:13,19
286:21
ran 283:5
291:21
Randall 25:5
26:7,15
Randolph 1:22
2:18 302:9
randomly
133:12
Rangel 292:10
rape 87:12
rapport 58:14
81:15
rarely 99:18
reach 281:4
reacted 86:1
read 40:18
83:17,21
118:18 156:11
177:11 211:1

250:17 299:12
reading 165:20
reads 120:7
real 61:12 98:10
256:24 280:17
reality 55:23
realize 45:24
realized 44:21
really 73:3 82:4
98:9,10 100:21
109:9 150:6
266:2
Reask 184:14
reason 8:12
17:18 60:24
61:4,15,17,19
61:21 66:3,14
66:21 67:9,14
68:10,20
123:18 133:10
141:5 186:10
186:22 219:13
220:15 283:10
300:6,8,10,12
300:14,16,18
300:20,22
301:6,8,10,12
301:14,16,18
301:20,22
reasonable
61:13
reasons 213:16
reassign 181:10
reassigned
30:17 179:12
181:12 190:20
196:21 202:5,9
206:6 210:5
214:9 235:2
240:6 241:1
272:17
reassigning
198:6 203:14
204:4

reassignment
179:22 196:24
197:18 204:16
204:16 205:16
211:13 229:19
247:9 271:10
275:11
recall 6:4,8
26:11 27:4
38:6 48:17
70:16 72:13
77:2 89:6
114:10,11,14
115:6 266:2
receive 13:4
19:13 21:18
47:8 61:21
128:8,24 152:4
152:6 156:22
161:14 164:20
166:5 208:5
209:15 211:7
228:4 271:12
received 14:7
32:14 48:24
50:5 63:15
73:8 84:24
85:1 87:17
117:7 130:6,19
152:2,4 160:7
160:8 161:12
162:10,24
163:15 207:14
211:10,15
213:16 227:8
227:22 228:1
279:2 286:12
286:14,21
receiving 47:17
47:23 68:16
151:4 162:21
222:2 263:18
263:18 271:1
279:13

recess 103:12
112:7 215:13
recidivate 16:8
22:19 151:13
recited 65:5
recognize 82:17
158:14 190:8
191:12 216:16
228:11 249:5
recollect 155:9
221:13
recollection
128:17
recommended
208:1 237:22
reconditioned
22:20
reconnected
24:10
reconsider
181:22
record 4:13,17
7:2 17:22
64:14 91:18
95:20,23,24
103:11,14
112:5,9 129:12
145:6 148:8,16
167:16 174:23
190:6 202:22
215:12,15
224:12 228:17
255:16 256:10
256:12 263:21
263:23 295:23
records 210:19
236:23 263:22
264:5,9,17
recovering
215:5
recruited 14:16
14:18,19 17:10
17:11
redeploying

198:7
redesigned
183:1
redo 210:6
reduced 102:17
172:3 206:5
302:18
reduction 87:6
87:16 102:17
reenergizing
102:1
reengage 23:13
Reenrolling
179:2
refer 37:12,13
37:14 62:21
149:23 229:6,7
232:21
reference
269:10
referenced 77:9
88:11 163:21
221:14
referral 37:12
referred 65:2
81:12,14 136:7
150:24 151:17
157:3
referring 14:1
52:18,24 84:13
149:24 158:24
165:3 170:2
196:7 205:1
209:23 218:3
218:11 219:6
219:21 220:4
221:23 229:22
233:12 236:7
238:13 239:16
239:24 253:18
254:5 267:3,22
267:24 268:4,5
288:2
reflect 4:18

Theodis Chapman
August 21, 2017

331

223:5,12 257:6
**reflecting**
112:20
**reflection** 159:4
**refuse** 253:13
**refute** 97:10
**regarding** 5:17
77:23,24 97:1
97:7 200:18
217:22 251:2
270:7
**regards** 58:9
182:6 197:18
**registering** 60:5
**regular** 46:12
55:11 58:11
179:3 214:5
**regulating**
220:11
**regulation** 220:3
**regulations**
217:22 218:5
218:15
**reimburse**
211:17
**reimbursed**
211:24 212:8
**reimbursement**
211:19
**reinforcement**
22:24
**reinstated**
288:17 289:3
**reinstatement**
288:12
**reintegrated**
24:5
**reject** 54:21
67:16 219:19
220:13
**relate** 167:22
**related** 36:13
65:7 99:8
100:15 114:12

150:8 207:18
251:8 303:1
**relates** 66:18
75:8 105:10
152:11 214:22
273:23 274:1
**Relations**
242:22
**relationship**
106:8 291:11
**relationships**
169:21,22
**relatively** 291:4
**relaxation** 285:9
**relayed** 106:2
**relaying** 66:9
**release** 202:13
202:23 260:19
281:23 297:9
**released** 87:13
171:9 202:14
202:17 260:20
260:21,22
261:13,19,22
**relevancy** 211:3
212:24 254:21
**relevant** 251:16
251:23 254:7
**Relief** 296:9
**remain** 16:5
90:12 179:23
197:10
**remained**
272:15 273:14
**remaining** 127:8
197:1
**remedial** 40:16
**remedially**
40:15
**remediation**
23:3 161:22
**remedies** 20:13
**remember** 5:14
22:5 74:12

90:18 133:5
142:23 145:24
225:22 273:2,3
273:11,18
**removal** 272:12
**remove** 269:19
**removed** 25:19
29:24 30:23
31:10 33:1
34:15 41:10
60:7,11 65:4
111:6 126:9
173:17,24
175:6 180:21
182:20 190:12
240:16,22
271:21 272:3,5
274:18 290:7
291:10
**removing** 60:1
**rename** 240:1
**reoffend** 21:9
**reorganization**
167:23 168:11
177:16,23
196:8 198:18
198:24 206:16
**reorganized**
178:5 186:11
196:12
**repeat** 7:20 54:7
**repetitive**
242:18 251:6
**rephrase** 7:20
35:10 198:20
**replaced** 26:14
26:15,20
143:10
**report** 34:24
**reporter** 1:21
6:24 63:19
82:3,11 225:11
297:22 298:1
302:5

**Reporting** 14:23
15:7,14,15
**reports** 35:1
**represent**
246:16
**representing** 4:9
**reprimand**
75:15 259:24
**reprimands**
75:20 112:22
**reproduced**
303:8
**request** 36:1
65:1 66:3 72:4
72:11 73:6
139:8,12,24
202:13,23
242:12 260:19
**requested** 17:16
50:4 66:16
139:4,21,23
236:23 261:2
263:22
**requesting**
73:10 133:22
**requests** 73:4
**require** 75:19
173:8,9
**required** 39:16
**rescue** 87:20
**research** 91:16
97:9,13
**Reserve** 196:23
297:22 298:1
**reserved** 219:17
**reserves** 54:18
54:20 67:16
186:24
**resign** 124:17,18
**resigned** 124:20
125:3
**resolution** 23:22
**resolve** 248:7
266:9

**resolved** 225:24
**resonated**
145:22
**resources** 108:9
143:20,21
268:10,12
**respect** 251:2
**respectively**
154:24
**responding** 90:6
**response** 22:10
164:8 191:16
192:8,14,19
272:4 296:20
**responsibility**
113:8 303:7
**restaurant**
292:13
**restorative** 88:1
166:7
**restored** 87:24
**result** 101:20
260:18 279:20
281:17 292:10
**resulted** 120:8
**results** 147:15
**resume** 290:24
**retained** 240:20
**retaliating** 61:7
**retaliation**
204:18 205:19
217:5 218:18
229:2 231:7
244:1 288:11
291:10
**retaliatory**
35:13,23 222:1
237:9 251:11
**retired** 143:15
**retirement**
117:1
**retrained**
152:16
**returned** 237:24

Theodis Chapman
August 21, 2017

332

| | | | | |
|---|---|---|---|---|
| **revamp** 168:16 | 43:10,15,19 | 113:3,22 115:2 | 186:15,24 | 248:14 249:7 |
| 171:12 | 44:4,18,24 | 115:11,22 | 187:7,11,14 | 249:18,22 |
| **revenue** 297:10 | 46:3,21,22,24 | 116:14 117:8 | 189:10 190:11 | 251:13 253:5 |
| **Reverend** 10:15 | 47:2,15,24 | 117:14,23 | 190:18,23 | 254:15,20 |
| 10:15,18 279:4 | 48:1,21 49:23 | 118:15 119:1,7 | 191:15,17,21 | 255:23 256:22 |
| 282:20 | 50:7,7,19,23 | 119:9,22 120:3 | 192:17 193:11 | 257:4,14,21 |
| **review** 12:9 | 51:23 52:14,19 | 121:10,19,22 | 193:18,20,22 | 258:2,6 259:3 |
| 131:2,13 | 52:20,21,21 | 122:7,22 123:5 | 194:4,6,15,18 | 259:8,10,13,14 |
| 141:10 146:3 | 53:1,6,18 54:6 | 124:3,20 125:3 | 195:8,13,16,24 | 260:17 262:18 |
| 167:17 265:2 | 54:6,10,18,21 | 125:7,8,14,16 | 196:10,15 | 263:10 264:3,6 |
| 297:12 | 55:3,5,15 | 126:20 127:6 | 197:3,6,23 | 265:2,3,6,20 |
| **reviewed** 131:4 | 57:17,22 59:6 | 127:19 130:2 | 198:13 201:17 | 267:11,13,17 |
| 151:20 249:20 | 59:13 61:22 | 132:5,7,13 | 202:7 204:1,5 | 267:19 268:11 |
| 249:24 250:4 | 62:8,21,22 | 133:1 134:5,24 | 204:12,20,24 | 268:16,18,19 |
| **reviewing** | 64:2,8,20,22 | 135:10 138:9 | 205:11,18,21 | 268:23,24 |
| 139:19 264:8 | 65:15,18 67:8 | 138:23 139:6 | 205:24 206:3,8 | 269:23 270:10 |
| **rhyme** 133:10 | 67:16 68:10,18 | 141:20 143:19 | 206:13 209:21 | 270:13,17 |
| **Richard** 145:14 | 69:3,20 70:4 | 144:1 145:22 | 210:4 214:16 | 271:3,7,12,13 |
| 270:16 | 70:19,21 72:7 | 146:13,19 | 215:3,20 216:7 | 272:8,13,16,18 |
| **Richardson** | 72:15 73:17 | 148:19 150:14 | 216:9,18 217:6 | 273:9 274:3,6 |
| 117:13 | 74:14,23 75:1 | 151:21,22 | 217:8,9,11 | 275:4 276:2,7 |
| **Rick** 163:19 | 75:15,16 76:5 | 153:15,16 | 218:2 219:17 | 276:21 277:21 |
| **rid** 59:16 | 76:20,22 77:21 | 155:9,9 156:4 | 220:16 221:8 | 277:23 279:15 |
| **right** 4:17 5:2,9 | 78:10,20 79:13 | 156:16 157:3 | 221:19 222:18 | 279:21 280:6 |
| 5:12 6:22 7:12 | 79:18,24 80:1 | 158:16,19,21 | 222:24 223:1 | 280:21 281:5 |
| 7:23 8:7,11 9:8 | 80:15,17,20,22 | 159:12,19 | 223:17 224:16 | 281:12 285:21 |
| 10:9,22 11:15 | 80:23 81:3,4 | 160:2,5,9,21 | 224:17 225:7 | 285:24 286:1,4 |
| 11:17 12:8,13 | 81:20 82:2,14 | 162:19 163:6 | 225:13 227:2,6 | 287:1,3,4,18 |
| 12:17,21 13:12 | 82:19,21 83:5 | 165:7 167:2,14 | 227:19,22,23 | 288:4,9,23 |
| 14:6 17:5,6,8 | 83:11,13,20 | 168:6,12 169:6 | 228:3,13,22 | 289:7 290:4,6 |
| 18:5 19:22 | 84:8,13,18 | 170:18,22 | 229:8,10,11 | 290:11,18 |
| 20:9,17,19,21 | 85:6 86:14 | 171:10,23 | 230:9,13,22 | 291:2 293:21 |
| 22:2,9 24:17 | 88:23 89:5 | 172:23 173:1 | 231:4,6,19,24 | 294:21 295:6 |
| 25:9,24 26:5 | 91:24 92:6,13 | 173:18,18 | 232:5,9 234:24 | 295:18 296:12 |
| 26:12,23 27:4 | 93:4 94:9 95:1 | 174:14 175:7 | 235:3,4,5,11 | 297:18,20 |
| 27:17,23 28:24 | 95:7 96:11 | 175:22 176:9 | 235:11 237:8 | **rightfully** |
| 29:16,23,24 | 97:4 99:15,21 | 176:12,17 | 237:12 238:12 | 164:16 |
| 30:4,6,8,17,19 | 99:23 100:13 | 177:8,17,18,23 | 238:20 239:11 | **rights** 94:5 |
| 31:11,13 33:4 | 101:8 102:8 | 178:1,12 | 241:7 242:9 | 111:13 218:22 |
| 33:7,14,18,24 | 103:23,24 | 179:10,21 | 243:2,19,22 | 242:20 243:1 |
| 34:6 35:16 | 104:6,18 106:5 | 180:2,5,7,11 | 244:16 245:1,7 | **risk** 59:2 136:18 |
| 36:24 37:10 | 106:9 107:9,12 | 180:22 181:1 | 245:13,16,23 | **Rivera** 202:8,18 |
| 39:6,9 41:2,11 | 107:14,21 | 183:5,10,15 | 246:9,14,20 | **Roberts** 28:6,19 |
| 41:13 42:1,17 | 109:1 111:22 | 184:10,13 | 247:23,24 | 29:6 138:14 |

WADLINGTON Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

333

204:4
**Roberts'** 28:16
**Rohan** 1:11 73:3
  73:6,9 143:7
  148:3,8
**role** 65:22 73:24
  74:20 76:18
  78:2 85:16,19
  91:22,24 94:18
  109:14,17,19
  112:2 113:23
  114:3,17 115:9
  122:10 137:23
  172:2
**romantically**
  116:1 117:20
**Ron** 65:13
**room** 24:1
  146:15 234:4,5
  234:6,10,11,15
  266:4
**Rose** 1:12
  143:11,13,14
**rotated** 38:2
**rough** 27:16
**roughly** 245:21
  246:6
**rule** 88:8 207:12
**rules** 1:18 4:24
  5:3 6:16 45:5
  105:9
**run** 92:17
  291:18
**runs** 280:11
**RUR** 202:12,13
  260:19 261:11
  261:21
**Russell** 138:10
  138:12 145:14

――――――――
**S**
**S-e-a-y** 122:2
**S-e-v-i** 75:24
**S-e-v-i-k** 76:1

**safe** 39:3
**safest** 39:1
**safety** 56:10
**salary** 41:14
  42:9 206:5
  286:3 289:5,9
  289:12
**Samuel** 171:4
**San** 157:7
  162:12 268:22
  271:2 288:1
**Sanctions** 171:5
**Sara** 1:9 299:9
**Saturday** 103:3
saw 96:5,16,23
  99:6 128:13,15
  128:19,19
  200:8 208:2
  267:9 282:22
  283:2
**saying** 42:19
  43:13 52:9
  60:2 68:8
  71:23 77:3
  92:21 133:24
  154:11 159:21
  169:16 174:12
  178:8 199:16
  218:12 238:4
  241:1 254:10
  265:1 272:5
  287:22
**says** 58:1 70:5
  83:12 87:3
  100:2 112:17
  114:5 115:22
  121:12 122:17
  123:16 124:16
  127:21 129:22
  132:11 135:12
  144:17 147:17
  175:24 177:10
  177:18 179:10
  192:7,21 193:7

195:20 196:1
196:19 197:17
217:19 229:13
239:12 240:12
240:13 248:24
249:9 250:17
252:3 253:11
254:1 256:20
266:22 267:12
267:12 276:21
279:3 287:11
288:12 293:13
293:22 296:6
**scale** 223:23
**scantron** 146:23
**schedule** 52:8
**Scholarship**
  165:24
**school** 12:23
  19:9,14 22:18
  24:6,11 38:2
  38:16 39:12,18
  39:23 40:14,19
  40:20 41:1,3
  151:8,9,11
  166:2 171:9,21
  179:2 210:19
  213:10
**schoolboy** 173:3
**schools** 38:8,11
  38:13,18,19
  39:4 40:1
  179:3,3
**SCHWARTZ**
  2:4
**score** 153:6
  248:4
**Scott** 289:19,22
**scratched** 237:2
**screen** 57:2
**scrutiny** 229:15
  231:21,21
  232:14 254:21
  254:23

**se** 39:23
**season** 294:10
  295:4,7
**Seay** 122:2
**second** 3:9 82:20
  85:12 91:12
  95:21 112:6
  115:22 122:13
  123:6,16
  139:22 147:3,7
  148:22 150:7
  156:17 222:15
  222:19 249:8
  259:17 266:23
  266:24 267:1
  276:9
**secrecy** 146:8
**section** 129:4,14
  156:12
**secure** 39:1
  144:4
**security** 39:2
  147:10 293:15
  294:20 297:6
**see** 5:15 20:2
  24:3 27:15
  28:23 55:19
  57:13 58:3
  59:1,3 65:13
  70:4 77:11
  83:12 87:1
  93:7 95:15
  100:7,20 102:2
  112:15 113:1
  113:18 114:24
  115:13 116:4
  118:23 120:13
  121:15 130:8
  135:14 138:2,3
  140:10,17,18
  140:19,21
  141:17 142:1
  144:22 147:22
  154:19,23

157:1 158:2
161:19 168:22
179:19 183:3
187:18 189:3
192:10 193:8
195:16 196:2,4
197:21 198:10
203:5 204:22
217:14,15,23
233:5 241:12
242:6 245:5
249:3,12 252:6
253:15 256:2
256:17 257:17
260:1 267:15
268:8 276:15
279:9 281:13
282:10,13
287:16 288:14
293:15 296:2
**seeing** 57:19
  86:4 200:12
  279:22 282:20
  285:14
**seen** 70:23 73:13
  73:17,18 96:21
  127:16,17
  136:20 192:5,6
  195:5 246:11
  264:5
**segment** 53:12
**segue** 97:4
**segues** 41:23
**self-explanatory**
  20:24
**semantics** 125:1
**semicolon**
  253:11
**send** 40:13
  54:16 72:3
  78:4,5,6
  133:24
**sends** 66:5
**senior** 197:12

Theodis Chapman
August 21, 2017

334

276:11
**seniority** 174:8
 179:11 181:23
 188:13 189:8,9
 189:12 190:13
 198:11 208:21
 273:22,23
 274:2,6,6
**sense** 47:7 68:22
 68:24 166:24
**sent** 20:15 41:2
 74:10 78:13
 79:17 87:21
 88:1 273:5
**sentence** 115:22
 117:24 123:23
 123:24 130:5
 156:18 197:16
 239:12 252:20
**sentencing**
 55:20 67:24
 136:4
**sentiments** 66:9
**separate** 45:22
 54:14 182:8,11
 183:2 186:4
 199:17,20
**September**
 201:7
**service** 151:7
 153:8 211:21
 212:6 276:10
 276:12
**services** 1:11
 3:15 14:24
 16:22,23 20:10
 40:6 57:15
 58:8 87:17,24
 88:1 136:9
 137:21 150:4
 151:4 188:10
 211:18,24
**set** 45:5 56:8
 133:24 139:9

172:19,19
188:20 205:6
303:11
**sets** 40:3,5
 126:22 292:23
 293:3
**setting** 19:14
 23:17 280:23
**settings** 19:9
 22:18 188:17
 188:19
**settled** 9:7,12
 68:5
**seven** 261:24
 265:13
**severe** 280:18
**Sevick** 75:22
 77:16 79:10
 119:23 205:7
 253:20
**Sevick's** 77:17
**sexually** 116:2
 117:20
**shadow** 210:9
**shaking** 7:15
**Shanahan**
 261:20,22
 262:4 263:1,12
 263:13 264:1
**share** 108:19
**shared** 110:22
 151:2 263:8
**Shavers** 1:21
 302:4 303:16
**she'll** 82:7
**sheet** 59:17
 98:10 100:22
 140:20 147:5
 180:20 196:19
 210:21 236:23
 300:1 301:1
**sheet(s)** 299:16
 299:17
**sheets** 161:1

236:10,11,14
**shift** 86:21,21
**shifted** 261:10
**ship** 169:18
 170:12
**shock** 253:9
**shooting** 57:23
 284:10
**shop** 292:3
**Shore** 105:3,4,5
**short** 31:13
 204:7 236:19
**shortened** 32:9
 32:10,11
**shorter** 172:15
**shorthand** 1:21
 302:5,20
**shot** 24:2 91:1
 167:5 261:24
 263:15
**show** 66:17
 130:14 226:4
**showed** 73:9
 89:10 90:1
**shown** 171:7
**sic** 288:19,20
**side** 17:14 23:9
 105:7 153:17
 153:19
**sidebars** 68:11
**sign** 54:15,16
 59:17 102:21
 103:1 219:16
 247:19
**sign-in** 98:9
 100:22 180:20
**signature** 70:8
 70:12,15,16,18
 70:20,24 71:3
 71:11,18,23
 72:10 74:12
 216:24 228:14
 249:14 297:22
 300:23 301:23

**signed** 236:24
 249:20
**signifies** 78:15
**signing** 72:18
 247:23
**signs** 66:2,4
 67:15,15 70:2
 70:5 247:21,21
**similar** 85:23
 89:3 90:4
 156:23 212:4
**similarly** 1:6
 299:6
**simply** 133:21
**single** 56:7
**sit** 51:12 60:17
 89:13 139:21
 140:17 159:3
 243:23 245:18
 250:7 251:17
 251:21 266:8
 285:8
**sitting** 100:9
 139:19 141:23
 146:19 178:3
 246:14
**situated** 1:6
 299:6
**situation** 118:5
 208:13
**situations**
 157:17
**six** 29:8,9 44:9
 44:18,20 46:7
 181:5
**skill** 40:3,5
 188:20 289:19
 292:23 293:3
**skills** 289:20
**sleep** 9:21
**sleepless** 284:21
**sleeplessness**
 296:17
**small** 19:1 278:6

**smaller** 172:15
**Smith** 48:9 49:1
 62:3,6 73:9,15
 76:14 85:8,10
 89:7 94:16
 95:6 96:24
 97:2 107:7,8
 107:19,22
 108:22 109:8
 109:14 111:9
 113:6 114:2,17
 115:9 117:15
 192:4,21 247:1
 250:22 252:19
 252:22 258:6
 258:13 259:2,8
 259:11 263:7
 263:19,20
 264:2
**Smith's** 48:12
**snacks** 171:8
**Sneed** 125:17
**so-called** 46:13
 46:15 195:11
 208:16 220:10
 240:17
**social** 13:14
 16:23 45:14
 55:21 57:9,11
 57:13 67:20
 81:9 110:16
 151:3 210:22
 210:22 211:21
 212:6
**socialize** 96:13
**socially** 106:12
 107:4,23
**socials** 42:23
**software** 53:9
**Solamei** 49:13
**Solamei's** 49:16
**solely** 19:24
**soon** 255:21
 295:21

Theodis Chapman
August 21, 2017

335

sooner 51:1
sorry 6:14 14:11
  20:8 34:20
  49:4 54:6
  84:14 88:9
  101:6 110:6
  117:5 120:4,5
  143:4 148:21
  155:18 158:19
  170:6 177:10
  181:10 182:22
  184:15 203:11
  206:22 211:11
  215:4 222:18
  227:11 239:19
  239:22 272:22
  272:24 277:8
  287:8,9,22
  289:21
sort 22:20
  242:11
sorts 113:21
sought 293:14
  294:1
sound 17:5 30:8
  30:19 75:1
sounds 7:11
  22:9 294:20
source 140:13
sources 297:6
South 105:3,4,5
Southeast
  104:17 105:17
span 102:14
  233:18
spanned 109:23
sparked 164:12
speak 6:12
  10:10 11:22
  12:2 96:6,7
speakers 15:18
speaking 163:19
  236:13
special 292:7

specialized 21:6
  136:6 137:9
  150:18 152:10
  152:17 207:17
specialty 152:10
specific 19:16
  22:5 41:8
  61:14 72:23
  73:18,19 74:20
  77:8 78:2
  83:22 89:12
  97:16 124:5
  129:4 145:2
  152:11 161:11
  162:12 163:12
  165:4 199:1
  207:3 214:11
  214:23 218:7
  220:3 235:8,12
  237:6 250:14
  260:3 290:14
specifically 12:5
  46:9 73:10
  84:11 110:20
  115:19 123:7
  126:5 143:1
  161:12 162:20
  164:4 183:1
  200:4 218:9,10
  219:6 221:23
  238:11 239:3
  239:24 242:23
  243:11 258:22
  261:11 266:15
specificity
  152:18
specifics 239:7
specifies 202:16
speculate 278:1
spell 4:13 28:7
  63:9,19 75:23
spent 156:20
spiritual 279:6
SPO 134:20

202:8,17 204:8
spoke 48:16
spoken 109:8
Spooner 34:2,8
  169:12 220:7
Springfield 78:5
  78:14
spur 160:18
spurred 160:20
Sr 10:16 279:4
SS 302:1
stabilization
  16:19
staff 203:13
stand 14:22
  17:20 56:17
  260:11
standard 45:4
  47:11 48:4,5,8
  52:11 139:9,14
  163:21 221:18
standards 85:23
  99:7 100:14
  111:17 126:22
  179:18 192:24
  224:1,2,3,4,5,6
  226:4
start 14:3,12
  17:3 36:14
  40:11 58:13,14
  96:2 131:19
  162:17 168:7
  173:15 177:21
  250:16 293:17
started 13:22
  24:18,22 26:1
  32:18 35:14
  36:6,16,17,20
  36:20 37:21
  38:19 55:2
  110:19 111:14
  111:16 152:3,5
  209:16,17
  222:3 283:7

284:10,14
starting 110:10
  129:21
starts 95:16
  256:17 295:9
state 2:14 4:12
  11:8,18 13:7,9
  13:13 67:14
  156:21 224:12
  250:20 302:1,6
  302:10
state's 37:14
  211:2
stated 121:13
  160:10
statement
  129:24 221:15
  271:20 288:16
states 1:1,18
  66:3 160:13
  299:1
station 90:2
statistics 110:15
stay 41:9 108:7
  174:2,4
stayed 175:6
staying 121:10
  147:16
stealing 292:5
steer 170:12
step 20:14 79:10
  79:16 191:2,17
  191:18 192:7
  192:14,19
  193:4,14 194:5
  194:17 226:23
  226:24,24
  227:3 247:14
steps 191:1
  226:23 253:23
stereotype 44:13
Steve 17:19
  221:5
steward 71:16

76:13 84:20,21
  84:22 85:3
  91:3,7 92:11
  93:4,5 94:1,11
  95:1 114:12
  116:13,16
  122:13,15,16
  124:6,7 126:4
  128:11,16
  146:24 262:12
  262:22 264:11
  264:13,18
sticking 129:2
stilted 7:4
stipulate 154:14
stipulations
  219:1
stock 154:9
stolen 237:24
stop 43:1 137:10
  148:6 156:10
  293:4
straight 47:5
  50:16,18 52:12
  54:2 66:12,12
  67:11 159:9,10
  159:12 160:7
  164:19 288:1
Street 1:22 2:6
  2:18 302:9
strengths 136:21
Strickland 25:5
  25:12 26:7
strike 14:11
  75:2 85:2 88:9
  160:15
struck 225:19
struggling 44:16
student 22:21
students 23:19
  32:13 37:8,18
  38:5 291:11
studied 138:7,17
  138:20 149:7,9

Theodis Chapman
August 21, 2017

336

studies 13:3
study 138:6,13
  155:2
stuff 71:12
  108:8 113:6,13
  113:15 129:22
  156:9 207:6
  232:7 233:1
  244:5 283:13
  284:13 292:5
  294:18
sub-units
  200:11
subject 4:23
  49:22 231:20
subjected 99:2
  111:1 217:20
  218:12 229:13
  279:19
subjective
  137:17 266:3
  267:14
submitted 198:3
  243:16
subordinates
  118:21 137:24
subscribe
  299:14
Subscribed
  299:21
subsequently
  26:7 178:21
  229:13 230:11
  261:4
substance 21:5
  36:5 61:12,13
  61:16
substantiate
  112:18
substantive
  157:19
subtle 61:10
success 40:4
  151:17

successes 168:19
successful 39:22
  230:17 291:15
successfully
  166:4
sudden 182:19
suffered 281:16
  284:19 296:13
suggestion
  174:16
suit 166:10
  285:19 303:2
Suite 2:6
sum 63:23
summarize
  127:20
summer 294:16
Sunday 10:21
sunset 126:8,8
supervise 15:15
  203:20
supervised
  14:20 15:21
supervises
  203:21
supervising
  15:19,20
  134:20
supervisor
  16:18 32:20,21
  33:2,3,5,10
  34:17,19 43:3
  50:13 54:15,19
  56:13 57:10
  63:1,7 65:12
  65:24 67:15
  90:8 106:3
  134:14,20
  137:22 154:2
  155:15 166:12
  203:14 204:4
  212:17 219:10
  219:11 230:21
  247:14,22

266:7,18
  280:17
supervisors
  48:19 80:22,23
  131:19,21
  153:13
supervisory
  132:8 144:21
  145:10 147:18
  147:20 204:8
  204:10 264:22
support 92:18
  92:19,22
  104:10 136:22
  136:23 137:2
  279:6,7
supportive
  91:14
supposed 43:8
  45:15 47:3,7,8
  52:7 53:12
  59:23 66:6
  104:22 105:11
  137:14 149:22
  150:2 164:16
  198:5,9 200:20
  203:15 206:24
  211:1 212:24
  248:12,13
supposedly
  66:10 144:20
  148:3 154:7
  166:18
suppress 239:1
sure 7:2 62:2
  70:10 85:15
  123:3,4 129:20
  145:7 153:20
  155:14 165:17
  167:3 168:14
  175:12,17
  182:4 184:23
  185:5,8 200:5
  207:8 209:9,9

212:23 215:4
  232:7 242:15
  244:4 269:3
  270:2,5 278:7
  293:8
survey 19:17
  134:6 137:18
  138:2
surveys 137:19
suspend 90:16
  211:5 261:5
suspended
  171:8 261:6
suspension
  76:12,16
suspensions
  75:18 76:7,15
  77:9,14 112:21
  114:6 130:2
suss 278:18
sustainably
  165:21
switch 69:9
  79:20
switched 47:4
switching 49:5
  215:9
sworn 4:1,4
  299:21 302:15
symptoms
  284:19 296:16
synopsis 19:1
system 53:8
  56:14 57:1
  59:12,22,24
  71:2,7,8 89:17
  136:16 212:4
  236:17

_____
**T**
_____
T-a-t-a-n-e-s-...
  29:10
T-h-e-o-d 4:14
tactic 126:12

take 6:24 7:24
  8:2 45:17 47:1
  51:21 67:17
  68:15 72:9
  82:14 98:23,24
  102:1 129:10
  132:15 133:1
  133:23 134:3
  146:15 156:8
  170:12,15
  174:18 203:15
  215:7,8,9
  224:7 233:21
  265:8 283:19
  284:23 297:14
taken 1:16,20
  75:21 133:17
  138:24 139:1
  204:17 275:3
  300:2 301:2
talk 7:10 10:17
  12:5,13 77:8
  79:21 91:19
  130:4 153:24
  179:21 213:19
  221:1 252:23
  274:14
talked 10:23
  107:6 108:22
  109:1 136:16
  153:4 207:5
  214:12,15,24
  222:22 229:18
  229:23 232:13
  235:7,9 241:7
  244:2 251:18
  253:18 257:20
  258:3 259:15
  268:21 269:8
  270:7 271:17
  272:14 274:5
  280:22 296:10
talking 6:23
  31:19 55:10

Theodis Chapman
August 21, 2017

| | | | | |
|---|---|---|---|---|
| 62:4 69:11 | 16:20 22:14 | 114:6 | 301:2 302:11 | 78:4,22 89:12 |
| 132:7 151:10 | 33:8 42:1 | **terms** 51:24 52:3 | 302:14 | 100:10,13 |
| 155:5 159:1 | 45:19 50:8 | 88:20 196:11 | **therapist** 281:5 | 122:17 125:5 |
| 173:3 179:22 | 66:24 67:3,5 | 217:20 218:12 | **thereof** 303:3 | 126:15 132:3 |
| 192:15 196:8 | 82:16 83:20 | 229:14 | **thing** 7:8 48:20 | 138:13,24 |
| 203:6 204:17 | 107:7 111:9,23 | **test** 137:11 | 61:24 64:6 | 139:1 146:2 |
| 212:4 225:17 | 119:20 125:21 | 139:4,10 | 95:13 98:22 | 155:11 160:2 |
| 226:7 232:22 | 127:6 133:18 | 140:18 141:2 | 118:9 135:21 | 161:5 164:9 |
| 255:23 267:7 | 135:16 140:6 | 141:10,17 | 153:3 154:18 | 177:5 188:14 |
| 271:8 272:19 | 162:7 164:4 | 142:1 146:20 | 221:20 229:12 | 205:14 206:3 |
| 274:20 276:17 | 168:12 173:14 | 148:22 149:12 | 233:13 239:2 | 209:6 214:8,14 |
| **talks** 201:4 | 181:9,11 195:8 | 150:6,7 155:20 | 250:17 259:6 | 221:16 238:8 |
| 257:16 | 224:18 285:18 | 265:9 | 259:10 264:15 | 238:10 243:24 |
| **tamperable** | **telling** 69:1,4,6 | **testified** 4:4 | 280:1 | 244:6,19 246:4 |
| 250:10 | 119:16,19 | 206:3 209:10 | **things** 21:23 | 246:15 251:15 |
| **tampered** | 162:4 | 265:21 | 22:24 26:10 | 251:19,23 |
| 182:21,23,24 | **Temple** 279:5 | **testify** 8:9,14 | 36:13 39:16 | 253:7 254:11 |
| 183:21 186:3 | **Temporary** 23:7 | 302:15 | 46:16 57:20 | 255:5 264:22 |
| 236:11 237:2 | 202:15 | **testimony** | 58:13 59:4 | 265:14,14,21 |
| **tangible** 223:8 | **ten** 32:12,12 | 290:20 302:18 | 61:11 62:19 | 266:1 272:7 |
| 223:10 | **ten-and-a-half** | 302:22 303:10 | 71:17,18 74:7 | 273:8 280:15 |
| **targeted** 110:21 | 159:17,19 | **testing** 23:15 | 75:18 86:22 | 280:16 284:4 |
| 182:19 212:18 | **tends** 284:9 | 266:17 | 94:16 97:19 | 286:4,22 |
| **targeting** 199:23 | **tenure** 91:7 | **tests** 154:19 | 99:8 108:1,13 | 289:22,24 |
| **task** 89:16 | 93:14 104:1 | **Texas** 268:22 | 169:5,16,17 | 290:2,3 293:19 |
| **Tatanesha** 29:10 | 126:4 139:2 | **tgeoghegan@...** | 171:12 193:2 | 297:18,24 |
| 31:10 171:1 | 148:11 153:24 | 2:9 | 207:18,20 | **thinking** 5:17 |
| 177:1 189:17 | **tenured** 170:16 | **thank** 34:5,14 | 212:5,8,12 | 29:2,3 83:21 |
| **taught** 23:24 | **term** 38:18 | 122:5 203:2 | 218:14 226:14 | 93:8 122:21 |
| 172:7 | 125:19 | 284:22 285:1 | 233:16 238:15 | 123:2 224:22 |
| **TDC** 23:6 | **terminate** 211:5 | **thanked** 292:8 | 238:16 244:18 | 226:18 237:13 |
| **teach** 172:4 | **terminated** | **thanking** 261:1 | 250:21 260:12 | 242:2 246:5,7 |
| **team** 3:16 | 72:12 100:6,12 | **Thanks** 31:7 | 262:13 282:6,7 | 262:10 |
| 169:19 195:21 | 116:3 117:21 | 34:22 142:7 | 285:4,7 292:19 | **third** 23:2,5,9 |
| 198:17,23 | 118:3,13 | **theft** 237:20 | 293:1 296:19 | 116:9 201:2 |
| 199:9 | 124:15 128:5 | **theirs** 221:6 | **think** 6:7,9 8:13 | 253:12 297:9 |
| **teas** 285:6 | **termination** | **Theo** 67:6 68:12 | 17:2 26:17 | **Thirteen** 271:8 |
| **technical** 289:19 | 72:2,5,6,10 | 69:6 111:19 | 29:8 35:5 | **THOMAS** 2:5 |
| **technically** | 75:16 76:11 | 258:22 | 48:14 49:2,13 | **thorough** 280:18 |
| 45:15 178:6,9 | 96:22 97:7 | **Theodis** 1:4,15 | 49:15,16 52:15 | **thought** 109:5 |
| **Tekip** 163:20 | 237:22 | 3:2 4:2,14,19 | 53:20 57:1 | 110:11 208:16 |
| 270:16,18 | **terminations** | 173:23 192:8 | 61:3,14 62:4 | 212:21 213:8 |
| 273:7,8 | 71:17 75:17 | 248:24 299:4 | 63:22 74:8 | 241:11 276:20 |
| **tell** 6:19 7:19 | 76:7,8 112:21 | 299:20 300:2 | 75:24 76:2 | **thousand** 5:16 |

Theodis Chapman
August 21, 2017

338

28:24 29:2
30:10,11 92:24
93:8 94:22
102:13 148:13
184:17 255:4
265:11 284:4
**threat** 207:11
**three** 15:21
26:21 27:3,10
31:18 38:1
46:11 49:21
50:17,21 51:20
78:4 98:13
102:24 103:5,7
115:24 122:21
122:21 133:11
154:7 167:21
172:11 173:8
183:2,23
189:19 200:24
208:5 210:1
230:4 261:7
272:15 274:11
274:12,17
293:19,19,20
**three-and-a-h...**
232:17,19
**three-and-a-h...**
221:3
**tidbit** 278:6
**time** 5:13 16:7,8
16:10 19:21
24:3 25:21
26:3 27:8 28:4
32:2 37:3,17
37:19 40:4
41:15 42:24
43:2,9 45:16
46:7,13,14,17
46:18,20 47:6
47:8,18 49:7
50:10,14,15,16
50:18 51:6,13
51:17,24 52:1

52:6,6,8,10,11
52:12,15,16
53:1,8,12,13
53:14,17,22,23
53:24 54:10
56:8 58:10,11
59:8 60:1,5,6,7
60:8,9,22 61:1
62:10 63:16,17
65:1 66:12
67:11,12,22
68:4 90:2 91:6
93:16 94:19
96:16,19 97:2
102:1 110:10
116:24 117:10
122:24 123:13
124:4 126:12
127:5 128:6,11
139:11,15,17
140:13 141:17
146:22 148:12
150:12,17,20
151:5,12 154:6
156:20 157:12
159:4,8,9,11
159:12,20,20
159:22 160:7,8
160:14 161:1
161:13 162:10
162:22,24
163:2,16,22
164:2,5,19
166:12,17,23
172:8,14,15
184:6,16 185:2
187:8 188:23
188:23 195:18
197:8 198:23
199:8,19 200:7
200:12 201:8
209:18 214:15
217:22 218:4
218:14 219:7

219:12 220:3
220:12,17,17
220:18,19,23
221:2,3,11
222:7 230:22
232:5,15,16,23
233:18,21,21
234:17,23
235:7,17,18
236:10,11,12
236:13,14,16
236:19,20,23
237:1,2,5,20
237:23 244:7
244:10,10,14
249:23 250:4
257:16 262:8
262:12 269:18
270:7 271:1
275:17 283:17
283:20 287:24
288:1,1 294:2
**time-and-a-half**
164:5
**time/comp** 49:7
50:10
**times** 5:7 46:8
55:17,22 60:10
102:6 109:7
130:18 132:15
132:19 151:2
154:7 164:22
164:22 169:3
231:5 251:5
253:2,4 261:24
294:19
**Timothy** 1:9
69:16 299:9
**Tina** 32:21 33:3
34:18 89:15,15
90:19 222:8
230:24
**title** 31:14 77:18
134:19 178:14

275:8,11,18,22
**titles** 276:1
**to-wit** 302:7
**today** 6:19 8:9
8:14,18 9:20
9:23 10:12,24
11:23 12:10
51:12 82:7
83:2 89:13
100:9 167:5
207:1 243:7,14
243:23 245:18
250:7 251:18
251:21 297:4
**told** 51:16 65:3,5
65:8 66:13
68:9 69:5
73:13,14 98:15
105:22 119:20
142:23 176:3,4
177:22 178:1
181:4 221:2
225:22 237:23
240:10 264:2
265:7 272:2
277:5
**ton** 18:3
**Tonette** 49:10
60:21
**tool** 136:18
211:20
**top** 192:20
195:20 196:2
249:10 256:1
256:15,21
269:2
**tornado** 282:13
**total** 24:19
114:5 245:19
274:6
**totally** 203:17
282:12 283:6,7
**track** 59:9,14,15
**tracked** 86:20

**tracks** 89:18
**trade** 101:22
166:4
**traditional** 19:8
22:18 24:6,10
39:18
**traditional/ins...**
197:1
**traditionally**
104:21 105:11
199:22
**traffic-related**
8:24
**train** 257:16
**trained** 40:23
135:23 152:7
152:12,13
207:13 209:13
232:1
**training** 21:18
21:21 29:20
135:24 149:1,3
152:4,6,20,21
156:21,23
157:3,5,6,20
157:21 159:1
160:23 161:8
161:11 165:2,3
165:4 166:20
166:23 167:14
179:17 189:15
189:22 207:10
207:14,15,22
208:2 209:10
209:23 210:1,6
210:7 211:8,16
211:17 212:11
214:9 268:20
268:22 269:24
270:8,12,19,20
271:3,12 274:8
287:15,21
288:6
**trainings** 157:19

Theodis Chapman
August 21, 2017

339

165:11,12
167:8 270:24
**transcribed**
302:20
**transcript**
299:13,15
302:22
**transcripts**
167:17 303:7
**transfer** 31:3
79:5 208:23
247:8 276:12
**transferred**
208:18
**transition** 24:13
65:16
**transitioned**
43:24
**transitioning**
40:24
**transpired** 91:6
**transport** 98:12
101:15
**trauma** 280:13
280:16
**traumatized**
238:16,24
**treasurer** 92:2,3
92:10 93:14
95:4 107:16
**treated** 89:11
105:1,8 111:16
168:21 190:17
**treaters** 285:13
**treatment** 36:12
47:14 68:16
86:5 89:11
101:16,17
102:4,16
111:16 112:18
118:20 119:4
120:8 136:10
214:22,23
218:20 222:1

279:1,12
**tree** 137:7
**trial** 9:6 55:21
136:4
**trickle-down**
282:18
**tried** 45:6 205:5
239:18 240:1
**trip** 161:8,11,11
162:12 163:12
164:1,4
**trips** 161:17,23
163:22 164:1
**true** 129:24
130:1,3 160:8
223:5 250:8
258:11 288:16
299:14 302:21
**truly** 282:3
**truth** 6:19
302:15,15,16
**truthfully** 8:14
**try** 7:7,20 56:10
61:10 67:21
89:8 91:16
108:7 133:7
169:15 188:3
238:14 244:4
248:6 266:9
292:5
**trying** 48:17
49:13,15 64:13
92:17 114:13
155:6 170:12
185:16,23
187:3 198:1,21
199:17,20
200:9 226:21
233:14 238:10
238:18 243:20
258:18 261:5
282:6
**tub** 285:8
**Tube** 285:2

**turn** 114:18
115:11 120:5
129:3 132:5
228:7
**turned** 55:7
251:24 276:5
**Turns** 284:9
**tutor** 213:21
**tutoring** 15:17
171:18 213:21
**twelve** 32:12
35:8 172:13
**Twenty** 295:15
**Twenty-four**
11:16
**twice** 59:3 88:2
102:24,24
139:1
**two** 5:16 9:13
10:6 23:11
26:13 27:12,23
28:24 29:2
30:9,11 46:16
49:12,20,22
51:9,11 54:3,4
54:8,9 87:10
92:7,24 93:8
94:22 102:13
102:24 103:5,6
105:5 116:13
123:11,19
126:21 148:13
170:4 171:24
180:15 184:16
189:13 197:1
197:12 200:24
201:1 208:22
208:23 212:8
241:8,24,24
253:12 255:4
260:20 262:2,9
265:11 266:5,5
270:13 274:11
274:11 280:10

282:19 284:3
285:8 290:2
293:19,20
**two-hour-a-day**
171:6
**type** 21:18 32:13
108:21 110:20
149:5,6 188:20
279:11
**typewriting**
302:21
**typically** 259:22

___
**U**
___
**U.S** 4:21
**Uh** 80:24 205:12
**Uh-huh** 95:17
97:14 112:16
113:2 269:12
**UIC** 146:23
147:1
**Um** 49:3 88:14
101:5 145:4
**umbrella** 162:3
162:9 270:22
**unbeknown**
43:6
**uncommon** 86:7
98:4,5
**uncovering**
58:15 89:9
**undergrad** 13:8
**underlining**
21:7 35:13
**underlying**
250:19
**undermining**
214:21
**understand** 6:18
7:16,18,19,21
52:15 53:20
76:6 127:3,5
149:10 170:11
184:24 186:8

187:4,5 192:22
220:1 226:21
245:11 278:9
283:12
**understanding**
47:1 50:9 52:4
73:23 74:18,19
74:21,23 75:6
75:9,10,13,17
75:18,19 76:8
77:19 79:7,16
80:19 90:22
104:7 125:22
143:23 149:17
149:19 154:23
155:7 186:2
192:13 197:7
197:24
**unfortunately**
127:20 208:19
**unintended**
109:19
**unintendedly**
110:2
**union** 36:1
71:16 73:8
77:4,7 85:3,10
91:3,19,22
92:8,11,18,18
93:4,5,24
94:10,18
107:14 113:7
114:3,12,16,19
118:18 124:7
128:11,12
139:10,13,15
141:15 146:24
147:11 156:19
181:20 182:18
192:20 198:9
200:18 205:3
230:16 236:22
262:22 264:11
264:13 286:16

WADLINGTON REPORTING SERVICE, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

340

**unit** 21:2,3,4,6
30:6 49:12
84:23 88:5,12
89:2 104:9,14
104:15 148:4,4
149:22 150:18
152:17,19
161:6,21,23
162:1,10 182:9
182:13 183:4
187:15 189:19
189:23 197:19
198:19 199:1
207:9,17,24
208:8,19,24
270:21 273:6
274:2,16
276:12 278:3
280:16
**United** 1:1,18
299:1
**units** 21:19
136:6 137:8
152:10 182:8
183:2,23
199:23
**University** 13:7
13:9
**unknown** 1:5,13
146:12 299:5
**unpack** 18:14
42:17 127:10
**unwilling** 68:2
**upcoming** 295:3
**update** 236:18
**updated** 89:18
**uphold** 109:20
**use** 18:3 45:7
46:1,24 51:13
61:10 97:23
98:7,8,12,19
98:21 99:20
101:3 103:7
212:14 220:19

220:21,22
221:2,11
232:16,18,19
235:17
**usually** 16:10,12
52:5 92:7
106:14,15
108:20 131:18
131:18 142:2
202:16 248:1
295:9,10,11
**utilize** 55:6
**utilized** 114:20
136:15 137:18
199:7 212:1
**utilizing** 21:8
99:24 137:24

— **V** —

**vacated** 89:19
**validate** 157:14
157:18 162:4
**varied** 172:10
**varies** 58:21
294:13,19
**vehicle** 98:4,6,12
98:20,21 101:4
101:7,12 102:6
**vehicles** 97:23
98:8 103:6
**verbal** 50:4,6
112:21 233:8
259:24 266:5
**Verification**
249:9
**versa** 213:20
**versus** 4:20
**vet** 92:16,19,20
**vetted** 219:20
220:13
**vice** 213:20
**videos** 171:7
**view** 141:2
**Villa** 101:19

**Vincent** 171:4
**violate** 87:4
125:24 198:11
**violated** 94:6
**violation** 126:7
190:13
**violations** 136:3
**violent** 19:11
87:10
**Virginia** 121:13
155:11 260:10
**visits** 253:8
**voluntary**
264:15
**volunteer**
101:14 106:22
**volunteering**
102:15 107:1
**volunteers**
101:20
**votes** 92:22
**vs** 1:8 299:8

— **W** —

**Wadlington**
1:20 302:4
303:16
**wait** 7:5,6,8
182:22,22
**waiting** 191:3
194:10 230:14
**waive** 297:23
**walk** 24:3
**walked** 266:4
**Wallace** 105:2
**want** 5:2 6:12
7:4 8:22 15:8
21:11 25:20
30:15 35:5
38:8,15 41:7,8
41:22,23 45:17
46:6,10,16
50:9 51:16
52:1,22 58:18

61:23 62:5,18
65:9,14 67:12
71:4 73:23
74:17 77:8
79:20,21 83:5
83:7,15,16,20
84:3 87:4
91:18 94:22
95:13 102:12
104:23 112:13
113:21,22
119:13 120:12
124:24 126:13
126:13,24
129:9,10,11
130:4 148:8
156:7,10
159:15 162:12
167:2,3,23
169:1,5 170:22
173:10,19
175:2 178:9
179:23 180:2
187:16 192:13
200:3,10
202:18 206:4
210:6 214:18
215:6 216:7
217:12 219:24
223:11 225:13
226:15,16,19
229:11 241:14
244:4 249:8
250:16 251:17
256:23 257:23
258:22 259:14
259:16 261:18
262:8 264:16
265:18,23
267:23 269:2,8
270:1,2,5,6
271:17 276:8
278:18 281:23
281:23 282:1,1

285:23 287:7
287:19 288:17
290:11,14,19
291:7 296:20
297:13
**wanted** 144:14
157:18 169:15
169:17 180:5
181:9,11
197:15 202:21
213:2 220:2
**wants** 126:17
133:12 171:12
**wards** 166:1
**Warner** 181:15
**Washington** 2:6
**wasn't** 42:13
48:3 80:14
86:6,10 97:8
98:9 119:11
124:20 133:16
159:10 166:20
183:19 194:1
238:5 264:2
265:6 266:17
275:4 284:14
284:15
**waste** 187:23
**watched** 231:23
**watermark**
146:23
**way** 15:3 19:5
42:11 59:24
68:9 69:2 75:4
75:16 79:10
95:8 96:20
97:6,7 100:24
104:22,23,24
105:3,8 108:15
111:15 114:8
115:3 116:21
133:8 138:15
153:1 155:1
168:21 175:10

Theodis Chapman
August 21, 2017

341

| | | | | |
|---|---|---|---|---|
| 176:9,14 178:5 | 208:1 214:7 | **whereof** 303:10 | 215:19 216:9 | 45:7,13 47:9 |
| 184:5 188:12 | **week-by-week** | **Whichever** | 255:11 302:11 | 50:14,16 53:14 |
| 191:1 195:18 | 24:12 | 179:5 | 302:14,19,23 | 54:3,8 60:8,9 |
| 225:2 232:18 | **weekends** | **white** 30:14 | **witnessed** 282:8 | 80:11 103:22 |
| 274:9 278:9 | 101:22,24 | 63:12 84:23 | **woman** 262:17 | 106:11 113:14 |
| 303:1,2 | 160:11,13 | 86:2 89:14 | **won** 225:1,16 | 117:9 283:10 |
| **ways** 285:7,10 | **weekly** 214:6,7 | 115:23 116:19 | 230:16 | **worker** 60:20 |
| **we'll** 12:12 | **weeks** 23:10 | 118:1 148:5,18 | **wondering** | 72:12 |
| 32:24 41:7,18 | 32:9 35:9 51:9 | 155:16,17 | 192:5 | **working** 13:22 |
| 41:24 45:19 | 51:11,20 | 156:22 162:1 | **word** 159:13 | 14:3 15:5 |
| 70:3 77:5 | 172:13,13 | 163:9,10 | **words** 186:22 | 16:14 42:12,20 |
| 127:4 156:3 | 207:15 209:22 | 203:16 208:20 | **work** 11:6,17 | 44:15 50:14 |
| 205:24 224:12 | 233:19 | 218:22 220:20 | 13:14 16:15 | 52:10 55:18 |
| 263:12 279:15 | **weight** 283:6 | 221:4 259:20 | 17:1,15 18:10 | 56:6,6 66:3 |
| **we're** 8:18 33:20 | 284:1,12,15 | 259:21 260:7 | 23:20 27:1 | 67:14 89:1 |
| 41:6 61:24 | **went** 9:7 21:11 | 261:10,23 | 31:23 32:24 | 99:11 106:8 |
| 64:10,11 91:17 | 27:10,11,22 | 266:24 276:11 | 42:23 44:12,16 | 128:16 151:15 |
| 106:24 107:20 | 31:16 32:12 | 277:20 282:12 | 45:13 52:13 | 160:11 167:10 |
| 107:20 120:4 | 42:14 68:13 | 290:3 | 53:23 56:8,9 | 168:16 170:24 |
| 129:2 151:10 | 79:10 89:2 | **whites** 142:10 | 58:19 63:2 | 199:2 200:2 |
| 167:20 169:19 | 104:14 110:10 | 155:3 236:2 | 67:22 68:3,4 | 254:17 261:1 |
| 171:15,15,16 | 110:18 111:4 | 269:18 | 78:8 81:10,17 | 264:10 275:8 |
| 171:18,18,21 | 129:21 130:21 | **wide** 71:1,5 | 82:5 86:13,19 | 294:12 296:14 |
| 173:3 191:3 | 135:22 139:13 | **wife** 11:6 | 86:24 90:13 | **works** 21:6 |
| 196:8 201:9 | 139:22 140:12 | **William** 1:12 | 96:5,14 97:19 | 176:21 278:8 |
| 215:1 216:4 | 141:14 149:1 | 140:1,2 143:10 | 104:3,8 106:17 | 280:15,16 |
| 230:14 269:3 | 153:21 161:17 | 143:11,14,15 | 106:22,22,24 | **world** 281:24 |
| 270:2 278:14 | 163:11,24 | 181:14 206:17 | 107:3,23 | **worse** 84:23 |
| 285:22 287:4 | 164:1,3 165:22 | 231:8 278:8 | 110:16 116:23 | 90:24 297:3 |
| **we've** 106:17,18 | 166:1,5 191:1 | **willing** 68:6 | 116:23 125:14 | **worth** 157:15 |
| 107:6 177:5 | 201:8 209:5 | 246:18 290:24 | 137:4 150:9 | 162:6 |
| 206:18 215:1 | 226:23 236:17 | **Willis** 139:15 | 155:13 160:13 | **worthy** 226:5 |
| 230:15 244:3 | 236:17,22 | **winded** 226:15 | 165:8 166:8,16 | **wouldn't** 21:23 |
| 258:3 264:22 | 258:4 270:19 | 226:16,19 | 171:21 188:20 | 47:4 86:23 |
| 265:16 268:21 | 275:1 277:17 | **wiped** 282:12 | 219:12,13 | 252:9 |
| 296:10 | 277:18 297:3 | **Wisconsin** | 223:6 232:6 | **wraparound** |
| **weaknesses** | **weren't** 40:1 | 101:19 | 233:6 234:6,14 | 151:7 |
| 136:22 | 43:14 46:19,20 | **witness** 4:1,3 6:1 | 282:14 284:7,8 | **Wright** 25:5 |
| **weapons** 64:7 | 88:12,17 | 6:14 63:21 | 293:14 294:7 | 26:6,20 |
| **wearing** 285:19 | 154:18 159:7 | 110:9 126:20 | 294:15 295:3 | **write** 133:21 |
| **week** 46:2 51:3 | 220:16 232:4 | 129:16 154:17 | 296:15 | 217:14 281:12 |
| 51:14,20 54:9 | 240:13 | 158:6,9 170:14 | **work-related** | **write-up** 85:1 |
| 55:12,18 58:20 | **west** 1:22 2:6,18 | 178:8,10 185:3 | 107:2 | 262:1,15 |
| 58:24 59:1 | 17:14 302:9 | 185:7,9 215:16 | **worked** 16:18 | **writing** 61:20 |

Theodis Chapman
August 21, 2017

342

66:23 134:8
181:19,20,21
200:8 302:18
**written** 50:3
51:22 112:21
116:6 134:4
205:3,3,7
233:2 238:22
254:1
**wrong** 88:20
127:23 140:20
140:22 267:13
**wrote** 220:2
221:24

---

**X**

**X** 3:1 36:6 67:7

---

**Y**

**Yards** 104:21,22
**YAZI** 136:17
211:19,20
**yeah** 15:10 18:4
19:3 32:5,5
49:5,9 55:4
60:4,20 61:18
62:12,12 64:18
71:8 84:5,21
98:18 109:18
110:6,7 115:20
118:17 119:15
122:23,23
123:10 126:10
128:16 129:15
142:14 145:12
150:19 156:14
158:9,13
159:16 165:15
174:17,20,21
178:19 182:14
184:19 185:1,5
185:9,9,20
187:3 192:12
192:22 198:21

199:3 200:6,13
202:10,19,20
203:24 214:4
215:9 233:10
234:19,21
239:18 242:13
243:20 253:17
254:8 255:10
260:8 264:24
264:24 266:21
267:8 268:14
269:1 271:18
273:13 274:7
274:10,12
275:6 279:16
280:7 283:4
284:4 286:7
295:5,5 296:4
**year** 18:18,18
22:1 28:10,11
28:11,13,13
29:9 30:11
43:18 102:14
102:14 122:18
131:5,7,17
153:8 157:21
262:6 283:18
286:6 291:21
**years** 15:8 92:7
110:13,13
112:23 113:20
122:21 130:20
130:22 133:11
133:15 188:13
189:19 207:17
208:22,23
212:11 213:4
227:17 230:4
262:9 274:11
274:11,12,17
293:19,20
**Yep** 215:1
**yeses** 7:13
**yesterday** 10:20

**young** 1:12
32:22 33:3
34:18 140:10
140:15 141:16
143:2,5,13
222:8 230:24
231:2 237:17
291:16,19,22
292:1,3,9
**Young's** 33:9,22
141:20
**younger** 292:6
**youth** 14:24
16:22 19:7
23:21 37:7
86:7
**Yusef** 171:4
177:2,4 273:1
273:1,3,6,14
273:21

---

**Z**

**ZIP** 38:22

---

**0**

**002033** 191:11
**002035** 190:7
**084-002443**
303:16

---

**1**

**1** 3:9 81:22 82:4
199:14 201:19
204:15 252:15
299:13
**1.5** 62:11 160:8
161:12 162:22
287:22
**1/14/16** 3:13
**10** 113:19
114:18 153:10
233:19 265:17
**10-and-a-half**
164:18
**10:00** 1:24

295:11
**100** 1:21 2:18
302:9
**11** 115:11
268:19 269:24
284:4
**11/15/2015** 44:2
**11/23/15** 3:12
**12** 109:11 114:5
114:6 120:6
121:12 145:11
209:24,24
210:1 213:4
233:19 270:11
**12-year** 37:17
**123rd** 105:2
**13** 35:18 92:24
102:13 121:11
130:21,22
158:7 207:17
227:18 230:6
230:12 255:5
**13-and-a-half**
164:19
**13th** 1:22 2:18
302:9
**14** 29:3 92:5
93:13 123:1,2
130:20,21
158:7 212:11
227:18 230:6
230:12 234:20
234:22 255:5
276:3 283:17
**15** 1:8 92:5 93:1
93:13,13
132:24 148:14
172:21,24,24
173:2,3,3,6,7
183:13,14
230:6 231:11
234:19 255:9
255:10,11
278:13,23

283:17 299:8
**158** 3:10
**15th** 303:11
**16** 83:10 227:23
227:24
**17** 83:10 95:12
95:19 122:23
132:23
**18** 64:11 95:19
129:6 217:2
218:17 241:9
293:9
**180** 246:5
**19** 64:11 129:6
132:7 156:6
**190** 3:11
**191** 3:12,13
**194** 3:16

---

**2**

**2** 3:10 158:4,12
164:17 167:14
191:2 196:23
197:9 202:2
226:23 250:16
288:11
**20** 23:10 38:9,9
153:8 188:8
245:4
**20-year-olds**
64:11
**200,000** 63:24
**2000** 9:11,11
36:19,21
**2001** 36:19,21
36:21
**2002** 18:18
19:23
**2003** 13:5 14:5
14:15 18:17
22:6,9 24:18
24:22 25:22
27:8 36:20
37:17 80:12

Theodis Chapman
August 21, 2017

343

**2005** 9:5
**2007** 132:12
  133:4,14 135:6
  142:11 150:13
  265:14 279:2
**2008** 33:6 93:8,9
  94:21,23
  112:23 114:5
  114:23 167:19
  231:3
**2008-2015**
  128:12
**2009** 5:15 273:8
**2010** 27:16
  284:4
**2011** 157:7,24
  158:1 162:13
  165:4 167:14
  268:22 270:8
  284:4
**2012** 33:16
  132:12,17,19
  133:4,14 135:6
  140:7 142:11
  149:14 150:13
  265:9
**2013** 32:18
  33:17 35:17
  112:24 114:23
  231:11
**2014** 92:4 95:5
  96:22 158:7
  217:2 218:17
  219:22 231:11
  234:19 237:16
  237:18 241:9
  255:5,6 283:22
**2015** 25:19,22
  27:9 29:17,22
  30:5,16 31:2,8
  31:17 33:1
  34:16 37:17
  38:4,6 41:10
  42:2 47:20

92:4 95:5
102:13 168:8
168:13,14
170:20 171:11
172:8 173:16
174:3 175:5,10
175:10,14,18
176:6,10
177:12 179:23
180:23 184:6
184:17,18
195:14 200:8
227:21 228:5
228:22 229:24
230:2 234:18
235:1 237:14
237:14 240:24
241:4,10 242:5
242:16 255:14
272:10 273:15
275:17 286:10
**2016** 44:7,7
  65:15,16 92:4
  131:11,14,15
  131:16,24
**2017** 1:23
  299:13 302:8
**2018** 299:22
  303:12
**2031** 192:3
**2032** 192:4
**21** 195:13 200:8
  299:13
**213** 2:8
**2133** 228:18
**2134** 228:18,18
**2137** 216:19
**2138** 216:19
**2149** 195:4
**216** 3:17
**21st** 1:23 302:7
**22** 96:22 287:7,8
  287:8,9,10
**225** 3:18

**23** 245:4 288:10
  296:2,3
**248** 3:19
**25** 172:22
  277:17
**26** 112:15,15
**27** 113:19 114:4
**28** 172:24

**3**

**3** 3:11 190:2,6
  191:2,18
  201:20 202:7
  226:24 252:12
  253:11 256:16
  260:22
**3,750** 63:23
**3.5** 220:22
**3/12/69** 12:16
**3/14/11** 3:10
**30** 172:24 208:9
**303** 299:14
**312** 2:8,20
**32** 115:12,19
  259:7
**33** 113:20
**34** 114:19 115:5
  191:11
**3477** 92:9
  112:19 114:19
  195:21 197:20
**35** 55:13
**372-2511** 2:8
**38** 258:9,12
**39** 115:13

**4**

**4** 3:12 79:10,16
  191:2,7,11
  192:7,14,19
  193:4,14 194:5
  194:17 201:20
  203:3,9,11,16
  226:24 227:3

228:21 235:1
241:4,10
242:16 254:13
255:23 256:16
256:19,20
**4:00** 16:8
**40** 37:22 47:9
  55:13 115:13
  246:4,6
**40-something**
  246:7
**400** 112:22
  132:2 223:21
  224:1,2
**41** 118:17 120:3
**420** 245:22,22
**44** 3:9
**440-2014-05395**
  224:13
**45** 37:22
**46** 120:5,7
**48** 83:7

**5**

**5** 3:3,13 5:17
  164:22 191:23
  192:3 203:8,9
  204:1 258:3
**5:00** 260:23
  295:11,13
**5:07** 298:5
**56** 84:15,17
**57** 83:8
**58** 95:18
**59** 236:20
**5907** 1:8 299:8
**599** 224:1

**6**

**6** 3:14 194:22
  195:3 199:14
  259:6
**60** 16:12 150:10
  236:20

**600** 223:24
**60601** 2:19
**60602-3271** 2:7
**60s** 41:16,17
  297:3
**63** 95:18 100:2
**64** 56:18 57:2
  129:5,21 212:5
**65** 132:6 135:11
  139:3 150:10
**66** 144:17
  147:16
**67** 129:5
**67th** 104:23
**68** 156:7,16
**69** 156:7 168:2,7
  175:24 177:9

**7**

**7** 3:17 112:14
  145:11 216:11
  216:15 228:8
**7.5** 45:15
**7/18** 250:6
**7/18/17** 249:16
**7/21/15** 3:14
**70** 41:17 150:10
  153:5,11 179:8
  271:9
**71** 168:2 204:15
**711** 2:6
**72** 156:7,12
  286:5,6
**73** 286:5
**73,000** 286:6
**77** 2:6
**79** 245:4
**7th** 22:8

**8**

**8** 3:18 93:9
  225:4,8 228:9
  233:19 259:14
**8-21-17** 300:2

WADLINGTON Reporting Service, Inc.
(312) 372-5561

Theodis Chapman
August 21, 2017

344

301:2
**8:00** 16:9
**814-5022** 2:20
**83(a)** 288:12
**85th** 105:4

-----

**9**

**9** 3:19 93:9,10
248:18,23
264:20
**90** 36:17,18
**900** 105:6
**91** 36:17,18
**93** 36:16
**95** 20:1
**97** 13:11 17:5
**99** 15:9,10,10