**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY JORDAN, KENNETH GREENLAW, THEODIS CHAPMAN, and PATRICK NELSON, on behalf of themselves and others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | No. 15 C 5907 |
| v. | ) ) | Judge Sara L. Ellis |
| TIMOTHY EVANS, Chief Judge of the Circuit Court of Cook County | ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiffs Anthony Jordan, Kenneth Greenlaw, Patrick Nelson, and Theodis Chapman,

who worked as Juvenile Probation Officers in the Circuit Court of Cook County, filed an action

against Defendant Timothy Evans, in his official capacity as Chief Judge, alleging discrimination

and retaliation. Evans previously filed a motion for summary judgment that the Court granted in

part and denied in part. Evans now seeks summary judgment on Plaintiffs' disparate impact

claim under the Illinois Civil Rights Act of 2003 ("ICRA"), 740 Ill. Comp. Stat. 23/5, and

Chapman and Nelson's claim that Evans denied them compensation for out-of-state job training

because of their race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e *et seq.* The Court grants summary judgment on Plaintiffs' disparate impact

claim because Chapman and Nelson do not have standing and Jordan and Greenlaw failed to

make a *prima facie* showing of disparate impact to survive summary judgment. Additionally, the

Court grants summary judgment for Evans on Chapman and Nelson's Title VII out-of-state

training claim because it is barred by the statute of limitations. Evans also seeks leave to amend

his answer and affirmative defenses to add a statute of limitations defense under the ICRA and a preemption defense. Because Plaintiffs did not object to Evans' motion to amend his answer to assert a statute of limitations defense, the Court grants that part of the motion. However, the Court denies Evans' motion insofar as he seeks to assert a preemption defense because Evans unduly delayed in raising this defense and it would unfairly prejudice Plaintiffs.

**BACKGROUND**[1]

## I. The Office of the Chief Judge of the Circuit Court of Cook County and the Cook County Juvenile Probation Department

As Chief Judge, Evans is responsible for the assignment of approximately 400 judges. The Office of the Chief Judge (the "Office") supervises approximately 2,400 employees across 15 offices, including the Juvenile Probation Department ("JPD"). From July 1994 until May 2014, Michael Rohan was the Director of JPD. Rose Golden was the JPD Director from May 2014 to January 2015, when Avik Das became Director. Rohan and Golden are Caucasian, and Das is Asian. Donna Neal served as Deputy Chief Probation Officer from July 2007 through February 2016 and was in charge of the Jumpstart Unit from 2011 through 2014; Neal is African American. The Director of JPD has authority over all levels of discipline, short of termination. The Director may impose verbal and written reprimands, suspensions, and temporary suspensions without the Chief Judge's permission. However, the Chief Judge learns of suspensions and other disciplinary actions and must approve terminations. Rohan testified that

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Facts and the accompanying exhibits. The Court considers all facts in the light most favorable to Plaintiffs, as the non-moving party. Plaintiffs also filed a Statement of Additional Disputed Facts. The Court has reviewed those facts, as well as the supporting materials, and added the facts relevant to this motion. Although Plaintiffs failed to comply with this Court's standing order, the Court declines Evans' invitation to disregard these facts altogether. However, the Court reminds Plaintiffs that they should follow this Court's standing orders moving forward. Moreover, the Court derives some facts from the parties' previous Statement of Undisputed Facts, Doc. 116, because the parties previously agreed those facts were undisputed.

2

when terminating a JPD employee, the JPD Director makes a recommendation to the Office, which either accepts or rejects that recommendation.

## II.    The Union and Collective Bargaining Agreement

AFSCME Council 31, Local 3477 (the "Union") represents probation officers for purposes of collective bargaining, including disciplinary grievances.  From 2010 to 2016, Jason Smith was a Union steward.  Smith was Vice President of the Union from 2012 to 2014 and President from 2014 to 2016.  In those roles, Smith was responsible for filing grievances, representing JPD employees in grievance meetings, making information requests of the JPD, receiving and reviewing documents from the JPD, and bargaining with JPD management.  From 2012 to 2016, Smith was involved in representing the probation officers on essentially all discipline that the JPD issued.  Smith's duties as a union officer brought him into substantial contact with employees throughout the JPD, and he gained personal knowledge of the structure of the JPD and the terms and conditions of employment for bargaining unit employees.  During Smith's Union presidency, the racial makeup of the bargaining unit was approximately 50% white, 40% black, and 10% other.

A collective bargaining agreement between the Union and the Chief Judge governs the employment relationship between JPD and the Chief Judge.  The CBA provides:

> [t]he Employer has the right to discipline employees.  The Employer may only impose the types of discipline listed in Section 2 of this Article.  Although discipline shall normally be progressive and corrective, the Employer need not apply these types of discipline in sequence, but rather base the type of discipline to fit the severity of the offense and/or infraction involved.  The Employer may only discipline an employee for just cause."

Doc. 184-8 at 16.  Michael Rohan testified that during his time as Director of the JPD, "major causes of discipline" were not subject to progressive discipline.  Although no written document

3

defined a "major cause of discipline," Rohan testified that it involved "pretty egregious behavior," including stealing, theft of services, and falsification of records. Doc. 184-1, Rohan Dep. 20:10–21:9. Additionally, Rohan testified that JPD would have investigated an allegation of racial disparity in the discipline imposed on juvenile probation officers. *Id.* 17:20–18:17. Rohan refused to share information on discipline with bargaining unit members who were not union officers because he viewed it as confidential. *Id.* 45:17–46:16. Smith testified that the Office denied all of the grievances he brought on behalf of JPD officers who alleged racial discrimination. Doc. 184-2, Smith Dep. 50:17–51:11. Das testified that during his time as a union steward—2000 through 2012—he filed meritorious complaints by African American officers suffering race discrimination. Doc. 184-3, Das Dep. 46:1–47:23, 109–110. Das further testified that Rohan took steps to remedy meritorious claims of discrimination but did not know whether Rohan took "any remedial steps to ensure that there weren't future instances of similar conduct targeting African Americans for race discrimination." *Id.* 47:20–48:11.

### III. Kenneth Greenlaw

Kenneth Greenlaw was an employee at the JPD from 1999 until 2014. Although he began as a juvenile probation officer, he was a compliance officer with the Intensive Probation Services Division ("IPS") at the time of his termination. In his role with the IPS, Greenlaw's job responsibilities included visiting juveniles' homes and schools to verify compliance with probation conditions. Greenlaw used a department vehicle in connection with this position, and he used a JPD-administered gas card to fill the tank. JPD required that users of gas cards obtain receipts and document information on a vehicle inspection sheet before and after their shifts, which included indicating the level of gas in the vehicle.

4

On March 10, 2013, JPD conducted an investigatory hearing relating to allegations that Greenlaw misused his gas card. Smith and Jeff Haynes, Greenlaw's union representatives, attended the hearing, and Greenlaw had an opportunity to explain the discrepancies in his gas use. The specific allegations against Greenlaw included the following: (1) forty-five instances of gas purchases made twice daily that did not correspond with the miles Greenlaw travelled; (2) forty instances of missing vehicle inspection forms; (3) twenty-eight occasions of missing gas receipts; (4) three instances of gas purchased at the beginning of a shift when gas had been purchased at the end of the previous shift; (5) three instances of gas purchases made outside of documented work hours; and (6) one instance of gas purchases made on days that Greenlaw documented he worked the entire day in the office. On April 11, 2014, there was a rebuttal hearing during which Greenlaw had an opportunity to respond to the charges against him. Greenlaw had union representation at this meeting. Rohan recommended that the Office terminate Greenlaw based on JPD's investigation that found Greenlaw had made fraudulent use of his gas card on multiple occasions. Greenlaw's partner in the IPS, Ernest Boyd, was terminated for the same reason. On April 22, 2014, Rohan informed Greenlaw of his termination in a letter. The letter re-stated the charges raised at the hearing, indicated that neither Greenlaw nor his union representatives mitigated the allegations, and noted that misuse of the vehicle and gas card amounted to theft of services. *See* Doc. 184-11. The Cook County Comptroller's Office conducted an audit and found discrepancies in record keeping for many vehicles throughout Cook County agencies, including JPD.

In 2015, Greenlaw filed a grievance with the Union that alleged his termination was erroneous; Greenlaw did not allege that he was terminated because of his race. Doc. 184-9, Greenlaw Dep. 119:12–120:5. Nonetheless, Smith presented information of racially disparate

discipline on behalf of Greenlaw as part of his grievance proceedings. The Union denied Greenlaw's grievance. Greenlaw understood his termination to be based on chronic noncompliance with department protocols and misuse of his department assigned gas card. Greenlaw was unable to identify a JPD employee who misused an assigned department gas card and was not terminated, but Boyd is the only employee whom Greenlaw knew that was terminated for that reason. When asked whether it would have been harder for the department to make him a scapegoat if he were Caucasian, Greenlaw answered, "I don't know." *Id.* 94:19–23. Greenlaw did not see Caucasian employees at JPD treated better in the workplace. *Id.* 125:19–21.

## IV.     Anthony Jordan

Jordan began his employment with JPD in April 1998 as a Juvenile Probation Officer. In 2007, JPD suspended Jordan due to an arrest for possession of cannabis and domestic battery. Rohan made the decision to suspend Jordan, and Jordan does not believe he was suspended because of his race or treated unfairly. JPD suspended Jordan again in 2008 based on allegations that he sexually harassed an intern. Again, Rohan administered this discipline, and Jordan served a three-day suspension. In November 2010, JPD placed Jordan on a three-month supervision plan. In October 2011, Jordan entered into a last chance agreement with JPD after being faced with the choice of entering into that agreement, moving forward with arbitration, or being terminated. A last chance agreement stipulates the employee complies with certain restrictions and expectations but will be terminated if he fails to comply. Pursuant to the agreement, Jordan's "non-compliance with directives, department standards, and protocols from [his] supervisor, deputy chief, and administrators" would result in termination. Doc. 184-15 at 2. Jordan received a thirty-day suspension in connection with his agreement.

6

In 2014, Jordan transferred to the Electronic Monitoring division. His responsibilities included attaching tracking bracelets to probationers and monitoring whether probationers left their house or if they failed to charge their tracking bracelet. Jordan was assigned to monitor between fifteen and twenty probationers. Jordan testified that his supervisor informed him that he had discretion over whether to issue a violation report when the electronic monitoring indicated that a probationer had violated the terms of release. On September 16, 2014, JPD placed Jordan on temporary suspension because a probationer on Jordan's caseload violated the terms of his probation and committed rape "on [Jordan's] watch." Doc. 184-13, Jordan Dep. 87:19–21. Although Jordan had submitted a violation report for the probationer on September 14, 2014, he did not submit violation reports on August 29 or September 3, despite unauthorized movements. Jordan believes that JPD suspended him because of his race. During his deposition, Jordan was not aware of any Caucasian probation officer that was accused of the same conduct as he was.

JPD terminated Jordan on February 3, 2015 for failure to discharge his duties as a probation officer, failure to monitor the electronic monitoring software on a daily basis and appropriately respond, and failure to abide by JPD's code of conduct. The letter terminating Jordan also referenced his last chance agreement. Rose Golden, the JPD Director at that time, made the decision to terminate Jordan. Jordan contends that he was terminated because of his race. Jordan testified that he was a "scapegoat" because of his race because "there have been other officers who would either receive verbal, written, or be transferred to another unit or another department rather than lose their job for more than what [he] was terminated for." *Id.* 130:10, 131:18–21. However, Jordan could not identify another JPD probation officer who was not terminated after a juvenile under his charge violated probation and committed rape.

7

Similarly, Jordan could not identify any officer who engaged in "egregious" misconduct that JPD did not terminate. Although Jordan's direct supervisor, Brian Modjeski, participated in an investigatory hearing regarding Jordan's failure to submit a violation report, JPD did not discipline Modjeski nor his supervisor, William Pieroth. Modjeski and Pieroth are both Caucasian.

**V.     Theodis Chapman and Patrick Nelson**

Theodis Chapman and Patrick Nelson began their employment with JPD as probation officers with the Jumpstart Unit in 2001 and 2003, respectively. The Jumpstart program was designed to provide education to juvenile probationers who were not complying with educational services or going to school. Although both worked as teachers, the program also employed outreach officers who went to the field to bring absent probationers to class. As of August 2017, neither had a history of discipline. From March 3, 2011 through March 6, 2011, Chapman, Nelson, and other Jumpstart employees, as well as employees from the Advocacy Unit, attended an out-of-state training in San Antonio, Texas. The final two days of the conference occurred on Saturday and Sunday. Neal was responsible for recommending that JPD grant probation officers in the Jumpstart Unit receive compensatory time. On February 25, 2011, Neal requested that Rohan award compensatory time for attending the out-of-state training to Chapman and Nelson, as well as the other employees that attended. Rohan approved Neal's request on March 8, 2011. In a sworn declaration, Neal stated that those employees were awarded twenty-four hours of compensatory time from March 5, 2011 and March 6, 2011. Nelson and Chapman both testified that they received compensatory time for the San Antonio conference and that was the only out-of-state conference they attended.

Nelson filed a charge of racial discrimination against JPD with the EEOC on August 8, 2014. The charge alleged that JPD subjected Nelson to different terms and conditions of employment, including denying him "the ability to earn and use compensatory time" and "a performance bonus." Doc. 184-5, Nelson Dep. 74:16–20. Additionally, Chapman filed a charge of racial discrimination with the EEOC on August 18, 2014. The charge alleged that JPD subjected Chapman to different terms and conditions of employment, including "regulations regarding compensatory time and lowered performance evaluations." Doc. 184-4, Chapman Dep. 217:19–24.

During Nelson's work with the Jumpstart program, the attendance at the program fell "tremendously." Doc. 184-8, Nelson Dep. 109:20–110:1. Due to this falling enrollment, Nelson heard talk of restructuring the program. When Nelson learned that the teaching position in the Jumpstart program would be eliminated, there were approximately six to fifteen probationers per class, which was down from a high of seventy. In November 2015, the JPD eliminated the instruction side of Jumpstart and transferred Nelson and Chapman to field probation positions. Das testified that JPD ultimately eliminated the Jumpstart program due to its "becoming less and less utilized" and JPD was short-staffed in other areas. Doc. 184-3, Das Dep. 68–69. Das decided to prioritize field probation and electronic monitoring and close Jumpstart. *Id.* 118–19. Although their salaries did not change following their transfer out of Jumpstart, Chapman and Nelson testified that they worked more hours, the hours were less regular, and they lost any opportunity for professional development in the field of alternative education, an area in which both had expertise and in which they wished to continue working. Neither submitted a bid to remain in Jumpstart.

## VI. Plaintiffs' Disparate Impact Claim

In the Second Amended Complaint ("SAC"), Plaintiffs make allegations regarding the JPD's racially disparate disciplinary decisions between 2008 and 2013 compiled by the Union. *See* Doc. 55 ¶¶ 26–33. Evans contended that he lacked knowledge or information sufficient to admit or deny specific numerical allegations. Smith testified that he compiled the data for the allegations in paragraphs 26 through 33 based on records that the JPD provided the Union while Smith was an officer. To Das' knowledge, no one at JPD investigated whether the specific numerical allegations in those paragraphs were correct. When asked whether the indicated disparity in discipline was possible when he was involved in the disciplinary process, Das acknowledged it was possible. Doc. 184-1, Das Dep. 43:13–17. Smith testified that during a disciplinary hearing involving a Caucasian JPD officer who was cited for insubordination, William Patterson, the Human Resources Director, stated that "if the union wasn't complaining about discrimination, you wouldn't be here." 184-2 Smith Dep. 134:8–10, 136:9–16. Smith also testified that JPD suspended another Caucasian employee who made false entries to visits he never completed for 1.5 days; comparatively, JPD required an African American officer to accept a last chance agreement for putting in false information as to visits or contacts she never made. Those two officers were in different units and had different supervisors. However, Rohan was JPD's final decisionmaker and therefore made disciplinary decisions for both officers. According to Smith, Rohan overrode the African American officer's supervisor in imposing that punishment. When Das became Director, he settled an open grievance involving an African American officer who alleged she had received disparate discipline based on her race.

## VII.    This Litigation

Plaintiffs filed a complaint in this Court on July 5, 2015, and served it as early as August 4, 2015.  Plaintiffs later filed the SAC that included claims that Evans discriminated and retaliated against[2] Plaintiffs in violation of Title VII, violated the Illinois Probation Act, and violated the ICRA.  On September 20, 2016, the Court granted Evans' motion for judgment on Plaintiffs' Illinois Probation Act claim.  *See* Doc. 69.  On September 9, 2019, the Court granted Evans' motion for summary judgment against Jordan and Greenlaw.  *See* Doc. 150. Additionally, the Court concluded that the statute of limitations barred Nelson and Chapman's claims regarding the supervisor's exam.  However, Nelson and Chapman's claims as to whether their transfers amounted to a demotion, whether Evans' reason for the transfers was pretext, and their claim that they were discriminated against in compensation for attending an out-of-state training survived summary judgment.  Further, on a motion for reconsideration, the Court explained that to the extent that Plaintiffs asserted a disparate impact claim in Count IV, that claim remained pending.  *See* Doc. 159.  Evans now moves for summary judgment on that claim, as well as Nelson and Chapman's claim that they were denied compensation for out-of-state training.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record.  Fed. R. Civ. P. 56 & advisory committee's notes.  The party seeking summary judgment bears the initial burden of proving that no genuine issue of material

---

[2] Only Nelson and Chapman brought the retaliation claim.

fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving

party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to

identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v.*

*Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue

of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th

Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party

and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986).

## ANALYSIS

### I. Plaintiffs' Disparate Impact Claim

"Disparate impact claims require no proof of discriminatory motive and 'involve

employment practices that are facially neutral in their treatment of different groups but that in

fact fall more harshly on one group than another and cannot be justified by business necessity.'"

*Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012) (quoting *Int'l Bhd. of Teamsters v.*

*United States*, 431 U.S. 324, 335 n.15 (1977)); *see also Vitug v. Multistate Tax Comm'n*, 88 F.3d

506, 513 (7th Cir. 1996) ("A disparate impact exists where a specified employment practice,

although neutral on its face, has a disproportionally negative effect on members of a legally

protected class." (citation omitted)). "To succeed on a disparate impact claim, plaintiffs bear the

burden of showing that a particular employment practice causes a disparate impact on the basis

of race." *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003). Evans argues that the Court

should grant summary judgment on Plaintiffs' disparate impact claim for the following reasons:

(1) Plaintiffs lack standing to pursue these claims; (2) the statistics in Plaintiffs' complaint do not

support their claim; (3) the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/1-101 *et*

12

*seq.*, governs employment discrimination and therefore preempts the ICRA claims; and (4) ICRA conflicts with the IHRA.

### A. Standing to Pursue Disparate Impact Claims

The Court will first address whether Plaintiffs have Article III standing to pursue their disparate impact claims. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "To invoke a federal court's jurisdiction, a plaintiff must allege and then show (1) injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 939 (7th Cir. 2016). Further, "[t]o have standing to bring a disparate impact claim, a plaintiff must show that she was personally injured by the defendant's alleged discriminatory practice." *Farrell v. Butler Univ.*, 421 F.3d 609, 617 (7th Cir. 2005) (citing *Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996)). "If standing is challenged by a motion for summary judgment, plaintiffs cannot rest on 'mere allegations' but must offer evidence to support standing." *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) ("'The party invoking federal jurisdiction bears the burden of establishing' standing—and, at the summary judgment stage, such a party 'can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts.'" (quoting *Lujan*, 504 U.S., at 561); *Midwest Fence Corp.*, 840 F.3d at 939 ("The party invoking federal jurisdiction bears the burden of establishing standing, and the elements of standing must be supported with the quantum of evidence required at each successive stage of litigation.").

### 1.  Chapman and Nelson's Standing

Here, Evans argues that the Office did not subject Chapman and Nelson to any discipline and they therefore suffered no cognizable injury.  However, this confuses the relevant inquiry; for standing purposes, Chapman and Nelson are only required to set forth an injury in fact, there is no requirement that they were "disciplined."  The parties agree that in November 2015, the Office transferred Nelson and Chapman to field probation positions.  Although their salaries remained the same, Chapman and Nelson testified that they worked more hours, the hours were less regular, and they lost any opportunity for professional development in the field of alternative education, an area in which both had expertise and in which they wished to continue working. This is enough to create an issue of material fact as to whether they suffered an injury.  *Cf.* Doc. 150 at 18–19 (this Court's earlier summary judgment opinion explaining that there is a question of fact as to whether the transfers amounted to a materially adverse action).

Where Chapman and Nelson's standing argument runs into trouble is proof of causation. They have failed to provide a link between Evans' alleged discriminatory practice and their injury.  It is not enough to overcome a challenge to standing to allege an injury; Chapman and Nelson must also trace a line from Evans' conduct to their particular injury.  Plaintiffs' disparate impact claim challenges Evans' administration of discipline.  Specifically, Plaintiffs contend that Evans "has abdicated his duty to exercise meaningful supervision of the *discipline* imposed by the Cook County Department of Juvenile Probation and has abused his discretion in failing to exercise appropriate supervision and delegating the decisions to *impose discipline* when he knows or should know of the racially discriminatory pattern and practice of such *discipline*." Doc. 55 ¶ 86 (emphasis added).  The remedy that Plaintiffs seek also relates to the imposition of discipline.  But the undisputed facts show that Chapman and Nelson were never disciplined, the

practice which they challenge. Doc. 184 ¶ 75, 77. Further, Chapman and Nelson, who have the

burden here, offer no evidence that Evans' oversight of discipline caused their transfer; their

brief does not even address the causation element of standing. Instead, the facts indicate that

Evans was not involved with the elimination of the Jumpstart program. Das testified that he

eliminated the program because it became less utilized and JPD was short-staffed in other areas.

Das decided to eliminate the program in favor of prioritizing field probation and electronic

monitoring. Nelson even testified that during his time with the Jumpstart program, attendance

fell "tremendously," and although there were once seventy probationers in the program, Nelson

had six to fifteen probationers per class at the time he learned that his teaching position would be

eliminated. Doc. 116 ¶¶ 103, 104. Chapman and Nelson have not pointed to anything to connect

Evans' administration and oversight of discipline to the decision to transfer them. *See Sterk v.*

*Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014) (to establish standing, the

"injury must be fairly traceable to the challenged action of the defendant"); *Ladik v. Wal-Mart*

*Stores, Inc.*, No. 13-CV-123-BBC, 2014 WL 4187446, at *8 (W.D. Wis. Aug. 22, 2014)

(granting summary judgment on the plaintiffs' disparate impact claims because the plaintiffs

failed to show a causal connection between the policies and level of pay). Even if the Court

broadly reads Plaintiffs' disparate impact claim to also include Evans' "supervision" generally,

*see* Doc. 189 at 7, Chapman and Nelson have failed to carry their burden to create an issue of

material fact as to whether Evans supervised the decision to transfer them. *See Carpenter v. Bd.*

*of Regents of Univ. of Wis. Sys.*, 728 F.2d 911, 915 (7th Cir. 1984) (plaintiffs must show that

they were injured by the policy alleged to have had a disparate impact); *see also Melendez*, 79

F.3d at 668 (the Seventh Circuit has required that a plaintiff alleging disparate impact establish

that he was qualified for the position sought for purposes of standing).  Accordingly, Chapman and Nelson lack standing to pursue their disparate impact claims.

### 2.  Greenlaw and Jordan's Standing

Next, Evans argues that Greenlaw and Jordan do not have standing because they cannot show that their terminations resulted from Evans' alleged deficient administration of discipline. Evans only appears to challenge the causation element, and termination undoubtedly qualifies as an injury for standing purposes.  Greenlaw and Jordan respond that "the Department pervasively discriminated against African-American officers like Greenlaw and Jordan when disciplining them, characterizing the same conduct as more or less severe depending on the race of the officer being disciplined, and imposing the harshest disciplinary penalties—suspensions and terminations—on black officers far out of proportion to their numbers."  Doc. 189 at 7. Greenlaw and Jordan contend that Evans failed to exercise proper supervision over their discipline, which led to their termination when other officers would not have been terminated. The parties agree that Rohan was the JPD Director who recommended Greenlaw's termination and that Evans, as the Chief Judge, had to approve all terminations.  Doc. 184 ¶¶ 1, 6–8, 29, 33. These facts establish causation because Evans was responsible for approving Greenlaw's termination, which demonstrates that Evans' administration of discipline resulted in Greenlaw's termination.  Finally, the Court is undoubtedly able to provide redress.[3]  For the same reasons, Jordan has standing to pursue his claim.  *See id.* ¶¶ 63, 71.

---

[3] The remainder of Evans' arguments as to why there is no standing go to the merits of Plaintiffs' claims, rather than the relevant standing inquiry.  For instance, Evans argues that there is no evidence that his delegation of termination decisions to the JPD director adversely affected Greenlaw and Jordan and that their conduct warranted their termination.  *See* Doc. 183 at 10.  However, this does not relate to standing because for purposes of standing, Greenlaw and Jordan are only required to show that they suffered an injury and Evans' actions caused that injury.  At this stage, it is not relevant whether their conduct warranted the alleged injury.

## B.      Statistics Offered in Support of ICRA Claim

For their disparate impact claim, Plaintiffs must show that "a particular employment practice causes a disparate impact on a member of a protected class." *Puffer*, 675 F.3d at 717. To establish a *prima facie* case of disparate impact, Plaintiffs must: (1) "isolate and identify 'the specific employment practices that are allegedly responsible for any observed statistical disparities,'" and (2) "demonstrate causation by offering 'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" *Vitug*, 88 F.3d at 513 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)); *see also Puffer*, 675 F.3d at 717*; cf. Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 889 (N.D. Ill. 2015) (Illinois courts look to cases addressing alleged violations of federal civil rights statutes to guide their interpretations under ICRA); *Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010) (finding same *prima facie* standard applicable to ICRA disparate impact claim).

First, Plaintiffs must identify a specific practice; "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). Rather, to satisfy this requirement, Plaintiffs must identify a specific test, requirement, or practice within a general policy that has a disparate impact. *See id.* Here, Plaintiffs allege that Evans' "method of administration of discipline and supervision . . . had the effect of subjecting them to discrimination in the form of less favorable workplace treatment because of their race." Doc. 184 at 7; *see also* Doc. 55 ¶ 86 (Evans "has abdicated his duty to exercise meaningful supervision of the discipline imposed by the Cook County Department of Juvenile Probation and has abused his discretion in failing to exercise appropriate supervision and delegating the decisions to impose discipline when he

17

knows or should know of the racially discriminatory pattern and practice of such discipline"). Whether this qualifies as a specific employment practice is a close call. On one hand, Plaintiffs appear to challenge the Office's administration of discipline generally. *See Welch v. Eli Lilly & Co.*, 585 F. App'x 911, 912–13 (7th Cir. 2014) (plaintiff failed to identify specific employment practice by pointing to culture of giving supervisors great say in hiring and discharge decisions and disciplining employees); *Aberman v. Bd. of Educ. of City of Chicago*, 242 F. Supp. 3d 672, 685 (N.D. Ill. 2017) (plaintiff failed to allege a specific employment practice by stating that the defendant used her position to inject her personal bias into teacher discipline); *Zmigrocki v. Cook Cty.*, No. 12 C 9697, 2015 WL 500621, at *2 (N.D. Ill. Feb. 4, 2015) (plaintiff's reference to a "political hiring/firing policy" and general references to a hiring process were insufficient to satisfy burden). That is, Plaintiffs appear to contest Evans' oversight of discipline, rather than identify a specific aspect of his oversight. *See Stout v. Potter*, 276 F.3d 1118, 1124 (9th Cir. 2002) ("Plaintiffs generally cannot attack an overall decision-making process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact."); *Combs v. Grand Victoria Casino & Resort*, No. 1:08CV00414RLYJMS, 2008 WL 4452460, at *3 (S.D. Ind. Sept. 30, 2008) (Defendant's "unreasonable and arbitrary methods and subjective practices of investigation and decision-making" not a specific employment practice). On the other hand, Plaintiffs' claim could be read as challenging Evans' alleged delegation of decision-making and failure to meaningfully supervise the disciplinary process. *See O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 929 (7th Cir. 2018) (employer's decision to condition benefits on retirement eligibility was a specific practice); *Murdock-Alexander v. Tempsnow Emp.*, No. 16-CV-5182, 2016 WL 6833961, at *8 (N.D. Ill. Nov. 21, 2016) (employer's alleged preference for assigning Hispanic employees over

18

African American employees is a specific employment practice to survive a motion to dismiss). The Court need not decide whether Plaintiffs have identified a specific employment practice, however, because they have failed to satisfy the causation element.

Plaintiffs must also show that the specific employment policy caused the alleged disparate impact. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989), *superseded on other grounds by statute*, 42 U.S.C. § 2000e-2(k). A disparate impact claim that relies on a statistical disparity but fails to demonstrate a causal connection is insufficient. *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542 (2015). "A robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards*, 490 U.S. at 653).

Here, Plaintiffs provide charts indicating the racial breakdown of reprimands and terminations/suspensions from 2008 through 2013. *See* Doc. 55 ¶¶ 27–33. The charts list the number of employees reprimanded or terminated/suspended by race, as well as the corresponding percentage compared to the total number of employees disciplined. However, this is insufficient to show disparate impact because it does not take into account the nondiscriminatory reasons for the alleged unfair employment practice. *Mozee v. Am. Com. Marine Serv. Co.*, 940 F.2d 1036, 1047 (7th Cir. 1991) ("The plaintiffs' analysis must take into account the major variables one might expect to cause a statistical disparity."); *Richardson, Jr. v. Rush-Presbyterian-St. Luke's Med. Ctr.*, No. 99 C 7540, 2002 WL 461695, at *15 (N.D. Ill. Mar. 26, 2002) (plaintiff's statistics that included the percentage of African American faculty and those with certain contracts were "merely a few raw numbers without analysis" and did not show disparate impact). Nor do Plaintiffs indicate the racial breakdown in the overall labor pool. *See*

*Zmigrocki*, 2015 WL 500621, at *2 (plaintiff's chart that included a breakdown of the number of employees that the employer had discharged by age and race was insufficient to satisfy her burden of providing statistical evidence because it did not take into account the racial breakdown in the labor pool); *see also Anderson v. Nat'l R.R. Passenger Corp.*, No. 03 C 7589, 2006 WL 931699, at *7 (N.D. Ill. Apr. 6, 2006) ("The basic problem with relying on statistics is that statistics can only show a relationship between the employer's decision and the racial traits of the employees, they do not show causation."). The chart in Plaintiffs' response brief that includes the "percentage of probation workforce" by race does not cure this flaw. Those percentages actually relate to the racial makeup of the bargaining unit during Smith's union presidency from 2014 through 2016 and are therefore irrelevant to the data regarding discipline from 2008 through 2013. *See* Doc. 189 at 4 (citing Doc. 116 ¶ 128); Doc 116 ¶ 6. Additionally, Plaintiffs fail to demonstrate causation because the data they offer is from 2008 through 2013 and is therefore unrelated to the claims at issue. The Office terminated Greenlaw in 2015 and Jordan in 2014. Accordingly, Greenlaw and Jordan must offer disparate impact statistics from the same time period during which they were terminated to support their claim that Evans' failure to adequately supervise discipline had a disparate impact that caused their terminations. *See Welch*, 585 F. App'x at 913 (plaintiff lacked evidence to support disparate impact claim where she did not identify coworkers who received more favorable raises in the two years that she alleged she received low raises); *see also Melendez*, 79 F.3d at 668 ("Absent direct evidence showing that a plaintiff was not hired or promoted because of a discriminatory employment practice, we assume that an unqualified plaintiff was not hired or promoted for the obvious reason-that he was unqualified."). Therefore, Greenlaw and Jordan have failed to make a *prima facie* showing of

disparate impact to survive summary judgment. The Court grants summary judgment on Plaintiffs' disparate impact claim.

### C.     IHRA Preemption

Evans next argues that Plaintiffs' claims fail because the IHRA governs employment discrimination and preempts Plaintiffs' ICRA claims. Evans also argues that Plaintiffs attempted to circumvent IHRA's remedial scheme by filing an ICRA claim. The Court addresses these arguments together because through the latter argument, Evans seeks to re-package his preemption argument. Plaintiffs respond that preemption is an affirmative defense that Evans has waived by failing to assert it in the pleadings and raising it five years into litigation.

Federal Rule of Civil Procedure 8(c) requires a party to raise an affirmative defense, including preemption, in the pleadings. *See Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005); *see also Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010) ("Preemption is an affirmative defense . . . . and pleadings need not anticipate or attempt to circumvent affirmative defenses."). The purpose of Rule 8(c) is to avoid unfair surprise and prejudice, and a defendant should inform the court and opposing parties of its intent to assert an affirmative defense as soon as it is "reasonably apparent." *See Venters v. City of Delphi*, 123 F.3d 956, 967 (7th Cir. 1997). A defendant's delay in asserting an affirmative defense results in a waiver "only if the plaintiff is harmed by the defendant's delay in asserting it." *Reed*, 915 F.3d at 478 (quoting *Matthews v. Wis. Energy Corp., Inc.*, 642 F.3d 565, 570 (7th Cir. 2011)). When a defendant waits until the close of discovery to raise an affirmative defense, such harm is assumed. *See Martin v. F.E. Moran, Inc.*, No. 13 C 03526, 2017 WL 1316255, at *7 (N.D. Ill. Apr. 10, 2017) (rejecting the defendant's assertion of an affirmative defense at the summary judgment stage because plaintiffs may have made more of an effort to seek discovery); *Laborers' Pension Fund v. Dynamic*

*Wrecking & Excavation, Inc.*, No. 07 C 2156, 2008 WL 4874110, at *6 (N.D. Ill. June 13, 2008) (it would be prejudicial to allow the defendants to raise an affirmative defense after close of discovery).

Here, Evans did not raise preemption in his answer to the amended complaint. Nor did Evans raise it in the first round of summary judgment briefing. Instead, Evans raised this defense in his second motion for summary judgment, almost three years after the close of discovery. *Messina v. Sigmatron Int'l, Inc.*, No. 01 C 3882, 2004 WL 421658, at *1 (N.D. Ill. Mar. 4, 2004) (granting the defendant leave to amend its pleading to assert an affirmative defense after discovery had been closed for a year would prejudice the plaintiff and the litigation process); *Martinez v. Baldwin Steel Co.-Chicago Div.*, No. 99 C 5230, 2000 WL 1029228, at *3– *4 (N.D. Ill. July 26, 2000) (the defendant unjustifiably delayed assertion of affirmative defense to the plaintiff's detriment where it sought to assert its defense on the eve of closing discovery and no circumstances justified the delay). Evans does not provide any reason for the delay in asserting preemption, and the Court concludes that allowing Evans to assert preemption at this late stage would harm Plaintiffs. *See Glenwood Halsted LLC v. Vill. of Glenwood*, No. 11 C 6772, 2015 WL 13879895, at *3 (N.D. Ill. June 10, 2015) ("The Court refuses to reopen three years' worth of fact discovery based on Defendants' eleventh-hour request to amend their affirmative defenses because of the clear prejudice it would have on Plaintiff."); *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 482 (7th Cir. 2019) (district court abused its discretion in considering affirmative defense in part because the defendant offered no excuse for the delay).

For the same reasons, the Court denies Evans' motion for leave to amend the answer to add the affirmative defense of preemption. Federal Rule of Civil Procedure 15 governs the

amendment of pleadings. Rule 15 provides that "a party may amend its pleadings only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Although leave to amend "'shall be freely given when justice so requires,' [it] is not to be automatically granted." *Johnson v. Cypress Hill*, 641 F.3d 867, 871–72 (7th Cir. 2011) (quoting *Johnson v. Methodist Med. Ctr. of Ill.*, 10 F.3d 1300, 1303 (7th Cir.1993)). Courts have "broad discretion" to deny leave to amend for a variety of reasons, including undue delay, undue prejudice, or futility. *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009). Additionally, a party must show "good cause" to amend a pleading after the Court's scheduling order deadline. *Kuhn v. United Airlines, Inc.*, 640 F. App'x 534, 537 (7th Cir. 2016) (citation omitted). As discussed, Evans has not shown good cause to support leave to amend the answer to assert preemption, and Evans has significantly delayed raising preemption, which would prejudice Plaintiffs at this stage. *See Walker v. Bankers Life & Cas. Co.*, No. 06 C 6906, 2008 WL 11516705, at *1 (N.D. Ill. Apr. 14, 2008) ("[E]xcessive delay can itself be prejudicial, and the longer the delay, the greater the presumption against granting leave."); *Glenwood Halsted*, 2015 WL 13879895, at *3 (denying the defendants' motion for leave to file second affirmative defenses in part because they did not explain the extensive delay or indicate that they were unable to ascertain the affirmative defenses at the time they filed their affirmative defenses); *Krawczyk v. Del Re*, No. 98 C 6817, 2002 WL 1759830, at *3 (N.D. Ill. July 30, 2002) (defendant's request to assert affirmative defense was "far-too-tardily-advanced" approximately fifteen months after the close of discovery).

Evans argues that Plaintiffs did not object to the motion for leave to amend its answer and affirmative defenses and it therefore waived any objection to the preemption affirmative defense. But that is not the complete picture. Although Plaintiffs initially informed Evans via email that

23

they did not object to the motion, later that month, Plaintiffs filed a response brief to Evans' motion for summary judgment and clearly objected to the affirmative defense. *Compare* Doc. 190-1 (Plaintiffs' counsel replying "no objection" to Evans' pending motion for leave to amend its answer and affirmative defenses on June 11, 2020), *with* Doc. 189 at 14–15 (arguing that the Court should not allow Evans to raise an affirmative defense because of unfair prejudice and delay on June 27, 2020). In his motion for leave to amend, Evans even acknowledged that "Plaintiffs have the opportunity to respond to these defenses in opposition to Defendant's Motion for Summary Judgment." Doc. 178 ¶ 16. Therefore, the Court cannot find that Plaintiffs waived any objection. The Court denies Evans leave to assert the affirmative defense of preemption.

## II.    Chapman and Nelson's Out-Of-State Training Claim

Evans next argues that the statute of limitations bars Chapman and Nelson's out-of-state training claim. Chapman and Nelson allege that Evans denied them compensation for out-of-state job training because of their race in violation of Title VII. *See* Doc. 55 ¶¶ 68, 82(G). "Under Title VII, a plaintiff in Illinois must file an employment discrimination charge with the EEOC within 300 days 'after the alleged unlawful employment practice occurred.'" *Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004) (quoting § 2000e–5(e)(1)); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104–05 (2002); *Barrett v. Ill. Dep't of Corr.*, 803 F.3d 893, 898 (7th Cir. 2015) ("The limitations period for a Title VII claim runs from the date the unlawful employment practice occurred."). Nelson filed a charge of discrimination regarding his inability to earn and use compensatory time with the EEOC on August 8, 2014, and Chapman filed a charge on August 18, 2014. *See* Doc. 184 ¶¶ 78–81. Accordingly, their claims are time-barred if they accrued before October 12, 2013, and October 22, 2013, respectively.

To ascertain the date of accrual, the Court must "identify the unlawful practices alleged and the dates on which these practices 'occurred.'" *Stepney*, 392 F.3d at 239. The complaint alleges that Nelson and Chapman "were denied compensation for time spent doing job-related training out-of-state, when white probation officers did receive compensation for similar out-of-state training." Doc. 55 ¶ 68; *see also* Doc. 55 ¶ 82(G) (seeking damages because they were denied compensation for out-of-state training). According to the testimony of both Nelson and Chapman, the only out-of-state training where they should have earned compensatory time was a 2011 conference in San Antonio. Doc. 184 ¶ 92. The parties agree that this conference occurred from March 3, 2011 through March 6, 2011. *Id.* ¶ 82. But because the discrimination alleged here relates to the denial of compensation, the Court must ascertain the date on which compensation was awarded. On March 8, 2011, Rohan approved Neal's request that JPD award compensatory time to Nelson, Chapman, and the other officers that attended the out-of-state training. *Id.* ¶¶ 88–89. Therefore, the allegedly unlawful employment practices occurred in March 2011, approximately two-and-a-half years before the earliest permissible accrual date in this case. Accordingly, Chapman and Nelson's out-of-state training claim is untimely, and the Court does not reach the merits of the claim.[4] The Court grants summary judgment for Evans.

### III. Evans' Motion for Leave to Amend the Answer and Affirmative Defenses

Evans also seeks leave to amend the answer to include a statute of limitations defense under ICRA. As discussed, Rule 15 allows a party to amend its pleadings with written consent or the court's leave, which a court should generally freely give. Fed. R. Civ. P. 15(a)(2). Here,

---

[4] Chapman and Nelson argue that regardless of whether the Court finds the claim untimely under Title VII, it is timely under ICRA. *See* Doc. 189 at 15. That is false: a plaintiff must file an ICRA claim "not later than two years after the violation." 740 Ill. Comp. Stat. 23/5(b); *see also Brown v. Cook Cty.*, No. 17 C 8085, 2018 WL 3122174, at *16 (N.D. Ill. June 26, 2018) (ICRA imposes a two-year statute of limitations). As discussed, the violations occurred over four years before Plaintiffs filed their complaint. Therefore, the claims are untimely under Title VII and ICRA.

Plaintiffs filed no response brief objecting to Evans' request and stated in writing that they had "no objection" to Evans' motion. *See* Doc. 190-1. They also raise no objection in their summary judgment brief. Further, although Evans seeks to amend his answer late into litigation, the Court does not find that this amendment would harm Plaintiffs. *Curtis*, 436 F.3d at 711 ("[A] delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed as a result."). Notably, in their response brief, Plaintiffs argued that even if their claims were untimely under Title VII, they were timely under ICRA. Evans already raised an affirmative defense of statute of limitations with respect to Title VII, and Plaintiffs' shifting legal theories demonstrate that the addition of a statute of limitations defense under ICRA would not prejudice them. Accordingly, the Court grants Evans' leave to amend the answer to include a statute of limitations defense under ICRA.[5]

## CONCLUSION

For the foregoing reasons, the Court grants Evans' motion for summary judgment [182] on Plaintiffs' disparate impact claim and Chapman and Nelson's out-of-state training claim. Additionally, the Court denies Evans' motion for leave to amend the answer [178] insofar as Evans seeks to assert a preemption affirmative defense; however, the Court grants Evans leave to amend the answer to assert a statute of limitations defense.


Dated: November 11, 2020

_____
SARA L. ELLIS
United States District Judge

---

[5] Evans indicates that he seeks to add this affirmative defense due to the claims relating to Greenlaw and Jordan's terminations. Although the Court has granted summary judgment for Evans on these claims, the Court sees no reason to deny leave based on the reason offered for the amendment.